UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIJAY SANGAR, M.D., Ph.D. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. No.  06-2015 (CKK) |
| | ) |
| PETE GEREN | ) |
| Acting Secretary of the Army [1] | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

COMES NOW the Plaintiff, through undersigned counsel, and hereby moves,

pursuant to Fed. R. Civ. P. 56(a), for summary judgment.

## I.    INTRODUCTION

Plaintiff is a former lieutenant colonel who served nearly 18 years on active duty

as a medical officer in the Army.

In 1997, he was struck ill with a chronic, debilitating neurological illness.

Because of this illness, Plaintiff was moved by the Army to administrative duties which

did not involve the clinical practice of medicine.  In 2002, the Plaintiff was tried before a

Board of Inquiry which was charged to decide whether the Plaintiff should be removed

from active duty.  The 2002 Board of Inquiry retained Plaintiff in service.

Subsequent to 2002, Plaintiff was again assigned to administrative duties which

did not involve the clinical practice of medicine.  In violation of its own regulations, the

Army thereafter completely failed to document or evaluate the Plaintiff's performance of

---

[1]    Pete Geren became Acting Secretary of the Army on March 2, 2007, and is
substituted for the former Army Secretary pursuant to Fed. R. Civ. P. 25(d).

duty. In 2004, Plaintiff's commander solicited Plaintiff to surrender any claim to clinical practice privileges, which were in any case unnecessary to the performance of Plaintiff's duties.  Plaintiff heeded his commander's request.  In 2005, the Army again subjected the Plaintiff to a Board of Inquiry, this time removing the Plaintiff from active duty for failure to obtain clinical practice privileges.  The Army did so despite the commander's solicitation that the Plaintiff surrender his clinical privileges and despite the fact that the Plaintiff's administrative assignment did not require any such privileges.

The Walter Reed Command noted Plaintiff discharge documents as being for "misconduct," even though the 2005 Board of Inquiry awarded Plaintiff an Honorable Discharge.

In 2005, Plaintiff applied to the Army Board for Correction of Military Records (ABCMR), raising identical claims as in this suit.  In August 2006 the ABCMR denied the Plaintiff's claims in toto.  After exhausting his administrative remedies before the ABCMR, Plaintiff brings this suit pursuant to the Administrative Procedures Act, 5 U.S.C. §702, and seeks judicial review of the failure of the ABCMR to correct his military records pursuant to 10 U.S.C. §1552.

Plaintiff's claim is that the Army failed to follow its own regulations in removing him from the service with a characterization of misconduct.

## II.      MATERIAL FACTS NOT SUBJECT TO DISPUTE[2]

Pursuant to LCvR. 56.1, the Plaintiff submits the following:

**Plaintiff's background**

1.      Plaintiff was commissioned an officer in the Medical Corps of United States Army in 1988.  In 1994, he was promoted to the rank of Lieutenant Colonel, and at that time was commissioned as an officer in the Regular Army.  Plaintiff's Exhibit 16, p. 2.

2.      Plaintiff holds a Ph.D. in mycology and an M.D. degree.  In 2000, plaintiff was board certified in nuclear medicine by the American Board of Nuclear Medicine.  He has been licensed to practice medicine by the State of Missouri since 1988.  That license has never been subject to adverse action.  Plaintiff's Exhibit 11, p. 6.

**Plaintiff's illness**

3.      In 1997, Lieutenant Colonel Sangar was diagnosed with Chronic Inflammatory Demyelinating Polyneuropathy, (CIDP) an organic disease of the brain (not a mental illness) which interferes with cognitive functions in its victims.  The organic disease was discussed at length in a medical evaluation contained within the

---

[2]      The record in this case contains the Plaintiff's Application for Relief to the Army Board for Correction of Military Records (ABCMR), which was filed on October 16, 2005.  Plaintiff's Application included 14 exhibits which are reproduced with this Motion as Plaintiff's Exhibits 1 through 14.  Exhibit 15 is a true copy of the Plaintiff's filing before the ABCMR.  The government made no filing to the ABCMR, which requested no supplementation, and decided the case based on Plaintiff's application.  The final decision of the ABCMR is reproduced herein as Plaintiff's Exhibit 16.  Applicable Army Regulations are reproduced herein as Plaintiff's Exhibits 17 through 20.  By affixing his electronic signature to this Motion below, the undersigned counsel hereby certifies under penalty of perjury, pursuant to Fed. R. Civ. P. 56(e), that Exhibits 1 through 16 are true and complete copies of the documents of record below, and that those Exhibits are admissible as evidence before this Honorable Court.

proceedings of a Medical Evaluation Board held at Madigan Army Medical Center in 2001. Plaintiff's Exhibit 1.

4.    The evaluation described LTC Sangar's condition: "Presently Dr. Sangar has evidence of an abnormal EMG with mild residual effects from the CIDP. He still has significant neuropsychological impairments and the diagnosis of Cognitive Disorder, NOS (Not Otherwise Specified). The Cognitive Disorder is chronic, stable, and not likely to improve. Unfortunately, there is no current treatment available for his cognitive disorder." Plaintiff's Exhibit 1, p. 10.

5.    On May 24, 2001, based upon the extensive medical evaluation conducted by two psychiatrists and a neurologist, the Plaintiff was issued a permanent physical profile under the provisions of Army Regulation 40-501 on the basis of: 1) Cognitive Disorder NOS, Moderate;  2) Decreased Visual Acuity in the Left Eye; and 3) Cervical Spondylosis. The Profile required an assignment limitation as follows: "Cannot be assigned as a physician in the specialty of nuclear medicine given his Cognitive Disorder, NOS." Plaintiff's Exhibit 3.

6.    While the Plaintiff's profile and withdrawal of clinical practice privileges was applicable to his service as a nuclear medicine physician, he was otherwise found capable of performing military duties and his continuance on active duty was "not medically contraindicated." He was retained on active duty. Plaintiff's Exhibit 4, p. 2.

**Plaintiff reassigned to non-clinical duties, 1998-2005**

7.    From 1998 through 2002, Plaintiff was assigned by the Army to duty as a Medical Abstraction Physician. Plaintiff's Exhibit 5.

8.     In November 1999, because of plaintiff's illness, the commander of

Walter Reed permanently revoked Plaintiff's clinical practice privileges.  Plaintiff's

Exhibit 16, ¶6. Plaintiff's assignment as a Medical Abstraction Physician in the years

subsequent to this revocation therefore did not require clinical practice privileges.

Plaintiff's Exhibit 5.

9.     Clinical practice privileges necessary to physician who are involved in

patient care.  Plaintiff's Exhibit 18, Army Regulation 40-68, ¶7-15.  However, physicians

who operate in an administrative assignment such as Plaintiff's do not require privileges.

Plaintiff's Exhibit 18, Army Regulation 40-68, ¶9-2b "Members of health care staff who

function under a standard job description in the performance of their duties… do not

require clinical privileges";  Plaintiff's Exhibit 7, fourth unnumbered page "[t]he two

OERs covering the period Nov 99 thru Nov 01… address the fact that he is not

performing as a Nuclear Medicine Physician";  Plaintiff's Exhibit 11, p. 5 (testimony of

Colonel Fitzpatrick, Plaintiff's commander, admitting he solicited Plaintiff to abandon

clinical practice credentials in 2004 while Plaintiff was assigned as a Medical Abstraction

Physician).

10.     Plaintiff's last Officer Evaluation Report, which was issued in 2002, listed

Plaintiff's duties and responsibilities as a Medical Abstraction Physician as:

> Responsible for abstracting medical records from Tumor
> Registry at Walter Reed Army Medical Center.
> Participates in the maintenance of Tumor Registry files,
> reviews and analyzes materials to determine nature of the
> action to be taken, and completeness of information.

Plaintiff's Exhibit 5, first page of each Officer Evaluation Report – Part III
"Duty Description"

**Plaintiff subjected to first Board of Inquiry, 2002**

11.     On March 26, 2002, the Plaintiff was notified that he was subject to a "show cause" Board of Inquiry under the provisions of Army Regulation 600-8-24 "based on a downward trend in your overall performance resulting in a consistent period of mediocre service and failure to properly perform assignments commensurate with your grade and experience.  This is substantiated by your Officer Evaluation Reports [OERs]." Plaintiff's Exhibit 6.

12.     The Board of Inquiry convened on December 17, 2002, to consider whether the Plaintiff should be separated.  The board made the following finding of fact: "LTC Sangar has some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination, as follows: "It is the opinion of the board that the cited downward trend in OERs from July 97 thru Nov 99 is potentially attributable to LTC Sangar's diagnosed CIDP.  The two OERs covering the period Nov 99 thru Nov 01 do not address a downward trend, but address the fact that he is not performing as a Nuclear Medicine Physician.  Furthermore, there is disagreement among Nuclear Medicine Experts concerning his qualifications."  Plaintiff's Exhibit 7, fourth unnumbered page.

13.     The 2002 Board of Inquiry unanimously voted to retain the Plaintiff in service, recommending that "LTC Sangar be retained in the service with reassignment with a period of supervision to assess his suitability to be credential [*sic*] and practice as a Nuclear Medicine Physician."  Plaintiff's Exhibit 7, Section V, fourth unnumbered page.

**Walter Reed fails to follow findings of first Board of Inquiry, 2003**

14.    The appointing authority approved the board's findings on February 26, 2003, but the Plaintiff was never transferred from his assignment at Walter Reed. Plaintiff's Exhibit 7, first unnumbered page; Plaintiff's Exhibit 11, p. 8.

15.    In expectation of being allowed to return to a non-administrative assignment which involved patient care, Plaintiff applied for and was granted supervised clinical practice privileges at Walter Reed on April 28, 2003. Plaintiff's Exhibit 8.

16.    However, Plaintiff was not returned to clinical practice by decision of his commanding officer, Colonel Thomas Fitzpatrick.  Plaintiff's Exhibit 11, pp. 4-5.

17.    He was continued in his permanent assignment as a Medical Abstraction Physician at the Tumor Registry.   Plaintiff's Exhibit 11, pp. 8-9.

18.    At no time subsequent to this assignment as a Medical Abstraction Physician was Plaintiff ever informed or required by his superiors to obtain and maintain clinical practice credentials to continue in his non-clinical assignment as a Medical Abstraction Physician – indeed, Colonel Fitzpatrick admitted under oath that he solicited Plaintiff to surrender any clinical practice privileges in April 2004.  Plaintiff's Exhibit 11, p. 5.

**Plaintiff's brief clinical training in Washington state, 2003**

19.    On September 22, 2003, the Plaintiff was sent on temporary duty (TDY) to Madigan Army Medical Center to perform a brief period of training in nuclear medicine. This period extended to December 2, 2003.  Plaintiff's Exhibit 10.

20.    The Plaintiff was issued clinical practice credentials by Madigan as a nuclear medicine physician for the period September 22, 2003 through May 5, 2005. These credentials were never subsequently modified or revoked, and unlike his Tumor

Registry assignment at Walter Reed, were necessary to his TDY clinical medical duties at Madigan.  Plaintiff's Exhibit 9.

21.     Memoranda related to Plaintiff's performance of duty noted that "we are all encouraged by your attention, cooperation and willingness to learn" (October 21, 2003 memo); "we are attempting to give him honest feedback on all the good things he is doing as a physician" (October 31, 2003 memo); "Dr. Cote stated that he has noticed a marked improvement in Dr. Sangar's skills" (November 13, 2003 memo).  The final memorandum noted that the brief refresher course was truncated by two weeks because of the death of Plaintiff's father.  Despite six years' illness and absence from the regular practice of medicine, it also noted that "LTC Sangar is a pleasant physician who availed himself of the learning opportunities at MAMC.  However, based on our observations of his performance, we do not feel that LTC Sangar can practice independently at this time." (January 23, 2004 memo).  Plaintiff's Exhibit 10.

22.     Many physicians and other health care practitioners within the Army's health care system do not practice medicine independently.  The governing regulation for health care providers provides for an entire category of "supervised clinical privileges" for health care providers who, like Lieutenant Colonel Sangar, have been away from medical practice for lengthy periods of time, and who are undergoing retraining. Plaintiff's Exhibit 18, Army Regulation 40-68, ¶7-15d.

23.     The typical period for such training and limited clinical credentialing is six months, not the 10 weeks of Plaintiff's case.  Army Regulation 40-68. ¶9-4e(2)(c).

**Plaintiff returns to non-clinical duties at Walter Reed, 2004**

24.     Plaintiff's temporary duty at Madigan was terminated, and he was returned to Walter Reed, which made no effort to employ the Plaintiff in nuclear medicine, and re-sent him to the Tumor Registry where he resumed his six-year-long assignment as a Medical Abstraction Physician.  Plaintiff's Exhibit 11, p. 9.

**Plaintiff's commander solicits surrender of any clinical practice privileges**

25.     Colonel Thomas Fitzpatrick, Deputy Commander of Walter Reed Hospital, admitted under oath that in fact he solicited the Plaintiff in April 2004 to voluntarily relinquish any clinical practice credentials which Plaintiff might hold. Plaintiff's Exhibit 11, p. 5.

**Plaintiff's commander violates Army regulations by not evaluating Plaintiff's performance**

26.     As Plaintiff's supervising officer, Colonel Fitzpatrick was responsible to prepare a yearly Officer Evaluation Report (OER) appraising the performance of Plaintiff as an Army Officer.  Plaintiff's Exhibit 19, Army Regulation 623-3 "Evaluation Reporting System," ¶1-8.

27.     Colonel Fitzpatrick issued Plaintiff's OER only until the date of the first Board of Inquiry in 2002.  Plaintiff's Exhibit 5.  He thereafter failed to evaluate Plaintiff's performance of duty in 2003, 2004, and 2005.  Plaintiff's Exhibit 15, p. 10-13; Plaintiff's Exhibit 16, p. 8.

28.     Officer Evaluation Reports are the primary means by which an officer's performance of duty is evaluated in the Army.  Plaintiff's Exhibit 19.

29.     Army Regulation 600-8-24 requires that if an officer is to be subjected to a Board of Inquiry and separated, "[t]he officer's ineffectiveness will be systematically

recorded in documents that specify each period covered, duties observed, and defects

noted.  Recommendations for elimination action will not be based on generalities and

vague impressions.  It is necessary to document, in writing, the precise reasons an officer

is considered ineffective."  Plaintiff's Exhibit 20, Army Regulation 600-8-24, "Officer

Transfers and Discharges" ¶ 4-1b.

**Plaintiff subjected to second Board of Inquiry, 2004-05**

30.    On September 24, 2004, the Plaintiff received notice of a second initiation

of elimination.  The claim was:

> My action is based on the following specific reasons for
> elimination:  On 23 January 2004, the Madigan Army
> Medical Center Nuclear Medicine Service and the Nuclear
> Medicine Consultant to The Surgeon General concluded
> that you could not practice independently as a nuclear
> medicine physician after completing your six weeks of
> refresher training and familiarization followed by four
> weeks of assessment of your potential to practice
> independently.  This independent training and evaluation
> was performed following several years of performance
> problems at Walter Reed Army Medical Center.

Plaintiff's Exhibit 12.

31.    The letter cited, without identifying any specific instance: "Conduct or

actions that result in the loss of a professional status, such as withdrawal, suspension or

abandonment of professional license, endorsement, or certification that is directly or

indirectly connected with or is necessary for the performance of one's military duties.

(For AMEDD [Army Medical Department] officers, this includes the partial or complete

suspension, limitations, withdrawal, or denial of clinical practice privileges.)"  Plaintiff's

Exhibit 12.

**No instances of "suspension, limitation, withdrawal, or denial" of privileges**

32.    Subsequent to the first Board of Inquiry in 2002, at no time was Plaintiff subject to "partial or complete suspension, limitations, withdrawal or denial of clinical practice privileges."  Plaintiff's Exhibit 8 (Walter Reed privileges);  Plaintiff's Exhibit 9 (Madigan privileges);  Plaintiff's Exhibit 11, p. 3 (testimony of Susan Reed), p. 5 (testimony of Col. Fitzpatrick admitting he solicited Plaintiff to relinquish any privileges he may hold).

**Second Board of Inquiry violates Army's "Administrative Double Jeopardy" rule**

33.    A second Board of Inquiry was held on March 28, 2005.  At the hearing, the Recorder submitted voluminous documentation concerning conduct that was already the subject of the 2002 show cause board.  Specifically, Government Exhibits 14, 15, 16, 17, 18, and 19 of the Record of Proceedings all outlined incidents and conduct of the Plaintiff which took place years before the first show cause board, held in December 2002.   These documentary exhibits included:

> *  05 February 1999 memorandum: Notice of suspension of LTC Sangar's clinical privileges.
>
> *  19 April 1999 memorandum: Notice of suspension of LTC Sangar's clinical privileges.
>
> *  03 November 1999 memorandum: Notice to LTC Sangar of the revocation of his clinical privileges.
>
> * 03 November 1999 memorandum: LTC Sangar's receipt of the notice of the revocation of his privileges.

* 18 February 2000 memorandum: Notice of LTC

Sangar informing him that his appeal of the revocation of

his privileges is denied.

* 30 November 2000 memorandum: Notice to LTC

Sangar informing him that the MEDCOM Appeals

Committee supports the decision to revoke his privileges.

Plaintiff's Exhibit 13

34.    In addition to the documents he introduced, the Recorder solicited

extensive testimony from witnesses concerning allegations of conduct by the Plaintiff

which also were the subject of the December 2002 board.   This testimony included:

* Ms. Susan Reed extensively referencing

Plaintiff's 1999-2000 performance of duty.

* Colonel Thomas Fitzpatrick extensively

testifying about Plaintiff's performance of duty from 1999-

2002.

Plaintiff's Exhibit 11, pp. 3-4 (Reed), 4-6 (Fitzpatrick).

35.    After re-considering all of this evidence and testimony which had already

been thoroughly considered by the December 2002 Board of Inquiry, the new Board of

Inquiry in March 2005 voted to eliminate the Plaintiff from the service.  Plaintiff's

Exhibit 11, handwritten "Findings and Recommendations Worksheet."

36.    In the 2005 Board of Inquiry, almost all of the government's documentary

exhibits concerned conduct and performance of duty by the Plaintiff prior to the first

show cause board held in December 2002 which decided to retain the Plaintiff in service.

Almost all of the testimony of all witnesses offered for testimony by the board recorder concerned conduct and performance of duty by the Plaintiff prior to December 2002. Plaintiff's Exhibit 11.

37.    In addition, the government failed to offer any documentary exhibits such as Officer Evaluation Reports for the years 2003, 2004, or 2005 that would demonstrate poor performance by the Plaintiff of his actual assigned duty as a Medical Abstraction Physician, for which no clinical practice credentials are required. Plaintiff's Exhibit 11.

38.    The March 2005 board recommended an Honorable Discharge. Plaintiff's Exhibit 11, handwritten "Findings and Recommendations Worksheet."

**Walter Reed converts honorable discharge to discharge for "misconduct"**

39.    However, the post-board processing by Walter Reed added in the specification of "misconduct" to the Plaintiff's separation documents, making the Plaintiff ineligible for any separation pay for his nearly 18 years of continuous active federal service.  No explanation exists in the record why this additional, highly pejorative description of Plaintiff's long service was added to his military records.  Plaintiff's Exhibit 14, Form DD214.

**Plaintiff exhausts administrative remedies**

40.    Plaintiff appealed his discharge for misconduct to the Army Board for Correction of Military Appeals on October 16, 2005.  Plaintiff's Exhibit 15.

41. The Army Board denied Plaintiff's appeal *in toto* on August 31, 2006. Plaintiff's Exhibit 16.

### III.    STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### IV.    LEGAL ARGUMENT

The Army, like other military departments and government agencies in general, is bound by law to follow its own regulations.  Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997).  Under the Administrative Procedures Act, "a court may review a military discharge decision to determine if the decision was arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law, regulation, or published procedure."  Crane v. Sec'y of the Army, 92 F. Supp.2d 155, 164 (W.D.N.Y. 2000)(citing 5 USC § 706(2)(A) and Perez v. United States, 850 F. Supp. 1354, 1365 (N.D. Ill. 1994)). In the instant case, the Army failed to follow its own regulations in three material respects.

First, the Army assigned the Plaintiff to non-clinical practice duty as a Medical Abstraction Physician, and Plaintiff's commander specifically solicited Plaintiff relinquish any clinical practice privileges, but then the same Commander sought the discharge of Plaintiff for the "misconduct" of not maintaining clinical practice privileges. Plaintiff cannot be lawfully discharged for "failure to maintain clinical practice

privileges" when it is undisputed that he was not required to maintain them, particularly

when viewed in light of the fact that this status was explicitly solicited by his

commander.  Army Regulation 40-68, ¶9-2b.

Second, the Army's own regulations require that if any officer is to be discharged

for performance of duty issues, the shortcomings "will be systematically recorded in

documents that specify each period covered, duties observed, and defects noted.

Recommendations for elimination action will not be based on generalities and vague

impressions.  It is necessary to document, in writing, the precise reasons an officer is

considered ineffective."  Plaintiff's Exhibit 20, AR 635-100, ¶4-1b, "Eliminations."  In

this case, there was a total failure of the Walter Reed command to provide *any* written

evaluations of Plaintiff for years on end, a failure to document any observed duties, a

failure to note any defects in Plaintiff's performance of duty.

These failures were not harmless nor were they immaterial – both the Army's

own regulations and the applicable case law emphasize the central role Officer

Evaluation Reports in judicial review of military personnel cases.  See, e.g., Godwin v.

United States, 338 F.3d 1374 (Fed. Cir. 2003)(failure to make OER for a six-month

period is a legal error sufficient to set aside discharge); Frizelle, 111 F.3d at 177 (D.C.

Cir. 1997)(Plaintiff's demonstration that OER entries erroneous sufficient to void

discharge).  See also Plaintiff's Exhibit 19, Army Regulation 623-3, "Evaluation

Reporting System," ¶1-8c ("the primary function of [OERs] is to provide information to

HQDA [Headquarters, Department of the Army] for use in making personnel

management decisions…. Reports that are incomplete or fail to provide a realistic and

objective evaluation will make personnel management decisions difficult.")

15

Third, the Army subjected the Plaintiff to two Boards of Inquiry which considered identical allegations of misconduct. After the first Board of Inquiry voted to retain the Plaintiff in service in 2002, the Army's own "administrative double jeopardy" regulation barred a re-trial of allegations of misconduct already decided by the 2002 Board of Inquiry. Army Regulation 600-8-24, ¶4-4. In the absence of any Officer Evaluation Reports subsequent to 2002, the documentary evidence and testimony of the 2005 Board of Inquiry was almost entirely a re-run of the 2002 Board.

**a.    Plaintiff's duties and clinical practice status**

It is not disputed in the record that following his CIDP illness in 1998, Plaintiff was transferred to non-clinical practice duties at the Walter Reed Tumor Registry. See Plaintiff's Exhibit 5, 2000, 2001, and 2002 OERs. Indeed, in November 1999 Plaintiff's permanent credentials as a nuclear medicine physician were permanently revoked, making it legally impossible for his work as a Medical Abstraction Physician to have necessitated clinical practice credentials. Plaintiff's Exhibit 16, ¶6.

The convening letter of the 2005 Board of Inquiry erroneously cited its basis as being justified by "the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges." Plaintiff's Exhibit 12, ¶1. In the instant case, there was simply no instance subsequent to the 2002 Board of Inquiry where the Plaintiff's clinical practice credentials were suspended, limited, withdrawn, or denied. When Plaintiff was given TDY clinical duties in 2003, he obtained and maintained appropriate clinical practice credentials. Plaintiff's Exhibit 9. In 2003, Plaintiff applied for and received supervised clinical practice privileges in the hope that he would be transferred back from the Tumor Registry to a clinical practice position. Plaintiff's Exhibit 8. However, the

record reveals that the Plaintiff was not allowed to return to clinical practice duties at

Walter Reed – and more damningly from the Army's perspective, the Plaintiff's

commander, Colonel Fitzpatrick, actually solicited the Plaintiff to relinquish even these

limited credentials.  Plaintiff's Exhibit 11, p. 5 (testimony of Colonel Fitzpatrick).

The Plaintiff was simply not required to maintain clinical practice credentials and

the finding by the Board of Inquiry that a failure to seek them out is not only contradicted

by the documents of record, but legally of no moment.[3]  The Army adopted its own

regulations, delineating that some officers are required to hold clinical practice privileges,

while others are not.  Army Regulation 40-68, ¶9-2b.  Once the Army promulgated

regulations and instructions which govern Plaintiff's clinical status, this "action becomes

subject to judicial review for compliance with those regulations and instructions.

Sargisson v. United States, 913 F.2d 918, 921 (Fed. Cir. 1990).  By both the plain terms

of the OERs of Plaintiff, as well as a fair reading of AR 40-68, Plaintiff was not required

to maintain credentials for his duty as a Medical Abstraction Physician.  Upholding a

punitive discharge based upon such a non-existent requirement offends the law.

The Army's failure to adhere to its own regulations constitutes a violation of the

Administrative Procedures Act.   Crane, 92 F. Supp.2d at 164 (citing Miller v. Henman,

804 F.2d 421, 424 (7th Cir. 1986) and Montilla v. INS, 926 F.2d 162, 167 (2d Cir.

1991)).  Although the deference given to military decision making in general is great, the

instant case does not involve second-guessing military decision-making, only an

examination of whether the Army followed its own rules.  In the words of the D.C.

---

[3]     A legal analogy would hold that a judge of this Court would be liable to
impeachment and removal from office for a failure to apply for membership in the Utah
State Bar.  Membership in that body is obviously not required by law to serve as a United
States District Judge in the District of Columbia.

Circuit, "the issue before the court does not involve a military judgment requiring

military expertise, but rather review of the Board's application of a procedural

regulation." <u>Kreis v. Sec'y of the Air Force</u>, 406 F.3d 684, 686 (D.C. Cir.

2005)(reversing Board for Correction of Military Records discharge decision for failure

to adhere to regulations).

**b.      The Army's wholesale failure to document Plaintiff's performance of duty**

The first assignment of error neatly demonstrates why the Plaintiff's second

assignment of error is so important.  In judicial review of Army administrative actions,

the primary emphasis of the case law is upon Officer Evaluation Reports (OERs) to

determine performance of duty issues.  Had the Plaintiff needed to apply for and maintain

clinical practice privileges in the years 2003, 2004, and 2005, a properly-maintained

military personnel record would have documented the necessity, the Plaintiff's failure,

and corresponding consequences.

In this case, the Army failed to document the performance of duty in the method

required by regulation.  A reviewing court put in this circumstance can only cast about to

other portions of the record to determine what Plaintiff's duties and performance were in

the years 2003-05.  Had the Plaintiff been properly evaluated in those years, the record

would show that he performed his non-clinical duties at the Walter Reed Tumor Registry

in an acceptable manner.  Plaintiff's OERs for 2000-2002, reproduced at Plaintiff's

Exhibit 5, demonstrate the fact that his work outside the clinical medical field did not

constitute "misconduct" for which his discharge was warranted, since the 2002 Board of

Inquiry decided not to discharge him for failure to maintain clinical practice credentials,

since he was not working in an assignment which required them.[4]  Proper evaluation of

an officer's performance of duty is a legal entitlement, not a nuisance.  The failure to

provide a rated officer with a proper OER casts legal doubt over the validity of a

separation premised upon misconduct or ineffective performance of duty, especially

when the nexus between the discharge and the regular performance of duty is the sole

question at issue.  Godwin, 338 F.3d at 1381.

Plaintiff served nearly 18 years on active duty and was discharged with a

pejorative characterization of service – his ability to defend himself by showing exactly

what his proper duties were and that he carried them out – was destroyed by the complete

failure of the Walter Reed command to follow the legal requirement of reviewing his

performance in an OER for three consecutive years.  Army Regulation 635-100, ¶4-1b.

The absence of proper OERs and the deviations from the Army's regulations

requiring written documentation of performance deficiencies cannot be dismissed as

"deviations from [Army] policy [that] are trivial."  Frizelle v. Slater, 111 F.3d at 178.  A

---

[4]     Indeed, the most obvious failing of the Walter Reed Command in the last few years has absolutely nothing to do with clinical practice privileges, but the criminal neglect of wounded soldiers dumped in rodent-infested, rotting barracks unfit for human habitation.  See "Soldiers Face Neglect, Frustration at Army's Top Medical Facility," The Washington Post, February 18, 2007, p. A01.

The principal witness against Plaintiff was Colonel Thomas Fitzpatrick, Deputy Commander of Walter Reed until recently.  Based upon very graphic press reportage in the public domain, it is beyond dispute that the neglect of the patients under Colonel Fitzpatrick's care and supervision as Walter Reed Deputy Commander is far worthier of condemnation by the Army than a failure by Plaintiff to obtain unnecessary clinical practice privileges.

Even though the Plaintiff did not hold clinical practice privileges, he still served in the years 2002-05 as a lieutenant colonel in the United States Army.  Had Colonel Fitzpatrick and the Walter Reed command wished, it could have placed Plaintiff in charge of renovating and fixing facilities for the troops – it does not require clinical practice privileges to kill rats and clean up a tenement for wounded soldiers.  Instead, the Walter Reed Command expended enormous effort to discharge Plaintiff for the "misconduct" of having gotten ill.

claim for relief based upon OERs "is premised on procedural defects in the decision-making process that are clear violations of a statute or regulation that governs the process by which OERs are compiled and considered." Lindsay v. United States, 295 F.3d 1252, 1258 (Fed. Cir. 2002)(citing cases).

**c.    The Army's violation of "administrative double jeopardy"**

The Army's regulation governing officer discharges is AR 600-8-24, "Officer Transfers and Discharges."

Specifically, ¶4-4b. requires that:

> [N]o officer will be considered for elimination for reasons stated in Paragraph 4-2 because of conduct that has been the subject of administrative elimination proceedings that resulted in a final determination that the officer should be retained in the Service. For purposes of this paragraph, an officer will be considered to have been the subject of elimination proceedings only if allegations against the officer were acted on by a Board of Inquiry convened under this chapter.[5]

In the 2005 Board of Inquiry, almost all of the government's documentary exhibits covered conduct and performance of duty by the Plaintiff prior to the 2002 Board of Inquiry which decided to retain the Plaintiff in service. Plaintiff's Exhibit 13. The testimony of both witnesses offered for testimony by the Army concerned, in substantial portion, conduct and performance of duty by the Applicant prior to December 2002. See Plaintiff's Exhibit 11, pp. 3-6 (testimony of Ms. Reed and Colonel Fitzpatrick). The government failed to offer any testimony or documentary exhibits whatsoever which demonstrated poor performance by the Plaintiff of his actual assigned duty as a Medical Abstraction Physician, violating Army Regulation 600-8-24, ¶4-1b.

---

[5]    There are four exceptions to this explicit policy, none of which are applicable to Plaintiff's case. See Army Regulation 600-8-24, ¶4-4d.

In its decision on Plaintiff's administrative appeal, the ABCMR completely failed to address the Plaintiff's "administrative double jeopardy" argument.  The ABCMR did barely acknowledged it, referencing it only in passing in ¶3 of its decision, thereafter ignoring it in favor of a parade of horribles all stemming from the Plaintiff's 2002 Board of Inquiry.  Plaintiff's Exhibit 16.  Plaintiff's argument, based upon the Army's own regulation, was set forth in detail in Plaintiff's Exhibit 15, pp. 10-13.  The fact that the ABCMR would focus on allegations of substandard performance of duty prior to the 2002 Board of Inquiry demonstrates exactly why the Administrative Double Jeopardy regulation exists – that allegations of substandard performance or misconduct, once decided in favor of an officer, may not be endlessly re-litigated until the government finds a Board of Inquiry willing to vote for a discharge.[6]

Because it ignored the Plaintiff's legal argument, the ABCMR's decision cannot be deferred to by a reviewing court, as there is simply no basis to determine how the Board reached its decision.  Absent any reasoned explanation in the Board's decision, the ABCMR's decision is arbitrary and capricious.   Kreis v. Sec'y of the Air Force,  406 F.3d 684, 687 (D.C. Cir. 2005).

A decision of the Army to try the Plaintiff before a Board of Inquiry twice for the same allegations of misconduct violates the Army's own clear regulation forbidding such

---

[6]    The application of the Army's "administrative double jeopardy" regulation found in Army Regulation 600-8-24 appears to be a case of first impression.  The provision was discussed in two reported cases, Charette v. Walker, 996 F. Supp. 43, 56-57 (D.D.C. 1998) and Walker v. United States, 1998 U.S. Dist. LEXIS 14929 (E.D. La. 1998) but was not applied in either because at least one of the boards in either case was not a "Board of Inquiry" under the terms of the regulation or its predecessor.  A similar Navy regulation was discussed in the case Brigante v. United States, 35 Fed. Cl. 526, 532 (1996), and also not applied for the same reason.  In Plaintiff's case, by way of contrast, both proceedings were Boards of Inquiry as described in the regulation.

practices.  As noted, the Administrative Procedures Act "requires the Army to follow its own administrative procedures." Crane, 92 F. Supp.2d at 164 (citing Smith v. Resor, 406 F.2d 141, 145 (2d Cir. 1969).  The ABCMR failed to discuss or explain why the regulation does not apply to Plaintiff's case, and this Court may not therefore presume to engage in a bout of mind-reading to divine the ABCMR's reasoning when the record sits starkly silent.  The ABCMR's "discretionary order will be upheld, if at all, on the same basis articulated given by the agency itself." Kreis, 406 F.3d at 686.  In this case, there is no basis whatsoever to determine why the ABCMR ignored the Army's administrative double jeopardy regulation, and thus its decision to affirm Plaintiff's discharge for "misconduct" cannot stand.

## V.      REMDEDY SOUGHT AND CONCLUSION

Because the Army failed to adhere to its own procedural regulations when it discharged plaintiff for "misconduct" in 2005, the discharge of the Plaintiff violated the law.  In such circumstances, the Court is empowered to, and should, order the decision of the ABCMR be reversed, that Plaintiff's discharge be removed from his military records, and that Defendant should be ordered to reinstate the Plaintiff to active duty effective the date of his illegal discharge, October 28, 2005. See, e.g., Crane, 92 F. Supp.2d at 167-68.  An appropriate order is appended hereto.

Respectfully submitted,


/s/_____
Christopher A. Sterbenz
Counsel for Plaintiff
P.O. Box 126
Vienna, Virginia  22183
(703) 620-2313
CASterbenz@aol.com
D.C. Bar No. 437722

## REQUEST FOR ORAL ARGUMENT

Pursuant to LCivR 7(f), the Plaintiff respectfully requests the Court hold an oral

hearing on the instant motion.



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing, together with 20 exhibits, was filed and
served on March 5, 2007, via the Court's electronic delivery system upon the following
counsel of record for Defendant:

Steven M. Ranieri
Special Assistant U.S. Attorney
555 Fourth Street, N.W.
Room E4408
Washington, D.C.  20530

/s/_____
Christopher A. Sterbenz

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

VIJAY SANGAR, M.D., Ph.D.                        )
                                                 )
                              Plaintiff          )
                                                 )
         v.                                      ) C.A. No.  06-2015 (CKK)
                                                 )
PETE GEREN                                       )
Acting Secretary of the Army                     )
                                                 )
                              Defendant.         )
_____

## ORDER

      UPON CONSIDERATION of the Plaintiff's Motion for Summary Judgment, the

Defendant's opposition thereto, and the entire record herein, it is, this _____

day of _____, 2007, hereby ordered that the Motion is GRANTED.

      IT IS FURTHER ORDERED that the decision of the Army Board for Correction

of Military Records of August 31, 2006, denying Plaintiff relief, is REVERSED, that the

Defendant shall immediately restore the Plaintiff to active duty as a lieutenant colonel in

the United States Army, retroactive to October 28, 2005, and that the Defendant shall

remove from Plaintiff's official military record the results of the 2005 Board of Inquiry

and any discharge documents which were produced pursuant to it.

      SO ORDERED.

                                 _____
                                 Colleen Kollar-Kotelly
                                 United States District Judge

Copies to:

Christopher A. Sterbenz             Steven M. Ranieri
Counsel for Plaintiff                  Counsel for Defendant
P.O. Box 126                         555 Fourth Street, N.W.
Vienna, Virginia  22183           Suite E4408
                                   Washington, D.C.  20530

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 1 (Exhibit 1 of Plaintiff's ABCMR Application)

Medical Evaluation Board Summary, 2-6 April 2001

# MADIGAN ARMY MEDICAL CENTER

## MEDICAL EVALUATION BOARD NARRATIVE SUMMARY

**DATE OF EXAMINATION**: 2-6 April 2001

**SOURCES OF INFORMATION:**
1. Nine Officer Efficiency Reports, DA Form 67-8, from period 19880719 – 19950720
2. Letter of Recommendation for Regular Army Selection from COL Kenneth Steinweg, dated 17 Apr 1995
3. Letter of Recommendation for Regular Army Selection from COL Marcella Nipps, dated 10 Apr 1995
4. General Counseling Form, dated 10 Feb 1997
5. Officer Evaluation Report, DA form 67-8, dated 30 Jun 97 (period 19960721 – 19970630)
6. Memorandum for LTC Vijay Kumar Sangar from COL Ana Rodriguez dated 28 Jul 97
7. Memorandum for LTC Vijay Kumar Sangar from COL Ana Rodriguez dated 3 Sep 97
8. Statement from LTC Vijay Kumar Sangar, no subject, dated 22 Sep 97
9. Neuropsychological Evaluation from Walter Reed Army Medical Center Psychology Department, dated 19 Mar 98
10. Memorandum for the Physical Evaluation Board from COL Thomas Auer, Commander Womack Army Medical Center, dated 22 Jul 1998
11. Neuropsychological Evaluation from Walter Reed Army Medical Center Psychology Department, dated 27 Dec 98
12. Officer Evaluation Report, DA form 67-8, dated 19 Apr 99 (period 19971001 – 19980930)
13. Neuropsychological Evaluation from Walter Reed Army Medical Center Psychology Department, dated 28 Sep 99
14. Partial Copy of transcript from Credentials Meeting on 19 Nov 1999, pp.22-26, 37, 43-44, 51,65-7,85
15. Report of Medical Board National Naval Hospital Bethesda, signed by CAPT A.J. Dutka and LCDR John Hughes, dated 22 Nov 99
16. Letter To Whom It May Concern from Dr. Lawrence E. Holder, Professor of Radiology, University of Maryland School of Medicine, dated 13 Dec 1999
17. Neuro-psychiatric Evaluation, by Dr Ajit Trikha, MD, dated 14 Dec 99
18. Letter to Mr. Christopher Sterbenz from Jerry L. Brittain, Ph.D., dated 15 Dec 99
19. Memorandum for Lieutenant Commander John Hughes, MD from Christopher A. Sterbenz, Attorney at Law RE: Rebuttal to Medical Board, LTC Vijay Sangar, U.S.A, dated 22 Dec 99
20. Memorandum for Commander, WRAMC, Washington DC, SUBJECT: Addendum to Medical Board Proceedings on LTC Vijay Sangar, 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, by COL Lyle Carlson, Chief Department of Psychology, dated 31 Jan 00

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED: 21 May 2001
```

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

21. Officer Evaluation Report, DA form 67-8, dated 31 May 00 (period 19981001 – 19991111)
22. Memorandum for Physical Evaluation Board, SUBJECT: Supervisor's Report for LTC Sangar's MEB, dated 15 May 2000
23. Defense Finance and Accounting Military Leave and Earnings Statement, period covering 1-31 Aug 00
24. Officer Record Brief for LTC Vijay Sangar, dated 07 Aug 00
25. Report of Medical Examination, SF 88, dated 17 Aug 00
26. Report of Medical History, SF 93, dated 17 Aug 00
27. Physical Evaluation Board Proceedings, signed by LTC Curtis Southern, dated 11 Sep 00
28. Memorandum for President, US Army Physical Evaluation Board, WRAMC, SUBJECT: Return of Physical Evaluation Board Proceedings, RE: LTC Sangar, Vijay K., 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, dated 28 Sep 00
29. Memorandum for LTC Vijay K. Sangar from COL Michael A. Dunn, Commander, WRAMC, SUBJECT: Notification of Commanding Officer Referral for Mental Health Evaluation (Non-Emergency), dated 23 Mar 01
30. Letter of Reference from COL Daniel Kopp, DCCS at Ft Leonard Wood, no date
31. Neuropsychology Consultation by Dr Jack Norris, dated 4 April 2001
32. Neurology Consultation by Dr. Traci Ryan, MD, dated 5 April 2001
33. Clinical Interview on 5 April 01 for 1 hour and on 6 April 01 for 1.5 hours

**MILITARY HISTORY**: LTC Sangar is a nuclear medicine physician assigned to Walter Reed Army Medical Center since August 1995. His previous assignment was at Fort Leonard Wood, Missouri from July 1988 to August 1995. He came into the Army as a Major and was promoted on time to Lieutenant Colonel in 1994. He has no Article 15s or courts martial. The Walter Reed Army Medical Center Credentials Committee suspended his credentials to practice medicine in Feb 99 and revoked them in Nov 99.

BRANCH OF SERVICE: U.S. Army

DATE OF CURRENT TOUR ON ACTIVE DUTY: Entered AD on 18 Jul 1988. He currently has 12 years time in service.

MOS TITLE AND NUMBER: Nuclear Medicine Physician, 60B

UNIT AND DUTY STATION: Co B, WRAMC, Washington, DC

PRIOR DISABILITY RATINGS (VA OR PRIOR PEB): None

ADMINISTRATIVE ACTIONS ONGOING (COURTS-MARTIAL, ELECTIVE EARLY RETIREMENT, BARS TO REENLISTMENT, RETIREMENT OR SEPARATION DATES): This is the third medical evaluation board for LTC Sangar. He is currently awaiting the outcome of several administrative actions

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED: 21 May 2001
```

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

including the second medical evaluation board that was returned by the PEB and a challenge to the removal of his credentials.

**CHIEF COMPLAINT:** Dr. Sangar was referred to the undersigned through a command directed mental health evaluation for definitive diagnosis and determination of any functional impairment.

**SOURCE OF REFERRAL:** This soldier was referred from Walter Reed Army Medical Center to Madigan Army Medical Center for a complete medical and psychiatric evaluation. The formal counseling document required by DOD 6490.4 was examined at the beginning of the evaluation and was properly filled out and signed by Colonel Michael Dunn, the Commander of Walter Reed Army Medical Center, and by the servicemember on 23 March 2001. This referral was prompted by a letter, dated 20 October 2000, to Walter Reed Army Medical Center from Major John MaGee of the Physical Evaluation Board. The letter requested an update to the second medical evaluation board dated 22 November 1999 to "ascertain the current medical impairment of the officer, if any, and determine the functional impact of such medical impairment, if any". In addition, there were specific questions addressed by Major MaGee for the Medical Board.

**EVALUATION STATUS:** This evaluation was performed on an outpatient basis by Drs. Hough and Hicks of the Department of Psychiatry and Dr. Traci Ryan of the Department of Neurology with consultation from the Neuropsychology Service.

**HISTORY OF PRESENT ILLNESS:** Dr. Sangar reports that he came to the United States at the age of 22. He had an excellent command of the English language. He had studied English in high school and most of his college courses were taught in English. He speaks four languages including English, Hindi, Punjabi, and Urdu. He arrived in the United States with a college degree and a master's degree in biology. He attended the University of Kansas from 1966-69 where he obtained a Ph.D. in Botany with a specialty in Mycology. He then attended a 3-year postdoctoral fellowship at the Ohio State University in microbiology. Dr. Sangar reports that he had no academic problems whatsoever.

After his fellowship he was employed at three different pharmaceutical companies: two years at Miles Laboratory, three years at Searle, and three years at McDonnell-Douglas Chemical Division. He reports that he constantly dreamed of going to medical school and after applying was accepted at a Santo Domingo Medical School in the Dominican Republic. He attended this medical school because it offered him a chance to teach microbiology to third year medical students as well as receive free tuition and a stipend. He denies that he had any academic problems or failed any course work, however no grades are available for review.

In June 1982, during his second year of medical school, he was involved in a motor vehicle accident. This was apparently a fairly serious accident in which a driver struck the passenger side of the car, on the same side that LTC Sangar was sitting. His head struck the window and there was a loss of consciousness.

SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

3

LTC Sangar states it was a few minutes, but one note in the medical record states a thirty-minute loss of consciousness. He noticed immediately that he had some loss of vision in his left eye. He also suffered some rib fractures during the accident. After the accident he was convinced by a friend to have a thorough evaluation at Mercy Hospital in Miami, Florida. Two CT scans were done revealing part of the sphenoid bone had been displaced and was lodged in the left optic nerve. He had to have a left frontal craniotomy and neurosurgical decompression of the left optic nerve. He sustained some permanent visual loss in the left eye. As a result of the injury and subsequent neurosurgery, he had to take an entire semester off from medical school. He denies that there was any cognitive decline after this accident or any problems with concentration and memory; however, it was at this point in his academic career that he began to have problems.

After graduation from medical school, Dr. Sangar passed his ECFMG (an examination for foreign medical graduates). However, he failed the FLEX exam the first time he took it and had to take it a second time. Dr. Sangar did not do an internship, but instead enrolled in a pathology residency at St. Louis University, Deaconess Hospital. After the second year of the residency, he decided to change specialties because he did not enjoy the work he was doing in pathology. He could not attend his preferred residency of dermatology because he did not have an internship. He discovered that he could apply his two years of pathology residency to nuclear medicine. Therefore, he completed the remaining two years of a four-year residency in nuclear medicine at the University of Missouri in Columbia, Missouri. Following his residency, he had trouble passing the certification exam for nuclear medicine. He failed the exam 6 to 7 times before finally passing it in September 2000. He reports that several times, he only missed by "a few" percentage points. It should be noted that at the time he passed the exam, his score was above the mean on only three out of ten test sections.

He entered active duty as a Major and was assigned to the hospital in Fort Leonard Wood, Missouri. He denies that he had any problems there with his work or any complaints from patients. He received good OERs and performance evaluations. His section passed all appropriate Joint Commission and Nuclear Regulatory Commission inspections. It should be noted that he was the only nuclear medicine physician at the facility. It is unclear how much peer review of his work was done.

In August 1995, Dr. Sangar was transferred to Walter Reed Army Medical Center where there is a training program in radiology and a fellowship in nuclear medicine. He reports that there was some conflict between him and the chief of the nuclear medicine service. He reports that this conflict escalated to the point of involving the commander of the hospital. He also lodged complaints with the Walter Reed Army Medical Center IG and the Pentagon IG. He asked to be transferred as early as 1996 but the request was denied. The conflict with his supervisor caused him significant stress.

An OER from 30 June 1997 states that Dr. Sangar completed the Command and General Staff School but failed his certifying exam for nuclear medicine. He was given a "2" instead of a "1" in part IV

SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

of the performance section which states "demonstrates appropriate knowledge and expertise in assigned tasks". He states on interview that several of his cases had been identified as having problems during a quality improvement review.

In the same month, Dr. Sangar began to experience problems with proximal muscle weakness. Nerve conduction velocity studies showed increased conduction times and EMG showed "profound muscle weakness". He reports that he was having difficulty walking and initially took two weeks of leave but became worse. Coincidentally he was hospitalized in June for what was presumed at that time to be prostatitis and was treated with a 3-week course of ciprofloxacin. In July he was readmitted to the hospital for 6-8 weeks. He was diagnosed with chronic inflammatory demyelinating polyneuropathy (CIDP) and started on a regimen of Prednisone treatment with 80 mg a day, and then eventually tapered off over a period of months. He reports that he was given 4 to 6 weeks of convalescent leave during September and October, and that there was some conflict with his supervisor over that convalescent leave. He states that it was January 1998, approximately 7 to 8 months after the initial onset of the illness, before he began to feel better. It was over a year later, in January 1999, before that he felt that he had absolutely no symptoms. He acknowledged that he might have had some problems with cognitive function before the CIDP was diagnosed from May through July 1997 and then again after he returned to work in November 1997 through January 1998. He reports some problems with concentration, short-term memory, and in dictation of medical reports. In February 1998, Dr. Dutka, a neurologist at the Naval Hospital Bethesda began a medical evaluation board for the CIDP. During much of this time, he was still taking Prednisone. In March 1998, it was noted in the medical record he was still on 20 mg every other day.

In April 1998, three months after he reports that he initially felt better, he received the first of three neuropsychological evaluations. The overall impression was "clear and unequivocal deficits in neuropsychological functioning. Measured intelligence was in the average range significantly below the level that would be expected given his academic achievement." There was a significant disparity of 42 points between his verbal IQ (122) and his performance IQ (80). The report further stated, "marked difficulties were observed in visuospatial/visuoperceptual performance, visual memory, reasoning abilities, and language functioning…. It would seem very unlikely that he would have been able to achieve his present level of academic achievement without significant difficulties if he had been functioning at his present level …."

In September 1998, he received the results of the first medical board that he was fit for duty. He also received his OER for the period of October 1997 through September 1998. This was a "referred OER" with no's on conceptual technical skills and executing in the performance evaluation section. The rater states, "he remains in a limited capacity" and "LTC Sangar received remedial training and performed under clinical supervision". His senior rater noted Dr. Sangar's "technical skills and ability to execute plans have been impaired. Likely as a result of this [CIDP] medical condition".

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:   NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001
```

50275-102

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

In December 1998, he received a repeat of his neuropsychological testing, which notes that "he reports full recovery and is unaware of any cognitive deficits". The impression from this testing was very similar to the first one. The summary states "the patient continues to exhibit clear and unequivocal deficits in neuropsychological functioning". He had similar scores in verbal and performance IQ's with a similar disparity between them.

During this same month, the nuclear medicine consultant sent Dr. Bauman from Madigan Army Medical Center to do an objective evaluation of Dr. Sangar. He reportedly conducted an oral examination in which there were a number of major mistakes noted. The formal report from that evaluation was not available to the Medical Evaluation Board. In February 1999, based upon the two neuropsychological tests and the evaluation by Dr. Bauman, LTC Sangar's clinical privileges were suspended.

In April 1999, he received a followup appointment with Dr. Dutka of neurology at Naval Hospital Bethesda for his CIDP. His impression was that the patient had "slight weakness in his hands" but there was no notation of any cognitive deficits.

In September 1999, Dr. Sangar received a third neuropsychological evaluation. The impression from the testing was consistent with the first two batteries: "Dr. Sangar continues to exhibit clear and unequivocal deficits in neuropsychological functioning. His deficits and visual spatial/visuoperceptual performance, visual memory, reasoning, and language functioning were suggestive of a chronic, rather than an acute process". It should be noted that the patient had mild residual effects from the CIDP and was not on steroids at the time of the third battery of neuropsychological testing.

In September 1999, Dr. Sangar was also evaluated with a set of senior evaluators who looked at a set of sixteen cases and discovered eight major mistakes. Dr. Sangar hired an independent expert who contested many of the findings and found that there were only three major (and four minor) errors rather than eight major (and seven minor) errors out of 23 cases examined. Based upon this nuclear medicine clinical skill evaluation, as well as the third set of neuropsychological testing, in November 1999 the Water Reed Medical Center credentials committee revoked his privileges to practice. During that same month, Dr. Sangar received a "relief for cause" OER. Part IV of the performance evaluation section showed "no's" in the same blocks as before including conceptual, technical skills, and executing. It stated "LTC Sangar does not exhibit the fund of knowledge and image interpretation skills expected of a board-eligible nuclear medicine physician".

Drs. Dutka and Hughes performed a medical evaluation board at Bethesda in November 1999. Dr. Sangar hired an attorney and questioned the three previous neuropsychological batteries on legal, but not on clinical grounds stating that the proper procedures for command mental health referral had not been followed. He obtained an evaluation at his own expense by Dr. Trikha, a board certified forensic and adult psychiatrist whose evaluation showed "no diagnosis" on axis I and "currently does not exhibit any cognitive

SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:   20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED: 21 May 2001

impairment or signs of former mental illness". Based on the evaluation by Dr. Trikha and the review of the "invalid" neuropsychological testing by the two private neuropsychologists, LTC Sangar's attorney submitted a rebuttal to the medical board. In October 2000, the second medical board was returned to Walter Reed for further evaluation and clarification.

## PAST HISTORY AND REVIEW OF SYSTEMS:

PAST HISTORY:

Illnesses: Positive PPD in 1966 (never treated with INH), polyarticular tophaceous erosive gout, decreased visual acuity in the left eye with optic nerve head pallor thought secondary to the eye trauma in June 1982, chronic inflammatory demyelinating polyneuropathy (CIDP), June 1997, hypertriglyceridemia.

Injuries: Motor vehicle accident in June 1982 with 30 minute loss of consciousness and sphenoid bone lodging in the optic nerve; cervical spondylosis with permanent profile

Surgical History: Past surgical history is significant for left frontal craniotomy after the motor vehicle accident performed at Mercy Hospital in Miami, Florida.

Hospitalizations and Outpatient Treatment:  See above.

Medications:  Current medications include Lopid 1,200 mg twice daily.

Drug Allergies: INCLUDE **PENICILLIN (RASH), NORVASC (RASH), VOLTAREN (URTICARIA AND AN ANAPHYLACTIC-LIKE REACTION), PROBENECID (ANAPHYLACTIC-LIKE REACTION), AND ALLOPURINOL (DRUG ERUPTION, DESENSITIZED).**

Substance Use (alcohol/tobacco): The patient reports that he drinks one alcoholic beverage most days but never more than 2 or 3 drinks at a time. He has never had a DUI, blackouts, or alcohol treatment. He has never had any injuries or medical problems as a result of his alcohol. He smoked 1-1.5 packs per day for many years but quit in April 1990. He denies using any other illicit drugs. He drinks 3-4 cups of tea per day, but does not drink any other caffeinated beverages.

Social History: Dr. Sangar was born in the Pakistan side of Punjab, India in the Brahman class. He was raised with his father, mother, and two younger brothers and got along well with everyone. He described his household as "decent, strict, and loving". His father is a retired professor and an author of eighteen books. His mother was a homemaker and died two years ago of renal failure. There is no family history of psychiatric illness or substance abuse. He denied that he was a witness to any significant trauma growing up and denied any physical or sexual abuse. He had a variety of interests including basketball, which he played at the university. His main goal and "dream" was to come to the United States for a Ph.D. He denies any behavioral problems, trouble with the law, or arrests while growing up. He has been married for 26 years, and this is the first marriage for both him and his wife. They have two sons, age 21 and 20, both are healthy and doing well. He was raised a Hindu and is active in his faith.

REVIEW OF SYSTEMS: Dr. Sangar denied any current problems with sleep, appetite, weight changes, concentration, memory, self-esteem, libido, guilt, or suicidal ideation. He further denied fever, stroke, seizures, other closed head injuries, hypoxia, significant headaches (for the past 4-5 years), hearing difficulties, problems with thought processes, learning or memory, distractibility, problems with verbal expression, or organizational difficulties.

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001
```

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

**PHYSICAL EXAM**: Performed as part of the Neurology Examination. See SF 88/93

**LABORATORY DATA**: The serum cholesterol was 204 (nl<200) and the triglycerides were 336 (nl 40-160). The uric acid was 7.9 (nl). Otherwise with complete blood count, serum chemistries, liver function test, B12/Folate levels, TSH, Free T4, and PSA were all within normal limits.

**IMAGING STUDIES**: MRI of the Brain performed on 6 April 2001 at 1345, IMPRESSION: "Postoperative changes of old left frontal craniotomy without evident intracranial abnormality. Inflammatory changes of the paranasal sinus mucosa, worse in the left maxillary sinus."

Cervical Spine films at Walter Reed AMC: "diffuse disc space narrowing with osteophytes – anterior osteophytic bridging at C5-6"

**CONSULTATIONS**:
Neuropsychology:  IMPRESSION: "LTC Sangar produced a neuropsychological profile that demonstrates acquired impairment of higher cerebral functions. Degree of impairment is mild to moderate. This appears to be a stable condition. There are indications of greater involvement of the right cerebral hemisphere. There are indications of involvement of anterior regions. It is likely that the current impairment resulted from multiple events, to include his head injury, the neurosurgery (to remove bone from left optic nerve), possibly exacerbated by stress and/or prolonged treatment with steroid. Neuropsychological domains that are currently impaired include executive functioning (processing speed, inhibition, regulation), left hand motor and tactile/motor functioning, and spatial reasoning. It is recommended that he be periodically evaluated for change in this condition, e.g., every 3-5 years".

Neurology: LTC Sangar exhibits evidence of his previous diagnosis of CIDP on both clinical and today's electrophysiologic examination. There is no evidence of clinical impairment as would affect neuropsychiatric examination except for in tasks involving strength in the non-dominant hand (L). He does, however, demonstrate evidence of significant dysfunction. Motor impersistence and frontal release signs may suggest that his head injury in 1982 was indeed quite significant certainly he has physical evidence of injury on his ophthalmologic examination. With regard to his present occupational, visual and spatial impairment, and left-sided apraxia may be of significant importance.
In closed head injury, the highest degree of impairment typically manifests in the first months to two years following the injury. During this time, LTC Sangar was able to complete medical school missing only one semester. It is entirely unclear how long the visual spatial deficit has been present.
        At this time I see no evidence for a progressive degenerative neurologic illness. This likely represents a gentleman who suffered a significant closed head injury in the past who began to have job difficulties when faced with a significant medical illness, steroid treatment, and depression. The effect of the

SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

CIDP seems to be resolved. He may still have the neurocognitive deficit, but this is likely a direct effect of the closed head injury.

Internal Medicine: Assessment was "Elevated triglycerides, responsive to Lopid. Triglycerides recently elevated because he stopped Lopid. Borderline blood pressure". The recommendation was to take Lopid regularly, weight loss, increased exercise, and follow-up in three months.

Rheumatology: Assessment was "Chronic Gout – still having approximately one attack per year. Would not recommend prophylactic therapy given the low frequency of attacks and given his history of renal failure. Would also avoid NSAIDS and colchicine"

Orthopedics: Assessment was "Cervical Spine degenerative disc disease consistent with age and history – completely normal physical/neuro exam. No follow-up required"

EMG: Sensory nerve responses of the right upper and lower extremities showed an absent ulnar response and a slightly low amplitude sural response, with median and radial responses being normal. Motor nerve responses of the right upper and lower extremities were normal. F-wave of the right ulnar nerve was normal, and absent for the right peroneal nerve. EMG of the right iliopsoas muscle showed slightly polyphasic motor units. Interpretation was, "This is an abnormal electrodiagnostic study due to Generalized Acquired Polyneuropathy. No evidence of a myopathy was present".

**DIAGNOSIS:**
Axis I:       (294.9) Cognitive Disorder, NOS, moderate: Likely secondary to closed head injury and subsequent left frontal craniotomy; Aggravated by an episode of CIDP and steroid treatment; Manifested by clear and unequivocal deficits in neuropsychological functioning with a moderate degree of impairment of higher cerebral functions, general intelligence in the average range with verbal scale score significantly higher than performance scale score, with problems in visuospatial/visuoperceptual performance, visual memory, and reasoning abilities. Impairment for military duty as a nuclear medicine physician is marked. Impairment for social and industrial adaptability for a career in medicine is severe, for another less demanding career is moderate. LOD: no, EPTS: yes.
Axis II:      No diagnosis.
Axis III:     Status post MVA with Closed head injury and left frontal craniotomy (June 1982)
              CIDP (June 1997)
              Decreased Visual Acuity in the Left Eye
              Polyarticular tophaceous erosive gout
              Positive PPD
              Cervical spondylosis,
              Hypertriglyceridemia
              Multiple drug allergies.

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:   NA
FMP/SOCIAL SECURITY NUMBER:   20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001
```

50275-102

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

Axis IV:       Current stressors are moderate including ongoing medical evaluation board, administrative actions which prevent him from working in his chosen career and possible loss of his career in the Army.
Axis V:       Current functioning GAF – 55, some severe impairment in occupational functioning as a physician but moderate impairment for functioning in a number of other professions. Please see below for further explanation.

**SUMMARY:** Dr. Sangar is suffering from a chronic cognitive disorder that we believe is secondary to his severe closed head injury (as defined by AR 40-501, chapter 2-28f) from the motor vehicle accident and the subsequent left frontal craniotomy in 1982. We believe that this has resulted in a generalized, chronic, stable neuropsychological impairment that has improved very little over the intervening 19 years. He has been able to partially compensate for his deficits with his preserved verbal abilities, persistence, and an advanced premorbid educational level. It is our opinion he was not identified as impaired at Ft Leonard Wood because it was a low stress environment and there was no one there with sufficient nuclear medicine experience to verify his competence. Once he transferred to Walter Reed Army Medical Center, he was expected to perform at a much higher level of competence. He suffered an episode of CIDP that from the spring of 1997 through most of 1998 was very debilitating. The combination of the illness itself, the accompanying weakness, reduced energy, and effect of the prednisone treatment further impaired his ability to perform as a nuclear medicine physician. He was unable to compensate and was identified as an impaired physician. Despite the fact that LTC Sangar has fully recovered from his CIDP, he continues to exhibit significant cognitive deficits that are consistent with those previously identified while he was ill and taking prednisone. He recently passed his nuclear medicine certifying examination, after 5-6 previous failures; however, he has not been functioning as a nuclear medicine physician since his privileges were suspended in February 1999.

**PRESENT CONDITION:** Presently Dr. Sangar has evidence of an abnormal EMG with mild residual effects from the CIDP. He still has significant neuropsychological impairments and the diagnosis of Cognitive Disorder, NOS. The Cognitive Disorder is chronic, stable, and not likely to improve. Unfortunately, there is no current treatment available for his cognitive disorder.

**CURRENT FUNCTIONAL STATUS:**
IMPACT ON DUTY: Based on independent evaluations from nuclear medicine physicians, visual spatial and apraxia findings on neurological exam, four sets of neuropsychological testing, and the opinion of the Walter Reed Army Medical Center credentials committee, Dr. Sangar cannot function in his specialty as a nuclear medicine physician. However, he currently has intelligence in the normal range and could perform in a number of careers outside the realm of medicine.
STABILITY: We believe this his cognitive disorder is a chronic, not an acute disorder. It is stable. Functionally, he is also stable. Given the longevity of the deficit, he will likely not improve.
PROGNOSIS: His prognosis for recovery of his premorbid functioning prior to the motor vehicle accident is poor.

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:   NA
FMP/SOCIAL SECURITY NUMBER:   20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001
```

50275-102                                                                          AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

COMPLIANCE: Dr. Sangar has been compliant with medical appointments, medication, and treatment recommendations.
GEOGRAPHIC ASSIGNMENT CONSIDERATIONS: None.

**CONCLUSIONS**: The servicemember fails to meet retention criteria in accordance with AR40-501, paragraph 3-34 under organic conditions for this Existing Prior to Service (EPTS) condition. He is competent to handle his own financial affairs, understand and participate in the MEB proceedings. This servicemember is referred to the physical evaluation board with the following limitations. Please see attached form DA 3349.

**RECOMMENDATIONS**: It is recommended that LTC Sangar be medically boarded for Cognitive Disorder, NOS, and that he not return to his role as nuclear medicine physician.

## ANSWERS TO SPECIFIC QUESTIONS FROM THE PEB:

1. Were the physicians who forwarded the MEB to WRAMC of the opinion that the soldier's mental condition did not meet retention standards?

Yes. It is the opinion of the MEB that this soldier does not meet retention standards based upon the diagnosis of Cognitive Disorder, NOS.

2. Did the physicians who accomplished the MEB consider the September 1999 neuropsychological evaluation accomplished by Walter Reed in determining the diagnosis and/or medical findings on the MEB?

Yes. The board relied primarily upon the full Neuropsychological Testing completed at Madigan Army Medical Center in 3 April 2001. These results were consistent with the previous neuropsychological examinations.

3. The agency views Cognitive Disorder, NOS, as a psychiatric diagnosis. There appears to have been no psychiatrist on the MEB.

At the present MEB there were two psychiatrists, Dr. Hough and Dr. Hicks. There was also a neurologist, Dr. Traci Ryan and a consultant neuropsychologist, Dr. Jack Norris, Ph.D.

4. Is the memorandum dated 31 January 2000 by COL Carlson, a neuropsychologist at Walter Reed Army Medical Center a part of the MEB, and if so, was it reviewed and approved by the appropriate medical reviewing approving authority in accordance with chapter 7, AR40-3?

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:21 May 2001
```

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

The board reviewed this memorandum signed by COL Carlson and is in agreement with all the points on the memorandum.

*(signature)* LTC, MC
DAVID W. HOUGH, LTC, MC, PSYCHIATRIST
MADIGAN ARMY MEDICAL CENTER, TACOMA, WA

*(signature)*
RUSSELL W. HICKS,  COL, MC, PSYCHIATRIST
MADIGAN ARMY MEDICAL CENTER, TACOMA, WA

*(signature)*
TRACI RYAN, MAJ, MC, NEUROLOGIST
MADIGAN ARMY MEDICAL CENTER, TACOMA, WA

```
SERVICEMEMBER NAME: SANGAR, VIJAY K.
REGISTER NUMBER:   NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: PSYCHIATRY
DATE DICTATED:
DATE TRANSCRIBED:
```

****
Madigan Army Medical Center  Neurophysiology Service
Electroneuromyography Report
****

**Name:** Sangar, Vijay    **SSN:** 20/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    **Date of Birth:** 1/3/44    **Age:** 57
**Referring Physician:** Ryan    **Date:** 05 Apr 01
**Height (in.):** 5'11"    **Skin Temperature (deg. C):** 34

### Motor Nerve Conduction:

| Nerve and Site | Latency (ms) | (Upper Normal) | Amplitude (mV) | (Lower Normal) | Distance (mm) | CV (m/s) |
|---|---|---|---|---|---|---|
| Ulnar nerve .R | | | | | | |
|   Wrist | 3.2 | U 3.5 | 9.5 | L5.60 | 80 | |
|   Below elbow | 7.4 | | 8.5 | | 232 | 55 |
| Peroneal Nerve.R | | | | | | |
|   Ankle | 4.1 | U 6.7 | 8.9 | L2.20 | 80 | |
|   Fibular head | 11.7 | | 8.5 | | 335 | 44 |

### F-wave Studies:

| Nerve | Latency(ms) |
|---|---|
| Ulnar nerve .R | 29.5 (<33) |
| Peroneal nerve .R | absent |

### Sensory Nerve Conduction:

| Nerve and Site | Latency (ms) | (Upper normal) | Amplitude (μV) | (Lower normal) | Distance (mm) |
|---|---|---|---|---|---|
| Ulnar nerve.R | | | | | |
|   Wrist | absent | | | | 140 |
| Radial nerve.R | | | | | |
|   Forearm | 2.2 | U 2.4 | 45 | L13.0 | 100 |
| Median nerve.R | | | | | |
|   Wrist | 3.2 | U 3.5 | 36 | L10.0 | 140 |
| Sural nerve.R | | | | | |
|   Mid Calf | 3.9 | U 4.0 | 5 | L5.00 | 80 |

### Electromyography

| Muscle | Side | Level | (+) Waves | Fibrillation Potentials | Fasiculation Potentials | Insertional Activity | Amplitude | Duration | Phases | Recruitment |
|---|---|---|---|---|---|---|---|---|---|---|
| Iliopsoas | Right | L2-3 | 0 | 0 | 0 | Nl | Nl | Nl | Slight Inc'd | Nl |

### Summary

1. Sensory nerve responses of the right upper and lower extremites showed an absent ulnar response and a slightly low amplitude sural response, with the median and radial responses being normal.
2. Motor nerve responses of the right upper and lower extremities were normal.
3. F-wave of the right ulnar nerve was normal, and absent for the right peroneal nerve.
4. EMG of the right Iliopsoas muscle showed slightly polyphasic motor units..

### Interpretation

This is an abnormal electrodiagnostic study due to:

1. Generalized Acquired Polyneuropathy.  No evidence of a myopathy was present

J. Edward Hartmann, M.D.
MAJ, MC
C, Neuromuscular Section, Madigan AMC

## MADIGAN ARMY MEDICAL CENTER

## MEB CONSULTATION

**DATE OF EXAM**: 5 April 2001

**CHIEF COMPLAINT**: Extremity weakness and failure to perform assigned duties due to mental decline.

**SOURCE OF REFERRAL**: This is a MEB consult. It is focused on the service member's neurologic condition.

**HISTORY OF PRESENT ILLNESS**: The patient is a right-handed Indian male who is here for MEB evaluation with a previous diagnosis of chronic inflammatory demyelinating polyneuropathy and cognitive decline. He is currently 46 years old and has a history of the diagnosis of chronic inflammatory demyelinating polyneuropathy (CIDP) in 1997. He relates that his illness began in June 1997 when he first noted that he had proximal extremity weakness and difficulty climbing stairs. This progressed over days to weeks to involve the arms and some shortness of breath. He was diagnosed by lumbar puncture and electrodiagnostic studies, as having (CIDP). He was treated with a course of tapering steroids over the next 2 years and currently states that he is subjectively free of disease and back to himself. During the course of his illness, issues arose with his competence in doing his primary MOS, which is that of a nuclear medicine physician at Walter Reed Army Medical Center, where he served from beginning August 1995. The evaluation that ensured included neuropsychiatric testing and suggested deficit in both verbal and visuospatial skills area. During this time, he openly admits to feeling depressed, as this was occurring during the course of his (CIDP) illness. He was also under the influence of steroid medications for treatment of the (CIDP). He denies any sensation of cognitive decline, personal change or alteration in judgment and has no new habits or behaviors. He denies hoarding behaviors or any behaviors suggestive of obsessive-compulsive traits. He denies impairment in social functioning or previous academic difficulties. He admits, however, that he did have some difficulty passing the Federal Licensing Exam and failed the first attempt. He has since attempted the nuclear medicine specialty examination 5 X, passing on the 6th effort.

**PAST MEDICAL HISTORY**: As it pertains to the current complaint, he has had severe gout since the 1970s. In 1982 during the first year of medical school, LTC Sangar was involved in a severe MVA with resulting closed head injury. He was unconscious for an uncertain period of time and suffered loss of vision in his left eye. This was later diagnosed as a sphenoid bone fracture with bone fragment impaling the left optic nerve and required frontal craniotomy and removal of the bone fragment. He has since had visual loss in the left eye. He has a history of positive PPD since childhood and at least 1 positive FTA-ABS antibody testing, which was followed up with a negative VDRL, RPR test and

SERVICEMEMBER NAME:  Sangar, Vijay
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: Neurology
DATE DICTATED:
DATE TRANSCRIBED:

micro-hemagglutination-Treponema pallidum (MHA-TP) and felt to be false positive syphilis testing. Relevant to the history of present illness, the service member missed only 1 semester of medical school and returned to complete medical school and went on to seek his specialty training in the United States.

**PHYSICAL EXAMINATION:** A general examination reveals an anxious though alert and oriented lieutenant colonel, well dressed in class B duty uniform. He is fluent and his memory is 3/3 objects at 5 minutes. He demonstrates a left upper extremity apraxia with motor commands of both intention and activity. He does not demonstrate any agnosia. Visuospatial demonstrates excellent clock and cube formation, but very poor visual memory when tested with complex figure at both 5 and 10 minutes with decline in interval performance. He exhibits motor impersistence with some mirroring during complex motor commands. He follows commands hesitantly, but without dystonic posturing. His verbal ability demonstrates normal aprosody and intonation. His confrontational naming is intact with a single paraphasic error. His repetition is intact. He has normal reading and writing. He is able to follow 3-step commands, however, with hesitation and some prompting. His cranial nerve examination reveals optic atrophy on the left. No papilledema. His extraocular movements are intact. He has a left-sided APD and his vision is count fingers in the left eye with the right eye being normal refracted vision. He demonstrates symmetric facial strength and sensation except over the left frontal area where there is the old craniotomy scar. He has a symmetric palate and a midline tongue. Motor examination reveals normal tone and bulk without fasciculations or abnormal movements. His strength is 5/5 with the exception of the intrinsics of the left hand, which are all 4/5. Sensory, there is no reported deficit to light touch, pinprick, vibration, temperature or proprioception. Cerebellar examination is intact to finger-nose-finger, heel-to-shin and rapid alternating movements. His gait is intact to heel, toe in tandem without posturing on stress gait. Reflex examination reveals 1/4 throughout the upper extremities and the left knee jerk is 1/4. The right knee jerk and Achilles reflexes are absent. The toes are downgoing. There is a positive glabellar reflex. There is no palmomental or snout reflex noted.

**LAB DATA:** Reveals normal chemistries, cholesterol of 204 with triglycerides 336 and his thyroid stimulating hormone 1.31, normal. His prostate specific antigen is within normal limits. CBC is within normal limits. His B12 and folate are also within normal limits. Repeat EMG and NCV were accomplished on the day of examination and revealed absent sensory nerve action potential (SNAP) and F waves in the bilateral lower extremities. There was evidence of polyphasic potentials in both proximal and distal muscles of the upper extremities, supporting evidence of the diagnosis of previous (CIDP).

**IMAGING STUDIES:** MRI was performed on the day of this examination, which reveals postoperative changes in an old left frontal craniotomy without evident intracranial abnormality and inflammatory changes of the paranasal sinus mucosa, worse in the left maxillary sinus; otherwise normal without evidence of focal brain atrophy or degenerative signs.

```
SERVICEMEMBER NAME:  Sangar, Vijay
REGISTER NUMBER:   NA
FMP/SOCIAL SECURITY NUMBER:   20/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
SERVICE/CLINIC: Neurology
DATE DICTATED:
DATE TRANSCRIBED:
```

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

**DIAGNOSIS:**
1. Chronic inflammatory demyelinating polyneuropathy (CIDP), resolved.
2. Closed head injury, severe in accordance with Army Regulation 40-501, 2-28f existing prior to service.
3. Optic atrophy left, secondary to #2.
4. Neurocognitive deficits likely secondary to closed head injury.

**CURRENT FUNCTIONAL STATUS:**
STABILITY: LTC Sangar exhibits evidence of his previous diagnosis of (CIDP) both on clinical and today's electrophysiologic examination. There is no evidence of clinical impairment as would affect his neuropsychiatric examination, except for in tasks involving strength in the nondominant left hand. He does, however, demonstrate evidence of significant neurocognitive dysfunction. Motor impersistence and frontal release signs present in his examination suggest that his head injury in 1982 was indeed quite significant. Certainly, he has physical evidence of injury on his ophthalmologic examination with the left APD and optic atrophy. With regard to his present occupation, visual and spatial impairment and left-sided apraxia are of significant importance.

In closed head injury, the highest degree of impairment typically manifests in the first months to 2 years following the injury. During this time, LTC Sangar was able to complete medical school, missing only 1 semester. It is entirely unclear how long the visuospatial deficit has been present and could be very longstanding.

At this time, I see no evidence for a progressive degenerative neurologic illness. This likely represents a gentleman who has suffered a significant closed head injury in the past who began to have job difficulties when faced with significant medical illness, steroid treatment and depression. The effect of the (CIDP) seems to have resolved. The neurocognitive deficit remains, but, as above, is likely due to the direct effect of closed head injury in medical illness.

Current functional status and impact on duty performance: It is likely that LTC Sangar may have significant difficulties in his primary occupation as a nuclear medicine physician, particularly with regard to the visuospatial deficit and the apraxia. His job requires that he manipulates items in space in his mind for interpretation of nuclear medicine studies and may present for him exceptional difficulty.

ABILITY: This is not likely to decline further. There is no evidence of a declining neurodegenerative disorder.

---

```
SERVICEMEMBER NAME:  Sangar, Vijay
REGISTER NUMBER:  NA
FMP/SOCIAL SECURITY NUMBER:  20/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
SERVICE/CLINIC: Neurology
DATE DICTATED:
DATE TRANSCRIBED:
```

---

50275-102

AUTOMATED OPTIONAL FORM 275-E(12-77)
Prescribed by GSA and 1CMR
FIRMR (41 CFR) 201-45.505

PROGNOSIS: At the present time, there is no indication that his prognosis will worsen over time. The course of (CIDP) may indeed be relapsing and remitting and he is at least subjectively free of disease at this point.

COMPLIANCE: There is no evidence that his compliance has been, but excellent through the course of his illness.

GEOGRAPHIC CONSIDERATIONS: He should be within 24-hours travel of a major medical center with a neurologist available for treatment of (CIDP) should his symptoms recur.

**CONCLUSIONS:** The service member's neurologic condition meets retention criteria in accordance with Armed Regulation 40-501 given that the severe head injury existed prior to service; however, it is extremely unlikely that the service member would be able to function in the capacity of a nuclear medicine physician. He may, however, be well qualified for other positions utilizing his intelligence and skills.

**RECOMMENDATION:**
ADMINISTRATIVE DISPOSITION: From the viewpoint of the service member's neurologic condition, the service member should be referred to the PEB for further adjudication.

CLINICAL DISPOSITION: The patient should continue to have regular neurologic examinations approximately every 6 months.

TRACI D. RYAN, MAJ, MC
MADIGAN ARMY MEDICAL CENTER, TACOMA, WA
TDR:mlb/7508
Received/revised 9 May 9, 2001/dkh

SERVICEMEMBER NAME: Sangar, Vijay
REGISTER NUMBER: NA
FMP/SOCIAL SECURITY NUMBER: 20/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
SERVICE/CLINIC: Neurology
DATE DICTATED:
DATE TRANSCRIBED:

50275-102

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 2 (Exhibit 2 of Plaintiff's ABCMR Application)

Plaintiff's Officer Evaluation Report, dated 19 April 1999

00128906                                    787                              BOARDS: SS4

# OFFICER EVALUATION REPORT
For use of this form, see AR 623-105; the proponent agency is ODCSPER

*SEE PRIVACY ACT STATEMENT ON DA FORM 67-9-1*

## PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK | d. DATE OF RANK | | | e. BRANCH | f. DESIGNATED SPECIALTIES |
|---|---|---|---|---|---|---|---|
| SANGAR, VIJAY | 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 | LTC | 1994 | 07 | 18 | MC | 60B |

| g. UNIT, ORG., STATION, ZIP CODE OR APO, MAJOR COMMAND | | | | | | | h. REASON FOR SUBMISSION |
|---|---|---|---|---|---|---|---|
| BRAVO COMPANY, Walter Reed Army Medical Center, Washington DC 20307 MC | | | | | | | 05   Annual |

| i. PERIOD COVERED | | | | | | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER COPY (Check one and date) | | | | | n. PSB INITIAL | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM | | | THRU | | | 9 | P | 2 | 1. Given to Officer | | | | | | | |
| Year | Month | Day | Year | Month | Day | | | | Y | 2. Forwarded to Officer | | Date 990423 | Y | MM | MC01 |
| 1997 | 10 | 01 | 1998 | 09 | 30 | | | | | | | | | | |

## PART II - AUTHENTICATION (Rated officer's signature verifies rated officer has seen completed OER Parts I-VII and the admin data is correct)

| a. NAME OF RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| BRAZAITIS, MICHAEL P | 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 | COL | Chief, Dept of Radiology | *[signature]* | 4-19-99 |

| c. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| | | | | | |

| e. NAME OF SENIOR RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| PHILLIPS, YANCY Y | 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 | COL | DCCS, WRAMC | *[signature]* | 4-19-99 |

| SENIOR RATER'S ORGANIZATION | BRANCH | SENIOR RATER TELEPHONE NUMBER | E-MAIL ADDRESS |
|---|---|---|---|
| Headquarters Company, WRAMC Washington DC 20307 | MC | 202-782-8397 | COL Yancy.Phillips@wramc1-amedd.army. |

| f. This is a referred report. Do you wish to make comments? | ☒ Yes, comments are attached | ☐ No |
|---|---|---|

| g. SIGNATURE OF RATED OFFICER | DATE |
|---|---|
| *[signature]* Vijay Sangar | 4/19/99 |

## PART III - DUTY DESCRIPTION

| a. PRINCIPAL DUTY TITLE | b. POSITION AOC/BR |
|---|---|
| Staff, Nuclear Medicine Service | 60B |

b. SIGNIFICANT DUTIES AND RESPONSIBILITIES. REFER TO PART IVa, DA FORM 67-9-1

Serves as staff physician performing and interpreting diagnostic nuclear medicine studies, including Radioimmunoassay. Performs therapeutic nuclear medicine procedures. Provides consultation in Nuclear Medicine to referring physicians and other health care professionals. Provides instruction to Nuclear Medicine Fellows, Radiology residents, medical students, and technologists. Provides support to research protocol activities in the clinic, complete quality management programs, and utilization reviews for the Nuclear Regulatory Commission and JCAHO inspections. Performs other administrative duties as assigned by the Chief.

## PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM (Rater)

99 School

CHARACTER Disposition of the leader; combination of values, attributes, and skills affecting leader actions

a. ARMY VALUES (Comments mandatory for all "NO" entries. Use PART Vb.)

| | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | X | | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | | X | |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | X | | 6. SELFLESS-SERVICE: Places Army priorities before self | | X | |
| 3. COURAGE: Manifests physical and moral bravery | X | | 7. DUTY: Fulfills professional, legal, and moral obligations | | X | |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | X | | | | | |

b. LEADER ATTRIBUTES / SKILLS / ACTIONS: First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb. Comments are mandatory

| b.1. ATTRIBUTES (Select 1) | X MENTAL | YES ☒ NO | 2. PHYSICAL | YES ☒ NO | 3. EMOTIONAL | YES ☒ NO |
|---|---|---|---|---|---|---|
| Fundamental qualities and characteristics | Possesses desire, will, initiative, and discipline | | Maintains appropriate level of physical fitness and military bearing | | Displays self-control; calm under pressure | |

| b.2 SKILLS (Competence) (Select 2) | X CONCEPTUAL | YES ☒ | X INTERPERSONAL | YES ☒ NO | 3. TECHNICAL | YES ☒ |
|---|---|---|---|---|---|---|
| Skill development is part of self-development; prerequisite to action | Demonstrates sound judgment, critical/creative thinking, moral reasoning | | Shows skill with people: coaching, teaching, counseling, motivating and empowering | | Possesses the necessary expertise to accomplish all tasks and functions | |
| | 4. TACTICAL Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | | | | |

| b.3. ACTIONS (LEADERSHIP) (Select 3) Major activities leaders perform: influencing, operating, and improving | | | | | | |
|---|---|---|---|---|---|---|
| INFLUENCING | 1. COMMUNICATING | YES ☒ NO | 2. DECISION-MAKING | YES ☒ NO | 3. MOTIVATING | YES ☒ NO |
| Method of reaching goals while operating / improving | Displays good oral, written, and listening skills for individuals / groups | | Employs sound judgment, logical reasoning and uses resources wisely | | Inspires, motivates, and guides others toward mission accomplishment | |
| OPERATING | X PLANNING | YES ☒ NO | 5. EXECUTING | YES ☒ | 6. ASSESSING | YES ☒ NO |
| Short-term mission accomplishment | Develops detailed, executable plans that are feasible, acceptable, and suitable | | Shows tactical proficiency, meets mission standards, and takes care of people/resources | | Uses after-action and evaluation tools to facilitate consistent improvement | |
| IMPROVING | 7. DEVELOPING | YES ☒ NO | 8. BUILDING | YES ☒ NO | X LEARNING | YES ☒ NO |
| Long-term improvement in the Army, its people and organizations | Invests adequate time and effort to develop individual subordinates as leaders | | Spends time and resources improving teams, groups and units; fosters ethical climate | | Seeks self-improvement and organizational growth; envisioning, adapting and leading | |

| c. APFT: PROFILE | DATE: APR 1998 | HEIGHT: 70 | WEIGHT: 175 | YES |
|---|---|---|---|---|

d. JUNIOR OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRY FOR RATERS OF LTs AND WO1s. WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1a AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED?   YES ☐ NO ☐ X

DA FORM 67-9, OCT 97    REPLACES DA FORM 67-8, 1 SEP 79, WHICH IS OBSOLETE, 1 OCT 97    USAPA V2.00

2 6 APR 1999

| NAME SANGAR, VIJAY | SSN 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 | PERIOD COVERED 19971001 – 19980930 |
|---|---|---|

**PART V – PERFORMANCE AND POTENTIAL EVALUATION (Rater)**

a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION

| ☐ OUTSTANDING PERFORMANCE, MUST PROMOTE | ☒ SATISFACTORY PERFORMANCE, PROMOTE | ☐ UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE | ☐ OTHER (Explain) |
|---|---|---|---|

b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE AND POTENTIAL FOR PROMOTION. REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND c DA FORM 67-9-1.

LTC Sangar's performance during this rating period has been encumbered by significant medical illness, including prolonged hospitalization, convalescence, and on-going slow recovery and rehabilitation. His physical stamina has been markedly reduced, reflecting on all aspects of his clinical performance. Although he has returned to duty, LTC Sangar remains in a limited capacity. His prolonged and repeated absence in a clinical environment has also adversely affected his re-acclimation and return to full duty. Before, during, and after hospitalization, he received remedial training and performed under clinical supervision. This remedial program continues to date. His potential for future assignments in an independent clinical role will be determined by ongoing reassessment of his professional skills.

c. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

**PART VI - INTERMEDIATE RATER**

**PART VII -SENIOR RATER**

a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE

| ☐ BEST QUALIFIED | ☒ FULLY QUALIFIED | ☐ DO NOT PROMOTE | ☐ OTHER (Explain below) |
|---|---|---|---|

I currently senior\_\_ 30 \_\_officer(s) in this grade
A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review   ☒ YES   ☐ NO (Explain in c)

b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA) HQDA COMPARISON OF THE SENIOR RATER'S PROFILE AND BOX CHECK AT THE TIME THIS REPORT PROCESSED

| *BELOW CENTER OF MASS RETAIN* |
|---|

RO: LTC SANGAR VIJAY
510561078

SR: COL PHILLIPS YANCY Y
577644993

DATE: 1999 04 26

TOTAL RATINGS: 30

RATINGS THIS OFFICER: 1

c. COMMENT ON PERFORMANCE/POTENTIAL

As a result of his significant medical condition, LTC Sangar's performance and potential as a leader, builder or motivator have not been demonstrated. Additionally, his technical skills and ability to execute plans have been impaired, likely as a result of this medical condition. With perseverance, diligence, and attention to detail, LTC Sangar has the potential to acquire full clinical status and satisfactory performance.

d. LIST 3 FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

Clinic Officer in Charge, Staff Physicianat Medical Center, General Medical Officer

DA FORM 67-9, OCT 97 (Reverse)    USAPA V2.00

THIS IS A CERTIFIED TRUE COPY

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 3 (Exhibit 3 of Plaintiff's ABCMR Application)

Plaintiff's Permanent Physical Profile, 8 May 2001

# PHYSICAL PROFILE

For use of this form, see AR 40-501; the proponent agency is the Office of The Surgeon General

| 1. MEDICAL CONDITION  Cognitive Disorder, NOS, Moderate Decreased Visual Acuity in the Left Eye Cervical Spondylosis | 2. | | | | | | |
|---|---|---|---|---|---|---|---|
| | | P | U | L | H | E | S |
| | | 1 | P3 | P3 | 1 | 2 | P4 |

| 3. ASSIGNMENT LIMITATIONS ARE AS FOLLOWS  Cannot be assigned as a physician in the specialty of nuclear medicine given his Cognitive Disorder, NOS. | CODES  U |
|---|---|

**4. THIS PROFILE IS** ☒ PERMANENT    ☐ TEMPORARY EXPIRATION DATE:

**5. THE ABOVE STATED MEDICAL CONDITION SHOULD NOT PREVENT THE INDIVIDUAL FROM DOING THE FOLLOWING ACTIVITIES**

| | | | |
|---|---|---|---|
| ☒ Groin Stretch | ☒ Thigh Stretch | ☒ Lower Back Stretch | ☐ Neck & Shoulder Stretch    ☐ Neck Stretch |
| ☒ Hip Raise | ☒ Quads Stretch & Bal. | ☒ Single Knee to Chest | ☒ Upper Back Stretch    ☒ Ankle Stretch |
| ☒ Knee Bender | ☒ Calf Stretch | ☒ Straight Leg Raise | ☐ Chest Stretch    ☒ Hip Stretch |
| ☒ Side-Straddle Hop | ☒ Long Sit | ☐ Elongation Stretch | ☐ One-Arm Side Stretch    ☐ Upper Body Wt Tng |
| ☒ High Jump | ☒ Hamstring Stretch | ☒ Turn and Bounce | ☐ Two-Arm Side Stretch    ☐ Lower Body Wt Tng |
| ☒ Jogging in Place | ☒ Hams. & Calf Stretch | ☒ Turn and Bend | ☒ Side Bender    ☐ All |

**6. AEROBIC CONDITIONING EXERCISES**

☐ Walk at Own Pace and Distance
☒ Run at Own Pace and Distance
☐ Bicycle at Own Pace and Distance
☐ Swim at Own Pace and Distance
☐ Walk or Run in Pool at Own Pace

☒ Unlimited Walking
☐ Unlimited Running
☒ Unlimited Bicycling
☒ Unlimited Swimming

☐ Run at Training Heart Rate for ____ Min.
☐ Bicycle at Training Heart Rate for____ Min.
☐ Swim at Training Heart Rate for ____ Min.

**7. FUNCTIONAL ACTIVITIES**

☒ Wear Backpack (40 Lbs.)
☒ Wear Helmet
☐ Carry Rifle
☐ Fire Rifle
With Hearing Protection
☒ KP/Mopping/Mowing Grass
☒ Marching Up to ____ Miles
☒ Lift Up to ____ Pounds
☐ All

**PHYSICAL FITNESS TEST**

☒ Two Mile Run    ☐ Walk
☒ Push-Ups    ☐ Swim
☒ Sit-Ups    ☐ Bicycle

**8. TRAINING HEART RATE FORMULA**

MALES 220        FEMALES 225

MINUS    (-) AGE
MINUS    (-) RESTING HEART RATE
TIMES    (X) % INTENSITY
PLUS    (+) RESTING HEART RATE

50% EXTREMELY POOR CONDITION
60% HEALTHY, SEDENTARY INDIVIDUAL
70% MODERATELY ACTIVE, MAINTENANCE
80% WELL TRAINED INDIVIDUAL

**9. OTHER**

| TYPED NAME AND GRADE OF PROFILING OFFICER  LTC David W. Hough, MD | SIGNATURE | DATE  8 May 2001 |
|---|---|---|
| TYPED NAME AND GRADE OF PROFILING OFFICER  COL Russell W. Hicks, MD | SIGNATURE | DATE  8 May 2001 |

**ACTION BY APPROVING AUTHORITY**

PERMANENT CHANGE OF PROFILE    ☒ APPROVED    ☐ NOT APPROVED

| TYPED NAME, GRADE & TITLE OF APPROVING AUTHORITY  TONY CARTER, COL, MC, DCCS | SIGNATURE | DATE  8 May 02 |
|---|---|---|

**ACTION BY UNIT COMMANDER**

THIS PERMANENT CHANGE IN PROFILE SERIAL    ☐ DOES    ☐ DOES NOT REQUIRE A CHANGE IN MEMBER'S
☐ MILITARY OCCUPATIONAL SPECIALTY    ☐ DUTY ASSIGNMENT    BECAUSE:

| TYPED NAME AND GRADE OF UNIT COMMANDER | SIGNATURE | DATE |
|---|---|---|

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name (last, first, middle); grade; SSN; hospital or medical facility)  SANGAR, Vijay K.  20/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  LTC, MC  AD USA | UNIT    Dept of Nuclear Med, WRAMC |
|---|---|
| | ISSUING CLINIC AND PHONE NUMBER  Dept Psychiatry, Madigan Army Med Ctr, Ft Lewis, WA |
| | DISTRIBUTION    UNIT COMMANDER - ORIGINAL & 1 COPY    HEALTH RECORD JACKET - 1 COPY    CLINIC FILE - 1 COPY    MILPO - 1 COPY |

**DA FORM 3349, MAY 86**    REPLACES DA FORM 5302-R (TEST) DATED FEB 84 AND DA FORM 3349 DATED 1 JUN 80, WHICH ARE OBSOLETE

USAPPC V1.00

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 4 (Exhibit 4 of Plaintiff's ABCMR Application)

Plaintiff's Medical Evaluation Board Proceedings, 22 May 2001

**MEDICAL EVALUATION BOARD PROCEEDINGS**

For use of this form, see AR 40-3; the proponent agency is the Office of The Surgeon General.

| | | |
|---|---|---|
| MEDICAL TREATMENT FACILITY<br>Madigan Army Medical Center<br>Tacoma, WA, 98431 | | DATE<br>22 May 01 |

| 1. NAME (Last, First, MI)<br>Sangar, Vijay K. | | 2. GRADE<br>LTC | 3. SSN<br>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 | 4. COMPONENT<br>AD |
|---|---|---|---|---|

| 5. DEPARTMENT<br>Psychiatry | 6. SEX<br>M | 7. DATE OF BIRTH<br>3 Jan 44 | 8. ORGANIZATION W alter Reed AMC Co B<br>Washington, DC, 20307-5001 |
|---|---|---|---|

| 9. TOTAL YEARS OF MILITARY SERVICE | | 10. DATE ENTERED CURRENT TOUR OF ACTIVE DUTY | 11. MILITARY OCCUPATIONAL SPECIALTY<br>(include code)60B Nuclear Medicine Physician |
|---|---|---|---|
| a. ACTIVE<br>12 yrs  9 mos | b. INACTIVE | 1988 | |

**ACTION BY THE BOARD**
*BY DIRECTION OF THE APPOINTING AUTHORITY,*
*THE BOARD CONVENED TO EVALUATE THE PATIENT IDENTIFIED ABOVE*

12.  The patient ☐ did  ☒ did not present views in own behalf.  *(When presented, attach a summary of the patient's comments to the report)*

13. DIAGNOSIS:

| AFTER CONSIDERATION OF CLINICAL RECORDS, LABORATORY FINDINGS, AND PHYSICAL EXAMINATION, THE BOARD FINDS THAT THE PATIENT HAS THE FOLLOWING MEDICAL CONDITIONS/DEFECTS. LIST ALL DIAGNOSIS. USE JOINT ARMED FORCES TERMINOLOGY AND DIAGNOSTIC CODE(S).<br>a | APPROXIMATE DATE OF ORIGIN<br>b | INCURRED WHILE ENTITLED TO BASE PAY<br>c | | EXISTED PRIOR TO SERVICE<br>d | | PERMANENTLY AGGRAVATED BY SERVICE<br>e | |
|---|---|---|---|---|---|---|---|
| | | YES | NO | YES | NO | YES | NO |
| Axis I: 294.9 Cognitive Disorder,NOS,moderate: Likely secondary to closed head injury and subsequent left frontal craniotomy. Aggravated by an episode of CIDP and steroid treatment; Manifested by clear and unequivocal deficits in neuropsychological functioning with a moderate degree of impairment of higher cerebral functions,general intelligence in the average range with verbal scale score significantly higher than performance scale score,with problems in visuospatial/visuoperceptual performance,visual memory,and reasoning abilities. Impairment for military duty as a nuclear medicine physician is marked. Impairment for social and industrial adaptability for a career in medicine is severe, for another less demanding career is moderate. LOD:no EPTS:yes. AR 40-501, 3-34. Axis II: No diagnosis. Axis III: Status Post MVA with closed head injury and left frontal craniotomy(june 1982)CIDP(June 1997)Decreased Visual Acuity in the Left Eye, Polyarticular tophaceous erosive gout,positive PPD,Cervical spondylosis,Hypertriglyceridemia multiple drug allergies. Axis IV: Current stressors are moderate Including ongoing medical evaluation board,adkinistrative actions which prevent him from working in his chosen career and possible loss of his career in the Army. Axis V: Current functioning GAF-55,some severe impairment in occupational functioning as a physician but moderate impairment for functioning in a number of other professions. Please see below for further explanation. | 1982 | | X | X | | | X |

14.  The board recommends that the patient be:

☐ Returned to duty
☐ Returned to duty with the following limitations:

☒ Referred to a Physical Evaluation Board (PEB)
☐ Other  *(specify)*

| | |
|---|---|
| 15. The patient ☐ does ☐ does not desire to continue on active duty under AR 635-40. *(Complete only when patient is referred to PEB)* | |
| 16. Continuance on active duty under provisions of AR 635-40 ☐ is ☒ is not medically contraindicated. *(Complete when answer to item 15 is affirmative)* Enter assignment limitations in Item 30. | |

| 17. TYPED NAME AND GRADE OF PHYSICIAN | SIGNATURE |
|---|---|
| DAVID W. HOUGH,LTC,MC,Psychiatry | *signature* LTC, MC |
| 18. TYPED NAME AND GRADE OF PHYSICIAN | SIGNATURE |
| RUSSELL W. HICKS,COL,MC,Chief,Psychiatry | *signature* |
| 19. TYPED NAME AND GRADE OF PHYSICIAN | SIGNATURE |
| TRACI D. RYAN,MAJ,MC,Neurology | *signature* |

### ACTION BY THE APPROVING AUTHORITY

20. ☒ The findings and recommendation of the board are approved.

21. ☐ The report of the board is returned for reconsideration.

22. ☐ The report of the board is forwarded to: _____ Comments are attached as inclosure _____

| 23. TYPED NAME, GRADE AND TITLE OF APPROVING AUTHORITY | SIGNATURE | DATE |
|---|---|---|
| TONY CARTER,COL,MC,DCCS | *signature* | *date* |

### ACTION BY PATIENT

24. I have been informed of the approved findings and recommendation of the board.

☐ I agree with the board's findings and recommendation.

☒ I do not agree with the board's findings and recommendation. My appeal is attached as inclosure *See attached*

| 25. TYPED NAME, GRADE AND SSN | SIGNATURE | DATE |
|---|---|---|
| VIJAY K. SANGER,LTC,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 | *Vijay K. Sanger* | 6/20/0_ |

### FURTHER ACTION BY APPROVING AUTHORITY

26. ☐ The appeal has been considered and the original findings and recommendation are confirmed.

27. ☐ The appeal has been considered and the report of the board is returned for reconsideration. Attach further action as inclosure _____

27. ☐ The appeal has been considered and the report of the board is forwarded to: _____
Comments are attached as inclosure

| 29. TYPED NAME, GRADE AND TITLE OF APPROVING AUTHORITY | SIGNATURE | DATE |
|---|---|---|
| | | |

30. CONTINUATION *(Identify by item number)*

The pateint is mentally competent to handle his own affairs. he has the capacity to understand the nature of and to cooperate in physical evaluation board proceeding and is not considered dangerous to himself or others.

P4 Profile is warranted given soldier's medical condition.

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 5 (Exhibit 5 of Plaintiff's ABCMR Application)

Plaintiff's Officer Evaluation Reports (3), dated: 7 Jan 01, 21 Feb 02, and undated, covering calendar year 2002.

# OFFICER EVALUATION REPORT
For use of this form, see AR 623-105; the proponent agency is ODCSPER

SEE PRIVACY ACT STATEMENT ON DA FORM 67-9-1

## PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK | d. DATE OF RANK | | | e. BRANCH | f. DESIGNATED / PMOS (WO) SPECIALTIES |
|---|---|---|---|---|---|---|---|
| SANGAR, VIJAY K. | 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 | LTC | Year 1994 | Month 07 | Day 18 | MC | 60B |

| g. UNIT, ORG., STATION, ZIP CODE or APO, MAJOR COMMAND | h. REASON FOR SUBMISSION |
|---|---|
| B Company, Walter Reed Army Medical Center, Washington, DC 20307-5001    MC | 05    Annual |

| i. PERIOD COVERED | | | | | | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER COPY (Check one and date) | | n. PSB INITIAL | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM | | | THRU | | | | | | 1. Given to Officer Date | | | | |
| Year 2001 | Month 11 | Day 12 | Year 2002 | Month 11 | Day 11 | 12 | | | 2. Forwarded to Officer | | | MM | MC01 |

## PART II - AUTHENTICATION (Rated officer's signature verifies officer has seen completed OER Parts I-VII and the admin data is correct)

| a. NAME OF RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| Fitzpatrick, Thomas M. | 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 | COL | DCCS, WRAMC | Thomas M Fitzpatrick | |

| b. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| | | | | | |

| c. NAME OF SENIOR RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| Jaffin, Jonathan | 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 | COL | Commander, WRHCS | Jonathan Jaffin | |

| SENIOR RATER'S ORGANIZATION | BRANCH | SENIOR RATER TELEPHONE NUMBER | E-MAIL ADDRESS |
|---|---|---|---|
| HQ Company, WRAMC Washington, DC 20307 | MC | (202) 782-6394 | jonathan.jaffin@us.army.mil |

d. This is a referred report, do you wish to make comments?  ☒ Yes, comments are attached  ☒ No

e. SIGNATURE OF RATED OFFICER  Vijay K Sangar MD    DATE

## PART III - DUTY DESCRIPTION

a. PRINCIPAL DUTY TITLE  Medical Abstraction Physician          b. POSITION AOC/BR  60B

c. SIGNIFICANT DUTIES AND RESPONSIBILITIES. REFER TO PART IVe, DA FORM 67-9-1

Responsible for abstracting medical records from Tumor Registry at Walter Reed Army Medical Center. Participates in the maintenance of Tumor Registry files, reviews and analyzes materials to determine nature of the action to be taken, and completeness of information.

## PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM (Rater)

CHARACTER  Disposition of the leader: combination of values, attributes, and skills affecting leader actions

a. ARMY VALUES (Comments mandatory for all "NO" entries. Use PART Vb.)

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | | ☒ | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | | ☒ |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | | ☒ | 6. SELFLESS-SERVICE: Places Army priorities before self | | ☒ |
| 3. COURAGE: Manifests physical and moral bravery | | ☒ | 7. DUTY: Fulfills professional, legal, and moral obligations | | ☒ |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | | | | | ☒ |

b. LEADER ATTRIBUTES / SKILLS / ACTIONS: First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb. Comments are mandatory in Part Vb for all "No" entries.

b.1. ATTRIBUTES (Select 1)

| 1. MENTAL ☒YES NO | ☒ 2. PHYSICAL ☒YES NO | 3. EMOTIONAL ☒YES NO |
|---|---|---|
| Fundamental qualities and characteristics / Possesses desire, will, initiative, and discipline | Maintains appropriate level of physical fitness and military bearing | Displays self-control; calm under pressure |

b.2. SKILLS (Competence) (Select 2)  Skill development is part of self-development; prerequisite to action

| 1. CONCEPTUAL ☒YES NO | ☒ 2. INTERPERSONAL ☒YES NO | ☒ 3. TECHNICAL ☒YES NO |
|---|---|---|
| Demonstrates sound judgment, critical/creative thinking, moral reasoning | Shows skill with people: coaching, teaching, counseling, motivating and empowering | Possesses the necessary expertise to accomplish all tasks and functions |
| ☒ TACTICAL  Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | |

b.3. ACTIONS (LEADERSHIP) (Select 3) Major activities leaders perform: influencing, operating, and improving

| INFLUENCING Method of reaching goals while operating / improving | ☒ 1. COMMUNICATING ☒YES NO  Displays good oral, written, and listening skills for individuals / groups | 2. DECISION-MAKING ☒YES NO  Employs sound judgment, logical reasoning and uses resources wisely | 3. MOTIVATING ☒YES NO  Inspires, motivates, and guides others toward mission accomplishment |
|---|---|---|---|
| OPERATING Short-term mission accomplishment | 4. PLANNING ☒YES NO  Develops detailed, executable plans that are feasible, acceptable, and suitable | 5. EXECUTING ☒YES NO  Shows tactical proficiency, meets mission standards, and takes care of people/resources | ☒ ASSESSING  Uses after-action and evaluation tools to facilitate consistent improvement |
| IMPROVING Long-term improvement in the Army its people and organizations | 7. DEVELOPING ☒YES NO  Invests adequate time and effort to develop individual subordinates as leaders | 8. BUILDING ☒YES NO  Spends time and resources improving teams, groups and units; fosters ethical climate | ☒ LEARNING  Seeks self-improvement and organizational growth; envisioning, adapting and leading change |

c. APFT: PASS  DATE: APR 2002  HEIGHT: 71  WEIGHT: 191  YES

d. JUNIOR OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRY FOR RATERS OF LTs AND WO1s.  WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1a AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED?  YES  NO  ☒

DA FORM 67-9, OCT 97    REPLACES DA FORM 67-8, 1 SEP 79, WHICH IS OBSOLETE, 1 OCT 97    USAPA V2.01

| NAME SANGAR, VIJAY K. | SSN 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 | PERIOD COVERED 20011112 – 20021111 |

## PART V - PERFORMANCE AND POTENTIAL EVALUATION (Rater)

**a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION**

☐ OUTSTANDING PERFORMANCE, MUST PROMOTE  ☐ SATISFACTORY PERFORMANCE, PROMOTE  ☐ UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE  ☒ OTHER (Explain)

**b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE AND POTENTIAL FOR PROMOTION. REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND c DA FORM 67-9-1.**

LTC Sangar participated in the abstraction of medical records from the Tumor Registry at Walter Reed in a satisfactory manner. He participated in the maintenance and review of Tumor Registry files. He reviewed and analyzed the materials to determine the nature of the action to be taken and the completeness of required information. LTC Sangar participated in the following continuing education courses on his own initiative: the UCLA Physician's Training course and the Annual Meeting of the Society of Nuclear Medicine.

**c. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

## PART VI - INTERMEDIATE RATER

## PART VII - SENIOR RATER

**a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE**

☐ BEST QUALIFIED  ☐ FULLY QUALIFIED  ☐ DO NOT PROMOTE  ☒ OTHER (Explain below)

I currently senior rate _____ officer(s) in this grade. A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review  ☒ YES  ☐ NO (Explain in c)

**b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA)**

☐ ABOVE CENTER OF MASS (Less than 50% in top box; Center of Mass if 50% or more in top box)
☐ CENTER OF MASS
☐ BELOW CENTER OF MASS RETAIN
☒ BELOW CENTER OF MASS DO NOT RETAIN

**c. COMMENT ON PERFORMANCE/POTENTIAL**

LTC Sangar has effectively performed all the duties he is assigned. He has an excellent attitutde. He still is not practicing clinical medicine. Therefore, his potential is severely limited and I recommend that he not be retained.

**d. LIST 3 FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

Laboratory Administrator, Clinic Administrator, Mycology Researcher

00440672

# OFFICER EVALUATION REPORT
For use of this form, see AR 623-105; the proponent agency is ODCSPER

SEE PRIVACY ACT STATEMENT ON DA FORM 67-9-1

## PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK | d. DATE OF RANK | | | e. BRANCH | f. DESIGNATED SPECIALTIES | PMOS (4d) |
|---|---|---|---|---|---|---|---|---|
| SANGAR, VIJAY K. | 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 | LTC | Year 1994 | Month 07 | Day 18 | MC | 60B | |

| g. UNIT, ORG., STATION, ZIP CODE OR APO, MAJOR COMMAND | h. REASON FOR SUBMISSION |
|---|---|
| B Company, Walter Reed Army Medical Center, Washington, DC 20307-5001   MC | 05   Annual |

| i. PERIOD COVERED | | | | | | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER COPY (Check one and date) | | n. PSB INITIAL | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM | | | THRU | | | | | | 1. Given to Officer | | | | |
| Year | Month | Day | Year | Month | Day | 12 | | Ø | X | | MM | MM | MC01 |
| 2000 | 11 | 12 | 2001 | 11 | 11 | | | | 2. Forwarded to Officer | 020201 | VKS | | |

## PART II - AUTHENTICATION (Rated officer's signature verifies officer has seen completed OER Parts I-VII and the admin data is correct)

| a. NAME OF RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| Brown, John H. | 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 | COL | Deputy Cdr Admin | John H. Brown | 020221 |

| b. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| | | | | | |

| c. NAME OF SENIOR RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| Block, Dale K. | 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 | COL | Deputy Cdr Clinical Svc | | 020221 |

| SENIOR RATER'S ORGANIZATION | BRANCH | SENIOR RATER TELEPHONE NUMBER | E-MAIL ADDRESS |
|---|---|---|---|
| HQ Company, WRAMC Washington, DC 20307 | MC | (202) 782-8397 | dale.block@na.amedd.army.mil |

d. This is a referred report, do you wish to make comments?  ☐ Yes, comments are attached  ☒ No

e. SIGNATURE OF RATED OFFICER  Vijay K Sanger  020221

## PART III - DUTY DESCRIPTION

a. PRINCIPAL DUTY TITLE  Medical Abstraction Physician

b. POSITION AOC/BR  60B

c. SIGNIFICANT DUTIES AND RESPONSIBILITIES. REFER TO PART IVa, DA Form 67-9-1
Responsible for abstracting medical records from Tumor Registry at Walter Reed Army Medical Center. Participates in the maintenance of Tumor Registry files, reviews and analyzes materials to determine nature of the action to be taken, and completeness of information. Did not work in Area of Concentration (AOC).

## PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM (Rater)

**CHARACTER**  Disposition of the leader: combination of values, attributes, and skills affecting leader actions

| a. ARMY VALUES (Comments mandatory for all "NO" entries. Use PART Vb.) | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | X | | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | X | |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | X | | 6. SELFLESS-SERVICE: Places Army priorities before self | X | |
| 3. COURAGE: Manifests physical and moral bravery | X | | 7. DUTY: Fulfills professional, legal, and moral obligations | X | |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | | | | X | |

b. LEADER ATTRIBUTES / SKILLS / ACTIONS: First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb. Comments are mandatory in Part Vb for all "NO" entries.

| b.1. ATTRIBUTES (Select 1) | 1. MENTAL | YES☒ NO | X PHYSICAL | YES☒ NO | 3. EMOTIONAL | YES☒ NO |
|---|---|---|---|---|---|---|
| Fundamental qualities and characteristics | Possesses desire, will, initiative, and discipline | | Maintains appropriate level of physical fitness and military bearing | | Displays self-control; calm under pressure | |

| b.2 SKILLS (Competence) | 1. CONCEPTUAL | YES☒ NO | 2. INTERPERSONAL | YES☒ NO | X TECHNICAL | YES NO☒ |
|---|---|---|---|---|---|---|
| (Select 2)  Skill development is part of self-development; prerequisite to action | Demonstrates sound judgment, critical/creative thinking, moral reasoning | | Shows skill with people: coaching, teaching, counseling, motivating and empowering | | Possesses the necessary expertise to accomplish all tasks and functions | |
| | X TACTICAL  Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | | | | YES☒ NO |

b.3. ACTIONS (LEADERSHIP) (Select 3) Major activities leaders perform: influencing, operating, and improving

| INFLUENCING | X COMMUNICATING | YES☒ NO | 2. DECISION-MAKING | YES☒ NO | 3. MOTIVATING | YES NO☒ |
|---|---|---|---|---|---|---|
| Method of reaching goals while operating / improving | Displays good oral, written, and listening skills for individuals / groups | | Employs sound judgment, logical reasoning and uses resources wisely | | Inspires, motivates, and guides others toward mission accomplishment | |
| OPERATING | 4. PLANNING | YES NO☒ | 5. EXECUTING | YES☒ NO | X ASSESSING | YES☒ NO |
| Short-term mission accomplishment | Develops detailed, executable plans that are feasible, acceptable, and suitable | | Shows tactical proficiency; meets mission standards, and takes care of people/resources | | Uses after-action and evaluation tools to facilitate consistent improvement | |
| IMPROVING | 7. DEVELOPING | YES☒ NO | 8. BUILDING | YES☒ NO | X LEARNING | YES☒ NO |
| Long-term improvement in the Army its people and organizations | Invests adequate time and effort to develop individual subordinates as leaders | | Spends time and resources improving teams, groups and units; fosters ethical climate | | Seeks self-improvement and organizational growth; envisioning, adapting and leading change | |

c. APFT: PASS    DATE: OCT 2001    HEIGHT: 71    WEIGHT: 191    YES

d. JUNIOR OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRIES FOR RATERS OF LTs AND WO1s.
WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1a AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED?  YES ☐ NO ☐ ☒

DA FORM 67-9, OCT 97    REPLACES DA FORM 67-8, 1 SEP 79, WHICH IS OBSOLETE, 1 OCT 97    USAPA V2.00

1 1 FEB 2002    FEB 1 5 2002

| NAME SANGAR, VIJAY K. | SSN 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 | PERIOD COVERED 20001112 – 20001111 |
|---|---|---|

## PART V - PERFORMANCE AND POTENTIAL EVALUATION (Rater)

**a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION**

| ☐ OUTSTANDING PERFORMANCE, MUST PROMOTE | ☐ SATISFACTORY PERFORMANCE, | ☒ UNSATISFACTORY PERFORMANCE, | ☐ OTHER (Explain) |
|---|---|---|---|

**b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE AND POTENTIAL FOR PROMOTION. REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND c DA FORM 67-9-1.**

LTC Sangar participated in the abstraction of medical records from the Tumor Registry at Walter Reed in a satisfactory manner. He participated in the maintenance and review of Tumor Registry files. He reviewed and analyzed the materials to determine the nature of the action to be taken and the completeness of required information. LTC Sangar participated in the following continuing education courses on his own initiative: the Harvard Nuclear Medicine Review and the meeting of the Southeastern Chapter of the Society of Nuclear Medicine. He renewed his medical license for 2 years in the state of Missouri and passed his APFT in a satisfactory manner. However, the Army should not retain this officer as his clinical privileges to practice medicine at Walter Reed have been revoked. In reference to Part IVb, Dr. Sangar's technical planning, and motivating abilities are severely impaired due to his inability to practice medicine. Therefore, he has no potential to continue in the US Army as a Medical Corps officer, since he has no privileges to practice his specialty.

**c. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

## PART VI - INTERMEDIATE RATER

## PART VII - SENIOR RATER

**a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE**

| ☐ BEST QUALIFIED | ☐ FULLY QUALIFIED | ☒ DO NOT PROMOTE | ☐ OTHER (Explain below) |
|---|---|---|---|

I currently senior rate **31** officer(s) in this grade

A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review  ☒ YES  ☐ NO (Explain in c)

**b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA)**

HQDA COMPARISON OF THE SENIOR RATER'S PROFILE AND BOX CHECK AT THE TIME THIS REPORT PROCESSED

*BELOW CENTER OF MASS*
*DO NOT RETAIN*

RO: LTC SANGAR VIJAY K
510561078

SR: COL BLOCK DALE K
217420263

DATE: 2002 02 21

TOTAL RATINGS: 47

RATINGS THIS OFFICER: 2

**c. COMMENT ON PERFORMANCE/POTENTIAL**

LTC Sangar participated in the abstraction of medical records from the Tumor Registry at Walter Reed in a satisfactory manner. However, the Army should not and cannot retain this officer as his clinical privileges have been revoked.

**d. LIST 3 FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC. ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

Laboratory Administrator, Clinic Administrator, Mycology Researcher

**DA FORM 67-9, OCT 97 (Reverse)**    USAPA V2.00

00382456

BOARDS: 5C41

## OFFICER EVALUATION REPORT
For use of this form, see AR 623-105; the proponent agency is ODCSPER

SEE PRIVACY ACT STATEMENT ON DA FORM 67-9-1

### PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK | d. DATE OF RANK | | | e. BRANCH | f. DESIGNATED SPECIALTIES / MAOS FAS |
|---|---|---|---|---|---|---|---|
| SANGAR, VIJAY | 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 | LTC | Year 1994 | Month 07 | Day 18 | MC | 60B |

| g. UNIT, ORG, STATION, ZIP CODE OR APO, MAJOR COMMAND | h. REASON FOR SUBMISSION |
|---|---|
| BRAVO COMPANY, Walter Reed Army Medical Center, Washington, DC 20307 MC | 05    Annual |

| i. PERIOD COVERED | | | | | | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER COPY (Check one and date) | | n. PSB INITIAL | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM | | | THRU | | | 12 | | ∅ | 1. Given to Officer | | | MM | MC01 |
| Year 1999 | Month 11 | Day 12 | Year 2000 | Month 11 | Day 11 | | | | X 2. Forwarded to Officer | Date 010710 | | | |

### PART II - AUTHENTICATION (Rated officer's signature verifies officer has seen completed OER Parts I-VII and the admin data is correct)

| a. NAME OF RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| FOLEY, BRIAN P. | 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 | COL | Dep Cdr for Admin | Brian P. Foley | 010710 |

| b. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| | | | | | |

| c. NAME OF SENIOR RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
|---|---|---|---|---|---|
| BLOCK, DALE K. | 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 | COL | Dep Cdr for Clin Svcs | | 010710 |

| SENIOR RATER'S ORGANIZATION | BRANCH | SENIOR RATER TELEPHONE NUMBER | E-MAIL ADDRESS |
|---|---|---|---|
| Headquarters Company, WRAMC Washington, DC 20307 | MC | DSN 662-8397 | dale.block@na.amedd.army.mil |

d. This is a referred report, do you wish to make comments?  ☒ No  ☐ Yes, comments are attached  ☒ No   SIGNATURE OF RATED OFFICER Vijay K Sangar   DATE 010710

### PART III - DUTY DESCRIPTION

a. PRINCIPAL DUTY TITLE  Physician / Tumor Registry Clerk       b. POSITION AOC/BR  60B

c. SIGNIFICANT DUTIES AND RESPONSIBILITIES. REFER TO PART IVa, DA FORM 67-9-1

Responsible for abstracting medical records from Tumor Registry at Walter Reed Army Medical Center. Participate in the maintenance of Tumor Registry files, reviews and analyzes materials to determine nature of the action to be taken, and completeness of information.

FY 01

Promotion

### PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM (Rater)

CHARACTER  Disposition of the leader: combination of values, attributes, and skills affecting leader actions

a. ARMY VALUES  (Comments mandatory for all "NO" entries. Use Part Vb.)

| | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | X | | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | | | X |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | X | | 6. SELFLESS-SERVICE: Places Army priorities before self | | | X |
| 3. COURAGE: Manifests physical and moral bravery | X | | 7. DUTY: Fulfills professional, legal, and moral obligations | | | X |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | X | | | | | |

b. LEADER ATTRIBUTES / SKILLS / ACTIONS:  First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb.  Comments are mandatory in Part Vb for all "NO" entries.

| b.1. ATTRIBUTES (Select 1) Fundamental qualities and characteristics | 1. MENTAL ☒ NO Possesses desire, will, initiative, and discipline | X PHYSICAL ☒ NO Maintains appropriate level of physical fitness and military bearing | 3. EMOTIONAL ☒ NO Displays self-control; calm under pressure |
|---|---|---|---|
| b.2. SKILLS (Competence) (Select 2) Skill development is part of self-development; prerequisite to action | 1. CONCEPTUAL ☒ NO Demonstrates sound judgment, critical/creative thinking, moral reasoning | 2. INTERPERSONAL ☒ NO Shows skill with people: coaching, teaching, counseling, motivating and empowering | X TECHNICAL ☒ NO Possesses the necessary expertise to accomplish all tasks and functions |
| | X TACTICAL  Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | ☒ NO |

b.3. ACTIONS (LEADERSHIP) (Select 3) Major activities leaders perform: influencing, operating, and improving

| INFLUENCING Method of reaching goals while operating / improving | X COMMUNICATING ☒ NO Displays good oral, written, and listening skills for individuals / groups | 2. DECISION-MAKING ☒ NO Employs sound judgment, logical reasoning and uses resources wisely | 3. MOTIVATING ☒ NO Inspires, motivates, and guides others toward mission accomplishment |
|---|---|---|---|
| OPERATING Short-term mission accomplishment | 4. PLANNING ☒ NO Develops detailed, executable plans that are feasible, acceptable, and suitable | 5. EXECUTING ☒ NO Shows tactical proficiency, meets mission standards, and takes care of people/resources | X ASSESSING ☒ NO Uses after-action and evaluation tools to facilitate consistent improvement |
| IMPROVING Long-term improvement in the Army | 7. DEVELOPING ☒ NO Invests adequate time and effort to develop individual subordinates as leaders | 8. BUILDING ☒ NO Spends time and resources improving teams, groups and units; fosters ethical climate | X LEARNING ☒ NO Seeks self-improvement and organizational growth; envisioning, adapting and leading |

c. APFT: PASS      DATE: OCT 2000     HEIGHT: 71      WEIGHT: 199      NO

d. JUNIOR OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRY FOR RATERS OF LTs AND WO1s.  WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1A AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED?    ☐ YES   ☐ NO   ☒

DA FORM 67-9, OCT 97      REPLACES DA FORM 67-8, 1 SEP 79, WHICH IS OBSOLETE, 1 OCT 87    11 JUL 2001    JUN 15 2001    USAPA V2.00

002708049 - 001    THIS IS A CERTIFIED TRUE COPY

| NAME SANGAR, VIJAY | SSN 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 | PERIOD COVERED 19991112 — 20001111 |
|---|---|---|

**PART V - PERFORMANCE AND POTENTIAL EVALUATION (Rater)**

a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION

☐ OUTSTANDING PERFORMANCE, MUST PROMOTE ☐ SATISFACTORY PERFORMANCE, PROMOTE ☐ UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE ☒ OTHER (Explain)

b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE AND POTENTIAL FOR PROMOTION. REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND c DA FORM 67-9-1.

LTC Sangar's performance as a nuclear physician for which he is being paid cannot be evaluated since he has not worked in that area during this entire rating period. The reason is he no longer holds clinical privileges in this institution are as discussed in detail in his previous OER. He can only be rated in the role as a Tumor Registry Clerk, normally a GS07 position. As such, he has executed the duties to a satisfactory level, although his productivity is certainly curtailed by his involvement with his legal and medical board actions and his on-going, self-paid continuing medical education. The courses he attended include: Conference by American College of Nuclear Cardiology, Harvard Nuclear Medicine Review, Emory University Nuclear Medicine Course and the Conference of the Radiological Society of North America. He maintains a valid medical license with the state of Missouri. He passed the American Board of Nuclear Medicine examination on 9 SEP 2000, just slightly over 12 years after he successfully completed his nuclear medicine residency at the Harry S. Truman Veterans Hospital in Columbia, Missouri. As to his potential, I can only note that he certainly has the potential to be a successful tumor registrar. I cannot offer an opinion on his potential as a nuclear physician besides what facts were already noted. Although able to pass the APFT satisfactorily, he has not been able to do the same for the body-fat standard.

c. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

**PART VI - INTERMEDIATE RATER**

**PART VII -SENIOR RATER**

a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE

☐ BEST QUALIFIED ☐ FULLY QUALIFIED ☐ DO NOT PROMOTE ☒ OTHER (Explain below)

I currently senior rate **31** officer(s) in this grade

A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review ☒ YES ☐ NO (Explain in c)

b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA)

HQDA COMPARISON OF THE SENIOR RATER'S PROFILE AND BOX CHECK AT THE TIME THIS REPORT PROCESSED

*BELOW CENTER OF MASS DO NOT RETAIN*

RO: LTC SANGAR VIJAY
510561078

SR: COL BLOCK DALE K
217420263

DATE: 2001 07 11

TOTAL RATINGS: 19

RATINGS THIS OFFICER: 1

c. COMMENT ON PERFORMANCE/POTENTIAL

Concur with rater. LTC Sangar satisfactorily performed his duties in the Tumor Registry as required. However, the Army should not and cannot retain this officer. The Surgeon General has reviewed LTC Sangar's case and finalized the revocation of his clinical privileges and forwarded that information to the National Clinical Data Bank. His potential will be most effectively realized as a civilian.

d. LIST 3 FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

Laboratory Administrator, Clinic Administrator, Mycology Researcher

**DA FORM 67-9, OCT 97 (Reverse)**    USAPA V2.00

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 6 (Exhibit 6 of Plaintiff's ABCMR Application)

Initiation of Elimination, First Elimination Board, 26 Mar 2002

**DEPARTMENT OF THE ARMY**
U.S. TOTAL ARMY PERSONNEL COMMAND
ALEXANDRIA VA
22332-0478

TAPC-PDT-PM  (600-8-24)

*Cdr, WRAMC Bde   2 6 MAR 2002*
*for action 17 Apr*

MEMORANDUM THRU Commanding General, Walter Reed Army Medical Center/North Atlantic Regional Medical Command, Washington, DC  20307-5001

FOR LTC Vijay K. Sangar, 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, B Company, Walter Reed Army Medical Center, Washington, DC  20307-5001

SUBJECT:  Initiation of Elimination

1.  You were identified by the FY00 Colonel MC/DE Promotion Board to show cause for retention on active duty under the provisions of Army Regulation (AR) 600-8-24, paragraphs 4-2a(1) and (5) because of substandard performance of duty.

2.  This action is based on a downward trend in your overall performance resulting in a consistent record of mediocre service and failure to properly perform assignments commensurate with your grade and experience.  This is substantiated by your Officer Evaluation Reports for the periods 001112-011111 (enclosure 1), 991112-001111 (enclosure 2), 981001-991111 (enclosure 3), 971001-980930 (enclosure 4), and 960721-970630 (enclosure 5).

3.  In conjunction with this action, a DA Form 268 (Suspension of Favorable Personnel Actions) has been initiated according to AR 600-8-2 (enclosure 6).

4.  You may have either the assistance of an officer of the Judge Advocate General Corps appointed as counsel, or seek civilian counsel of your own selection (obtained by you at no expense to the Government) to prepare a written statement indicating any pertinent facts or any rebuttal bearing on the question of your elimination.

   a.  This statement may be sworn or unsworn.

   b.  Documents submitted in rebuttal must be legible and reproducible.

   c.  You may also confer with your counsel for legal advice concerning your options stated in paragraph 7.

5.  If you are eliminated for substandard performance of duty, you will receive an Honorable discharge.  You may consult with your local finance office concerning separation pay (AR 600-8-24, Table 4-1(5)).

Printed on Recycled Paper

TAPC-PDT-PM
SUBJECT: Initiation of Elimination

6. Before taking further action, I will consider all written comments or any rebuttal that you may submit with your acknowledgment.

7. In accordance with AR 600-8-24, paragraph 4-11, you may:

    a. Submit your resignation in lieu of elimination. You may not request an effective date. The effective separation date will be no later than 30 days after receipt of written notification of the approved resignation.

    b. Request discharge in lieu of elimination. You may not request an effective date. The effective separation date will be no later than 30 days after receipt of written notification of the approved discharge.

    c. In lieu of resignation or discharge, submit a rebuttal or a declination statement and request appearance before a Board of Inquiry.

8. Your written rebuttal or resignation in lieu of elimination is to be submitted through your General Officer Show Cause Authority and the first Army General Officer in your chain of command or supervision. In many cases these may be the same individual.

9. You must acknowledge receipt in writing and exercise one of the options in paragraph 7 not later than 30 April 2002.

10. Your acknowledgment should be in the format provided at enclosure 7. If you elect the option in paragraph 7a or b, you will include your tender of resignation or request for discharge in lieu of elimination as an enclosure to your acknowledgment.

Encl

LAWRENCE R. ADAIR
Major General, USA
Commanding

2

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 7 (Exhibit 7 of Plaintiff's ABCMR Application)

Results of First Elimination Board, 26 Feb 03

05/18/2004 11:26 FAX                                                    ☒004



**DEPARTMENT OF THE ARMY**
U.S. TOTAL ARMY PERSONNEL COMMAND
200 STOVALL STREET
ALEXANDRIA VA 22332-0478



TAPC-PDT-PM                                              2 6 FEB 2003

MEMORANDUM THRU Commanding General, Walter Reed Army Medical Center/North Atlantic Regional Medical Command, Washington, DC 20307-5001

FOR LTC Vijay K. Sangar, 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, B Company, Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Retention on Active Duty

1. In accordance with the memorandum from this headquarters dated 26 March 2002, you were directed to show cause for retention on active duty because of substandard performance of duty. It has been determined, based on the recommendation from the General Officer Show Cause Authority, that you will be retained on active duty.

2. Documents contained in your Official Military Personnel File which were the basis for directing you to show cause for retention on active duty will remain in your file and may only be removed through an appeal.

3. The Report to Suspend Favorable Actions (FLAG) initiated at this headquarters has been closed favorably, effective 26 February 2003, and a copy is provided for you.

FOR THE COMMANDER:

Enclosure                          *signature* , MAJ, AG
                                   DALE E. DeBRULER
                                   LTC, AG
                                   Chief, Retirements and
                                   Separations Branch.

# REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER/BOARD OF OFFICERS

For use of this form, see AR 15-6; the proponent agency is OTJAG.

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

## SECTION I - APPOINTMENT

Appointed by MG Kevin C. Kiley, Commanding, Walter Reed Army Medical Center, Washington, DC 20307-5001

*(Appointing authority)*

on ___7 Oct 2002___    *(Attach inclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)*
*(Date)*

## SECTION II - SESSIONS

The (*investigation*) (*board*) commenced at    DCI Conference Room, Building 6, 4th Floor Room 4008    at    0800 hours
                                                        *(Place)*                                          *(Time)*

on    16 December 2002    *(If a formal board met for more than one session, check here* ⊠ *. Indicate in an inclosure the time each session began and*
       *(Date)*
*ended, the place, persons present and absent, and explanation of absences, if any.) The following persons (members, respondents, counsel) were*
present: *(After each name, indicate capacity, e.g., President, Recorder, Member, Legal Advisor.)*
COL James R. Greenwood, President
COL Carol F. Adair, Member
COL Wellington Sun, Member
LTC Vijay K. Sangar, Respondent
CPT Thomas F. Crumley, Military Counsel for Respondent
Mr. Spinner, Civilian Counsel for Respondent
CPT Andrew C. Tobman, Recorder
CPT Jennifer Crawford, Assistant Recorder
CPT Jennifer Kim, Legal Advisor
CPT Eric M. O'shea, Alternate Legal Advisor
SGT David R. Ventura-Grande, Reporter

The following persons *(members, respondents, counsel)* were absent: *(Include brief explanation of each absence.) (See paras 5-2 and 5-8a, AR 15-6.)*
On 17 December 2002, CPT Jennifer Kim, Legal Advisor, was absent and substituted by CPT Eric O'shea, Alternate Legal Advisor.

The (*investigating officer*) (*board*) finished gathering/hearing evidence at    1105 hours    on    17 December 2002
                                                                                 *(Time)*            *(Date)*

and completed findings and recommendations at    1243 hours    on    17 December 2002
                                                   *(Time)*            *(Date)*

## SECTION III - CHECKLIST FOR PROCEEDINGS

| A. COMPLETE IN ALL CASES | YES | NO | NA |
|---|---|---|---|
| Inclosures *(para 3-15, AR 15-6)* | | | |
| Are the following inclosed and numbered consecutively with Roman numerals: *(Attached in order listed)* | | | |
| a. The letter of appointment or a summary of oral appointment data? | X | | |
| b. Copy of notice to respondent, if any? *(See item 9, below)* | X | | |
| c. Other correspondence with respondent or counsel, if any? | X | | |
| d. All other written communications to or from the appointing authority? | X | | |
| e. Privacy Act Statements *(Certificate, if statement provided orally)*? | | | X |
| f. Explanation by the investigating officer or board of any unusual delays, difficulties, irregularities, or other problems encountered *(e.g., absence of material witnesses)*? | X | | |
| g. Information as to sessions of a formal board not included on page 1 of this report? | X | | |
| h. Any other significant papers *(other than evidence)* relating to administrative aspects of the investigation or board? | X | | |

FOOTNOTES: 1/ Explain all negati

| | | YES | NO | 1/ | N. |
|---|---|---|---|---|---|
| 2 | Exhibits *(para 3-16, AR 15-6)* | | | | |
| | a. Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | X | | | |
| | b. Is an index of all exhibits offered to or considered by investigating officer or board attached before the first exhibit? | | X | | |
| | c. Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | | | | X |
| | d. Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | | | | X |
| | e. Are descriptions or diagrams included of locations visited by the investigating officer or board *(para 3-6b, AR 15-6)*? | | | | X |
| | f. Is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded in a verbatim record? | | | | X |
| | g. If official notice of any matter was taken over the objection of a respondent or counsel, is a statement of the matter of which official notice was taken attached as an exhibit *(para 3-16d, AR 15-6)*? | | | | X |
| 3 | Was a quorum present when the board voted on findings and recommendations *(paras 4-1 and 5-2b, AR 15-6)*? | | | | X |
| **B. COMPLETE ONLY FOR FORMAL BOARD PROCEEDINGS** *(Chapter 5, AR 15-6)* | | | | | |
| 4 | At the initial session, did the recorder read, or determine that all participants had read, the letter of appointment *(para 5-3b, AR 15-6)*? | X | | | |
| 5 | Was a quorum present at every session of the board *(para 5-2b, AR 15-6)*? | X | | | |
| 6 | Was each absence of any member properly excused *(para 5-2a, AR 15-6)*? | X | | | |
| 7 | Were members, witnesses, reporter, and interpreter sworn, if required *(para 3-1, AR 15-6)*? | X | | | |
| 8 | If any members who voted on findings or recommendations were not present when the board received some evidence, does the inclosure describe how they familiarized themselves with that evidence *(para 5-2d, AR 15-6)*? | | | | X |
| **C. COMPLETE ONLY IF RESPONDENT WAS DESIGNATED** *(Section II, Chapter 5, AR 15-6)* | | | | | |
| 9 | Notice to respondents *(para 5-5, AR 15-6)*: | | | | |
| | a. Is the method and date of delivery to the respondent indicated on each letter of notification? | X | | | |
| | b. Was the date of delivery at least five working days prior to the first session of the board? | X | | | |
| | c. Does each letter of notification indicate — | X | | | |
| | (1) the date, hour, and place of the first session of the board concerning that respondent? | X | | | |
| | (2) the matter to be investigated, including specific allegations against the respondent, if any? | X | | | |
| | (3) the respondent's rights with regard to counsel? | X | | | |
| | (4) the name and address of each witness expected to be called by the recorder? | X | | | |
| | (5) the respondent's rights to be present, present evidence, and call witnesses? | X | | | |
| | d. Was the respondent provided a copy of all unclassified documents in the case file? | X | | | |
| | e. If there were relevant classified materials, were the respondent and his counsel given access and an opportunity to examine them? | | | | X |
| 10 | If any respondent was designated after the proceedings began *(or otherwise was absent during part of the proceedings)*: | | | | |
| | a. Was he properly notified *(para 5-5, AR 15-6)*? | | | | X |
| | b. Was record of proceedings and evidence received in his absence made available for examination by him and his counsel *(para 5-4c, AR 15-6)*? | | | | X |
| 11 | Counsel *(para 5-6, AR 15-6)*: | | | | |
| | a. Was each respondent represented by counsel? | X | | | |
| | Name and business address of counsel: | | | | |
| | *(If counsel is a lawyer, check here ☐ )* | | | | |
| | b. Was respondent's counsel present at all open sessions of the board relating to that respondent? | X | | | |
| | c. If military counsel was requested but not made available, is a copy *(or, if oral, a summary)* of the request and the action taken on it included in the report *(para 5-6b, AR 15-6)*? | | | | X |
| 12 | If the respondent challenged the legal advisor or any voting member for lack of impartiality *(para 5-7, AR 15-6)*: | | | | |
| | a. Was the challenge properly denied and by the appropriate officer? | | | | X |
| | b. Did each member successfully challenged cease to participate in the proceedings? | X | | | |
| 13 | Was the respondent given an opportunity to *(para 5-8a, AR 15-6)*: | | | | |
| | a. Be present with his counsel at all open sessions of the board which deal with any matter which concerns that respondent? | X | | | |
| | b. Examine and object to the introduction of real and documentary evidence, including written statements? | X | | | |
| | c. Object to the testimony of witnesses and cross-examine witnesses other than his own? | X | | | |
| | d. Call witnesses and otherwise introduce evidence? | X | | | |
| | e. Testify as a witness? | X | | | |
| | f. Make or have his counsel make a final statement or argument *(para 5-9, AR 15-6)*? | X | | | |
| | If requested, did the recorder assist the respondent in obtaining evidence in possession of the Government and in arranging for the presence of witnesses *(para 5-8b, AR 15-6)*? | | | | X |
| | Are all of the respondent's requests and objections which were denied indicated in the report of proceedings or in an inclosure or exhibit to it *(para 5-11, AR 15-6)*? | | | | X |

FOOTNOTES: 1/ Explain all negative answers on an attached sheet.
2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.

## SECTION IV - FINDINGS *(para 3-10, AR 15-6)*

The ~~(investigating officer)~~ *(board)*, having carefully considered the evidence, finds:
That LTC Sangar has some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination, as follows: It is the opinion of the board that the cited downward trend in OERs from July 97 thru Nov 99 is potentially attributable to LTC Sangar's diagnosed CIDP. The two OERs covering the period Nov 99 thru Nov 01 do not address a downward trend, but address the fact that he is not performing as a Nuclear Medicine Physician. Furthermore, there is disagreement among Nuclear Medicine Experts concerning his qualifications.

## SECTION V - RECOMMENDATIONS *(para 3-11, AR 15-6)*

In view of the above findings, the ~~(investigating officer)~~ *(board)* recommends:
That LCT Sangar be retained in the service with reassignment with a period of supervision to assess his suitability to be credential and practice as a Nuclear Medicine Physician.

## SECTION VI - AUTHENTICATION *(para 3-17, AR 15-6)*

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. *(If any voting member or the recorder fails to sign here or in Section VII below indicate the reason in the space where his signature should appear.)*

_____, CPT, JA          _____
(Recorder)                                          (Investigating Officer) (President)

_____                    _____
(Member)                                            (Member)

_____                    _____
(Member)                                            (Member)

## SECTION VII - MINORITY REPORT *(para 3-13, AR 15-6)*

To the extent indicated in Inclosure _____ , the undersigned do(es) not concur in the findings and recommendations of the board. *(In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)*

_____                    _____
(Member)                                            (Member)

## SECTION VIII - ACTION BY APPOINTING AUTHORITY *(para 2-3, AR 15-6)*

The findings and recommendations of the *(investigating officer)* (board) are *(approved)* ~~(disapproved)~~ ~~(approved with following exceptions/~~ ~~substitutions).~~ ~~(If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if oral) as a numbered inclosure.)~~

_____
KEVIN C. KILEY
Major General, USA
Commanding

# RECORD OF BOARD PROCEEDING

## LTC Vijay K. Sangar, 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, B Company, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC 20307-5001

Board of Inquiry under appointment by Commander, Walter Reed Army Medical Center (WRAMC), Washington, DC, 20307-5001, held at 0807 hours, Building 6, DCI Conference Room, Walter Reed Army Medical Center, on 16 December 2002.

### Persons Present:

COL James R. Greenwood, President
COL Carol F. Adair, Member
COL Wellington Sun, Member
LTC Vijay K. Sangar, Respondent
CPT Thomas Crumley, Counsel for the Respondent
Mr. Frank Spinner, Counsel for the Respondent
CPT Andrew C. Tobman, Recorder
CPT Jennifer Crawford, Assistant Recorder
CPT Jennifer Kim, Legal Advisor
CPT Eric M. O'shea, Alternate Legal Advisor
SGT David R. Ventura-Grande, Reporter

### Proceedings of a Board of Inquiry

Both the respondent and the government made no request for certain persons to be admitted to attend the proceedings as spectators.

As for further spectators, as the appointing authority has not specifically authorized the presence of any spectators during the proceedings, no unauthorized persons will be permitted to attend this hearing.

The Memorandum of Appointment is attached.

The Memorandum of Referral of Respondent is attached.

The reporter was sworn in.

The defense counsel challenged the president of the board under AR 600-8-24, paragraph 4-7f(6), for lack of impartiality.

The board recessed at 0815 hours, 16 December 2002, to determined if the president of the board should be replaced.

The board reconvened at 0825 hours, 16 December 2002.

All parties present when the board recessed were again present.

COL James R. Greenwood being the senior unchallenged board member determined that COL Maria H. Sjogren, the president of the board, will not participate in the board due to her prior involvement with the respondent's case.

The board recessed at 0827 hours, 16 December 2002, to wait for alternate board member.

The board reconvened at 0900 hours, 16 December 2002.

All parties present when the board recessed were again present.

COL Maria H. Sjogren was dismissed from her duties as president of the board, COL James R. Greenwood replaced COL Maria H. Sjogren as president of the board, COL Carol F. Adair, an alternate board member, was called and became the third board member.

No challenges by the government counsel.

The recorder swore in the members of the board.

The president of the board swore in the recorder and legal advisor.

The Memorandums of Notification are attached.

The president of the board read the respondent his rights.

The elimination packet is attached.

The board recessed at 0923 hours, 16 December 2002, to review the elimination packet, and Government Exhibit 1, and Defense Exhibit 1.

The board reconvened at 1034 hours, 16 December 2002.

All parties present when the board recessed were again present.

The recorder makes an opening statement.

The defense counsel makes an opening statement.

COL Dale K. Block was called as a witness, sworn and testified in substance as follows:

## QUESTION BY THE RECORDER

Dale K. Block, COL, U.S. Army. My present duty assignment is Walter Reed Headquarters Company Pentagon. I came familiar with LTC Sangar through the credentials committee, the

only things I was able to see were the actions that were brought to the credentials committee. The first action was a supervision action, which was back in 1997. He was placed under one year and half supervision process, from July 1997 until January 1999. During that time he was under a performance improvement plan, which was prescribed by the chief of nuclear medicine. On the first Friday of every month, the credentials committee would received a follow up report from the chief of nuclear medicine, and on January 1999 the chief of nuclear medicine stated in the report that there was no progression, therefore the credentials committee voted to suspend LTC Sangar's privileges in February 1999. The board did take his CIDP into consideration prior to processing the proceedings to supervise then to suspend and revoke his privileges. The PEB determines whether or not the individual is fit for duty, but has nothing to do with competency and its not related to the credentials hearing.

The Respondent's counsel requested a recess to consult with his client.

The board recessed at 1112 hours, 16 December 2002.

The board reconvened at 1115 hours, 16 December 2002.

All parties present when the board recessed were again present.

QUESTION BY THE DEFENSE COUNSEL

During the period that LTC Sangar was being evaluated he was diagnosed with having e a CIDP. I am aware that this year 2002, he has been diagnosed as fit for duty and is not suffering from CIDP. I was not aware that the army reported to the National Practitioner Data Bank that the reason for his revocation of clinical privileges was his cognitive impairment from demyelinating disease. I am not aware of any report of malpractice or any questions about his credentials or anything of that sort that came from Fort Leonard Wood during the time that LTC Sangar was assigned there, there is no indication that he had any problems performing his duties.

QUESTIONS BY THE BOARD

LTC Sanger mentioned that he was diagnosed with having a CIDP and was on steroids and that they were affecting his cognition, and his ability to function. I do not think his poor performance was not due to his CIDP.

The witness is excused.

The Recorder requested a recess until 1300 hours awaiting arrival of his next witness.

The board recessed at 1200 hours, 16 December 2002.

The board reconvened at 1317 hours, 16 December 2002.

All parties present when the board recessed were again present.

COL Michael P. Brazaitis was called as a witness, sworn and testified in substance as follows:

## QUESTION BY THE RECORDER

COL Michael P. Brazaitis, COL, U.S. Army. I am a diagnostic radiologist and a chairman of the department of radiology at Walter Reed Army Medical Center, a position I have held since April 1996. LTC Sangar was assigned to the nuclear medicine service, which is one of the three services of the department of radiology. All new faculty are looked at very carefully and monitor, and are in probation for the first year. During the monitoring period it was determined that LTC Sangar was interpreting studies that were outside of the norm that we have come to expect from interpretation, when we looked at his studies on a monthly basis there were more mistakes made by LTC Sangar then by other members in the department. We had a third party review the department's cases to eliminate any bias, 78 percent of LTC Sangar's cases had either major or minor discrepancies. Prior to 1999 I had ample opportunity to review his work, normally I would have his senior rater, but I was his rater to eliminate any bias in the department, also because I had established the performance improvement plan. The performance improvement plan sets goals and a set of steps to get to those goals.

## QUESTION BY THE DEFENSE COUNSEL

The last time I had an opportunity to be involved in evaluating LTC Sangar was back in 1999. I am not aware of any report of malpractice or adverse actions from Fort Leonard Wood during the time LTC Sangar was assigned there, there is no indication that he failed to perform his duties.

## QUESTIONS BY THE BOARD

His evaluation started a few months after his arrival to Walter Reed. Low productivity is not grounds for credential actions, low productivity would probably be reflected on his OER. I don't believe his CIDP was caused for his low productivity because we had about one year and a half of supervision before he was diagnosed with CIDP.

The witness is excused.

The Government has nothing further to offer.

The board recessed at 1400 hours, 16 December 2002.

The board reconvened at 1418 hours, 16 December 2002.

All parties present when the board recessed were again present.

Dr. George R. Brown, was called as a witness, sworn and testified in substance as follows:

## QUESTION BY THE DEFENSE COUNSEL

George Richard Brown, M.D., I'm a professor and associate chairman of psychiatry in the

Department of psychiatry in East Tennessee State University. My evaluation packet of LTC Sangar was originally used in the MEB in which I testified telephonically. As of October 2001, LTC Sangar is not suffering from a psychiatric disorder. I believed he was impaired from April or May 1997 until about April 2001. His ability to learn new information was impaired and he was not able to benefit from the performance improvement plan, during the time he was on treatment. There was no way for LTC Sangar to benefit from the performance improvement plan because he couldn't learn new information while he had the disease. LTC Sangar should be allowed to continue on active duty under supervision of someone who is not bias.

## QUESTION BY THE RECORDER

My best approximation of the time period that LTC Sangar was impaired is from April or May 1997 until about April 2001, I'm probably off by a month or two. Symptoms are variable from patient to patient but usually they occur over the course of weeks or months, patients might not be aware of the illness or of the symptoms. The earliest he was suffering from CIDP had to be February 1997.

The witness is excused.

The board recessed at 1525 hours, 16 December 2002, and will reconvened at the Department of Endocrinology Conference Room, Building 2, 7th Floor, room 7E09.

The board reconvened at 0825 hours, 17 December 2002.

All parties present when the board recessed were again present, with exception to CPT Jennifer Kim, Legal Advisor, who was absent and substituted by CPT Eric M. O'shea, Alternate Legal Advisor.

The president of the board swore in CPT Eric M. O'shea, the alternate legal advisor.

Dr. Lawrence E. Holder, was called as a witness, sworn and testified in substance as follows:

## QUESTION BY THE DEFENSE COUNSEL

Dr. Lawrence E. Holder, I'm a clinical professor in radiology in the university of Florida. In 1999 I was a professor of radiology and head of the division of nuclear medicine at the university of Maryland. I am a member of the American Board of Nuclear Medicine. I was involved with the credential hearing because I did an independent review of LTC Sangar's case studies, I also testified at the hearing. At the hearing I gave my opinion about LTC Sangar's ability to practice medicine, I testified that he was competent to practice nuclear medicine based on my reviews of his cases. I didn't take his CIDP into consideration while doing his reviews.

## QUESTION BY THE RECORDER

I didn't discuss my reviews of LTC Sangar's cases with LTC Sangar. There are no interactive portions to the exam, and there are no discussions between physicians during the exam.

## QUESTIONS BY THE BOARD

There were disagreements between my reviews and the reviews of other physicians, specifically about major and minor discrepancies. The cases I review were not selected by LTC Sangar.

The respondent invoked his right to remain silent.

LTC Vijay K. Sangar called as a witness, sworn and testified in substance as follows:

## QUESTION BY THE DEFENSE COUNSEL

At Fort Leonardwood our chief would pick up cases at random and reviewed them on a monthly basis. There were no issues as far as adverse action, adverse reports, malpractice claims or anything that came out while I was assigned there. In May 1997, I was beginning to feel very weak that's when I realized something was wrong with me. February 1997 was the last time I practiced nuclear medicine, I had to study on my own in order to pass the exam. In 1997 I filed an IG complaint against COL Rodriguez, there was a personality conflict between the two of us.

## QUESTION BY THE RECORDER

I had problems with my supervisor from the very beginning that is why COL Brazaitis was my rater. I didn't know that my poor performance was due to my CIDP.

## QUESTIONS BY THE BOARD

I have been in the Army for 14 and a half years. I don't think Walter Reed would not be a good place for me to come back because there is too much conflict. I am asking the board to give me a chance to practice medicine under supervision for a specified time. I was on steroids for about 2 years.

The witness is excused.

The board recessed at 1010 hours, 17 December 2002.

The board reconvened at 1035 hours, 17 December 2002.

All parties present when the board recessed were again present.

The recorder makes a closing argument.

The defense counsel makes a closing argument.

Neither the recorder nor the counsel for the respondent having anything further to offer, the board was closed at 1105 hours, 17 December 2002.

The board opened at 1243 hours, 17 December 2002, to read the Findings and Recommendations.

All parties present when the board closed are again present.

The board having carefully considered the evidence before it finds that LTC Sangar has some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination, as follows: It is the opinion of the board that the cited downward trend in OERs from July 97 thru Nov 99 is potentially attributable to LTC Sangar's diagnosed CIDP. The two OERs covering the period Nov 99 thru Nov 01 do not address a downward trend, but address the fact that he is not performing as a Nuclear Medicine Physician. Furthermore, there is disagreement among Nuclear Medicine Experts concerning his qualifications.

The board recommends that LCT Sangar be retained in the service with reassignment with a period of supervision to assess his suitability to be credential and practice as a Nuclear Medicine Physician.

The board adjourned at 1255 hours, 17 December 2002.

## Findings and Recommendations

The Board opened at ___1242___ hours, 17 December 2002.

**PRES:** The Board is open.

**RCDR:** Let the record show that all members present when the Board was closed, the respondent, counsel, recorder, and reporter are again present.

**PRES:** LTC Sangar, it is my duty as president of this Board of Inquiry to inform you that the Board in closed session and on secret ballot, a majority of the members present at the time the vote was taken concurring, has made the following findings and recommendations:

### Findings:

The Board having carefully considered the evidence before it finds the following:

    1. _____ That you have a substandard performance of duty as stated in the Memorandum of Initiation of Elimination.

    2. __X__ That you have some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination, as follows:
It is the opinion of the Board that the cited downward trend in OERs from July 97 thru Nov 99 is potentially attributable to LTC Sangar's diagnosed CIDP. The two OERs covering the period Nov 99 thru Nov 01 do not address a downward trend, but address the fact that he is not performing as a Nuclear Medicine physician. Furthermore, there is disagreement among Nuclear Medicine Experts concerning his qualification.

    3. _____ That you do not have any of the substandard performance of duty stated in the Memorandum of Initiation of Elimination.

In view of such findings, the board recommends:

    1. _____ That you be separated from the service.

    2. __X__ That you be retained in the service (with) ~~(without)~~ reassignment with a period of supervision to assess your suitability to be credentialed and practice as a Nuclear Medicine physician.

**PRES:** The matter before this Board of Inquiry having been determined, the proceedings are ended. The proceedings were completed at ___1243___ hours, 17 December 2002.



**DEPARTMENT OF THE ARMY**
NORTH ATLANTIC REGIONAL MEDICAL COMMAND
AND
WALTER REED ARMY MEDICAL CENTER
WASHINGTON, DC 20307-5001

REPLY TO
ATTENTION OF:
MCAT-JA

0 4 FEB 2005

MEMORANDUM FOR Commander, Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Legal Review – Board of Inquiry Concerning LTC Vijay K. Sangar, 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, B Co, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC 20307-5001

1. The Board of Inquiry on the above soldier has been reviewed and is legally sufficient. The Board of Inquiry properly convened under AR 600-8-24 and the hearing was conducted in compliance with the procedural requirements set forth in AR 600-8-24 and AR 15-6. The Board's findings are based on evidence presented at the hearing and the findings support the recommendations.

2. POC is the undersigned or SGT Ventura at (202) 782-1672.

JASON A. BAROCAS
CPT, JA
Administrative Law



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC 20307-5001

REPLY TO
ATTENTION OF
MCAT-JA (600-8-24)

1 1 FEB 2003

MEMORANDUM FOR RECORD

SUBJECT: Report of Proceedings for Board of Inquiry Concerning LTC Vijay K. Sangar, 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, B Company, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC 20307-5001

1. The Board of Inquiry concerning LTC Vijay K. Sangar was held at 0800 hours, at Walter Reed Army Medical Center on 16 December 2002.

2. The following is provided in reference to the report of proceeding IAW AR 600-8-24, paragraph 4-15c(1)(j)(3) and Figure 4-2. According to Figure 4-2, the recorder of the board and the appointing authority (or his or her designated representative) should answer the following questions with a yes or no response and attest to the response by entering the date and their signatures (including rank) at the completion of the questions.

| 1. | Was respondent served with a notice to show cause (paras. 4-18 through 4-23)? | YES |
|---|---|---|
| 2. | If respondent made an election other than to appear, was appropriate action taken (paras 4-24 and 4-25)? | N/A |
| 3. | Were the orders appointing the board issued by the GOSCA (para 4-6f)? | YES |
| 4. | Did the order appointing the board designate a respondent's counsel (para 4-12a)? | YES |
| 5. | Is the board comprised of three or more officers of proper grade and one or more recorders, and is each qualified (para 4-7)? | YES |
| 6. | If the respondent is a non-Regular Army officer, was one or more members of the board a Reserve component officer (para 4-7a)? | N/A |
| 7. | Do the appointing orders clearly specify the matter to be investigated and cited specifically the regulations which the board is convened (AR 15-6, para 2-1b)? | YES |
| 8. | Was an officer of The Judge Advocate General's Corps designated as recorder (para 4-9a)? | YES |
| 9. | Was a civilian court reporter erroneously employed (AR 15-6, para 2-2)? | NO |
| 10. | Does the record show at the outset of each session the time, date, place, and station; and does it also show the time of each closing (para 4-9d(5))? | YES |
| 11. | Were all orders appointing the board and appointing personnel read by the recorder at the initial session, and are they attached to the records as exhibits (para 4-9d(4))? | YES |
| 12. | Were at least three members or such larger number as constitutes a majority of those detailed as members, present at all hearings (para 4-7a)? | YES |
| 13. | At the opening of each session, did the recorder note for the record the presence of members of the board and the respondent and his or her counsel, if any (para 4-9d(5))? | YES |
| 14. | If a member was absent or a new member was appointed, was the record read by and were all prior proceedings made known to, him or her before the proceedings continued (AR 15-6, para 5-2 d)? | YES |
| 15. | Does the record show that the officer concerned was notified by the GOSCA of show cause action and furnished substance of the grounds at least 30 days prior to convening of a board (paras 4-8 b, 4-11b)? | YES |
| 16. | Does the record show that the officer concerned was given at least 10-days notice of the time and | YES |

MCAT-JA

SUBJECT: Report of Proceedings for Board of Inquiry Concerning LTC Vijay K. Sangar, 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, B Company, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC 20307-5001

| | | |
|---|---|---|
| 16. | Does the record show that the officer concerned was given at least 10-days notice of the time and place of the convening of the board (para 4-9d(1))? | YES |
| 17. | Does the record show that at a sufficiently early date, the respondent had access to and was furnished copies, if desired, of all releasable records and documents referred to the board (para 4-9d(2))? | YES |
| 18. | Was the respondent advised by the president of his or her rights and privileges as prescribed by paragraph 4-8 g? | YES |
| 19. | a. Did the president ask the members of the board to state any facts known to them that they believe might be grounds for challenge for cause (para 4-8f)? | a. YES |
| | b. Was the respondent extended the right to challenge any member of the board for cause (para 4-11d)? | b. YES |
| 20. | Was action of the board on challenges proper (para 4-11d)? | N/A |
| 21. | Were the members of the board sworn by the recorder, and was the recorder sworn by the president (para 4-9 d and 4-8e)? | YES |
| 22. | Does the record show that at the outset of the proceedings the members refreshed their memories as to the contents of the records, documents, and reports furnished with the case (para 4-8 f)? | YES |
| 23. | Was the respondent permitted counsel of his or her own selection under the conditions set forth in paragraphs 4-11a, 4-12a, and 4-12 b)? | YES |
| 24. | Did the president advise the respondent of his or her right to present pertinent evidence (para 4-11 f)? | YES |
| 25. | Did the president ask the respondent to state for the record whether he or she desired a copy (para 4-11 c)? | YES |
| 26. | Were spectators other than those specifically requested by the respondent or as authorized by the appointing authority, present during the proceedings (para 4-14)? | N/A |
| 27. | a. Was the respondent at all open sessions of the board, unless the respondent was excused by the President of the Board and expressly waived his or her right to attend (para 4-11)? | a. YES |
| | b. Was the respondent counsel at all open sessions of the board, unless his or her absence was expressly excused by the president of the board (para 4-12 d)? | b. YES |
| 28. | Were all witnesses, including the respondent if he or she elected to testify, sworn (para 4-13d and 4-11f(4))? | a. YES |
| | b. Were they sworn by the president or recorder (para 4-9d(6) and AR 15-6, para 3-1)? | b. YES |
| 29. | Was the respondent advised of his or her rights under the Uniform Code of Military Justice, Article 31, where appropriate (para 4-11f and AR 15-6, para 5-5)? | YES |
| 30. | Is a copy of the psychiatric report made part of the record (para 4-3 and table 4-3, as appropriate)? | N/A |
| 31. | If hospitalization for observation or treatment was directed by the board, were the proceedings suspended, pending final medical disposition (para 4-3c)? | N/A |
| 32. | If evidence was submitted through a deposition (para 4-13a), was it taken as provided in the Uniform Code of Military Justice, article 49 (AR 15-6, para 13b)? | N/A |
| 33. | If evidence on behalf of the Government was procured by affidavit or correspondence, was the respondent given reasonable notice and afforded an opportunity to meet adverse allegations (para 4-11c and AR 15-6, para 5-8)? | YES |
| 34. | Did the board insist on the highest quality of evidence reasonably obtainable and available (AR 15-6, para 3-15)? | YES |
| 35. | Are all exhibits properly identified in and bound with the record (AR 15-6, para 3-15)? | YES |
| 36. | Was the respondent afforded reasonable opportunity to present his or her case (paras 4-11b, c; 4-8a; 4-9 d(1) and (2); 4-11f(2), (3), and (4))? | YES |
| 37. | Before the hearing was terminated and near the end, was the respondent asked by the president to state for record whether he or she had presented all evidence available in his or her own behalf (para 4-11j)? | YES |

MCAT-JA
SUBJECT: Report of Proceedings for Board of Inquiry Concerning LTC Vijay K. Sangar, 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, B Company, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC 20307-5001

|  |  |  |
|---|---|---|
|  | the record of the substance of the expected evidence, and was all documentary evidence referred to in the statement included in the record (para 4-11j)? |  |
| 39. | Was the action of the board on requests by the respondent for additional time to procure and present evidence appropriate (para 4-11j)? | N/A |
| 40. | Did the board make proper findings and include data required by paragraph 4-15b(1)? | YES |
| 41. | Are the findings supported by substantial evidence (AR 15-6, para 3-9)? | YES |
| 42. | Does the recommendation conform to and is it limited to one of the permissible prescribed forms (para 4-15 b(2))? | YES |
| 43. | Were the findings and recommendation of the board determined in closed session by secret ballot, a majority of the members present at the time the vote was taken concurring in each (para 4-15 b(1))? | YES |
| 44. | Were the findings and recommendation announced to the respondent as soon as they were finally determined (para 4-15 b(5))? | YES |
| 45. | Was the record prepared by the recorder or under his or her supervision (AR 15-6, para 5-3)? | YES |
| 46. | Were the requirements of AR 15-6, paragraphs 3-13 through 3-19, complied with in preparing the record? | YES |
| 47. | a. Is the record authenticated by the signatures of all members present at the deliberations on the findings and recommendation and also by that of the recorder (AR 15-6, para 3-16)?<br>b. If any of the foregoing persons were unable to authenticate the record because of death, disability, or absence, is the reason stated following the authentication by the officers (AR 15-6, para 3-16)? | a. YES<br><br>b. N/A |
| 48. | Is the record prepared in duplicate, each complete with all exhibits appended (para 4-15c)? | YES |
| 49. | Has the respondent's counsel examined the record of the Board of Inquiry hearing and so indicated by his or her signature following the authentication? | YES |

3.  The point of contact is the undersigned at (202) 782-3288.


ANDREW C. TOBMAN
CPT, JA
Recorder


KEVIN C. KILEY
MAJOR GENERAL, MC
Commanding

3

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 8 (Exhibit 8 of Plaintiff's ABCMR Application)

Clinical Privileges Certification, WRAMC, 16 May 03



## DEPARTMENT OF THE ARMY
### WALTER REED ARMY MEDICAL CENTER
#### WASHINGTON, DC   20307–5001

REPLY TO
ATTENTION OF:

MCHL-MAO-MS (40-68)                                      16 May 2003

MEMORANDUM FOR **VIJAY K. SANGAR**

SUBJECT:  Privileging Status

1.  Your application for clinical privileges at Walter Reed Army Medical Center was reviewed by the Credentials Committee at its last meeting.  Based on review and recommendations of that committee and approval by the Commander, Walter Reed Army Hospital, clinical privileges were granted as specified at Encl.1, DA Form 5440A-R.

2.  You were granted an Initial Appointment/Supervised Privileges for the period **06 May 2003 through  05 May 2004.**

3.  Two copies of this memorandum are provided.  Please acknowledge receipt at 1st Encl and return the original to the Medical Staff Office.  The copy and the copy of your delineated privileges are for your files.

                                          Marie E. Bailey
                                   for  SUSAN L. REED
                                        Administrator, Medical Staff Office

Encl.
1.  DA Form 5440A-R
2.  Evaluation of Privileges, DA 5441-R (if applicable)

MCHL - (40) 1st End

Walter Reed Army Medical Center, Nuclear Medicine Service/Dept. of Radiology

Medical Staff Office, Room 2J37, ATTN:  Marie E. Bailey

I hereby acknowledge receipt of a copy of the privileges as stated in the Memorandum above.  I understand that I have 10 working days from receipt of these privileges to appeal the Commander's decision, should I disagree with this delineation.

                                          Signature Block of Practitioner
                                          _____



CCQAS

## APPROVAL OF CLINICAL PRIVILEGES/STAFF APPOINTMENT
(For use of this form, see AR 40-68; the proponent agency is OTSG.)

| 1. NAME OF PROVIDER (Last, First, MI) | 2. RANK/GRADE | 3. SSAN | 4. EFFECTIVE PERIOD (YYYYMMDD) |
|---|---|---|---|
| SANGAR, VIJAY K. | LTC | 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 | FROM 20030506 TO 20040505 |

5. PRIVILEGES REQUESTED. (Specify discipline(s))

| | | | |
|---|---|---|---|
| a. Aerospace medicine | k. Neurology | u. Physician assistant | |
| b. Anesthesia | l. Nurse anesthesia | v. Podiatry | |
| c. Audiology | m. Nurse midwifery | w. Psychiatry | |
| d. Chiropractic | n. Nurse practitioner | x. Psychology | |
| e. Clinical pharmacy | o. Obstetrics and gynecology [X] | y. Radiology/Nuclear medicine | |
| f. Dentistry | p. Occupational therapy | z. Social work | |
| g. Dietetics | q. Optometry | aa. Speech pathology | |
| h. Emergency medicine | r. Pathology | ab. Surgery | |
| i. Family practice | s. Pediatrics | ac. Other (specify) | |
| j. Internal medicine | t. Physical therapy | | |

6. RECOMMENDATIONS. The following department/service and credentials committee recommendations are based on a review of the provider's verified licensure, education and training, experience, physical and mental capabilities to perform the requested privileges and demonstrated current competence. Exceptions or stipulations are noted below in block 7.

| a. MEDICAL TREATMENT FACILITY/DENTAC (Name and location) | b. APPOINTMENT STATUS | c. CATEGORY OF PRIVILEGES |
|---|---|---|
| WALTER REED ARMY MEDICAL CENTER WASHINGTON DC, 20307-5001 | [X] Initial   [ ] None  Ext[X] Active  [ ] Affiliate  [ ] Temporary | [ ] Regular  [X] Supervised  [ ] Temporary |

| d. ADMITTING PRIVILEGES | | e. PLAN OF SUPERVISION | f. NAME OF SUPERVISOR (If applicable) |
|---|---|---|---|
| [ ] Requested  [X] Not requested | [ ] Granted  [ ] Not granted | [X] Required  [ ] Not required | MAJ Aaron Stack |

g. AGE GROUPS: (Check all that apply.)  [ ] Neonates (Birth - 28 days)  [ ] Infants (1-24 mos)  [ ] Children (2-12 yrs)
[ ] Adolescents (13-17 yrs)  [ ] Young Adults (18-23 yrs)  [ ] Adults (24-65 yrs)  [ ] Geriatrics (> 65 yrs)

| h. DEPARTMENT/SERVICE CHIEF (Typed name and title) AARON L. STACK, MAJ, MC C, NUCLEAR MEDICINE SERVICE | i. SIGNATURE | j. DATE (YYYYMMDD) 2003 04 30 |
|---|---|---|

k. The credentials committee met on 2 May 03 to review the merits of this provider's application for staff appointment and/or clinical privileges. It is the decision of this committee to [X] CONCUR  [ ] NOT CONCUR with the above recommendations. Exceptions or stipulations are noted below in block 7.

| l. CREDENTIALS COMMITTEE CHAIRPERSON (Name and rank) THOMAS M. FITZPATRICK, COL, MC, DCCS | m. SIGNATURE | n. DATE (YYYYMMDD) 20030505 |
|---|---|---|

7. REMARKS

C, DEPARTMENT OF RADIOLOGY

8. The Executive Committee of the Medical/Dental Staff (ECMS/ECDS) reviewed this provider's request for privileges and medical staff appointment, as applicable, on _____ . It is the decision of this committee to [ ] CONCUR  [ ] NOT CONCUR with the above recommendations.

| 8a. ECMS/ECDS CHAIRPERSON (Name and rank) Same as Item "I." | 8b. SIGNATURE | 8c. DATE (YYYYMMDD) |
|---|---|---|

9. APPROVAL. Based on my review of the information submitted in support of the provider's licensure, education and training, and his/her demonstrated competence, privileges are approved and medical staff membership is awarded as requested. The period for which clinical privileges and staff membership are in effect is as noted above in Block 4.

| 9a. NAME OF HOSPITAL/DENTAC COMMANDER JONATHAN H. JAFFIN, COL, MC COMMANDING | 9b. COMMANDER'S SIGNATURE | 9c. DATE (YYYYMMDD) 20030506 |
|---|---|---|

DA Form 5440A, DATE          DA FORM 5440A-R, JUN 91 IS OBSOLETE          Page 1 of 1 Pages

## DELINEATION OF CLINICAL PRIVILEGES - NUCLEAR MEDICINE
(For use of this form, see AR 40-68; the proponent agency is OTSG.)

| 1. NAME OF PROVIDER (Last, First, MI) | 2. RANK/GRADE | 3. FACILITY |
|---|---|---|
| SANGAR, VIJAY K. | LTC | WRAMC |

INSTRUCTIONS:
* PROVIDER: Enter the appropriate provider code in the column marked "REQUESTED". Each category and/or individual privilege listed must be coded. For procedures listed, line through and initial any criteria/applications that do not apply. Your signature is required at the end of Section I. Once approved, any revisions or corrections to this list of privileges will require you to submit a new DA Form 5440.

SUPERVISOR: Review each category and/or individual privilege coded by the provider and enter the appropriate approval code in the column marked "APPROVED". This serves as your recommendation to the commander who is the approval authority. Your overall recommendation and signature are required in Section II of this form.

| PROVIDER CODES | APPROVAL CODES |
|---|---|
| 1 - Fully competent to perform | 1 - Approved as fully competent |
| 2 - Modification requested (Justification attached) | 2 - Modification required (Justification noted) |
| 3 - Supervision requested | 3 - Supervision required |
| 4 - Not requested due to lack of expertise | 4 - Not approved, insufficient expertise |
| 5 - Not requested due to lack of facility support | 5 - Not approved, insufficient facility support |

### SECTION I - CLINICAL PRIVILEGES

**Category I.**
Includes practitioners who have completed a limited training program in nuclear medicine, such as part of an accredited residency. Under this category of privileges, practitioners may perform and interpret procedures only within a specialized area of nuclear medicine (e.g. heart, thyroid).

| Requested | Approved | |
|---|---|---|
| | | Category I clinical privileges |

**Category II. Includes Category I.**
Includes practitioners who have completed a minimum of six months of nuclear medicine training, involving all organ systems, in an accredited program, but are not necessarily board certified. Under this category practitioners may perform and interpret in multiple areas but must request consultation to perform or interpret modified or new procedures, or when the diagnosis is in doubt.

| Requested | Approved | |
|---|---|---|
| | | Category II clinical privileges |

**Category III. Includes Categories I and II.**
Includes practitioners who have completed eighteen months of nuclear medicine training in an accredited program, but who are not necessarily board certified. Under this category practitioners may perform and interpret in multiple areas but must request consultation when the diagnosis is in doubt.

| Requested | Approved | |
|---|---|---|
| | | Category III clinical privileges |

**Category IV. Includes Categories I, II and III.**
Includes practitioners who have specialty certification granted by the American Board of Nuclear Medicine, the American Board of Radiology with Special Competence, or their equivalent. Members in this category may perform and/or interpret procedures on a full-time basis without consultation.

| Requested | Approved | |
|---|---|---|
| 3 | 3 | Category IV clinical privileges |

### DIAGNOSTIC NUCLEAR MEDICINE

| a. In-vivo imaging and non-imaging evaluations using radiopharmaceuticals. All organ systems. (Specify imaging systems below.) | | b. In-vivo imaging and non-imaging evaluations using radiopharmaceuticals. Limited to (Specify organ systems): ___ (Specify imaging systems below.) | |
|---|---|---|---|
| Requested | Approved | Requested | Approved |
| 3 | 3 | (1) planar | 3 entri | (1) planar |
| 3 | 3 | (2) SPECT | 3 entri | (2) SPECT |
| 3 | 3 | (3) PET (coincidence or dedicated) | 3 entri | (3) PET (coincidence or dedicated) |

### THERAPEUTIC NUCLEAR MEDICINE

| Requested | Approved | |
|---|---|---|
| 3 | 3 | a. Treatment of patients using radiopharmaceuticals. All radioisotopes. |
| | | b. Treatment of patients using radiopharmaceuticals that is limited to (Specify radioisotopes and/or procedures, e.g. I-131 for hyperthyroidism): |
| | | |
| | | |

**DA Form 5440-KK, DATE**     PREVIOUS EDITIONS ARE OBSOLETE     *Page 1 of 2 Pages*

| IN-VITRO NUCLEAR MEDICINE | | |
|---|---|---|
| **Requested** | **Approved** | |
| 3 | 3 | a. Laboratory type studies including radioimmunoassay and blood volume/component analysis using radiopharmaceuticals. All procedures. |
| 3 *erase* | | b. Laboratory type studies including radioimmunoassay and blood volume/component analysis using radiopharmaceuticals that is limited to *(Specify procedures)*: |
| | | |
| | | |

| ADDITIONAL PRIVILEGES | | | | |
|---|---|---|---|---|
| **Requested** | **Approved** | | **Requested** | **Approved** |
| | | a.  Bone Densitometry | | |

**COMMENTS**

| | |
|---|---|
| ✳ SIGNATURE OF PROVIDER  *Vijau K Saupe MD* | DATE *(YYYYMMDD)*  2003/04/28 |

**SECTION II - SUPERVISOR'S RECOMMENDATION**

Approval as requested ☑    Approval with Modifications *(Specify below)* ☐    Disapproval *(Specify below)* ☐

**COMMENTS**

| DEPARTMENT/SERVICE CHIEF *(Typed name and title)*  AARON L. STACK, MAJ, MC  C, NUCLEAR MEDICINE SERVICE | SIGNATURE | DATE *(YYYYMMDD)*  2003 04 30 |
|---|---|---|

**SECTION III - CREDENTIALS COMMITTEE RECOMMENDATION**

Approval as requested ☑    Approval with Modifications *(Specify below)* ☐    Disapproval *(Specify below)* ☐

**COMMENTS**

| CREDENTIALS COMMITTEE CHAIRPERSON *(Name and rank)*  THOMAS M. FITZPATRICK, COL, MC, DCCS | SIGNATURE | DATE *(YYYYMMDD)*  20030505 |
|---|---|---|

DA Form 5440-KK, DATE          PREVIOUS EDITIONS ARE OBSOLETE          Page 2 of 2 Pages

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 9 (Exhibit 9 of Plaintiff's ABCMR Application)

Clinical Privileges Certification, MAMC, 25 Sep 03



**DEPARTMENT OF THE ARMY**
MADIGAN ARMY MEDICAL CENTER
TACOMA, WASHINGTON 98431-1100

REPLY TO
ATTENTION OF:

MCHJ-QCR (40-68)                                                                25 September 2003

MEMORANDUM FOR Vijay Sangar, LTC, MC, Dept of Radiology/Nuclear Medicine

SUBJECT: Notification of Appointment/Privileging Status

1. Based on review and recommendation by the Credentials Committee and approval by the Commander, Madigan Army Medical Center, clinical privileges and appointment were granted to you as defined in enclosures.

2. You were granted **Regular Privileges under Supervision with an Affiliate Appointment to the Medical Staff for the period 25 September 2003 thru 5 May 2005 on an ICTB.**

3. If you accept the appointment/privileges, please sign at the bottom of this memorandum. **Return the signed memorandum** *(without enclosures)* **to the Credentials Office as soon as possible.** Privileges for the period noted above cannot be exercised until this notification letter has been signed and returned. A copy of this memorandum and enclosures has been provided for your records.

4. If your privileges were not approved as requested or you disagree with the findings, you have the right to appeal the Credentials Committee recommendation to the Commander within 10 days, IAW AR 40-68. However, without acknowledgement of agreement, privileges for the above time period may not be exercised.

                                             *Jessie Rios*
                                             Jessie Rios
                                             Credentials Technician

Enclosures

1st End

FOR Credentials Management Office, Madigan Army Medical Center, Tacoma, 98431

I agree with the review of the Credentials Committee and the appointment/privileges awarded by the Commander on 25 September 2003.

                          *Vijay K Sangar*                    9/25/03
                          Signature                           Date

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 10 (Exhibit 10 of Plaintiff's ABCMR Application)

TDY Memoranda (4), 21 Oct 03, 31 Oct 03, 13 Nov 03, 23 Jan 04

MCHJ-RNM                                           21 October 2003

MEMORANDUM FOR LTC Vijay Sangar

SUBJECT: Performance Feedback

1. This performance feedback is being completed after four weeks in Nuclear Medicne at Madigan Army Medical Center during your 12-week TDY to this Clinic. In the first two weeks, you sat in on daily readout sessions in the Nuclear Medicine reading room with either Dr. Balingit, Billingsley or Cote. You were afforded the opportunity to observe Nuclear Medicine Pharmacy operations with Ms Jane Carter, Nuclear Pharmacist where you reacquainted yourself with the daily operations of a Nuclear Medicine Pharmacy. You were given formal training on accessing the computerized dictation system by Ms Cindy Hinkle in addition to training on accessing the computer network. You continue to attend daily radiology lectures held during the lunch hour.

2. During weeks #3 and #4, you transitioned from observing to dictating nuclear medicine exams under the supervision and tutorage of the nuclear medicine physician of the day.

3. After two weeks of dictations, Drs Balingit, Billingsley and Cote have the following suggestions for improvement in your daily activities as a Nuclear Medicine Physician: All three of the staff physicians have noted that you will need to be more attentive to details in your dictated reports. Examples cited have included the need to be more specific to location of lesions in the skeleton by naming levels and anatomic location, insuring that the proper radiopharmaceutical dose is dictated into the report, and attention to grammar. We would all encourage you to develop a pattern with computer operations, since you have continual recurring difficulties in signing on to the network and performing some of the repetitive computer tasks. Hopefully, time and repetition will allow this to become easier.

4. We are all encouraged by your attention, cooperation and willingness to learn. We encourage you to continue to apply your fund of knowledge and integrate it with your observations during read out.

MARC G. COTE, DO
COL, MC
Chief, Nuclear Medicine Service
OTSG Consultant

MCHJ-RNM                                                    31 October 2003

MEMORANDUM FOR RECORD

SUBJECT:   Meeting with LTC Sangar, Week 6 of 12-week (Dr Sangar initiated)

1.  Dr Sangar spontaneously dropped into my office to discuss and clarify what will occur in the upcoming week, which will be week 7 of his 12-week TDY to Madigan Nuclear Medicine.

2.  I asked how things went the past week while I was on TDY. Dr Sanger stated that he continues to learn despite making some mistakes. He asked for clarification on the total numbers of cases that were mentioned in the document that outlined the training and evaluation he would receive while at Madigan. I stated that the cases noted were listed as a "goal". I again emphasized to him that we three physicians found him very likable. During our meeting, I emphasized that we are attempting to give him honest feedback on all the good things he is doing as a physician. I also reminded him that he also wants us to be honest on his weaknesses, since he will ultimately be the one who has to deal with all of the pressures of practicing as an independent physician. Currently, I reminded Dr. Sangar that he is "protected" since he is practicing under one of the staff physicians. I also stated that he was only asked to interface with the Nuclear Medicine imaging network and had the luxury of a transcriptionist while others are expected to use the Powerscribe voice recognition system.

3.  Additionally, I told Dr. Sangar that Drs Billingsley and Balingit have expressed concern that Dr Sangar continues to have difficulty with repetitive sequencing processes on the computer. I stated to Dr Sangar that I hoped with some more practice that his abilities on the computer would improve and that he should be able to function independently on the computer in the next several weeks. I stated that his success in Nuclear Medicine and practicing really lies in his ability to function with computers on a day-to-day basis.

4.  Dr. Sangar asked about the dictation process starting next week. We discussed that the report he approves and sends to the supervising physician will be considered his final report, which would be just like the real world. Once you approve the study electronically, this is what is sent out for the record.

5.  I asked Dr. Sangar if he felt that the process was fair to date. He replied that all were being fair and cordial. I inquired if he had been treated the same prior to arriving at MAMC. He stated that we were teaching and mentoring in a non-threatening manner. I stated that we were doing our best to help him. He then started to bring up that he had a medical board and prior head injury. I replied that I did not want to know of its results so that we can remain as impartial to this mentoring process as possible.

6.  I empathized that it is hard on a senior physician's ego to receive criticism, but I stated that it is my opinion that I would rather hear it from a senior colleague than to become embroiled with a medical mistake and its ensuing litigation.

7.  We discussed that Dr. Sangar should develop increased speed as he progresses. He admitted that he is very slow as he goes over everything "3 to 4 times". I stated that inexperienced residents have a very slow learning curve, but usually experienced physicians have a much faster learning curve since they do not have to accumulate and assimilate a basic fund of knowledge. Therefore, in the upcoming weeks I was hopeful that he would be able to realize some increased efficiencies. I said that today's practices are very busy and he would be faced in the future with an unrelenting daily workload that demands personal efficiency.

MARC G. COTE, DO
COL, MC
Chief, Nuclear Medicine Service

MCHJ-RNM                                                    13 November 2003

MEMORANDUM FOR LTC Vijay Sangar

SUBJECT: Performance Feedback on Completion of Week #8 of 12-week MAMC Rotation

1. This performance feed back is being completed after eight full weeks in Nuclear Medicine at Madigan Army MEDCEN during your 12-week TDY to this clinic. On 13 November 2003 you met with Doctors Balingit, Billingsley and Cote in a conference held to offer you collective feedback on your nuclear medicine performance to date. The meeting was held in Dr. Cote's office to discuss strengths and weaknesses observed by the three staff physicians as you complete your second week of solo dictations.

2. Dr. Cote began by stating that the purpose of the meeting was to offer constructive feedback to Dr. Sangar and to serve as a forum where Dr. Sangar can offer feedback to all of the involved nuclear medicine physicians on what we can do to further assist him during his rotation at Madigan. Speaking for the three staff physicians, Dr. Cote again reiterated their understanding and appreciation of how difficult it must be for an experienced physician to receive feedback on their performance. Dr. Cote discussed that it is the goal of all of the nuclear medicine staff physicians at MAMC to see Dr. Sangar succeed; however, this must be tempered by elements of patient safety. Dr. Cote asked Dr. Sangar how his experience has been to date and whether he felt that he is being treated fairly by all of the staff. Dr. Sangar stated that his rotation at Madigan is exceeding his expectations and that he is finding Drs Balingit, Billingsley and Cote helpful and willing to teach. Dr. Sangar stated that he initially had reservations on coming to Madigan for his rotation, but since his arrival, his fears about the rotation have subsided in view of our positive approach in our interactions with him. Dr. Cote then asked Dr. Sangar how he felt he was doing in his rotation. Dr.. Sangar replied that he has learned a lot in a helpful, positive and teaching environment similar to his initial residency years ago. When questioned if he felt that he was ready for independent practice, Dr.Sangar stated that he realizes that he has a "ways to go", but is very encouraged.

3. Dr. Cote stated that he has noticed a marked improvement in Dr. Sangar's computer skills since his first week. Examples from the first week including difficulty in logging on the network systems were touched upon. Dr. Cote continued that Dr. Sangar is now navigating through the display screens. Dr. Cote also stated that bone scan interpretation has improved, but that further work on Dr. Sangars part is needed by being more descriptive of the location and extent of lesions. Dr. Cote also encouraged Dr. Sangar to be more specific as to bone locations in the extremities or ribs. Methods to improve in anatomic location by utilizing the charts and diagrams displayed in the reading room were suggested. Suggestions to use accepted known anatomical terms such as anterior axillary line, etc., were suggested. Dr. Cote said that he has observed that Dr. Sangar at times appears confused when confronted with a new screen display. We discussed the example of the wrong studies being selected on the computer by Dr. Sangar but not recognized at first by Dr. Sangar. Specific examples including displaying the same cardiac study on itself, or not recognizing that the stress and rest images were switched were mentioned. Dr. Cote also discussed and reviewed how cardiac lesions should be described so that the clinician can develop a mental picture of the geographical extent and severity of the coronary artery lesion. Dr. Cote said that overall work efficiency and speed has improved during the last several weeks.

4. Dr. Balingit spoke next and stated that he too has noticed an improvement in computer skills and interpretation, but stated that Dr. Sangar is not yet where he needs to be to practice independently. Dr. Balingit stated that he has noticed that Dr. Sangar appears to have difficulty in localizing the anatomical location of lesions. Dr. Balingit also suggested the use of the teaching graphics/props in the reading room. Dr. Sangar acknowledged that all of the physicians on a day-to-day basis have encouraged him to avail himself of the anatomy graphics on display in the reading room. Dr. Balingit stated that he has observed on several occasions that Dr. Sangar did not recognize when cardiac study image reversals occur on the display screen despite clear labeling of the image set by the computer on the screen. Dr. Balingit encouraged him to pay careful attention to details and the information being presented before him on the screen. In addition,

Dr. Balingit emphasized the need to review and question data that technologists present to him if the data does not make common sense. An example of a dictation where Dr. Sangar dictated a heart rate of 240 in a 55-year despite heart rates in the low 100s was given. Dr. Balingit discussed that Dr. Sangar should review renal scan utilized terms that are familiar to the clinicians.

4. Dr. Billingsley started his session by complementing Dr. Sangar on his improving speed and efficiency. Dr. Billingsley also discussed that he, Dr. Billingsley, has a strong personality that over the years can sometimes be intimidating to others, but that he is not meaning or trying to intimidate Dr. Sangar. Dr. Billingsley briefly discussed how the intensity of practice has increased over the recent years and that the clinical demands and workloads are unrelenting in modern medicine. Dr. Billingsley asked Dr. Sangar to be introspective as to his strengths and weaknesses. Dr. Billingsley expressed to Dr. Sangar that it was his personal observation that Dr. Sangar at times appears to exhibit processing difficulty and confusion at times when confronted with serial tasks that need to be performed in order to visualize and interpret the images before him.

5. Dr. Billingsley also discussed the content of Dr. Sangar's reports stating that the grammar needs considerable improvement. Dr. Balingit contributed that he found Dr. Sangar's reports hard to follow and confusing. Dr. Sangar stated that he would consider obtaining an English tutor. Dr. Cote suggested that the Army education centers including the one located at Ft Lewis have free courses and teaching modules available should he chose to utilize them.

6. Dr. Cote asked that the group meet together in approximately one week so that an ongoing dialogue may continue and afford Dr. Sangar the opportunity to continue to improve and sharpen his skills.

MARC G. COTE, DO
COL, MC
Chief, Nuclear Medicine Service



**DEPARTMENT OF THE ARMY**
MADIGAN ARMY MEDICAL CENTER
TACOMA, WASHINGTON 98431-1100

REPLY TO
ATTENTION OF:

MCHJ-RNM                                                    23 January 2004

MEMORANDUM THRU  Deputy Commander for Clinical Services, Madigan Army
Medical Center, Tacoma, WA 98431

FOR  Deputy Commander for Clinical Services, Walter Reed Army Medical Center, 6900
Georgia Avenue, Washington, DC 20307-5001

SUBJECT:  Nuclear Medicine Performance Feedback LTC Vijay Sangar

1.  This memorandum reviews the overall performance of LTC Vijay Sangar during his
TDY to Nuclear Medicine at Madigan Army Medical Center from 22 September through
2 December 2003.  Of the scheduled 12 weeks, the final two weeks were truncated by the
need of LTC Sangar to attend the funeral of his father overseas.  This memo summarizes
the mentoring and tutoring followed by the clinical performance evaluation that was
conducted at the request of Colonel Thomas Fitzpatrick, DCCS and Chairman of the
Credentials Committee, Walter Reed Army Medical Center (WRAMC), Washington,
DC.  Prior to this summary memorandum, interim memos were written and supplied to
LTC Sangar (copies enclosed).

2.  The 12-week rotation at MAMC was designed to first provide six weeks of refresher
training and refamiliarization for an experienced board certified physician with many
years of Nuclear Medicine practice.  Weeks 7 through 12 were designed to assess the
potential to practice independently and assess any limitations.  Prior to his arrival, LTC
Sangar reviewed and discussed the proposal with Colonel Fitzpatrick at WRAMC.  A
copy of the proposal, signed by LTC Sangar, is enclosed.

3.  Upon the arrival of LTC Sangar at MAMC, he received the standard classroom
training for physicians in computer network access conducted by the Automation
Management Office at MAMC.  He received individualized training on the computer
dictation system (Powerscribe) conducted by the Powerscribe Supervisor, Ms. Cindy
Hinkle.  Individualized training was provided to LTC Sangar on Nuclear Regulatory
Commission updates by Mr. Dan Rice, MAMC Radiation Protection Officer.  In addition,
during the first six weeks, LTC Sangar received individualized training and instruction
from the Nuclear Medicine staff physicians.  LTC Sangar was granted credentials with
supervision by the MAMC Credentials Committee.

4.  During the first two weeks, LTC Sangar observed daily clinic operations and sat in on
the daily readout sessions in the Nuclear Medicine reading room with either Doctors

MCHJ-RNM
SUBJECT: Nuclear Medicine Performance Feedback LTC Vijay Sangar

Balingit, Billingsley or Cote. LTC Sangar also spent time with Ms. Jane Carter, Nuclear Pharmacist, refreshing himself on nuclear pharmacy operations and regulatory requirements as they pertain to the practice of Nuclear Medicine. He received training on accessing the computer networks at MAMC in the New Employee Orientation sessions. In addition to nuclear medicine refresher training and mentoring, LTC Sangar attended the daily noon radiology didactic presentations.

5. During weeks three through six, LTC Sangar was transitioned from observing to dictating nuclear medicine exams under the supervision and tutorage of the nuclear medicine physician-of-the-day. He participated and examined patients or administered medication with the attending physician-of-the-day present at the exam table.

6. Each day LTC Sangar received personal feedback from the attending physician. On many occasions LTC Sangar met with all three staff physicians for group feedback where suggestions were made to aid in his performance. Memos from these meetings are enclosed. During these sessions Doctors Balingit and Cote made very clear to LTC Sangar that his electronic reports represented his cumulative efforts from interpretation of the study to communicating his findings to the referring physicians. LTC Sangar was also reminded on several occasions that these reports would represent his best efforts.

7. The performance of LTC Sangar during his last three weeks at MAMC manifested several areas of concern. While he had a grasp of radiopharmaceuticals, his knowledge base in common patient drugs used to treat patients was limited. This was of concern in view of the adverse synergistic effects that drugs such as Furosemide and ace inhibitors can have on patient hemodynamics. LTC Sangar demonstrated a cordial, respectful demeanor with patients; however, he appeared to struggle while performing physical exams on thyroid glands when assessing palpable thyroid nodules.

8. All three staff physicians requested repeatedly that LTC Sangar be more specific on his reports as to the description and location of lesions and their clinical significance. LTC Sangar's reports gave a general description of the lesion making it difficult for a radiologist or clinician to visualize the area and significance of the concern. Throughout the rotation of LTC Sangar, all three staff physicians expressed their concern over his poor description of the anatomical location of lesions, especially in the extremities. During his final week at MAMC, LTC Sangar still omitted subtle findings on bone scans that one would not expect an experienced physician to omit after intensive mentoring, even after a sabbatical from practice. LTC Sangar was provided with extensive feedback on his performance in scan interpretation including copies of his reports compared with the final staff verified report submitted for the patient record.

2

MCHJ-RNM
SUBJECT: Nuclear Medicine Performance Feedback LTC Vijay Sangar

9. It is our professional opinion that LTC Sangar has difficulty dealing with the details of scan interpretation. This opinion is based on several observations. Occasionally LTC Sangar would fail to recognize he had selected the incorrect images on the computer screen for interpretation. He submitted multiple erroneous reports he had proofread and submitted as the final report for staff review and electronic verification. One example was a hepatobiliary study where LTC Sangar stated obstruction in the body of the report but reported as a normal study in his final impression. Doctors Balingit and Billingsley emphasized that LTC Sangar proofread his transcribed reports carefully as they are the reports submitted to clinicians for use in evaluating the patient.

10. LTC Sangar is a pleasant physician who availed himself of the learning opportunities at MAMC. However, based on our observations of his performance, we do not feel that LTC Sangar can practice independently at this time. It is our opinion that his knowledge of anatomy and current pharmaceuticals is weak. We are concerned about his interpretative skills and the proofreading of reports. Based on our collective observations, we are unsure that a formal, structured mentoring program would be sufficient to improve his performance.

Concur/Nonconcur

ANTONIO G. BALINGIT, MD
LTC, MC
Nuclear Medicine Service

Concur/Nonconcur

JEROME L. BILLINGSLEY, MD
Nuclear Medicine Service

Concur/Nonconcur

MARC G. COTE, DO
COL, MC
Chief, Nuclear Medicine Service
OTSG Consultant

Enclosures

3

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 11 (Exhibit 11 of Plaintiff's ABCMR Application)

Record of Board Proceeding, Second Elimination Board, 28 Mar 05

# RECORD OF BOARD PROCEEDING

**Lieutenant Colonel Vijay K Sangar, 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, Bravo Company, Walter Reed Army Medical Center, Washington, DC 20307-5001**

Board of Inquiry under appointment by Commander, Walter Reed Army Medical Center (WRAMC), Washington, DC, 20307-5001, held at 0900 hours, Building 1, Room B202, on 28 March 2005.

## Persons Present:

COL Charles S. Serio, President
COL Deborah J. M. Omori, Member
COL Mary C. Nace, Member
LTC Vijay K. Sangar, Respondent
Mr. Frank Spinner, Counsel for the Respondent
CPT Gabriel Hinkebein, Counsel for the Respondent
CPT Jeffrey B. Jones, Recorder
CPT Christine L. Carlile, Legal Advisor
SGT Dwan K. Fullard, Reporter

## PROCEEDINGS OF THE BOARD OF INQUIRY

The Respondent requests that Dr. Lawrence E. Holder, Respondent's expert witness, be allowed to attend the proceedings as a spectator. The Recorder has no objections and there are no objections from the Board members.

The appointing authority has not specifically authorized the presence of any other spectators during the proceedings; therefore, no unauthorized persons are permitted to attend this hearing.

The Memorandum of Appointment is attached.

The Memorandum of Referral of Respondent is attached.

The Recorder administered the oath to the Reporter.

The Respondent waives the reading of his rights.

Respondent's counsel conducts voir dire of the Board. No challenges by Respondent's counsel.

No challenges by the Recorder.

The Recorder administers the oath to the members of the Board.

The Recorder administers the oath to the legal advisor.

The President of the Board administers the oath the Recorder.

The  legal advisor previously advised the Board members not to look at any documents prior to the Board.

Government procedural Exhibits 1-13 are admitted into evidence.

Government substantive Exhibits 14-22 are admitted into evidence.

The Memorandum of Notification is attached.

The Memorandum of Initiation of Elimination is attached.

The elimination packet is attached.

The Recorder makes an opening statement.

The counsel for the Respondent makes an opening statement.

The Recorder challenges the admissibility of evidence relating to the Madigan Army Medical Center Nuclear Medicine Service evaluation program.  The Recorder challenges on the grounds of relevance.  The Recorder also objects on the grounds that the information is protected by 10 U.S.C. 1102.

The Recorder and Respondent's counsel are heard.  The President of the Board determines, after consulting with the legal advisor, that the information relating to the Madigan evaluation period is admissible.

Government exhibit 23, in reference to Madigan, is admitted into evidence.

The Board recessed at 1004hours, 28 March 2005, to provide counsel for Respondent an opportunity to prepare Respondent's evidence.

The Board reconvened at 1026 hours, 28 March 2005.

All parties present when the Board recessed were again present.

Respondent's exhibits A-E are admitted into evidence.

Respondent's exhibits F-H are not admitted into evidence, because the individuals who wrote the letters are present to testify.

The documents relating to the Madigan evaluation period are admitted.  The documents

pertaining to the Respondent's training, orientation and evaluation will be sealed and become a part of the Respondent's case.

Respondent's Exhibit I is admitted into evidence.

The Respondent's counsel adds the document that the Recorder had previously removed from the Government packet, Madigan evaluation memorandum dated 23 January 2004, to Respondent's Exhibit I.

Judicial notice is taken of Army Regulation 40-68, Chapter 11.

Legal advisor excuses herself before the calling of the first witness.

Ms. Susan Reed, Chief of the Medical Staff Office, Walter Reed Army Medical Center, Washington, DC was called as a witness, was sworn, and testified substantially as follows:

## QUESTION BY THE RECORDER

I do know the Respondent in this case. I have been at Walter Reed Army Medical Center (WRAMC) for 12 years. My responsibilities include ensuring that providers are privileged to practice at WRAMC. The Credentialing Committee is composed of the department chairs. We meet once a month unless a another meeting is called. The Respondent's case has been brought up at the credentials meetings at every meeting for the past few months due to the fact that his credentials are lapsed since Nov 2000. When a doctor arrives to WRAMC, he comes to the credentials office where he is presented with a packet consisting of various privileging documents. Once the packet is complete, it is forwarded to the Chief of the department for review. Once the review is complete, the packet is returned to the credentials office for presentation at a committee meeting. The Chief of the department recommends what type of privileges WRAMC should provide the doctor. The committee votes and forwards the recommendation to the hospital commander who is the final approval authority. Privileges are renewed a year after the initial privileges are given and then every two years thereafter. The credentials office generally sends out the renewal packets. Adverse privileging actions occur when an event happens in the department or there are concerns by the Chief of negligent acts. The Chief will issue a summary suspension and take the matter before the Credentialing Committee. The committee hears the evidence and votes on the suspension. If the provider is suspended, he is given a letter that informs him of the adverse privileging action and explains his eligibility for a hearing. The provider can choose to waive the hearing. If the doctor requests a hearing, the Deputy Commander of Clinical Services (DCCS) is responsible for presenting the case to a review committee. Its recommendation is presented to the entire Credentialing Committee for recommendation. The matter is brought to the hospital commander for the final decision. The provider can appeal directly to the hospital commander in writing. After the hospital commander makes a decision, he forwards the case to the Surgeon General for final disposition. The provider must apply to the credentialing office to get privileges back after they have been suspended or revoked. The Respondent submitted one request for temporary re-instatement of his privileges so he could go to Madigan. The hospital granted him his request;

3

however, he has not contacted me at any other time. I am easy to contact and find if needed.

## QUESTIONS BY THE COUNSEL FOR RESPONDENT

I was aware that LTC Sangar was trying to PCS or get remedial training. I was not aware that Dr. Bridwell offered to help LTC Sangar with remedial training, nor was I aware that LTC Sangar went through the Physical Evaluation Board (PEB). I did know that a prior Board of Inquiry found him fit for duty for retraining. This hospital issued temporary privileges so that he could take part in the Madigan program. I did not know he was removed from the training before it was completed.

## QUESTIONS BY THE PRESIDENT OF THE BOARD

A provider can reapply for privileges regardless of where his paperwork is in the appeals process. It is not a normal trend for a provider to wait three years before applying for privileges. I am not sure what he has been doing since his privileges were revoked in 1999. He is still receiving physician's pay . I believe he took his Boards during this time.

The Board recessed at 1113hours, 28 March 2005, to allow Recorder to get next witness.

The Board reconvened at 1126 hours, 28 March 2005.

All parties present when the Board recessed were again present.

Colonel Thomas Michael Fitzpatrick, Deputy Commander of Clinical Services, Walter Reed Army Medical Center, Washington, DC, was called as a witness, was sworn, and testified substantially as follows:

## QUESTIONS BY THE RECORDER

I do know the Respondent LTC Vijay K. Sangar. I have been at WRAMC since 1984 except for the two years that I was at Fort Knox. I have been the DCCS and head of the Credentialing Committee for two-and-a-half years. The Credentialing Committee ensures that providers are adequately trained and competent in their areas of expertise. As the Chairman of the Credentialing Committee, I moderate the meetings and address any special issues that may arise. We meet once a month and I take care of special cases that are walked through. I devote about 10% of my time to committee work. There are approximately 20 members on the committee consisting of all of the Department chiefs at WRAMC. LTC Sangar's situation comes up just about every month. We are trying to decide what to do with him since he does not have any privileges. Taking privileges away from providers is extremely rare. I learned about the Respondent in 2002. He did not have privileges and there was a Show Cause Board that we had to address. In 1999, COL Dunn and Lieutenant General Peake upheld the Credentialing Committee's decision to revoke the Respondent's privileges because of poor clinical practices.

He was placed in the Tumor Registry before I took over as DCCS. In the Tumor Registry, he was pulling information from tumor patient records. The position is normally filled by a GS-6 not a Lieutenant Colonel or any other military personnel. You have to be certified as a tumor register to occupy the position, but the Respondent is not certified. He has been at the Tumor Registry for four-and-a-half to five years. He has not done any work at the registry for a long time. Mrs. Taylor notes that he is present but she has no supervisory role over him. I offered him a non-clinical position after he came back from Madigan. A few months after his return, he received some training on the computer system for the job, but has not done the job since. He does not qualify to practice Nuclear Medicine. I offered him several options. I suggested that he leave the military and receive additional training. I also suggested that he accept a position that did not require him to perform clinical duties until he reached retirement age. He refused. I am not comfortable placing the Respondent in another medical position within the hospital. He has two years in pathology and two years of nuclear medicine, so I could not even put him in general medicine. I do not think he has filed for reinstatement of privileges on his own. Privileges were given to him for the training at Madigan. It is LTC Sangar's responsibility to initiate re-privileging process. The Respondent passed the Nuclear Medicine Board after the fourth try. According to Human Resources Command there is no field to re-class him to. There was a Show Cause Board that generated the trip to Madigan. He did not want to leave the area, so we looked for local places for training. He went to Madigan for a 12-week evaluation program, but had to leave early due to a death in his family. If LTC Sangar applied for privileges, his request would have proceeded like any others. If LTC Sangar had any issues with his Madigan program, the only place he could address the matter is at the Credentialing Committee. He comes up for mandatory retirement next year.

## QUESTIONS BY THE COUNSEL FOR RESPONDENT

My office did prepare the voluntary relinquishment of clinical privileges letter dated 16 April 2004 (later mark Respondent exhibit K). LTC Sangar has a right to apply for privileges. If the request is not honored then the matter is reported to the National Practitioner's Data Bank. If he relinquishes privileges then it's a non-issue. I think it is very unlikely that he will be credentialed in nuclear medicine. The staff at Madigan felt that they had enough information to determine that he would not be able to practice independently. The individual provider has the personal responsibility to find out what he needs to do in order to get his privileges back. The 12-week period at Madigan was designed to establish how much and what type of training LTC Sangar would need. I am not sure what the pro-rated year is for eligibility, but he reaches mandatory age retirement next year.

## QUESTIONS BY THE PRESIDENT OF THE BOARD

He was under observation since losing privileges in 1997. We are not obligated to retrain providers who lose their privileges. He was put on performance improvement plan where there was no noticeable improvement. I thought it would be strenuous on the staff to retrain at WRAMC. I also offered to let him retrain in another medical facility at his own expense, but he could not obtain a license to do so. Dr. Cote and myself discussed the situation and he came up with six weeks training and six weeks of monitoring. After his emergency, a joint decision from

department that he was not going to improve under the short plan and he needed a long plan, which we are not obligated to provide. He has not practiced as a physician since 1997.

The Board recessed at 1210hours, 28 March 2005.

The Board reconvened at 1300 hours, 28 March 2005.

All parties present when the Board recessed were again present.

The Government rests.

Counsel for Respondent submits Respondent Exhibit J and K into evidence.

Dr. Lawrence E. Holder, University of Florida Jacksonville, Jacksonville, Florida, was called as a witness, was sworn, and testified substantially as follows:

## QUESTIONS BY THE COUNSEL FOR RESPONDENT

I do know the Respondent Dr. Vijay Sangar. I did an internship with the Public Health Service in Nevada, a radiology residency and nuclear medicine fellowship at the University of Cincinnati. I began practicing in Baltimore, Maryland as a volunteer faculty member at John Hopkins University. For10 years, until about 2001, I was the Chief of Nuclear Medicine at the University of Maryland  I was a member of the ACGME review committee for Nuclear medicine and Chair of the American Board of Nuclear Medicine for six years. I currently work as a Nuclear Medicine physician and teach residents. I was asked about 4 or 5 years ago to look at Dr Sangar's reports and compare them to the critiques that were made to determine if there were substantial discrepancies. Sometime after that review, someone wanted me to find out what a person who had not been in clinical practice for four or five years would need to do in order to re-establish competency in the area of Nuclear Medicine. There had been a lot of technological advances since that time. Then you would have some supervisory time, as well. I did learn that Dr. Sangar was sent to Madigan for training. After reviewing documents from Madigan training, I believed that Dr. Sangar was progressing.  There were some issues with the computer and network. He needs to be more specific when describing lesions and pay more attention to his dictations. However, the reports do not show a lack of progress or improvement. As far as I remember, I was not aware of him being diagnosis with any medical condition when I was asked to review Dr. Sangar's reports . I found that he was qualified to continue working. It would not surprise me that someone who had not been practicing for more than five years and after a 10-week program, that the individual would have some difficulties with the pharmaceuticals. There is a big difference between the 13 November 2003 and the 23 January 2004 memos. The 23 January 2004 memorandum is not clear in its description of Dr. Sangar's work. 12 weeks is not ample amount of time to get up to standard. It is a challenge for a person who has not worked in the field a while to catch on - especially when it takes those who have been continually practicing a while to catch on.

6

## QUESTIONS BY THE PRESIDENT OF THE BOARD

I believe Dr. Sangar needs more training with using the computer for looking at scans. When I was asked about a plan for getting a provider up to standard, I was not speaking of Dr. Sangar specifically. I envisioned someone who needs to be brought up to speed. From these reports, I believe they wanted Dr. Sangar to be more anatomically descriptive, he needs to get to the level that the facility is working on. In an academic setting, if someone was out for four years and needed to be retrained, then the university will look at the situation and decide on a case-by-case basis as to the suitability for a re-training request.

## QUESTIONS BY BOARD MEMBER COL NACE

There are various methods to report nuclear medicine findings. They vary from each facility. In a training program, I like for them to be extremely descriptive in the body of the report. The impression of the report needs to be precise and to the point. But each training facility is different. I believe that he has a good knowledge base, based on the fact he passed the Nuclear Medicine Board, which is a challenging test.

The Board recessed at 1355 hours, 28 March 2005.


The Board reconvened at 1400 hours, 28 March 2005.

All parties present when the Board recessed were again present.


Mr. Robert Bridwell, Integrated Medical Solutions, Charlestown, West Virginia, was called as a witness, was sworn, and testified substantially as follows:

## QUESTIONS BY THE COUNSEL FOR RESPONDENT

I do know Vijay Sangar. I was trained in the Army and went to medical school at the Uniformed Services University of Health Sciences (USUHS). I did my Internal Medicine internship at WRAMC, my residency at Tripler in Hawaii, and my fellowship in Nuclear Medicine at WRAMC. I was on-and-off staff at WRAMC for the past seven years until I got out in 2004. I recently got out and I now provide Quality Assurance education for companies worldwide. Vijay was my staff when I was a fellow, and I have worked with him through the years when I was a staff at WRAMC. I was aware of the situation that was going on with Dr. Sangar. I had expressed interest in training and tutoring Dr. Sangar, and the interest was well received by him. The training never happened. I did do a memorandum for record in April 2003 suggesting that Dr. Sangar's credentials be reinstated under a supervisory status.

## QUESTIONS BY THE PRESIDENT OF THE BOARD

When I got to WRAMC from USUHS, LTC Sangar was on staff and teaching me. My first year on staff he had Quality Assurance issues. I was in charge of some of his reading. When I returned to WRAMC in 2003, I volunteered to help Dr. Sangar.

## QUESTIONS BY BOARD MEMBER COL OMORI

I cannot remember to whom I gave the memorandum.

LTC Vijay K. Sangar, Walter Reed Army Medical Center, Washington, DC, was called as a witness, was sworn, and testified substantially as follows:

## QUESTIONS BY THE COUNSEL FOR RESPONDENT

I was born in India in 1944. I am 61-years-old. I received my Masters from Punjab University in India. I received a scholarship from the University of Kansas for a PhD in Microbiology in 1969. I had my fellowship in Microbiology at Ohio State University for three years. I wanted to go into medicine, so I looked into applying for medical schools. I was admitted to medical school in the Dominican Republic where I taught Microbiology as a faculty member. I Received my M.D. in 1984. My first residency was at Deaconess Hospital in St. Louis, Missouri. After that I had another residency in Missouri which ended 1988. I joined the Army in July 1988 and went to Fort Leonard Wood for seven years. I was Chief of Nuclear Medicine and also Chief of Radiology for a year. I then transferred to WRAMC in 1995. I started having problems in 1997. I was physically impaired form 1997 through 1999. In 1999, I went through the credential review process. In 2000, I was notified that my credentials were revoked. This information was forwarded to the National Practitioner Data Bank. I was never placed in an impaired provider program for my credentials to be restored. In September 2000, I became Board certified in Nuclear Medicine. The Army initiated a Medical Evaluation Board (MEB) because I was not able to work like a doctor due to my documented illness. After my privileges were revoked, I was sent to an MEB. In 2001, the Physical Evaluation Board (PEB) found me fit for duty. During the Boards, I was reassigned to work in Tumor Registry. After I was found fit, I took a letter from Mr. Spinner to COL Dunn and told him that I wanted to go back to work. I did not hear from him on that matter, but I was later notified that the hospital was initiating a Show Cause Board against me. The Board retained me. They asked if I wanted to stay at WRAMC, I told them I wanted to go somewhere else and retrain. I did speak with Dr. Bridwell about being retrained and I mentioned to COL Fitzpatrick about Dr. Bridwell's offer, but he denied the request. I mentioned transferring to Missouri to practice where I am licensed. I also brought up the possibility of going to Bethesda. Both of my suggestions were turned down by COL Fitzpatrick. I will be turning 62 next year prior to my 18 year mark in the Army. I am not aware of any retirement program that applies to me at age 62 with 17 years. I discussed with COL Fitzpatrick about PCSing to Fort Bragg, but the paperwork was halted. I have been fulfilling all of the requirements to maintain my Missouri medical license . I felt that the Madigan program was not long enough, but I dedicated myself to retraining and learning the new advances that had occurred during the time that I had not been practicing. I received an evaluation on 13

November 2003 and about a week-and-a-half later I went on emergency leave to India. After my emergency leave, I returned to WRAMC and was told that I would not be returning to Madigan. I was under the impression that I would be returning due to the fact that I had not completed my training. I do believe that if I were given adequate time to refresh my skills and to learn the computer systems that I would be able to practice unsupervised in Nuclear Medicine. I was told that I could extend my training time at Madigan, if needed. I was willing to go anywhere to get my training. I was given a memo to sign, but I decided not to because I did not want to give up my rights to practice medicine in the Army. I want to practice medicine. I was told that if I apply for my credentials that they would not given to me. There was no real job given to me, because, I believe, people thought I was going to be discharged by one of the Boards. I have asked to go back to Missouri, but have been denied because I could not obtain insurance. I stated that I would pay the money out of my own pocket to go for training, but the request was still denied. I have communicated with doctors and informed them of my situation and they were still interested with bringing me to their facilities.

## QUESTIONS BY THE RECORDER

I was sent to Tumor Registry in 1999. While there, I collected patient records and administered different codes for different ailments. I was given assignments by the personnel that worked at Tumor Registry; however, I did not have a supervisor. I was, and still am, being paid as a doctor. On a typical day, I arrive about 8 o'clock and wonder what it is that I am doing in the Registry and why I am not practicing medicine. The Army does not give me any work to perform. I do not seek out work to do on my own. I took the Nuclear Board exam in 2000. I wrote a letter to General Peake, through my counsel, informing him that I passed the Board and that I wanted to practice medicine. There was not any response. I did not apply for credentials at WRAMC, but there are other things in the works by my attorney. While I waited for things to work themselves out, I worked on little projects for COL Fitzpatrick in the Tumor Registry.

## QUESTIONS BY THE PRESIDENT OF THE BOARD

After returning from emergency leave, I came back to WRAMC and went back to Tumor Registry to await further information on my return to Madigan for training. For the first few years, I worked on projects that were given to me. I have not had an Officer Evaluation Report (OER) form in the past two years. My rater is COL Fitzpatrick and senior rater is the Hospital Commander for the past two years. Every year, except the past two years, I have been given an OER support form to fill out. I was not given a job description when I was sent to the Tumor Registry. I just focused on studying for the Boards. I did seek to go outside the military realm for training, but I cannot do so without a license. I have gone to GME training to maintain my license, but I have not gone to Missouri to train in my field. I can get out tomorrow and practice in Missouri, I believe that I could apply and receive credentials. I was the Chief of Nuclear Medicine at Fort Leonard Wood, and my last evaluations there were all excellent. My plan is to stay in the Army to complete 20 years and retire. I also hope to be transferred and apply to get credentials at a new facility. I did appeal the decision of them not releasing me to go to another facility with no response.

## QUESTIONS BY BOARD MEMBER COL NACE

I did not have any privileges when I requested to be transferred to Fort Bragg. I did get credentials to go to Madigan. I did not have a license to work with Dr. Holder when he was in Maryland. I can go to Missouri, because I am licensed there. If I signed that letter then I would have been forced out of the military. Then, I still would not be able get a job. I feel I was not given a fair chance becoming a healthcare provider and of being an asset to the Army. I have been practicing as a nuclear medicine physician for almost 10 of the 17 years of my Army career. I would apply for initial privileges at a new facility. I believe that if I went to a different environment I would have a better chance for improvement.

## QUESTIONS BY BOARD MEMBER COL OMORI

When I was diagnosed with CIDP, I did not apply for the impaired healthcare provider program. I was told that I should be under the program. I am not sure that I did not sign up for the program. I am not sure that I will have to retire when I turn 62 years of age.

The Board recessed at 1535 hours, 28 March 2005.

The Board reconvened at 1545 hours, 28 March 2005.

All parties present when the Board recessed were again present.

The Respondent rests.

The legal advisor returns to give the Board instructions.

The Recorder makes a closing argument.

The Respondent's counsel makes a closing argument.

Neither the Recorder nor the counsel for the Respondent has anything further to offer.

The Board was closed at 1638 hours, 28 March 2005.

The Board opened at 1726 hours, 28 March 2005, to read the Findings and Recommendations.

All parties present when the Board closed are again present.

The Board finds that after the loss of your credentials to practice Nuclear Medicine, you failed to perform to the standards expected of a Lieutenant Colonel in the United States Army. This

includes your lack of initiative to become recredentialed, your apparent lack of insight in recognizing your clinical limitations and deficiencies and how to pursue correcting them since January 2004. Without these credentials, you are unable to perform the duties for which you were employed.

The Board recommends that the Respondent be separated.

The Board adjourned at 1727 hours, 28 March 2005.

**SECTION IV - FINDINGS** *(para 3-10, AR 15-6)*

The *(investigating officer) (board)*, having carefully considered the evidence, finds:
After the loss of your credentials to practice Nuclear Medicine, you failed to perform to the standards expected of a Lieutenant Colonel in the United States Army. This includes your lack of initiative to become recredentialed, your apparent lack of insight in recognizing your clinical limitations and deficiencies and how to pursue correcting them since January 2004. Without these credentials, you are unable to perform the duties for which you were employed.

**SECTION V - RECOMMENDATIONS** *(para 3-11, AR 15-6)*

In view of the above findings, the *(investigating officer) (board)* recommends:
That you be separated from service under honorable conditions.

FINDINGS AND RECOMMENDATIONS WORKSHEET.

A BOARD OF OFFICERS WAS CONVENED ON ___28 Mar 2005___ TO

CONSIDER WHETHER ___LTC Vijay Sangar___, SHOULD BE

ADMINISTRATIVELY SEPᴬERATED FROM SERVICE ~~FOR~~

___Under the provisions of AR 600-8-24, paragraph 4-2b(9)___
___because of conduct or actions that result in the loss___
___of a professional status, such as withdrawal, suspension___
___or abandonment of professional license, endorsement or___
___certification that is directly or indirectly connected with___
___or is necessary for the performance of ones military duties___
(for AMEDD offices this includes the partial or complete suspension limitations withdrawal or
THE BOARD FINDS:  denial of clinical privileges)

The Board finds that:
   After the loss of your credentials to practice Nuclear Medicine,
you failed to perform to the standards expected of a Lt Colonel
in the U.S. Army. This includes your lack of initiative to
become recredentialed, your apparent lack of insight in
recognizing your clinical limitations and deficiencies
and how to pursue correcting them since January 2004.
Without these credentials, you are unable to perform
the duties for which you were employed.

AND BASED ON THOSE FINDINGS RECOMMENDS Per AR 600-8-24 YOU:

ARE TO BE SEPᴬERATED FROM SERVICE ___✗___

ARE TO BE RETAINED IN SERVICE _____

IF SEPARATED THE BOARD RECOMMENDS YOU BE SEPARATED UNDER

HONORABLE CONDITONS _____×_____

~~OTHER THAN HONORABLE CONDITIONS~~ _____ _____

DATED: 28 march 2005 a 17:23

PRESIDENT

VOTING MEMBER

VOTING MEMBER

**SECTION IV - FINDINGS**  *(para 3-10, AR 15-6)*

The *(investigating officer)* *(board)*, having carefully considered the evidence, finds:
After the loss of your credentials to practice Nuclear Medicine, you failed to perform to the standards expected of a Lieutenant Colonel in the United States Army. This includes your lack of initiative to become recredentialed, your apparent lack of insight in recognizing your clinical limitations and deficiencies and how to pursue correcting them since January 2004. Without these credentials, you are unable to perform the duties for which you were employed.

**SECTION V - RECOMMENDATIONS**  *(para 3-11, AR 15-6)*

In view of the above findings, the *(investigating officer)* *(board)* recommends:
That you be separated from service under honorable conditions.

## SECTION VI - AUTHENTICATION  *(para 3-17, AR 15-6)*

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. *(If any voting member or the recorder fails to sign here or in Section VII below, indicate the reason in the space where his signature should appear.)*

_____
*(Recorder)*

_____
*(Member)*

_____
*(Member)*

_____ Col, USA
*(Investigating Officer) (President)*

_____
*(Member)*

_____
*(Member)*

## SECTION VII - MINORITY REPORT  *(para 3-13, AR 15-6)*

To the extent indicated in Inclosure _____ , the undersigned do(es) not concur in the findings and recommendations of the board. *(In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)*

_____
*(Member)*

_____
*(Member)*

## SECTION VIII - ACTION BY APPOINTING AUTHORITY  *(para 2-3, AR 15-6)*

The findings and recommendations of the *(investigating officer) (board)* are *(approved) (disapproved) (approved with following exceptions/ substitutions)*. *(If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if oral) as a numbered inclosure.)*

Explanation of negative responses:

2b.   An index for the Government's exhibits is provided.   Respondent's exhibits are tabbed, but not indexed.

9c(4)  The Government provided the names and contact information of all potential witnesses in separate memoranda to Respondent's counsel.  The memoranda are included in Tab III of this packet.

03/03/2005 THU 13:50 FAX



# DEPARTMENT OF THE ARMY
## WALTER REED ARMY MEDICAL CENTER
### WASHINGTON, DC   20307-5001

REPLY TO
ATTENTION OF:

Suspense:  10 Days From Receipt

MCHL-DC                                      5 February 1999

MRMORANDUM FOR  LTC Vijay K. Sangar, Nuclear Medicine Service, Walter Reed
Army Medical Center, Washington, DC  20307-5001

SUBJECT:  Notice of Summary of Suspension of Clinical Privileges

1.  You are hereby notified that your clinical privileges at Walter Reed Army Medical Center
are suspended as follows:   Effective immediately, your clinical privileges have been
suspended.  The Credentials Committee was presented with evaluations that demonstrated
that you are not competent to perform clinical duties as a Nuclear Medicine Physician.

2.  You are advised that you have the right, upon your request , to have the credentials
hearing committee conduct a hearing to review this action concerning your privileges.  The
hearing procedures and your hearing rights are detailed in AR 40-68, chapter 4.

3.  In order to have this hearing, you must make a written request for the hearing to the
Chairperson of the Credentials Committee within 10 days from the date that you received this
notice.  If you fail to make the request within that time or if you fail to appear at the hearing
so requested, you waive your rights to the hearing and also waive rights to appeal to higher
medical authority.

YANCY Y PHILLIPS
Colonel, Medical Corps
Deputy Commander for Clinical Services

Acknowledgement of Receipt _____  Date ____2/8/99____
                                          Signature

GOVERNMENT EXHIBIT

14

03/03/2005 THU 13:51 FAX



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WASHINGTON, DC   20307-5001

REPLY TO
ATTENTION OF:

Suspense:   23 April 1999

MCHL-DC                                                     19 April 1999

MEMORANDUM FOR Lieutenant Colonel Vijay Sangar, Department of Radiology,
Nuclear Medicine Service, Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Notification of Credentials Hearing

1. The Credentials Hearing Committee will conduct a hearing concerning allegations that
may adversely affect your clinical privileges.

2. The allegation to be reviewed is that the Credentials Committee was presented with
evaluations that demonstrated that you are not competent to perform clinical duties as a
Nuclear Medicine Physician. There is concern that your knowledge, concentration and
judgment in providing safe patient care are impaired. There are statements from your
previous supervisor, from outside evaluators and minutes from the Impaired Provider
Committee, that are available for you in the Medical Staff Office, Rm. 2J35, Walter Reed
Army Medical Center (these documents have previously been provided to you, however if
you need other copies they are available).

3. The Committee will hold the hearing at 1600 hours on 3 May 1999 in Room 2A08, Walter
Reed Army Medical Center, Washington, DC. You have the right to be present, to present
evidence and call witnesses in your behalf, to cross examine witnesses called by the
committee, to consult legal counsel and to be advised by legal counsel at the hearing. It will
be your responsibility to arrange for the presence of any witnesses you desire. Military
counsel will not be made available to advise you at the hearing. You may retain a civilian
attorney at your own expense.

   a. Failure to appear at the hearing will constitute a waiver of the rights listed here and the
right to appeal.

   b. The time and place of the hearing may be changed by the chairperson of the hearing
committee upon your written request before the indicated suspense date if based on good
cause.

   c. The Committee will call the following witnesses:

        COL Ana Rodriguez, MC

GOVERNMENT EXHIBIT

**15**

03/03/2005 THU 13:51 FAX

MCHL-DC
SUBJECT: Notification of Credentials Hearing

        MAJ Carlos Jimenez, MC
        MAJ Kevin Cannard, MC
        MAJ Gregory Gahm, MS

FOR THE COMMANDER:

YANCY Y PHILLIPS
Colonel, Medical Corps
Deputy Commander for Clinical Services
 and Chairman, Credentials Committee

2

03/03/2005 THU 13:52 FAX



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC  20307-5001

REPLY TO
ATTENTION OF

MCHL-CDR                                                    3 November 1999

MEMORADUM FOR   LTC Vijay Sangar, MC, Walter Reed Army Medical Center,
Washington, DC

SUBJECT:  Notification of Revocation of Clinical Privileges

1.  You are hereby notified that your clinical privileges at Walter Reed Army Medical Center
are revoked as follows:  Effective immediately your clinical privileges have been revoked
based on the evidence presented at the Credentials Hearing that was held on 14 September
1999.

2.  You are advised that you have 10 duty days (extended in writing by the Commander for
good cause) from receipt of this letter to submit a request for reconsideration to the
Commander, Walter Reed Health Care System.  In the request for reconsideration, you, the
provider, will identify errors of fact or procedure that form the basis of the request.  The
burden is on you, the provider, to specify the grounds for reconsideration.

3.  The Commander has 15 duty days from receipt to consider your request.  If the
Commander denies your request in whole or in part, the action will be forwarded to the
Surgeon General who is the final appellate authority for revoking clinical privileges.

4.  The appellate authority will notify you, the provider, by certified mail of the decision
concerning appeal.

5.  Point of contact for this action is COL Yancy Phillips, Deputy Commander for Clinical
Services, (202) 782-8397 or the undersigned.

MICHAEL A. DUNN
Colonel, Medical Corps
Commander, Walter Reed Health Care System

GOVERNMENT EXHIBIT

16

03/03/2005 THU 13:52 FAX



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WASHINGTON, DC   20307-5001

REPLY TO
ATTENTION OF:

MCHL-CDR                                           3 November 1999

MEMORANDUM FOR  Commander, Walter Reed Health Care System

SUBJECT:  Receipt of Notification of Revocation of Clinical Privileges

I hereby acknowledge receipt of the subject Memorandum of Notification of Revocation of
Clinical Privileges.  The memorandum is dated 3 November 1999 and I received it on

_Nov 4, 1999._
Date

VIJAY SANGAR
Lieutenant Colonel, Medical Corps

GOVERNMENT EXHIBIT

**17**

03/03/2005 THU 13:52 FAX



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WASHINGTON, DC   20307-5001

REPLY TO
ATTENTION OF:

MCHL-CO                                                                 18 February 2000

MEMORANDUM FOR  LTC Vijay Sangar, MC, Walter Reed Army Medical Center,
Washington, DC 20307-5001

SUBJECT:  Request for Reconsideration of Revocation of Clinical Privileges

1.  After carefully considering the concerns raised by your attorney in his letter to me dated 20
December 1999, I have decided to proceed with the revocation of your clinical privileges as
initially stated in my memorandum to you of 3 November 1999.

2.  The revocation will now be forwarded to The Army Surgeon General, who is the final
appellate authority for revoking clinical privileges.

3.  The appellate authority will notify you by certified mail of his decision concerning your
appeal.

MICHAEL A. DUNN
Colonel, Medical Corps
Commanding

CF:  Mr. Sterbenz

I acknowledge receipt of this memorandum.

LTC Vijay Sangar, MC

18 February 2000

GOVERNMENT EXHIBIT

18

03/03/2005 THU 13:53 FAX



**DEPARTMENT OF THE ARMY**
OFFICE OF THE SURGEON GENERAL
5109 LEESBURG PIKE
FALLS CHURCH VA 22041-3258



REPLY TO
ATTENTION OF

MCHO-Q  (40-68)                                NOV 3 0 2000

MEMORANDUM FOR Commander, Walter Reed Army Medical Center,
6825 16ᵗʰ Street, N.W., Washington, DC
20307-5001

SUBJECT: Appeal of Revocation of Clinical Privileges by Vijay K. Sangar, LTC

1. The U.S. Army Medical command Appeals Committee met on 22 Jun 00 to consider the appeal of Dr. Sangar for the revocation of his clinical privileges. The results of the Appeals Committee are in support of your decision to revoke his clinical privileges.

2. After careful consideration of the entire record to include those matters noted in LTC Sangar's appeal, I have determined that the actions taken regarding his clinical privileges were proper.

3. Under the provisions of Army Regulation 40-68, this is the final action in the appeals process. This action will be reported to The National Practitioner Data Bank, The Federal of State Medical Boards, and known states of licensure.

JAMES B. PEAKE, MD
Lieutenant General
The Surgeon General

CF:
U.S. Army Medical Command, ATTN: MCHO-Q, 2050 Worth Road, Suite 26, Ft. Sam Houston, TX 78234-6026

GOVERNMENT EXHIBIT

19

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 12 (Exhibit 12 of Plaintiff's ABCMR Application)

Initiation of Elimination (Second Board), Sep 24, 2004

**DEPARTMENT OF THE ARMY**
NORTH ATLANTIC REGIONAL MEDICAL COMMAND
AND
WALTER REED ARMY MEDICAL CENTER
WASHINGTON, DC 20307-5001

REPLY TO
ATTENTION OF

MCAT-CG

SEP 2 4 2004

MEMORANDUM FOR LTC Vijay K. Sangar, 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, Bravo Company, Medical Center Brigade, Walter Reed Army Medical Center, Washington, DC, 20307-5001

SUBJECT:  Initiation of Elimination

1.  You are required to show cause for retention on active duty under the provisions of AR 600-8-24, paragraph 4-2b(9), because of conduct or actions that result in the loss of a professional status, such as withdrawal, suspension or abandonment of professional license, endorsement, or certification that is directly or indirectly connected with or is necessary for the performance or one's military duties. (For AMEDD officers, this includes the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges.)

2.  My action is based on the following specific reasons for elimination:  On 23 January 2004, the Madigan Army Medical Center Nuclear Medicine Service and Nuclear Medicine Consultant to The Surgeon General concluded that you could not practice independently as a nuclear medicine physician after your completing six weeks of refresher training and familiarization followed by four weeks of assessment of your potential to practice independently.  This independent training and evaluation was performed following several years of performance problems at Walter Reed Army Medical Center.

3.  In conjunction with this action, a DA Form 268, (Suspension of Favorable Personnel Actions) has been initiated according to AR 600-8-2 (Encl 4).

4.  You may either have the assistance of an officer of The Judge Advocate General's Corps appointed as counsel or seek civilian counsel of your own selection (obtained by you at no expense to the Government) to prepare a written statement indicating any pertinent facts or any rebuttal bearing on the question of your elimination.

    a.  This statement may be sworn or unsworn.

    b.  Documents submitted in rebuttal must be legible and reproducible.

    c.  You may also confer with your counsel for legal advice concerning your options stated in paragraph 7 below.

5.  If you are eliminated for substandard performance of duty only, you will receive an Honorable Discharge.  If you are eliminated for misconduct, moral or professional dereliction, the least favorable discharge you may receive is an Under Other Than Honorable Conditions Discharge.  The final decision on the type of discharge will be determined by HQDA.

MCAT-CG
SUBJECT:  Initiation of Elimination

6.  Before taking further action, I will consider all written comments or a rebuttal that you may submit with your acknowledgment.

7.  In accordance with AR 600-8-24, paragraph 4-11, you may:

     a.  Submit your resignation in lieu of elimination according to AR 600-8-24, chapter 4.  You may not request an effective date.  The effective separation date will be as stated in AR 600-8-24, paragraph 4-5.

     b.  Request discharge in lieu of elimination according to AR 600-8-24, chapter 4.  You may not request an effective date.  The effective date will be as stated in AR 600-8-24, paragraph 4-5.

     c.  Apply for retirement in lieu of elimination if otherwise eligible, in accordance with AR 600-8-24, chapters 4 and 6.  The effective date for retirement will be (as applicable, if you have at least 19 years and 6 months of AFS but less than 20 years AFS, the effective date will not be later than 60 days from the date you attain 20 years AFS.  If you have 20 or more years AFS, the effective date will be no later than 60 days from the date you elect retirement in lieu of elimination).  You must specifically state that your application is submitted in lieu of elimination.

     d.  In place of resignation, discharge, or retirement, submit a rebuttal or a declination statement and request appearance before a Board of Inquiry.

8.  You have 30 calendar days from the date you receive this notification to acknowledge receipt in writing and exercise one the options in paragraph 7.

9.  Your acknowledgment should be in the format provided at AR 600-8-24, figure 2-4.  If you elect an option in paragraph 7a through c, you will include your tender of resignation, request for discharge, or application for retirement in lieu of elimination as an enclosure to your acknowledgment.

4 Encls
1.  Memo, LTG Mikolashek, 1 Jun 04
2.  Clinical Performance Feedback
3.  DA Form 268
4.  ORB

KENNETH L. FARMER, JR.
Major General, MC
Commanding

2

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 13 (Exhibit 13 of Plaintiff's ABCMR Application)

Memorandum from Government, citing documents for Second Elimination Board, all predating First Elimination Board, dated 7 March 2005



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
6900 GEORGIA AVENUE, N.W.
WASHINGTON DC 20307-5001

REPLY TO
ATTENTION OF:

MCAT-JA                                                                     07 March 2005

MEMORANDUM FOR CPT GABRIEL HINKEBEIN, USA Trial Defense Service, Region I, (MDW Field Office) 229 Forrest Circle, Fort Myer, VA 22211

SUBJECT: Additional Documents – LTC Vijay Sangar Board of Inquiry

1. Please find enclosed three documents the Government plans to use at LTC Vijay Sangar's upcoming Board of Inquiry. This information was not included with the initial packet of materials submitted to the defense on 3 December 2004. The documents are:

    a. 05 February 1999 memorandum: Notice of suspension of LTC Sangar's clinical privileges;

    b. 19 April 1999 memorandum: Notice to LTC Sangar of credentials hearing;

    c. 03 November 1999 memorandum: Notice to LTC Sangar of the revocation of his clinical privileges;

    d. 03 November 1999 memorandum: LTC Sangar's receipt of the notice of the revocation of his privileges;

    e. 18 February 2000 memorandum: Notice to LTC Sangar informing him that his appeal of the revocation of his privileges is denied; and

    f. 30 November 2000 memorandum: Notice to LTC Sangar informing him that the MEDCOM Appeals Committee supports the decision to revoke his privileges.

2. POC for this memorandum is the undersigned at (202) 782-3288.

Encls                                    JEFFREY B. JONES
as                                       CPT, JA
                                         Recorder

CF:
Board Members (w/encls)
Mr. Frank Spinner (w/encls)

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 14 (Exhibit 14 of Plaintiff's ABCMR Application)

Plaintiff's DD Form 214, noting discharge for "Misconduct", dated 28 Oct 05, discharge orders, dated 26 Oct 05

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) SANGAR, VIJAY KUMAR | 2. DEPARTMENT, COMPONENT AND BRANCH ARMY/RA/MC | 3. SOCIAL SECURITY NUMBER 510 56 1078 | |
|---|---|---|---|

| 4a. GRADE, RATE OR RANK LTC | b. PAY GRADE 005 | 5. DATE OF BIRTH (YYYYMMDD) 19440103 | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) 00000000 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY ST LOUIS, MISSOURI | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) 101 CORD COURT WAYNESVILLE MISSOURI 65583 |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND W REED AMC CO B HS | b. STATION WHERE SEPARATED WALTER REED, DC 20307-5001 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED N/A | 10. SGLI COVERAGE   NONE AMOUNT: $400,000.00 |
|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) 60B 9B NUCLEAR MEDICINE OFF - 17 YRS 2 MOS// NOTHING FOLLOWS | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 1988 | 07 | 19 |
| | b. SEPARATION DATE THIS PERIOD | 2005 | 10 | 28 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0017 | 03 | 10 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0000 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0000 | 00 | 00 |
| | f. FOREIGN SERVICE | 0000 | 00 | 00 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. EFFECTIVE DATE OF PAY GRADE | 1994 | 07 | 18 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) ARMY COMMENDATION MEDAL//NATIONAL DEFENSE SERVICE MEDAL (2ND AWARD)//ARMY SERVICE RIBBON//GLOBAL WAR ON TERRORISM SERVICE MEDAL//NOTHING FOLLOWS | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) AMEDD OFFICER ADVANCE COURSE, JAN 1992//AMEDD OFFICER BASIC, JAN 1988//COMBAT CASUALTY COURSE, JAN 1988//COMMAND GENERAL STAFF COLLEGE, JAN 1996//NOTHING FOLLOWS |
|---|---|

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | | YES | X | NO |
|---|---|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | X | YES | | NO |

| 16. DAYS ACCRUED LEAVE PAID 60 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO X |
|---|---|---|---|

| 18. REMARKS CONTINUOUS HONORABLE ACTIVE SERVICE: 1988/07/19-2005/10/28//DD FORM 215 WILL BE ISSUED TO PROVIDE MISSING INFORMATION//MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//CHAPTER 4, AR 600-8-24(MISCONDUCT, MORAL OR PROFESSIONAL DERELICTION)//NOTHING FOLLOWS

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program. |
|---|

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) 101 CORD COURT WAYNESVILLE MISSOURI 65583 | b. NEAREST RELATIVE (Name and address – include ZIP Code) UNKNOWN 101 CORD COURT WAYNESVILLE MISSOURI 65583 | | |
|---|---|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO MO | DIRECTOR OF VETERANS AFFAIRS | X | YES | NO |
|---|---|---|---|---|

| 21. SIGNATURE OF MEMBER BEING SEPARATED SOLDIER NOT AVAILABLE TO SIGN | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) NATHANIEL M LEE, CHIEF TRANSITION CENTER |
|---|---|

| DD FORM 214- AUTOMATED, FEB 2000 | PREVIOUS EDITION IS OBSOLETE GENERATED BY TRANSPROC | MEMBER – 1 |
|---|---|---|

DEPARTMENT OF THE ARMY
HEADQUARTERS, WALTER REED ARMY MEDICAL CENTER
WASHINGTON, D.C. 20307-5001

ORDERS 299-0001                                                26 October 2005

SANGAR, VIJAY KUMAR 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 LTC W REED AMC CO B, (W2DH02), WALTER REED AMC,
DC 20307

You are reassigned to the U.S. Army transition point shown for transition
processing. After processing, you are discharged from the Component shown. If
you are delayed in reporting to the transition point, you still must report to
the transition point as soon as possible or as authorized to receive a new
effective date of discharge.

Assigned to: WALTER REED ARMY MEDICAL CENTER, WASH WALTER REED DC 20307-5001
Reporting date: 28 October 2005
Comp: REGULAR
Date of discharge unless changed or rescinded: 28 October 2005
Additional instructions: a. Any temporary commissions or appointments held are
   terminated. b. A. SOLDIER IS NOT ELIGIBLE FOR TRANSITIONAL HEALTH CARE
   UNDER 10 U.S.C SECTION 1145 UNTIL _N/A_ RESERVE ID CARD FORM
   2A(RES)(IF APPLICABLE) AND YOUR FAMILY MEMBER ID CARD B. MOVEMENT OF FAMILY
   MEMBER: YES C. ALL SOLDIER WILL BE REQUIRED TO CONTACT THE RESERVE
   COMPONENT CAREER COUNSELOR UPON RECEIPT OF ORDERS AT (202) 782-3803 D.
TRANSPORTATION ENTITLEMENT FOR ETS/ESA CHAPTERS. 12 MONTH TO MOVE TO EITHER THE
HOME OF RECORD OR PLACE OF ENTRY ON ACTIVE DUTY. E. YOU ARE TO REPORT TO THE
TRANSITION CENTER AT LEAST 30 DAYS PRIOR TO YOUR SEPERATION DATE,IF YOU NOT
   TAKING LEAVE OR 30 DAYS BEFORE PTDY/TRANSITION LEAVE FOR PRE-SEPARATION
   PROCESSING. (202) 783-3664\6030

FOR ARMY USE
Auth: AR 600-8-24
HOR: WAYNESVILLE MO US
Place EAD or OAD: ST LOUIS MO US
MDC: 7BO6

Format: 501

FOR THE COMMANDER:

```
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
X                                   X
X            OFFICIAL WRAMC         X
X                                   X
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
JENNIFER R. COBBS-GRANT
LTC,MS
CHIEF, MILITARY PERSONNEL
DIVISION
```

DISTRIBUTION:
LTC SANGAR (15)
Cdr W REED AMC CO B, (W2DH02) (3)
INDIV CONC (10)
TRANS PT (1)
MILPO BLDG 11 (1)
POB (1) PSB (1) FAO (1)
TRANSPORTATION (1) RCC (1)

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 15, Plaintiff's Application to Army Board for Correction of
Military Records, with brief, October 16, 2005

| APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552 (Please read instructions on reverse side BEFORE completing this application.) | Form Approved OMB No. 0704-0003 Expires May 31, 2006 |
|---|---|

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services and Communications Directorate (0704-0003). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**ROUTINE USE(S):** None.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members to review all pertinent information in making a determination of relief through correction of a military record.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA** *(The person whose record you are requesting to be corrected.)*

| a. BRANCH OF SERVICE (X one) | | | | | | |
|---|---|---|---|---|---|---|
| | ARMY | NAVY | AIR FORCE | MARINE CORPS | COAST GUARD | |
| X | | | | | | |

| b. NAME (Print - Last, First, Middle Initial) | c. PRESENT OR LAST PAY GRADE | d. SERVICE NUMBER (If applicable) | e. SSN |
|---|---|---|---|
| Saggar, Vijay K. | LTC/O-5 | 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 | 510 56 1078 |

| 2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES (Active Duty, Reserve, National Guard, Retired, Discharged, Deceased) | 3. TYPE OF DISCHARGE (If by court-martial, state the type of court.) | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY (YYYYMMDD) |
|---|---|---|
| Separated | Honorable -characterized as misconduct | 20051028 |

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** *(Entry required)*

See attached.

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** *(Entry required)*

See attached.

**7. ORGANIZATION AND APPROXIMATE DATE (YYYYMMDD) AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** *(Entry required)* Walter Reed Army Medical Center, Washington DC

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

| a. DATE OF DISCOVERY (YYYYMMDD) | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION. |
|---|---|
| 20051028 | N/A |

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*

See attached.

| 10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. (At no expense to the Government) (X one) | | YES. THE BOARD WILL DETERMINE IF WARRANTED. | NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE. |
|---|---|---|---|
| | X | | |

| 11.a. COUNSEL (If any) NAME (Last, First, Middle Initial) and ADDRESS (Include ZIP Code) Sterbenz, Christopher A. PO Box 126 Vienna VA 22183 | b. TELEPHONE (Include Area Code) 703 620 2313 |
|---|---|
| | c. E-MAIL ADDRESS casterbenz@aol.com |
| | d. FAX NUMBER (Include Area Code) |

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW.** If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name *(print)* and relationship by marking one box below.

| SPOUSE | WIDOW | WIDOWER | NEXT OF KIN | LEGAL REPRESENTATIVE | OTHER (Specify) |
|---|---|---|---|---|---|

| 13.a. COMPLETE CURRENT ADDRESS (Include ZIP Code) OF APPLICANT OR PERSON IN ITEM 12 ABOVE (Forward notification of all changes of address.) c/o Christopher A Sterbenz, Esq. PO Box 126 Vienna VA 22183 | b. TELEPHONE (Include Area Code) |
|---|---|
| | c. E-MAIL ADDRESS |
| | d. FAX NUMBER (Include Area Code) |

| 14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM. (U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.) | CASE NUMBER (Do not write in this space.) |
|---|---|

| 15. SIGNATURE (Applicant must sign here.) *Vijay K Saggar* | 16. DATE SIGNED (YYYYMMDD) 2005/10/16 |
|---|---|

**DD FORM 149, MAY 2005**          PREVIOUS EDITION IS OBSOLETE.

BEFORE THE ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

| | |
|---|---|
| Application of : | ) |
| | ) |
| Lieutenant Colonel Vijay K. Sangar, USA | ) |
| 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, | ) |
| | ) |
| Applicant. | ) |

Pursuant to the provisions of 10 U.S.C. § 1552, the Applicant, Lieutenant Colonel Vijay K. Sangar, USA, hereby petitions the Army Board for Correction of Military Records to reverse his involuntary discharge from active duty with an honorable discharge, dated October 28, 2005, with a characterization of misconduct, and to reinstate him on active duty retroactive to that date. Alternatively, the Applicant prays the Board remove all allegations of "misconduct" from the characterization of Applicant's service, and make him eligible for separation pay for his 18 years of service.

The basis for the application is as follows:

## I.    FACTUAL BACKGROUND AND EXHIBITS

### a.    Medical Illness and Disability of Applicant

In 1997, Lieutenant Colonel Sangar was diagnosed with Chronic Inflammatory Demyelinating Polyneuropathy (CIDP) an organic disease of the brain (not a mental illness) which interferes with cognitive functions in its victims. The organic disease was discussed at length in a medical evaluation contained within the proceedings of a Medical Evaluation Board held at Madigan Army Medical Center in 2001 (Appended hereto as Exhibit 1).[1]

---

[1]    This illness is referenced in the Applicant's Officer Evaluation Report for the period ending September 30, 1998, wherein his rater opined that: "LTC Sangar's performance during this rating period has been encumbered by significant medical

The evaluation described LTC Sangar's condition: "Presently Dr. Sangar has evidence of an abnormal EMG with mild residual effects from the CIDP. He still has significant neuropsychological impairments and the diagnosis of Cognitive Disorder, NOS (Not Otherwise Specified). The Cognitive Disorder is chronic, stable, and not likely to improve. Unfortunately, there is no current treatment available for his cognitive disorder."

Based upon the extensive medical evaluation conducted by two psychiatrists and a neurologist found at Exhibit 1, the Applicant was issued a **permanent** physical profile under the provisions of AR 40-501 on May 24, 2001, on the basis of: 1) Cognitive Disorder NOS, Moderate; 2) Decreased Visual Acuity in the Left Eye; and 3) Cervical Spondylosis. The Profile required an assignment limitation as follows: "Cannot be assigned as a physician in the specialty of nuclear medicine given his Cognitive Disorder, NOS." (Appended hereto as Exhibit 3).[2]

While the Applicant's profile was applicable to service as a nuclear medicine physician, he was otherwise found capable of performing military duties and his continuance on active duty was "not medically contraindicated." (See Exhibit 4). He was *retained* on active duty.

---

illness, including prolonged hospitalization, convalescence, and on-going slow recovery and rehabilitation. His physical stamina has been markedly reduced." (See Exhibit 2, OER dated April 19, 1999.)

[2]    From November 11, 1999 through November 11, 2002, the Applicant was not posted as a nuclear medicine physician, but was assigned as a "Physician/Tumor Registry Clerk" and "Medical Abstraction Physician" responsible for "abstracting medical records from Tumor Registry at Walter Reed Army Medical Center." See Exhibit 5 (Officer Evaluation Reports for Applicant for 2000, 2001 and 2002). Except from a brief period discussed in this application, the Applicant continued to serve in this capacity in the WRAMC Tumor Registry until his discharge on October 28, 2005. No OERs were prepared for the Applicant in 2003, 2004, or 2005, in violation of the requirements of AR 623-105.

This Permanent Profile was never revoked subsequent to May 24, 2001.

**b.    First Elimination Proceedings, 2002.**

On March 26, 2002, the Applicant was notified that he was subject to a "Show Cause" board under the provisions of AR 600-8-24 "based on a downward trend in your overall performance resulting in a consistent period of mediocre service and failure to properly perform assignments commensurate with your grade and experience. This is substantiated by your Officer Evaluation Reports [found in part in this Application at Exhibit 5]" (See Exhibit 6).

A hearing before a board of officers convened on December 17, 2002 to consider whether the Applicant should be separated. The board made the following finding of fact: "LTC Sangar has some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination, as follows: It is the opinion of the board that the cited downward trend in OERs from July 97 thru Nov 99 is potentially attributable to LTC Sangar's diagnosed CIDP. The two OERs covering the period Nov 99 thru Nov 01 do not address a downward trend, but address the fact that he is not performing as a Nuclear Medicine Physician. Furthermore, there is disagreement among Nuclear Medicine Experts concerning his qualifications."

The board unanimously voted to retain the Applicant in service, recommending that "LTC Sangar be retained in the service with reassignment with a period of supervision to assess his suitability to be credential and practice as a Nuclear Medicine Physician." (See Exhibit 7).

The appointing authority approved the board's findings in early 2003, but the Applicant was never transferred from his assignment at WRAMC. He was continued in a

3

permanent assignment as a Medical Abstraction Physician at the WRAMC Tumor Registry.[3]

**c.    Temporary Duty at Madigan Army Medical Center, 2003.**

After the Applicant was retained on active duty by the first show cause board in late 2002, he had been out of the regular practice of medicine (because of his CIDP illness and subsequent assignment to the WRAMC Tumor Registry) for almost six years (see Exhibit 5, OER dated April 19, 1999, noting onset of Applicant's lengthy illness and hospitalization). The Applicant was also under a permanent profile (see Exhibit 3) related to his Cognitive Disorder, NOS.

Despite the requirement of the first show cause board in December 2002 that the Applicant be transferred out of WRAMC, permanent change of station was never initiated. Instead, in September 2003, the Applicant was sent on Temporary Duty (TDY) to Madigan Army Medical Center to perform a brief period of refresher training in nuclear medicine.[4] This period extended from September 22, 2003 to December 2, 2003.

---

[3]    Assignment as a Medical Abstraction Physician does not require clinical privileges nor was Applicant allowed to perform any medical clinical duties in his role at the Tumor Registry. Nonetheless, WRAMC granted provisional clinical privileges to the Applicant on May 6, 2003 for a period of one year (See Exhibit 8). According to the then-applicable regulation governing clinical privileges, AR 40-68, paragraph 4-2(c): "During the provisional period, practitioners will be supervised directly or indirectly depending on the recommendations of the credentials committee. The appointed supervisor will submit monthly reports to the credentials committee; however, quarterly reports will be acceptable after three successive monthly reports." No supervisor ever supervised the Applicant in connection with his (non-existent) clinical duties at the Tumor Registry. No feedback was provided to Applicant regarding his performance of duty by WRAMC subsequent to the first show cause board, and no Officer Evaluation Reports were ever generated.

[4]    There is no explanation in the record as to why Applicant was to be subjected to refresher training in nuclear medicine; Applicant was under a permanent profile outlining his unsuitability to perform the cognitive tasks necessary for a nuclear medicine

4

The Applicant was issued credentials to practice as a nuclear medicine physician for the period September 22, 2003 through May 5, 2005.  (See Exhibit 9).  It is important for the purposes of this appeal to note that these credentials were never subsequently modified or revoked, and unlike his Tumor Registry assignment at WRAMC, were necessary to his TDY clinical medical duties at Madigan.

Memoranda related to Applicant's performance of duty during this period are appended hereto as Exhibit 10.  The memoranda, *inter alia*, noted that "we are all encouraged by your attention, cooperation and willingness to learn" (October 21, 2003 memo); "we are attempting to give him honest feedback on all the good things he is doing as a physician" (October 31, 2003 memo); "Dr. Cote stated that he has noticed a market improvement in Dr. Sangar's skills" (November 13, 2003 memo).  The final memorandum noted that the brief refresher course was truncated by two weeks because of the death of Applicant's father.  Despite six years' illness and absence from the regular practice of medicine, it also noted that "LTC Sangar is a pleasant physician who availed himself of the learning opportunities at MAMC.  However, based on our observations of his performance, we do not feel that LTC Sangar can practice *independently* at this time." (January 23, 2004 memo)(emphasis added).[5]

---

physician.  As any soldier is required to do, Applicant complied with his order to perform the brief refresher training.

[5]    Many physicians and other health care practitioners within the Army's health care system do not practice medicine independently.  Indeed, AR 40-68, the governing regulation for health care providers, provides for an entire category of "supervised clinical privileges" for health care providers who, like LTC Sangar, have been away from medical practice for lengthy periods of time, and who are undergoing retraining.  See AR 40-68 Paragraph 7-15d.  The typical period for such training and limited clinical credentialing is *six months*, not the 10 weeks of Applicant's case.  See AR 40-68, Para. 9-4e(2)(c).

Applicant's TDY at Madigan terminated, and he was returned to WRAMC, which made no further effort to employ the Applicant as a nuclear medicine physician (or in any other role as a soldier, for which his cognitive impairment did not disqualify him), and re-sent him to the WRAMC Tumor Registry where he resumed his six-years-long assignment as a Medical Abstraction Physician. After his return, the WRAMC Deputy Commander, Colonel Thomas M. Fitzpatrick, on April 16, 2004, requested that the Applicant to voluntarily relinquish all clinical privileges. (See Exhibit 11).[6] Applicant declined, but in any event, no clinical privileges were necessary to perform the purely administrative duties performed by LTC Sangar.

In 2003, 2004, and 2005, no officer evaluation reports were prepared for LTC Sangar. He did not receive any counseling from his chain of command related to his expected duties at his permanent duty station at WRAMC, no OER support forms, and absolutely no feedback as to any allegations of substandard performance of his duty as a Medical Abstraction Physician.[7]

---

[6]     COL Fitzpatrick also testified at the second show cause board which is the subject of this appeal that he solicited the Applicant to relinquish all medical clinical credentials. (See Exhibit 11 Transcript of Proceedings, p. 5). This is important because the separation of Applicant was premised upon misconduct – specifically, the Applicant's medical clinical credentials. The very witness who testified in support of Applicant's discharge for misconduct did *himself* solicited the Applicant to commit the alleged misconduct later alleged. The Army cannot officially solicit conduct from Applicant and then describe this conduct as being grounds for involuntary separation.

[7]     AR 40-68 "Clinical Quality Management," outlines the necessity of officers to apply for medical clinical credentials. Paragraph 9-2 states that "Health care practitioners who function independently to initiate, alter, or terminate a regimen of medical care must be privileged.... Members of the health care staff who function under a standard job description in the performance of their duties...do not require clinical privileges." Applicant's 2002 OER (see Exhibit 5) shows, for example, that he successfully performed the administrative duties of a Medical Abstraction Physician at a time when he did not have medical clinical credentials. None were necessary; neither by job description nor by regulation.

6

**d.     Second Elimination Proceedings, 2004-05.**

On September 24, 2004, the Applicant received what is appended hereto as

Exhibit 12, a second initiation of elimination. The claim was:

> My action is based on the following specific reasons for
> elimination: On 23 January 2004, the Madigan Army
> Medical Center Nuclear Medicine Service and the Nuclear
> Medicine Consultant to The Surgeon General concluded
> that you could not practice independently as a nuclear
> medicine physician after completing your six weeks of
> refresher training and familiarization followed by four
> weeks of assessment of your potential to practice
> independently. ***This independent training and evaluation
> was performed following several years of performance
> problems at Walter Reed Army Medical Center.***

Exhibit 12 (emphasis added).[8]

It is important to note the absence of several important items from the notice that

the Applicant received of the provisions of his show cause board:

1) No mention was made in the Initiation of Elimination letter that the Applicant

was not assigned as a nuclear medicine physician, and instead since 1999 has been

---

[8]     The letter did cite, without specifying any specific instance: "Conduct or actions
that result in the loss of a professional status, such as withdrawal, suspension or
abandonment of professional license, endorsement, or certification that is directly or
indirectly connected with or is necessary for the performance of one's military duties.
(For AMEDD officers, this includes the partial or complete suspension, limitations,
withdrawal, or denial of clinical practice privileges.)"

At all times after the time he was retained in service by the first show cause board
in December 2002, the Applicant was fully licensed to practice medicine by his state
board of medicine. In addition, the Applicant's administrative assignment as a Medical
Abstraction Physician did not require continuing clinical practice privileges, but in any
event, the Applicant's clinical practice privileges at Madigan Army Medical Center were
valid until long after the second show cause board concluded. In addition, no clinical
practice privileges were suspended, limited or denied by WRAMC, as noted in footnote
7, *supra*.

7

assigned as a Medical Abstraction Physician (See Exhibit 5, copies of Officer Evaluation Reports).

2) No mention was made in the Initiation of Elimination letter that the "several years of performance problems" at WRAMC had already been the subject of the December 2002 board which had retained the Applicant. (See Exhibit 7).

3) No mention was made in the Initiation of Elimination letter that the Applicant was under a permanent profile for an organic brain disorder which had been caused by the CIDP illness. (See Exhibit 3.)

4) No documentation was ever promulgated throughout the second show cause board proceedings that the "Nuclear Medicine Consultant to The Surgeon General" had ever made any adverse findings about the Applicant.

A show cause board was held on March 28, 2005. At the hearing, the Recorder submitted voluminous documentation concerning conduct already the subject of the 2002 show cause board. Specifically, Government Exhibits 14, 15, 16, 17, 18, and 19 of the Record of Proceedings[9] all outlined incidents and conduct of the Applicant which took place years before the first show cause board, held in December 2002.[10]  These documentary exhibits included:

* 05 February 199 memorandum: Notice of suspension of LTC Sangar's clinical privileges.

---

[9]    Applicant does not possess a complete copy of the second show cause boards' proceedings.  The Applicant requests that the ABCMR cause such a complete copy to be promulgated and provided to the Applicant.

[10]    These documentary exhibits are outlined in Exhibit 13, appended hereto (Letter of CPT Jeffrey B. Jones, Recorder, March 7, 2005).

\* 19 April 1999 memorandum: Notice of suspension of LTC Sangar's clinical privileges.

\* 03 November 1999 memorandum: Notice to LTC Sangar of the revocation of his clinical privileges.

\* 03 November 1999 memorandum: LTC Sangar's receipt of the notice of the revocation of his privileges.

\* 18 February 2000 memorandum: Notice of LTC Sangar informing him that his appeal of the revocation of his privileges is denied.

\* 30 November 2000 memorandum: Notice to LTC Sangar informing him that the MEDCOM Appeals Committee supports the decision to revoke his privileges.

In addition to the documents he introduced, the Recorder solicited extensive testimony from witnesses concerning allegations of conduct by the Applicant which also were the subject of the December 2002 board.   This testimony included:

\* Ms. Susan Reed extensively referencing Applicant's 1999-2000 performance of duty. (See Exhibit 11, transcript, pp. 3-4).

\* COL Thomas Fitzpatrick extensively testifying about Applicant's performance of duty from 1999-2002 (See Exhibit 11, transcript, pp.4-5).

After re-considering all of this evidence and testimony which had already been thoroughly considered by the December 2002 show cause board, the new show cause board in March 2005 voted to eliminate the Applicant from the service.

The March 2005 board recommended an honorable discharge.  However, the post-board processing by WRAMC added in specifications of "misconduct" to the separation documents, making the Applicant ineligible for any separation pay for his

nearly 18 years of continuous active federal service. (See Exhibit 14, Separation Order

and DD-214). No explanation exists in the record why this additional, highly pejorative

description of Applicant's long service was added to his military records.

## II.    LEGAL ARGUMENT

**a.    The decision to discharge the Applicant was based upon conduct which was subject to previous elimination proceedings that resulted in a final determination that he be retained in service.**

The regulation governing officer discharges is AR 600-8-24, "Officer Transfers

and Discharges."

Specifically, Paragraph 4-4b. requires:

> [N]o officer will be considered for elimination for reasons
> stated in Paragraph 4-2 because of conduct that has been
> the subject of administrative elimination proceedings that
> resulted in a final determination that the officer should be
> retained in the Service. For purposes of this paragraph, an
> officer will be considered to have been the subject of
> elimination proceedings only if allegations against the
> officer were acted on by a Board of Inquiry convened under
> this chapter.[11]

In the second show cause board, most of the government's documentary exhibits

offered concerned conduct and performance of duty by the Applicant prior to the first

show cause board held in December 2002 which decided to retain the Applicant in

service. The testimony of **both** witnesses offered for testimony by the board recorder

concerned, in substantial portion, conduct and performance of duty by the Applicant prior

to December 2002. The government failed to offer any documentary exhibits such as

Officer Evaluation Reports for the years 2003, 2004, or 2005 which demonstrated poor

---

[11]    There are three exceptions to this explicit policy, none of which are applicable to
LTC Sangar's case. See AR 600-8-24, Para. 4-4d.

performance by the Applicant of his **actual assigned duty** as a Medical Abstraction

Physician, for which no medical clinical credentials are required.  (See footnote 7, *supra*.)

AR 600-8-24, Para. 4-1 makes it plain that the basis for elimination from the

service may not be on such trifling grounds as set forth in the findings of the second show

cause board:

> When an officer shows ineffective tendencies (especially if
> the officer is inexperienced) when practicable, he or she
> will be given another chance under another commander.
> The officer's ineffectiveness will be systematically
> recorded in documents that specify each period covered,
> duties observed, and defects noted. Recommendations for
> elimination action will not be based on generalities and
> vague impressions. ***It is necessary to document, in writing,***
> ***the precise reasons an officer is considered ineffective.***
> (Emphasis added).

The primary tool for documenting the performance of duty of an officer is the

Officer Evaluation Report.  OERs are governed by AR 623-105.  Paragraph 1-8 of the

regulation makes the Army's policy clear:

> (2) Although the OERS is a multi–functional system, its
> basic structure—
> *(a)* Allows the rater to give shape and direction to the rated
> officer's performance.
> *(b)* Provides a chain–of–command evaluation of an
> officer's performance and potential.
> *(c)* Allows the entire evaluation reporting process to be
> reviewed.
> (3) The primary function of the OERS is to provide
> information to DA for use in making personnel
> management decisions. This information is supplied to DA
> by the rating chain in the officer's assigned attached
> organization.
> *(a)* The information provided on the OER, combined with
> the Army's needs and individual officer qualifications, is
> used as a basis for personnel actions. Included are
> promotion, elimination, retention in grade, retention on
> active duty, reduction in force, command selection, school

selection, assignment, specialty designation, and Regular
Army (RA) integration.
*(b)* To ensure that sound personnel management decisions
can be made and that an officer's potential can be fully
developed, evaluation reports must be accurate and
complete. Each report must be a comprehensive appraisal
of an officer's abilities, weaknesses, and potential. Reports
that are either incomplete or fail to provide a realistic and
objective evaluation make it difficult to determine an
officer's true potential.

* * *

*c. The evaluation reporting process.*
(1) The OERS process is designed to—
*(a)* Set objectives for the rated officer that support the
organization's mission.
*(b)* Review the rated officer's objectives and update them
to meet current needs.
*(c)* Promote performance–related counseling to develop
subordinates and better accomplish the organization's
mission.
*(d)* Evaluate the rated officer's performance.
*(e)* Assess the rated officer's potential.
*(f)* Ensure a review of the entire process.

Appendix E of AR 623-105 makes it even more clear how the OER is the central

personnel document of the Army's medical department:

The OER has a unique purpose when used to evaluate the
performance and potential of Medical Corps (MC), Dental
Corps (DE), Veterinary Corps (VC), Army Nurse Corps
(AN), Medical Specialist Corps (SP), Medical Service
Corps (MS) resident, intern, and fellowship students in
graduate health education. **Therefore, it should be given
primary emphasis in the evaluation process.**
(emphasis added)

In Applicant's case, the documentary record of OERs shows that the Applicant's

duty assignment was as a Medical Abstraction Physician from 1999 onwards. The

absence of any OERs subsequent to the December 2002 show cause board's decision to

retain the Applicant in service fails to establish any requirement for continuing medical

clinical credentialing in nuclear medicine, which was the entire *raison d'etre* of the Applicant's elimination from the service.

The WRAMC command violated the "Double Jeopardy" clause of AR 600-8-24 by seeking Applicant's discharge a second time for conduct which had already been thoroughly considered by the December 2002 show cause board. His discharge was illegal and contrary to AR 600-8-24, and should be removed from his military records.

**b.    Even if discharge of Applicant was warranted, the denial of separation pay on grounds of "misconduct" is inappropriate.**

The DD-214 and Discharge Order of the Applicant (See Exhibit 14) reflects his honorable discharge but mischaracterizes his elimination from service as being for "misconduct." This pejorative characterization is not present at any stage of the second show cause board's proceedings. It was apparently added *post hoc*.

The record of Applicant's service shows honorable, continuous service which does not contain any reprimand, criminal act, Article 15, or court-martial.

The very worst that can be said is that in 1997, Applicant became ill with CIDP, an organic disease of the brain which negatively affected his cognitive function. "Misconduct" is defined by AR 600-8-24 as:

> Conduct within the control of the officer concerned, which includes but is not limited to drug abuse, alcohol abuse, criminal conduct, and civil confinement and results in either of the following:
> *a.* Tends to bring the officer or the Army into disrepute; or
> *b.* Results in the loss or abandonment of or suspension from his or her professional status when lack of status adversely affects the member's ability to perform the duties; or
> *c.* Includes but is not limited to drug abuse, alcohol abuse, criminal conduct, and civil confinement.

13

Applicant did not take illegal drugs or abuse alcohol. He did not commit any criminal conduct. He was never confined by civil authorities. He became ill, and because of his illness, as demonstrated by Exhibits 1, 2, and 3, he was no longer able to practice medicine as a nuclear medicine specialist. Though he is no longer an officer in the Army, nor credentialed as a clinician at Walter Reed Army Medical Center, at all times relevant to this Appeal he continued to be licensed as a physician by his state licensing authority, and at the time of his second show cause board, he continued to hold medical clinical credentials at Madigan Army Medical Center (Exhibit 9), even though credentials were not ever necessary or required for his administrative duty as a Medical Abstraction Physician. (See Exhibit 5, 2002 OER noting satisfactory performance of duty as a Medical Abstraction Physician, at a time when the Applicant held no credentials at all.)

The board should therefore remove any finding of "misconduct" from the Applicant's discharge, making him eligible for the severance pay which he earned through his 18 years of upright, honorable service to his country.

## III.    RESERVATION OF SUPPLEMENTATION

The Applicant specifically reserves the right to supplement this Appeal

subsequent to its filing.

Respectfully submitted,

Christopher A. Sterbenz
Counsel for LTC Vijay K. Sangar
P.O. Box 126
Vienna, Virginia  22183
(703) 620-2313
D.C. Bar No. 437722

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 16

Decision of ABCMR denying relief, 31 August 2006



**DEPARTMENT OF THE ARMY**
**BOARD FOR CORRECTION OF MILITARY RECORDS**
**1901 SOUTH BELL STREET, 2ND FLOOR**
**ARLINGTON, VA  22202-4508**

## RECORD OF PROCEEDINGS

IN THE CASE OF:    SANGAR, VIJAY K.

BOARD DATE:        31 August 2006
DOCKET NUMBER:  AR20050018104

I certify that hereinafter is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in the case of the above-named individual.

| | |
|---|---|
| Mr. Carl W. S. Chun | Director |
| Mr. G. E. Vandenberg | Analyst |

The following members, a quorum, were present:

| | |
|---|---|
| Mr. William D. Powers | Chairperson |
| Mr. Jeffrey C. Redmann | Member |
| Ms. Karmin S. Jenkins | Member |

The Board considered the following evidence:

Exhibit A - Application for correction of military records.

Exhibit B - Military Personnel Records (including advisory opinion, if any).

ABCMR Record of Proceedings (cont)                    AR20050018104

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:

The applicant defers to counsel.

COUNSEL'S REQUEST, STATEMENT AND EVIDENCE:

1.  Counsel requests, in effect, that the applicant's discharge be voided and he be reinstated with retroactive entitlement of all benefits to the date of his discharge.  In the alternative, counsel requests that all "allegations" of misconduct be removed, his characterization of service be upgraded and he be shown to be eligible for separation pay with nearly 18 years of service.

2.  Counsel states, in effect, that although he had been found qualified for retention, the applicant was suffering from an organic disease which interfered with his cognitive functions.

3.  Counsel states that the March 2005 board of inquiry improperly considered information and records that were presented to the December 2002 board of inquiry that had voted to retain the applicant, thereby making the applicant's discharge illegal and contrary to Army Regulation 600-8-24 (Officer Transfers and Discharges).

4.  Counsel further states, in effect, that the lack of Officer Evaluation Reports (OERs) for the years 2002 through 2005 further violated his due process and prevented the applicant from getting a fair hearing by the March 2005 board of inquiry.

5.  Counsel provides a 15 page brief with 33 supporting documents from the applicant's personnel and medical service records.

CONSIDERATION OF EVIDENCE:

1.  The records show the applicant was appointed in the Medical Corps and entered active duty as a major in July 1988.  He was promoted to lieutenant colonel on 18 July 1994.  He was assigned to Walter Reed Army Medical Center (WRAMC) in August 1995 with a principal duty of Nuclear Medicine Physician.

2.  In 1997 the applicant was diagnosed with chronic inflammatory demyelinating polyneuropathy (CIDP), a neurological disorder characterized by progressive weakness and impaired sensory function in the legs and arms.  It often presents with symptoms that include tingling or numbness (beginning in the toes and

2

ABCMR Record of Proceedings (cont)                    AR20050018104

fingers), weakness of the arms and legs, loss of deep tendon reflexes, fatigue, and abnormal sensations.  CIDP is closely related to Guillain-Barre syndrome and it is considered the chronic counterpart of that acute disease.

3.  The applicant's 30 September 1998 OER shows he was serving in the principal duty of a staff medical officer, Nuclear Medicine Service.  His rater rated his performance and potential for promotion as "satisfactory performance, promote."  The rater also commented, "(the applicant's) performance during this rating period has been encumbered by significant medical illness, including prolonged hospitalization, convalescence, and ongoing slow recovery and rehabilitation…Although he has returned to duty,…remains in a limited capacity.  Before, during, and after hospitalization, he received remedial training and performed under clinical supervision."  The senior rater (SR) rated his promotion potential as "fully qualified" and his overall potential as below center of mass, retain.  The SR's comments included, "As a result of his significant medical condition, (the applicant's) performance capabilities have not been demonstrated."

4.  The Walter Reed Army Medical Center Credentials Committee suspended his credentials to practice medicine on 5 February 1999.

5.  The applicant's 11 November 1999 OER was a relief-for-cause report.  It shows his rater rated his performance and potential for promotion as "unsatisfactory performance, do not promote."  The rater also commented, "…a peer review committee found his cases to be unacceptable and an oral examination given by The Surgeon General's Consultant for Nuclear Medicine found that,…(the applicant) does not exhibit the fund of knowledge and image interpretation skills expected of a board-eligible nuclear medicine physician… A blinded evaluation by senior nuclear medical physicians confirmed this finding…His clinical privileges were suspended on 5 February 1999 by the Credentials Committee…"  The SR rated his promotion potential as "do not promote" and his overall potential as below center of mass, do not retain.

6.  Following a series of hearings, the Commander of the Walter Reed Health Care System formally revoked the applicant's privileges on 11 November 1999.

7.  On 9 September 2000, the applicant passed the American Board of Nuclear Medicine certifying examination.  Of the ten content areas, he exceeded the mean percentage correct for all takers in three areas, equaled the mean percentage in only one area, and had a lower percentage correct in six areas.

3

ABCMR Record of Proceedings (cont)                    AR20050018104

8.  The applicant's 11 November 2000 OER shows his principal duties as Physician/Tumor Registry Clerk.  His rater rated his performance and potential for promotion as "other."  The rater also commented in part, "He maintains a valid license with the state of Missouri.  He passed the American Board of Nuclear Medicine examination on 9 September 2000, just slightly over 12 years after he successfully completed his nuclear medicine residency…"  The SR rated his promotion potential as "other" and his overall potential as below center of mass, do not retain.

9.  The applicant was afforded a medical evaluation that was conducted from 2 through 6 April 2001.  The Medical Evaluation Board (MEB) Narrative Summary indicates this was the third MEB afforded the applicant.

10.  A physical profile, issued 24 May 2001, indicates the applicant is suffering from a moderate cognitive disorder, decreased visual acuity in the left eye, and cervical spondylosis.

11.  The applicant's 11 November 2001 OER shows his principal duties as Medical Abstraction Physician.  His rater rated his performance and potential for promotion as "unsatisfactory performance [do not promote]"; however, he also commented in part, "(The applicant) participates in the abstraction of medical records from the Tumor Registry at Walter Reed in a satisfactory manner."  The rater also noted that the applicant continued his education in nuclear medicine on his own initiative.  The SR rated his promotion potential as "do not promote" and his overall potential as below center of mass, do not retain.

12.  On 8 February 2002, a formal PEB concluded the applicant did not presently have any functional impairment which would prevent satisfactory performance of his duties.  The PEB noted that he had successfully completed the specialty board certification in nuclear medicine in September 2000 and that his Missouri state medical license was renewed in January 2002.  The most recent evaluation by a psychiatrist/neurologist indicated he had fully recovered from his neurological condition that was present in 1998/1999 when he was diagnosed with a cognitive disorder secondary to CIDP and steroid treatment.  A mental status examination and focused neurological examination on 8 October 2002 were normal with the possible exception of subtle weakness in the interosseous muscle of the non-dominant hand.  He was found fit for duty in his current grade and specialty.

ABCMR Record of Proceedings (cont)                    AR20050018104

13.  The applicant's 11 November 2002 OER shows his principal duties as Medical Abstraction Physician.  His rater rated his performance and potential for promotion as "unsatisfactory performance do not promote"; however, once again he also commented that the applicant participated in the abstraction of medical records from the Tumor Registry in a satisfactory manner and that he continued his education in nuclear medicine on his own initiative.  The SR rated his promotion potential as "do not promote" and his overall potential as below center of mass, do not retain.

14.  A board of inquiry convened on 17 December 2002 to determine if the applicant should be separated for a downward trend in overall performance resulting in a consistent record of mediocre service and failure to perform assignments commensurate with his grade and experience.  The applicant was given an opportunity to be present with his counsel at all open sessions of the board and to testify.

15.  The board of inquiry found that the applicant had some of the substandard performance of duty stated in the Memorandum of Initiation of Elimination (not available).  It was the opinion of the board that the cited downward trend in OERs from July 1997 through November 1999 was potentially attributable to the applicant's diagnosed CIDP.  The two OERs covering the period November 1999 through November 2001 did not address a downward trend but addressed the fact that he was not performing as a nuclear Medicine Physician.  Furthermore, the board found that there was disagreement among Nuclear Medicine experts concerning his performance.

16.  The board of inquiry recommended the applicant be retained in the service and reassigned for a period of supervision to assess his suitability to be credentialed and to practice as a Nuclear Medicine Physician.  The findings and recommendation of the board of inquiry were approved by Major General K___, Commander, WRAMC.

17.  By memorandum dated 16 May 2003, WRAMC granted the applicant supervised privileges for the period 6 May 2003 through 5 May 2004.

18.  On 25 September 2003, Madigan Army Medical Center, Tacoma, WA determined that the applicant was not qualified to practice independently but granted him regular privileges under supervision.  He was granted an affiliate appointment to the medical staff for the period 25 September 2003 through 5 May 2005.  The applicant was serving as the Medical Abstraction Physician during this period.

ABCMR Record of Proceedings (cont)                    AR20050018104

19. On 24 September 2004 the applicant was notified that elimination action had been initiated for conduct or actions that result in the loss of professional status. This includes, for medical officers, the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges. This was based on the determination that after completing six weeks of refresher training and familiarization he was found not to be able to practice independently.

20. On 28 March 2005 a board of officers hearing was convened to determine if the applicant should be retained. Testimony provided at that board indicates the applicant had not practiced as an independent physician since 1997. It was noted that the position of Physician/Tumor Registry Clerk was normally held by a GS-6 with a specific certificate of training, not by a lieutenant colonel physician and that the applicant did not have the normally required certificate for the position he was holding.

21. The board found that he had lost his credentials to practice Nuclear Medicine. Without these credentials he was unable to perform the duties for which he was employed. Based on the preponderance of the evidence the board recommended the applicant be separated under the provisions of Army Regulation 600-8-24, paragraph 4-2b(9) with an honorable discharge.

22. On 8 April 2005 the applicant acknowledged receipt of a copy of the Report of Proceedings from the Board of Inquiry and the Notice of Rights.

23. On 29 April 2005 Major General K___, Commander, WRAMC forwarded the Report of Proceedings to the Commander, United States Army Medical Command (MEDCOM) Fort Sam Houston, Texas for review.

24. The Proceedings were further forwarded to the Officer Elimination Board, Army Review Boards Agency, Alexandria, Virginia.

25. On 8 July 2005, the Officer Elimination Board reviewed the applicant's case and recommended he be eliminated.

26. On 11 July 2005, the Deputy Assistant Secretary (Army Review Boards) approved the elimination action.

27. A 12 July 2005 Army Human Resources Command memorandum to WRAMC directed that the applicant be discharged not later than 14 calendar days after the applicant received notification of the action but not to exceed 30 days from the date of this message.

ABCMR Record of Proceedings (cont)                    AR20050018104

28.  On 28 October 2005 the applicant was discharged under the provisions of
Army Regulation 600-8-24, chapter 4 for misconduct, moral or professional
dereliction.  He had 17 years, 3 months, and 10 days of creditable service.

29.  As noted in an earlier unrelated ABCMR decision, WRAMC informed the
Board's analyst that the applicant's OERs for 2003 and 2004 "slipped through"
and have not been completed.  Additionally, the Officer Special Review Board
informed the Board analyst that they had no record of the applicant submitting
any OER appeals.  A review of the PERMS (Personnel Electronic Record
Management System) failed to locate the OERs in question or any clarifying
information when or if they were completed.

30.  Army Regulation 600-8-24 (Officer Transfers and Discharges), paragraph
4-2b(9) provides that elimination action may be or will be initiated for substandard
performance of duty, a downward trend in overall performance resulting in an
unacceptable record of efficiency, or a consistent record of mediocre service,
failure to keep pace or to progress with contemporaries, as demonstrated by a
low record of efficiency when compared with other officers of the same grade and
competitive category or failure of an officer to absorb technical proficiency
required for grade and competitive category.  For Medical Corps officers, this
includes the partial or complete suspension, limitations, withdrawal, or denial of
clinical practice privileges.

31.  Department of Defense Instruction Number 1332.29 provides for the
eligibility to receive separation pay upon involuntary discharge or release from
active duty of Regular and Reserve components service members who have
completed at least 6 years, but fewer than 20 years, of active service.  The
service member's separation must be characterized as honorable and he or she
must be fully qualified for retention, but is denied reenlistment or continuation.

DISCUSSION AND CONCLUSIONS:

1.  In determining whether or not to retain an officer, a board of officers has to
determine if, based on the totality of his or her record, it is in the best interest of
the Army to retain that officer.  The use of the same information as was used by
the earlier board was appropriate since it was germane to whether or not the
applicant was qualified to practice in his medical specialty.

2.  While the earlier board of officers voted to retain the applicant, that board did
not give an unqualified retention decision.  It recommended a qualified retention
and that he be given a period of supervision to assess his suitability to be
credentialed and to practice as a Nuclear Medicine Physician.

7

ABCMR Record of Proceedings (cont)                    AR20050018104

3.  The records show that the privileges granted him by Madigan Army Medical Center were "regular privileges under supervision," not full regular privileges and WRAMC granted him only <u>supervised</u> clinical privileges.

4.  Without a granting of full unsupervised privileges to practice as a Nuclear Medicine Physician he does not meet the requirement of being fully qualified in his designated specialty, a requirement for retention eligibility.

5.  The applicant was not fully qualified for continuation and as such he does not meet the requirements for separation pay.

6.  The applicant's OERs for 2003 through 2005 were not available to the board of inquiry.  Additionally the available evidence does not indicate that they have been processed or if they have, that they were incorporated in the applicant's official record.

7.  While the OERs should have been completed and been available to the board of inquiry, the fact that they were not does not invalidate the findings of the board that the applicant was not qualified for retention in his medical specialty based on the preponderance of evidence.

<u>BOARD VOTE:</u>

_____  _____  _____  GRANT FULL RELIEF

_____  _____  _____  GRANT PARTIAL RELIEF

_____  _____  _____  GRANT FORMAL HEARING

_____  _____  _____  DENY APPLICATION

<u>BOARD DETERMINATION/RECOMMENDATION:</u>

The evidence presented does not demonstrate the existence of a probable error or injustice.  Therefore, the Board determined that the overall merits of this case are insufficient as a basis for correction of the records of the individual concerned.

CHAIRPERSON

8

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 17

Chapter 7, Army Regulation 40-501 "Standards of Medical Fitness"

Army Regulation 40–501

Medical Services

# Standards of Medical Fitness

Headquarters
Department of the Army
Washington, DC
18 January 2007

UNCLASSIFIED

Table 6–1
**Number of months for which a flying duty medical examination (FDME) is valid (Active Component)**[*]

| Birth Month | Month in which last FDME was given | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Jan | 12 | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 |
| Feb | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 |
| Mar | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 |
| Apr | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 |
| May | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 18 | 17 |
| Jun | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 18 |
| Jul | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 |
| Aug | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 |
| Sep | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 |
| Oct | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 |
| Nov | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 |
| Dec | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 |

Notes:
[*] Read down the left column to the examinee's birth month; read across to month of last FDME; intersection number is the maximum validity period. When last FDME was within the 3-month period preceding the end of the birth month, the validity period will normally not exceed 15 months. When the last FDME was for entry into aviation training, for FEB, postaccident, posthospitalization, pre-appointment (warrant officer candidate) etc., the validity period will range from 7 to 18 months. Validity periods may be extended, in accordance with 6–11*i*, by 1 month only for completion of an examination begun before the end of the birth month.

## Chapter 7
## Physical Profiling

### 7–1. General
This chapter prescribes a system for classifying individuals according to functional abilities. Also see paragraphs 3-12, 3-13, 3–25, 3–27, 3–30, 3–45, and 3–46 for additional guidance on amputations, coronary artery disease, asthma, seizure disorders, and heat and cold injuries.

### 7–2. Application
The physical profile system is applicable to the following categories of personnel:
  *a.* Registrants who undergo an induction or pre-induction medical examination related to Selective Service processing.
  *b.* All applicants examined for enlistment, appointment, or induction.
  *c.* Members of any component of the U.S. Army throughout their military service, whether or not on active duty.

### 7–3. Physical profile serial system
  *a.* The physical profile serial system is based primarily upon the function of body systems and their relation to military duties. The functions of the various organs, systems, and integral parts of the body are considered. Since the analysis of the individual's medical, physical, and mental status plays an important role in assignment and welfare, not only must the functional grading be executed with great care, but clear and accurate descriptions of medical, physical, and mental deviations from normal are essential.
  *b.* In developing the system, the functions have been considered under six factors designated "P–U–L–H–E–S." Four numerical designations are used to reflect different levels of functional capacity. The basic purpose of the physical profile serial is to provide an index to overall functional capacity. Therefore, the functional capacity of a particular organ or system of the body, RATHER THAN THE DEFECT PER SE, will be evaluated in determining the numerical designation 1, 2, 3, or 4.
  *c.* The factors to be considered are as follows:
    (1) *P—Physical capacity or stamina.* This factor, general physical capacity, normally includes conditions of the heart; respiratory system; gastrointestinal system, genitourinary system; nervous system; allergic, endocrine, metabolic and nutritional diseases; diseases of the blood and blood forming tissues; dental conditions; diseases of the breast, and other organic defects and diseases that do not fall under other specific factors of the system.
    (2) *U—Upper extremities.* This factor concerns the hands, arms, shoulder girdle, and upper spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.
    (3) *L—Lower extremities.* This factor concerns the feet, legs, pelvic girdle, lower back musculature and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.
    (4) *H—Hearing and ears.* This factor concerns auditory acuity and disease and defects of the ear.
    (5) *E—Eyes.* This factor concerns visual acuity and diseases and defects of the eye.
    (6) *S—Psychiatric.* This factor concerns personality, emotional stability, and psychiatric diseases.

*d.* Four numerical designations are assigned for evaluating the individual's functional capacity in each of the six factors. Guidance for assigning numerical designators is contained in table 7–1. The numerical designator is not an automatic indicator of "deployability" or assignment restrictions, or referral to an MEB/PEB. Likewise, the conditions listed in chapter 3, rather than the numerical designator of the profile, will be the determinant for MEB processing.

(1) An individual having a numerical designation of "1" under all factors is considered to possess a high level of medical fitness.

(2) A physical profile designator of "2" under any or all factors indicates that an individual possesses some medical condition or physical defect that may require some activity limitations.

(3) A profile containing one or more numerical designators of "3" signifies that the individual has one or more medical conditions or physical defects that may require significant limitations. The individual should receive assignments commensurate with his or her physical capability for military duty.

(4) A profile serial containing one or more numerical designators of "4" indicates that the individual has one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited.

*e.* Anatomical defects or pathological conditions will not of themselves form the sole basis for recommending assignment or duty limitations. While these conditions must be given consideration when accomplishing the profile, the prognosis and the possibility of further aggravation must also be considered. In this respect, profiling officers must consider the effect of their recommendations upon the Soldier's ability to perform duty. Profiles must be realistic. All profiles and assignment limitations must be legible, specific, and written in lay terms. If the commander has questions about a profile or is unable to use the Soldier within the profile, the procedures in paragraph 7–12 will apply.

(1) Determination of individual assignment or duties to be performed are command/administrative matters. Limitations such as "no field duty," or "no overseas duty," are not proper medical recommendations. (However, they are included as administrative guidelines in pregnancy profiles.) Profiling officers should provide enough information regarding the Soldier's physical limitations to enable the nonmedical commander and AHRC to make a determination on individual assignments or duties.

(2) It is the responsibility of the commander or personnel management officer to determine proper assignment and duty, based upon knowledge of the Soldier's profile, assignment limitations, and the duties of his or her grade and MOS.

(3) Table 7–1 contains the physical profile functional capacity guide.

(4) See TB MED 287 for profiling Soldiers with pseudofolliculitis.

## 7–4. Temporary vs. permanent profiles

*a. Permanent profiles.* A profile is considered permanent unless a modifier of "T" (temporary) is added as described in *b* below. A permanent profile may only be awarded or changed by the authority designated in paragraph 7–6.

(1) If the profile is permanent the profiling officer must assess if the Soldier meets retention standards by chapter 3. Those Soldiers on active duty who do not meet retention standards must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–26 for disposition of USAR and ARNG Soldiers not on active duty who do not meet medical retention standards.)

(2) Those Soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600–60, unless waived by the MMRB convening authority.

(3) Permanent profiles may be amended at any time if clinically indicated and will automatically be reviewed at the time of a Soldier's periodic examination.

(4) The Soldier's commander may also request a review of a permanent profile in accordance with paragraph 7–12.

*b. Temporary profiles.* A temporary profile is given if the condition is considered temporary, the correction or treatment of the condition is medically advisable, and correction usually will result in a higher physical capacity. Soldiers on active duty and RC Soldiers not on active duty with a temporary profile will be medically evaluated at least once every 3 months at which time the profile may be extended by the profiling officer.

(1) The profiling officer must review previous profiles before making a decision to extend a temporary profile. Any extension of a temporary profile must be recorded on DA Form 3349, and if renewed, item 9 on the DA Form 3349 must contain the following statement: "This temporary profile is an extension of a temporary profile first issued on (date)."

(2) Temporary profiles should specify an expiration date. If no date is specified, the profile will automatically expire at the end of 30 days from issuance of the profile. In no case will Soldiers carry a temporary profile that has been extended for more than 12 months. If a profile is needed beyond the 12 months, the temporary profile should be changed to a permanent profile.

## 7–5. Representative profile serial and codes

To facilitate the assignment of individuals after they have been given a physical profile serial and for statistical purposes, code designations have been adopted to represent certain combinations of physical limitations or assignment

guidance. (See table 7–2.) The alphabetical coding system will be recorded on personnel qualifications records. This coding system will not be used on medical records to identify limitations. The numerical designations under each profile factor, PULHES, are given in table 7–1.

## 7–6. Profiling officer

*a.* Commanders of Army MTFs are authorized to designate one or more physicians, dentists, optometrists, podiatrists, audiologists, nurse practitioners, nurse midwives, licensed clinical psychologists, and physician assistants as profiling officers. The commander will assure that those designated are thoroughly familiar with the contents of this regulation. Profiling officer limitations are as follows:

(1) *Physicians.* No limitations.

(2) *Dentists, optometrists, physical therapists, and occupational therapists.* No limitation within their specialty for awarding numerical designators "1" and "2." A temporary numerical designator "3" may be awarded for a period not to exceed 30 days. Any extension beyond 30 days must be signed by a physician. (See para 7–8.)

(3) *Audiologists.* No limitation within their specialty for awarding permanent numerical designators "1," "2," "3," or "4" in cases of sensorineural hearing loss if retrocochlear lesion has been ruled out. Changing from or to a permanent numerical designator "3" or "4" requires the co–signature of a physician approving authority (para 7–8).

(4) *Physician assistants, nurse midwives, nurse practitioners, and licensed clinical psychologists.* Limited to awarding temporary numerical designators "1," "2," and "3" for a period not to exceed 90 days. Any extension of a temporary profile beyond 90 days must be confirmed by a physician, except when the provisions of paragraph 7–9 apply. However, physician assistants with AOC 65DM1 certified in orthopedics have no limitations in awarding temporary orthopedic profiles or permanent profiles with a numerical designator of "1" or "2." Physician assistants with AOC 65DM1 may award permanent orthopedic profiles of "3" or "4" provided the profile is signed by the physician approving authority.

(5) *Podiatrists.* No limitations within their specialty for awarding temporary or permanent profiles with a numerical designator of "1" or "2." Podiatrists may award permanent profiles of "3" or "4" providing the profile is co-signed by a physician approving authority.

*b.* MEPS physicians will also be designated as profiling officers. (See para 7–7b.)

*c.* In those instances where a Soldier does not have access to an Army MTF, but is assigned to a location with another Department of Defense medical facility (Navy, Air Force), a physician from another service can be a profiling officer, if designated by the commander.

## 7–7. Recording and reporting of initial physical profile

*a.* Individuals accepted for initial appointment, enlistment, or induction in peacetime normally will be given a numerical designator "1" or "2" physical profile in accordance with the instructions contained in this regulation. Initial physical profiles will be recorded on DD Form 2808 by the medical profiling officer at the time of the initial appointment, enlistment, or induction medical examination.

*b.* The initial physical profile serial will be entered on DD Form 2808 and also recorded on DD Forms 1966 (Record of Military Processing—Armed Forces of the United States), in the appropriate spaces. When the modifier "T" is entered on the profile serial, or in those exceptional cases where the numerical designator "3" is used on initial entry, a brief, nontechnical description of the defect will be recorded in the "Summary of Defects" section on the DD Form 2808, in addition to the exact diagnosis. All physical, geographic, or climatic area limitations applicable to the defect will also be entered in that section. If sufficient room for a full explanation is not available in that section, proper reference will be made in that section number and an additional sheet of paper attached. It is not uncommon for the MEPS to assign a profile with the numerical designator of "3" or "0" pending a medical waiver review of a disqualifying condition. This is for their administrative purposes only. If the individual receives a medical waiver, the waiver documentation completed by the waiver authority should indicate the appropriate profile in accordance with table 7–1.

## 7–8. Profiling reviews and approvals

*a.* Permanent "3" or "4" profiles require the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8*f* apply). (Permanent profiles of "3" or "4" for the Individual Ready Reserve are valid with only one signature if signed by the AHRC Surgeon or his/her designee.) Temporary or permanent profiles of "1" or "2" require the signature of one profiling officer. See paragraph 7–6 to determine who is authorized to sign profiles.

*b.* Situations that require a mandatory review of an existing physical profile include—

(1) Return to duty of a Soldier hospitalized. The attending physician will ensure that the patient has the correct physical profile, assignment limitations(s), and medical followup instructions, as appropriate.

(2) When directed by the appointing authority in cases of a problematical or controversial nature requiring temporary revision of profile.

(3) At the time of the periodic medical examination.

(4) Upon request of the unit commander.

(5) On request of a PEB.

(6) When a permanent "3" or "4" profile is changed to a permanent "1" or "2" the change requires the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8*f* apply).

*c.* A temporary revision of profile will be completed when, in the opinion of the profiling officer, the functional capacity of the individual has changed to such an extent that it temporarily alters the individual's ability to perform duty. Temporary profiles written on DA Form 3349 will not exceed 3 months except as provided for in paragraphs 7–8*d* and 7–9. Temporary profiles written on DD Form 689 (Individual Sick Slip) will not exceed 30 days.

*d.* Tuberculous patients returned to a duty status who require anti-tuberculous chemotherapy following hospitalization will be given a temporary "2" profile under the P factor of the physical profile for a period of 1 year with recommendation that the Soldier be placed on duty at a fixed installation and will be provided the required medical supervision for a period of 1 year.

*e.* The physical profile in controversial or equivocal cases may be verified or revised by the hospital commander or command surgeon.

*f.* Physical profiles for Reserve Soldiers not on active duty and for those Soldiers activated on orders for greater than 30 days in the Ready Reserve (ARNG/AR), Standby Reserve (AR), and Retired Reserve (AR) status may be accomplished by the U.S. Army Regional Readiness Command (RRC) surgeons, division staff surgeons, Active Army or USAR medical facility profiling officers, the U.S. Army Reserve (USARC) Command Surgeon, the AHRC Command Surgeon or their designees. For ARNG/ARNGUS Soldiers not on active duty, profiles will be accomplished by State ARNG/ARNGUS providers. The respective state surgeons will be the approving authority for permanent "3" or "4" profiles. Approval authorities for the Army Reserve are the USARC Command Surgeon, the AHRC Command Surgeon, the U.S. Army Special Operations Command Surgeon, and the Regional Readiness Command Surgeons. Division surgeons that function as command surgeons may be delegated profile approving authority by the supporting RRC Surgeon or the USARC Command Surgeon.

*g.* Individuals who were found unfit by a PEB but COAD used to be assigned a code "V" on their physical profile code. The code "V" is no longer used for this purpose but rather to identify Soldiers with restrictions on deployment.

*h.* MEB members must ensure that the physical profile and assignment limitations are fully recorded on DA Form 3349. In cases where the Soldier is referred to a PEB, a copy of the most current DA Form 3349 will be forwarded to the PEB with the MEB proceeding, with distribution of the form as indicated in the "Distribution" block of DA Form 3349. Cooperation between the MEBs, PEB liaison officers, and the PEB is essential when additional medical information or profile reconsideration is requested from the MTF by the PEB. The limitations described on the profile form may affect the decision of fitness by the PEB. Table 7–1 should be used when determining the numerical designator of the PULHES factors. (For example, a Soldier should not be given a "3" or "4" solely on the basis of a referral to a PEB.)

## 7–9. Profiling pregnant Soldiers

*a. Intent.* The intent of these provisions is to protect the fetus while ensuring productive use of the Soldier. Common sense, good judgement, and cooperation must prevail between policy, Soldier, and Soldier's commander to ensure a viable program. This profile has been revised from the previous profile published in the 1995 edition of this regulation. This revision includes mandating an occupation health interview to assess risks to the Soldier and fetus and adding additional restrictions to reduce exposure to solvents, lead, and fuels that may be associated with adverse pregnancy outcomes.

*b. Responsibilities.*

(1) *Soldier.* The Soldier will seek medical confirmation of pregnancy and will comply with the instructions of medical personnel and the individual's unit commander.

(2) *Medical personnel.* A physician will confirm pregnancy and once confirmed will initiate prenatal care of the Soldier and issue a physical profile. Nurse midwives, nurse practitioners, and physician assistants are authorized to issue routine or standard pregnancy profiles for the duration of the pregnancy. An occupational history will be taken at the first visit to assess potential exposures related to the Soldier's specific MOS. This history is ideally taken by the occupational medicine physician or nurse. However, if this is not feasible, the profiling officer must complete the occupational history. After review of the occupational history, the profiling physician, in conjunction with the occupational health clinic as needed, will determine whether any additional occupational exposures, other than those indicated in the paragraphs below, should be avoided for the remainder of the pregnancy. Examples include but are not limited to hazardous chemicals, ionizing radiation, and excessive vibration. If the occupational history or industrial hygiene sampling data indicate significant exposure to physical, chemical, or biological hazards, then the profile should be revised to restrict exposure from these workplace hazards.

(3) *Unit commander.* The commander will counsel all female Soldiers as required by AR 600–8–24 or AR 635–200. The unit commander will consult with medical personnel as required. This includes establishing liaison with the occupational health clinic and requesting site visits by the occupational health personnel if necessary to assess any work place hazards.

*c. Physical profiles.*

(1) Profiles will be issued for the duration of the pregnancy. The MTF should ensure that the unit commander is provided a copy of the profile, and advise the unit commander as required. Upon termination of pregnancy, a new profile will be issued reflecting revised profile information. Physical profiles will be issued as follows:

(2) Under factor "P" of the physical profile, indicate "T–3."

(3) List diagnosis as "pregnancy, estimated delivery date."

*d. Limitations.* Unless superceded by an occupational health assessment, the standard pregnancy profile, DA Form 3349, will indicate the following limitations:

(1) Except under unusual circumstances, the Soldier should not be reassigned to overseas commands until pregnancy is terminated. (See AR 614–30 for waiver provisions and for criteria curtailing OCONUS tours.) She may be assigned within CONUS. Medical clearance must be obtained prior to any reassignment.

(2) The Soldier will not receive an assignment to duties where nausea, easy fatigue, or sudden lightheadedness would be hazardous to the Soldier, or others, to include all aviation duty, Classes 1/1A/2/3. (However, there are specific provisions in para 4–13*c* that allow the aircrew member to request and be granted permission to remain on flight status. ATC personnel may continue ATC duties with approval of the flight surgeon, obstetrician, and ATC supervisor.)

(3) Restrict exposures to military fuels. Pregnant Soldiers must be restricted from assignments involving frequent or routine exposures to fuel vapors or skin exposure to spilled fuel such as fuel handling or otherwise filling military vehicles with fuels such as mogas, JP8, and JP4.

(4) No weapons training in indoor firing ranges due to airborne lead concentrations and bore gas emissions. Firing of weapons is permitted at outdoor sites. (See (11) below, for other weapons training restrictions.) No exposure to organic solvent vapors above permissible levels. (For example, work in ARMS room is permitted if solvents are restricted to 1999 MIL–PRF–680, degreasing solvent.)

(5) No work in the motor pool involving painting, welding, soldering, grinding, and sanding on metal, parts washing, or other duties where the Soldier is routinely exposed to carbon monoxide, diesel exhaust, hazardous chemicals, paints, organic solvent vapors, or metal dusts and fumes (for example, motor vehicle mechanics). It does not apply to pregnant Soldiers who perform preventive maintenance checks and services (PMCS) on military vehicles using impermeable gloves and coveralls, nor does it apply to Soldiers who do work in areas adjacent to the motor pool bay (for example, administrative offices) if the work site is adequately ventilated and industrial hygiene sampling shows carbon monoxide, benzene, organic solvent vapors, metal dusts and fumes do not pose a hazard to pregnant Soldiers. (See (11), below, for PMCS restrictions at 20 weeks of pregnancy.)

(6) The Soldier should avoid excessive vibrations. Excessive vibrations occur in larger ground vehicles (greater than 1 1/4 ton) when the vehicle is driven on unpaved surfaces.

(7) Upon the diagnosis of pregnancy, the Soldier is exempt from regular unit physical fitness training and APFT testing/weight standards for the duration of the pregnancy and 180 days past pregnancy termination. After receiving medical clearance from their health care provider to participate in physical training, commanders will enroll Soldiers who are pregnant or postpartum to take part in the Army Pregnancy/Postpartum Physical Training (PPPT) program, an element of the Army Physical Fitness Training Program, in accordance with AR 350–1, Army Training and Education. The PPPT Program is designed to maintain health and fitness levels of pregnant Soldiers, and successfully integrate postpartum Soldiers back into unit physical fitness training programs with emphasis on achieving the APFT standards in accordance with guidance provided in the Army Physical Fitness Training Program, and meeting height/weight standards in accordance with guidance provided in the Army Weight Control Program. Pregnant and postpartum Soldiers must be cleared by their health care provider prior to participating in physical fitness training. Once pregnancy has been confirmed, the Soldier is exempt from wearing load bearing equipment (LBE) to include the web belt, individual body armor (IBA) and/or any other additional equipment. Wearing of individual body armor and/or any other additional equipment is not recommended and should be avoided after 14 weeks gestation.

(8) The Soldier is exempt from all immunizations except influenza and tetanus-diphtheria and from exposure to all fetotoxic chemicals noted on the occupational history form. The Soldier is exempt from exposure to chemical warfare and riot control agents (for example, nuclear, biological, and chemical training) and wearing MOPP gear at any time.

(9) The Soldier may work shifts.

(10) The Soldier must not climb or work on ladders or scaffolding.

(11) At 20 weeks of pregnancy, the Soldier is exempt from standing at parade rest or attention for longer than 15 minutes. The Soldier is exempt from participating in swimming qualifications, drown proofing, field duty, and weapons training. The Soldier should not ride in, perform PMCS on, or drive in vehicles larger than light medium tactical vehicles due to concerns regarding balance and possible hazards from falls.

(12) At 28 weeks of pregnancy, the Soldier must be provided a 15-minute rest period every 2 hours. Her workweek should not exceed 40 hours and the Soldier should not work more than 8 hours in any one day. The duty day begins when reporting for formation or duty and ends 8 hours later.

*e. Performance of duty.* A woman who is experiencing a normal pregnancy may continue to perform military duty until delivery. Only those women experiencing unusual and complicated problems (for example, pregnancy-induced

hypertension) will be excused from all duty, in which case they may be hospitalized or placed sick in quarters. Medical personnel will assist unit commanders in determining duties.

*f. Sick in quarters.* A pregnant Soldier will not be placed sick in quarters solely on the basis of her pregnancy unless there are complications present that would preclude any type of duty performance.

## 7–10. Postpartum profiles

*a.* Convalescent leave (as prescribed by AR 600–8–10) after delivery will be for a period determined by the attending physician. This will normally be for 42 days following normal pregnancy and delivery.

*b.* Convalescent leave after a termination of pregnancy (for example, miscarriage) will be determined on an individual basis by the attending physician.

*c.* Prior to commencing convalescent leave, postpartum Soldiers will be issued a postpartum profile. The temporary profile will be for 45 days. It begins on the day of child birth or termination of pregnancy and will allow PT at the Soldier's own pace. Soldiers are encouraged to use the AT-Home component of the ARMY PPPT program while on convalescent leave. If a Soldier decides to return early from convalescent leave, the temporary profile remains in effect for the entire 45 days.

*d.* Soldiers will receive clearance from the profiling officer to return to full duty.

*e.* In accordance with DOD Directive 1308.1, postpartum Soldiers are exempt from the APFT and for record weigh-in for 180 days following termination of pregnancy. After receiving clearance from their health care provider to resume physical fitness training, postpartum Soldiers will take part in the postpartum physical fitness training element of the Army. Postpartum Soldiers must receive clearance from their health care provider prior to returning to regular unit physical fitness training if it is before 180 days following pregnancy termination. After receiving clearance from their physician to resume physical training, they are expected to use the time in preparation for the APFT.

*f.* The above guidance will only be modified if, upon evaluation of a physician, it has been determined the postpartum Soldier requires a more restrictive or longer profile because of complicated or unusual medical problems.

## 7–11. Preparation, approval, and disposition of DA Form 3349

*a. Preparation of DA Form 3349.*

(1) DA Form 3349 will be used to record both permanent profiles and temporary profiles. DD Form 689 (Individual Sick Slip) may be used in lieu of DA Form 3349 for temporary profiles not to exceed 30 days and may include information on activities the Soldier can perform as well as the physical limitations. An SF 600 may be used to attach additional information to the DA Form 3349 on the physical activities a Soldier can or cannot perform if there is inadequate space on the DA Form 3349. This additional SF 600 should be clearly labeled as a continuation of the DA Form 3349.

(2) DA Form 3349 will be prepared as follows:

*(a) Item 1.* Record medical conditions and/or physical defects in common usage, nontechnical language that a layman can understand. For example, "compound comminuted fracture, left tibia" might simply be described as "broken leg." The checkboxes labeled Injury and Illness/Disease are used for tracking purposes. Check the injury box if the Soldier's medical condition is the result of an injury; otherwise, check the box labeled Illness/Disease.

*(b) Item 2.* Code designations (defined in table 7-2) are limited to permanent profiles for administrative use only and are to be completed by the profiling officer. The complete assignment limitations are recorded in item 10.

*(c) Item 3.* Enter under each permanent and temporary PULHES factors the appropriate profile serial code (1, 2, 3, 4, as prescribed) for the specific PULHES factor. A Soldier may have a permanent profile for one condition and a temporary profile for another. All permanent profile blocks must be filled in. Only the applicable block under the temporary profile needs to be completed. For example, a Soldier with a sprain ankle who has permanent H3 hearing loss would be coded 111311 in the permanent PULHES space but _ _ 3 _ _ under the temporary PULHES space.

*(d) Item 4.* Check the appropriate block for the type of profile. If the profile is temporary, enter the expiration date. If the profile is permanent, the profiling officer must assess if the Soldier meets retention standards by chapter 3. Those Soldiers on active duty who do not meet retention standards must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–26 for disposition of USAR and ARNG Soldiers not on active duty who do not meet medical retention standards). Those Soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600–60, unless waived by the MMRB convening authority.

*(e) Item 5.* Answer Yes or No to items 5a through 5f. These functional activities are the minimum requirements to be considered medically qualified for worldwide deployment. If any answer is No then the appropriate profile serial should in most cases be at least a 3. This will ensure that the Soldier's case will be individually reviewed by either an MEB or MMRB.

*(f) Item 6.* Physical Fitness Test. Check either yes or no to indicate whether the Soldier can perform the activities for the APFT. The yes or no blocks on the alternate APFT need only be completed if the Soldier has restrictions for the regular APFT. If the Soldier cannot perform at least an alternate APFT the profile serial should be at least a 3.

*(g) Item 7.* Check yes or no for all standard aerobic conditioning activities that the individual can or cannot do. The

yes or no blocks on the modified aerobic conditioning activities need only be completed if there are restrictions on the standard conditioning activities.

*(h) Item 8 and 9.* Check either yes or no to indicate whether the Soldier can or cannot perform upper or lower body weight training according to FM 21–20.

*(i) Item 10.* This space is for the following uses. In accordance with paragraph 7–4*b*, the profiling officer must review previous profiles before making a decision to extend a temporary profile. If this is an extension of a previous temporary profile, fill in the date of the original temporary profile in the space provided. Item 10 may also be used to list any other physical activity or physical activity restrictions not listed elsewhere on the form. Item 10 is continued on page 2 of the profile if there is insufficient space in item 10 on the front of the profile. Page 2 of the profile is optional.

*(j) Item 11.* This is optional. It allows the profiling officer to put specific limits on some common functional activities with respect to time, distance, weight and repetition parameters. If no values are listed it will be assumed these are within the normal limitations of a healthy individual.

*(k) Item 12, Item 13, and Item 14 signatures.* Print name and grade of profiling officer, signature, and date. Permanent "1" or "2" profiles require the signature of one profiling officer. The signature of the profiling officer for "1" or "2" profiles is written in the section: "Typed name and grade of profiling officer." Permanent "3" or "4" profiles require the signatures of two profiling officers, one of which is the physician approving authority (unless the provisions of 7–8*f* apply). (See para 7–8 to determine who is qualified to be a profiling officer.) Temporary profiles require only the signature of one profiling officer except for extensions of profiles noted in para 7–6*a*(2).

*(l) Item 15, Item 16, Item 17, and Item 18.* Action by approving authority. The approving authority checks "approved or not approved," signs, and dates the profile form. The approving authority will be designated by the MTF commander. (In the case of RC Soldiers not on active duty, see para 7–8*f*.) The approving authority for permanent "3" or "4" profiles must be a physician. If the approving authority does not concur with the profiling officer recommendation, the MTF commander will make the final decision.

*(m) Item 19, Item 20, and Item 21.* Action by the unit commander. This paragraph is optional and used if the commander disagrees with the profile and wants the profiling officer to reconsider the profile. It is also used if the commander indicates that the profile requires a change in the Soldier's MOS or duty assignment (see para 7–12*b*).

*(n) Item 24.* Include patient identification.

*(o) Item 25.* Include Soldier's unit.

*(p) Item 26.* Include the name of the issuing clinic and provider phone number. Provider e-mail is optional.

*b. Disposition of the physical profile form (permanent profiles) by the MTF.* The unit commander and military personnel office (MILPO) copies of DA Form 3349 will be delivered by means other than the individual on whom the report is made.

(1) Original to the Soldier's health record.

(2) One copy to the unit commander.

(3) One copy to the Soldier.

(4) One copy to the MILPO.

*c. Disposition of the physical profile form (temporary profiles).*

(1) Original in the Soldier's health record.

(2) One copy to the unit commander.

(3) One copy to the Soldier.

*d.* The profiling officer (or approving authority if applicable) is responsible for ensuring the PULHES and Date of Profile is entered into the Medical Protection System (MEDPROS).

## 7–12. Responsibility for personnel actions

*a.* Unit commanders and personnel officers are responsible for necessary personnel actions, including appropriate entries on personnel management records and the assignment of the individual to military duties commensurate with the individual's physical profile and recorded assignment limitations.

*b.* If the Soldier's commander believes the Soldier cannot perform with the permanent profile, the commander will make appropriate comments on the profile form in the section entitled "Action by Unit Commander" and request reconsideration of the profile by the profiling physician. Reconsideration must be accomplished by the physician who will either amend the profile or revalidate the profile as appropriate. Commanders may also request a review of temporary profiles.

## 7–13. Physical profile and the Army Weight Control Program

DA Form 3349 will not be used to excuse Soldiers from the provisions of AR 600–9. AR 600–9 contains a standard memorandum for completion by a physician if there is an underlying or associated disease process that is the cause of the overweight condition. The inability to perform all APFT events or the use of certain medications is not generally considered sufficient medical rationale to exempt a Soldier from AR 600–9.

**Table 7–1**
**Physical profile functional capacity guide**

| Profile | P | U | L | H | E | S |
|---------|---|---|---|---|---|---|
| Serial | Physical capacity | Upper extremities | Lower extremities | Hearing–ears | Vision–eyes | Psychiatric |
| Factors to be considered. | Organic defects, strength, stamina, agility, energy, muscular coordination, function, and similar factors. | Strength, range of motion, and general efficiency of upper arm, shoulder girdle, and upper back, including cervical and thoracic vertebrae. | Strength, range of movement, and efficiency of feet, legs, lower back and pelvic girdle. | Auditory sensitivity and organic disease of the ears | Visual acuity, and organic disease of the eyes and lids. | Type severity, and duration of the psychiatric symptoms or disorder existing at the time the profile is determined. Amount of external precipitating stress. Predisposition as determined by the basic personality makeup, intelligence, performance, and history of past psychiatric disorder impairment of functional capacity |
| 1 | Good muscular development with ability to perform maximum effort for indefinite periods. | No loss of digits or limitation of motion; no demonstrable abnormality; able to do hand to hand fighting. | No loss of digits or limitation of motion; no demonstrable abnormality; able to perform long marches, stand over long periods, run. | Audiometer average level for each ear not more than 25 dB at 500, 1000, 2000 Hz with no individual level greater then 30 dB. Not over 45 dB at 4000 Hz. Not over 35 dB at 3,000 Hz. | Uncorrected visual acuity 20/200 correctable to 20/ 20, in each eye. | No psychiatric pathology. May have history of a transient personality disorder. |
| 2 | Able to perform maximum effort over long periods. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent hand–to–hand fighting and do not disqualify for prolonged effort. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent moderate marching, climbing, timed walking, or prolonged effort. | Audiometer average level for each ear at 500, 1000, 2000 Hz, or not more than 30 dB, with no individual level greater than 35 dB at these frequencies, and level not more than 55 dB at 4000 Hz; or audiometer level 30 dB at 500 Hz, 25 dB at 1000 and 2000 Hz, and 35 dB at 4000 Hz in better ear. (Poorer ear may be deaf.) Not over 45 dB at 3000 Hz. | Distant visual acuity correctable to not worse than 20/40 and 20/70, or 20/30 and 20/100, or 20/20 and 20/ 400. | May have history of recovery from an acute psychotic reaction due to external or toxic causes unrelated to alcohol or drug addiction. |
| 3 | Unable to perform full effort except for brief or moderate periods. | Defects or impairments that require *significant* restriction of use. | Defects or impairments that require *significant* restriction of use. | Speech reception threshold in best ear not greater than 30 dB HL, measured with or without hearing aid; or acute or chronic ear disease. | Uncorrected distant visual acuity of any degree that is correctable to not less than 20/40 in the better eye. | Satisfactory remission from an acute psychotic or neurotic episode that permits utilization under specific conditions (assignment when outpatient psychiatric treatment is available or certain duties can be avoided). |
| 4 | *Functional level below P3.* | *Functional level below U3.* | *Functional level below L3.* | *Functional level below H3.* | *Visual acuity below E3.* | Does not meet S3 above. |

**Table 7–2**
**Profile codes**[a]

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE A | No assignment limitation. | No demonstrable anatomical or physiological impairment within standards established in table 7–1. |
| CODE B | May have assignment limitations that are intended to protect against further physical damage/injury. May have minor impairments under one or more PULHES factors that disqualify for certain MOS training or assignment. | Minimal loss of joint motion, visual and hearing loss |
| CODES C through P | Possesses impairments that limit functions or assignments. *The codes listed below are for military personnel administrative purposes. Corresponding limitations are general guidelines and are not to be taken as verbatim limitations. (For example, a Soldier with a code C may not be able to run but may have no restrictions on marching or standing.) Item 3 of DA Form 3349 will contain the specific limitations.* | |
| CODE C | Limitations in running, marching, standing for long periods etc. | Orthopedic or neurological conditions |
| CODE D | Limitations in any type of strenuous physical activity. | Organic cardiac disease; pulmonary insufficiency |
| CODE E | Limitations requiring dietary restrictions preventing consumption of combat rations. | Endocrine disorders–recent or repeated peptic ulcer activity–chronic gastrointestinal disease requiring dietary management. |
| CODE F | Limitations prohibiting assignment or deployment to OCONUS areas where definitive medical care is not available. | Individuals who require continued medical supervision with hospitalization or frequent outpatient visits for serious illness or injury. |
| CODE G | Limitations prohibiting wearing Kevlar, LBE, lifting heavy materials required of the MOS, overhead work. | Arthritis of the neck or joints of the extremities with restricted motion; disk disease; recurrent shoulder dislocation. |
| CODE H | Limitations on duty where sudden loss of consciousness would be dangerous to self or to others such as work on scaffolding, vehicle driving, or near moving machinery. | Seizure disorders; other disorders producing syncopal attacks or severe vertigo, such as Ménierè's syndrome. |

**Table 7–2**
**Profile codes\*—Continued**

| Code | Description/assignment limitation | Medical criteria (examples) |
|------|-----------------------------------|------------------------------|
| CODE J | Given known handicaps associated with high frequency hearing loss similar to this, Commanders are highly recommended to make an individual risk assessment of any Soldier with hearing loss that might be tasked to perform duties that require good hearing, for example; localization and detection of friend or foe sounds, scout, point, sentry, forward listening, post/observer, radio/telephone operator (RTO), and so forth. (See DA Pam 40–501, Chapter 2–4, Combat Readiness Effects.) Hearing Protection Measures required to prevent further hearing loss.<br><br>1. No exposure to noise in excess of 85 dBA (decibels measured on the A scale) or weapon firing without use of properly fitted hearing protection. Annual hearing test required.<br><br>2. Further exposure to noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for preparation of replacements for overseas movement (POR) qualification or annual weapons qualification with proper ear protection). Annual hearing test required.<br><br>3. No exposure to noise in excess of 85 dBA or weapon firing without use of properly fitted hearing protection. This individual is 'deaf' in one ear. Any permanent hearing loss in the good ear will cause a serious handicap. Annual Hearing test required.<br><br>4. Further duty requiring exposure to high intensity noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for overseas movement (POR) or weapon firing without use of properly ear protection). No duty requiring acute hearing. A hearing aid must be worn to meet medical fitness standards. | Susceptibility to acoustic trauma. |
| CODE L | Limitations restricting assignment to cold climates. | Documented history of cold injury; vascular insufficiency; collagen disease, with vascular or skin manifestations. |
| CODE M | Limitations restricting exposure to high environmental temperature. | History of heat stroke; history of skin malignancy or other chronic skin diseases that are aggravated by sunlight or high environmental temperature. |
| CODE N | Limitations restricting wearing of combat boots. | Any vascular or skin condition of the feet or legs that, when aggravated by continuous wear of combat boots, tends to develop unfitting ulcers. |
| CODE P | Limitations restricting wearing or being exposed to required items necessary to perform duty (for example, Latex, wool). | Established allergy to wool, latex. |
| CODE U | Limitation not otherwise described, to be considered individually. (Briefly define limitation in item 8.) | Any significant functional assignment limitation not specifically identified elsewhere. |
| CODE V | Deployment. This code identifies a Soldier with restrictions on deployment. Specific restrictions are noted in the medical record. | |
| CODE W | MMRB. This code identifies a Soldier with a permanent profile who has been returned to duty by an MMRB (MOS Medical Review Board.) | |

**Table 7–2**
**Profile codes*—Continued**

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE X | This code identifies a Soldier who is allowed to continue in the military service with a disease, injury, or medical defect that is below medical retention standards, pursuant to a waiver of retention standards under chapter 9 or 10 of this publication, or waiver of unfit finding and continued on active duty or in active Reserve status under AR 635–40. | |
| CODE Y | Fit for duty. This code identifies the case of a Soldier who has been determined to be fit for duty (not entitled to separation or retirement because of physical disability) after complete processing under AR 635–40. | |

Notes:
* Codes do not automatically correspond to a specific numerical designator of the profile but are based on the general physical/assignment limitations.

## Chapter 8
## Medical Examinations—Administrative Procedures

### 8–1. General
(See chap 6 for aviation administration procedures.) This chapter provides—

*a.* General administrative policies relative to military medical examinations.

*b.* Requirements for periodic, separation, mobilization, and other medical examinations.

*c.* Policies relative to hospitalization of examinees for diagnostic purposes and use of documentary medical evidence, consultations, and the individual health record.

*d.* Policies relative to the scope and recording of medical examinations accomplished for stated purposes.

### 8–2. Applications
The provisions contained in this chapter apply to all medical examinations accomplished at U.S. Army medical facilities or accomplished for the U.S. Army.

### 8–3. Physical fitness
*a.* Maintenance of physical and medical fitness is an individual military responsibility, particularly with reference to preventable conditions and remediable defects. Soldiers have an obligation to maintain themselves in a state of good physical condition so that they may perform their duties efficiently. Soldiers must seek timely medical advice whenever they have reason to believe that a medical condition or physical defect affects, or is likely to affect, their physical or mental wellbeing, or readiness status. They should not wait until the time of their annual physical health assessment to make such a condition or defect known. Soldiers are responsible to seek medical care and report such medical care to their unit commanders. This reporting includes civilian health care. Civilian health records documenting a change which may impact their readiness status will be placed in the reserve component Soldier's military health record.

*b.* Commanders will bring this matter to the attention of all Soldiers during initial orientation and periodically throughout their period of service. Unit commanders are responsible for ensuring their Soldiers are seeking timely care, reporting medical care rendered and providing any civilian medical records to the command. Unit commanders are responsible for ensuring their Soldiers are doing their annual physical health assessment or other required examinations. Commanders are responsible for ensuring the Soldier's readiness and medical status is properly documented in the personnel systems and the appropriate follow-up action is taken in regards to the Soldier's medical or readiness status.

### 8–4. Consultations
*a.* The use of specialty consultants, either military or civilian, is authorized in AR 40–400 and AR 601–270/AFR 33–7/MCO P–1100.75A.

*b.* A consultation will be completed in the case of an individual being considered for military service, including USMA and ROTC, whenever—

(1) Verification, or establishment, of the exact nature or degree of a given medical condition or physical defect is necessary for the determination of the examinee's medical acceptability or unacceptability based on prescribed medical fitness standards; or

(2) It will assist higher headquarters in the review and resolution of a questionable or borderline case; or

(3) The examining physician deems it necessary.

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 18

Army Regulation 40-68 "Clinical Quality Management" ¶¶7-15, 9-1 to 9-2

Army Regulation 40–68

Medical Services

# Clinical Quality Management

Headquarters
Department of the Army
Washington, DC
26 February 2004

## UNCLASSIFIED

*d. Supervision.* The OT with either category I or II privileges will be provided supervision/oversight of his/her clinical practice by a more experienced OT. In the absence of a more experienced OT, a physician may provide supervision/oversight.

## 7–14. Optometrist

*a. Description.* Doctors of Optometry (ODs) are primary health care providers who examine, diagnose, and treat (or prescribe courses of treatment) for beneficiaries suffering from diseases, injuries, or disorders of the visual system, the eye, and associated structures as well as diagnosis-related systemic conditions. As primary eye care providers, optometrists are part of the health care team and provide an entry point into the health care system. They are skilled in the co-management of conditions that affect their patients' eye health and vision and are sources of referral and consultation for other health care professionals.

*b. Professional credentials.*

(1) *Education.* ODs must have a 4-year OD degree from an accredited 4-year college of optometry acceptable to DA.

(2) *Licensure.* Optometrists will maintain a current, active, valid, and unrestricted optometry license from a U.S. State, District of Columbia, Commonwealth, territory, or jurisdiction.

*c. Scope of practice.* Optometrists may have privileges that include, but are not limited to—

(1) Examining, diagnosing, and treating or prescribing courses of treatment for eligible beneficiaries suffering from diseases, injuries, or disorders of the visual system, the eye, and associated structures as well as diagnosing related systemic conditions.

(2) Co-managing post-surgical eye cases and ocular complications of systemic illness in the inpatient and outpatient setting.

(3) Serving as consultant in optometry (primary eye care) for other health care professionals in the MHS.

(4) Promoting prevention and wellness, vision conservation, education and training activities, vision screenings, and positive eye and vision health behaviors.

(5) Prescribing drugs appropriate for ocular therapy. Prescriptive authority is based on the optometrist's education and experience. Graduates from U.S. schools of optometry (1985 and following) are deemed to possess the appropriate education.

*d. Supervision.* Optometrists are licensed independent practitioners and have no requirement for physician supervision.

## 7–15. Physician

*a. Description.* Physicians are primary or specialty health care providers who examine, diagnose, and treat or prescribe courses of treatment for beneficiaries suffering from diseases, injuries, or disorders of any or all of the body's systems. As either primary or specialty care providers, physicians are an integral member of the health care team and participate in most clinical pathways in the health care system. They are skilled in the management of acute and chronic conditions that affect their patients and are primary sources of consultation for other health care professionals.

*b. Professional credentials.*

(1) *Education.* Physicians must have completed an accredited medical degree program acceptable to DA.

(2) *Licensure.* Physicians will maintain a current, active, valid, and unrestricted (OSD(HA) authorized waiver) medical or osteopathic medical license from a U.S. State, District of Columbia, Commonwealth, territory, or jurisdiction acceptable to DA.

(3) *Board certification.* Physicians who have completed requirements for training and experience meeting the standards of various member boards of the American Board of Medical Specialties (ABMS) are encouraged to attain board certification in their respective specialties. However, board certification is not required to practice independently.

*c. Scope of practice.* Physician privileges may include, but are not limited to—

(1) Examining, diagnosing, and treating or prescribing courses of treatment within the scope of their training and experience for eligible beneficiaries suffering from diseases, injuries, or disorders.

(2) Serving as consultants for other health care professionals in the MHS.

(3) Promoting prevention and wellness, health and safety education and training activities, disease screenings, and positive health behaviors.

*d. Supervision.* Physicians are licensed independent practitioners and have no requirement for direct supervision. They will act independently in areas of medical and surgical care when they have demonstrated competency within their delineated privileges. Physicians in post-graduate clinical training (interns, residents, and fellows) are required to function under the supervision of experienced physicians participating in the GME system. A physician returning to practice after a lapse in providing patient care may be required to function for a specified period under the supervision of another more experienced physician (that is, enhanced supervision, as described in para 9–4e) if recommended by the credentials committee and approved by the MTF commander.

## Chapter 9
## The Privileging Process and Medical Staff Appointment

### 9–1. General

Privileging is the process whereby a specific scope and content of patient care services (delineated clinical privileges) are authorized for a health care provider by the privileging authority (MTF/USAR/ARNG unit commander/State Surgeon). Such authority is based on an evaluation of the individual's credentials, performance, and the specific needs of the organization.

   *a.* The privileging process is directed solely and specifically to the provision of quality patient care and is not a disciplinary or personnel management mechanism. Privileging actions may, however, accompany actions of an administrative or judicial nature or may engender such actions.

   *b.* A number of privileging actions, both routine and adverse, are available to the commander at the recommendation of the credentials committee. The routine privileging actions that are addressed in this chapter include privilege approval (with or without restrictions), privilege reappraisal, and privilege renewal. Adverse privileging actions include privilege restriction, reduction, suspension, revocation, and denial. These, and the non-adverse privileging action of placing a provider's privileges in abeyance and summary suspension, are discussed in chapter 10.

   *c.* Privileges are facility-specific. As such, the facility's characteristics, supportive resources, and staff are considered in the privileging decisions.

   *d.* Each department or service chief will develop criteria relevant to the award of clinical privileges for the department or service and will identify what privileges are appropriate for the scope of work in the given setting. DA Form 5440-series provides basic privileging criteria and other information that are applicable to the practice discipline. The form provides space for comments and privileges to be added, as needed, based on the MTF's scope of services, the provider's experience, and the DOD beneficiary health care requirements.

*Note.* While the criteria for award of privileges and the specific privileges pertinent to each department are the responsibility of the department/service chief, the MTF commander is the clinical privileges approval authority within the MHS.

   *e.* Providers will be granted clinical privileges appropriate to the settings in which they practice. This includes various departments, services, clinics, and the emergency center/service/department, both within the MTF and in MTF controlled outlying locations.

   *f.* Where full performance in a given GS civilian position requires the incumbent to be privileged, obtaining and maintaining clinical privileges in good standing is deemed a condition of employment.

   (1) In this regulation, "good standing" requires that the employee is—

   *(a)* Not in a remedial training program.

   *(b)* Able to practice independently.

   *(c)* Functioning with privileges that have not been reduced, restricted, suspended, revoked, or denied.

   (2) For civilian employees whose privileges are not in good standing, the MTF commander may elect to—

   *(a)* Terminate the employee.

   *(b)* Change the employee to a position at a lower grade (may be voluntary or involuntary).

   *(c)* Reassign the employee to a position for which privileges are not required (may be voluntary or involuntary).

*Note.* Any financial incentives associated with the previously held position shall be terminated.

   *g.* Reappraisal of defined clinical privileges will take place at least every 24 months (prior to the renewal of privileges) and when a provider is reassigned to a new duty station. (See paras 9–4*d*(2) and 9–4*e*.) For USAR/ARNG providers, see para 9–8*d*(1).) Renewal of clinical privileges is based on the provider's professional qualifications and demonstrated competence to perform the privileges requested. Providers who are assigned to nonclinical duty positions (for example, commander, USAREC or Office of TSG staff officer, or AMEDD Center and School instructor) who desire medical staff membership or clinical privileges are subject to the same procedures as all other applicants for membership or privileges. These individuals will only be privileged if they are expressly engaged in patient care activities appropriate to the discipline in which they are requesting privileges. The medical staff bylaws will address how the current competence of providers in administrative positions will be assessed for reappointment and clinical reprivileging. Examples of criteria that may be considered include, but are not limited to, department/service chief interview; documented continuing education/training; the acceptable interval between performance of procedures that are identified as complex, high risk, or problem prone; available patient outcomes assessment data; and clinical practice hours per month/year.

### 9–2. Practitioners who may be privileged

   *a.* Health care practitioners who function independently to initiate, alter, or terminate a regimen of medical care must be privileged. In this regulation, practitioners who are granted privileges are referred to as providers. Providers

include audiologists, behavioral health practitioners, chiropractors, clinical pharmacists, clinical psychologists, clinical social workers, dentists, dietitians, nurse anesthetists, nurse midwives, NPs, OTs, optometrists, PTs, physicians, PAs, podiatrists, psychological associates, speech therapists, and substance abuse rehabilitation counselors. Also included are CNSs, CHNs, and OHNs who, in selected circumstances and at the discretion of the commander, may be granted clinical privileges (see chap 7) and SBBs.

*b.* Members of the health care staff who function under a standard job description in the performance of their duties—utilizing practice guidelines or standing policies and/or procedures—do not require clinical privileges. Department/service chiefs are responsible for the ongoing assessment of the competence of personnel to safely perform assigned duties. For those who are not privileged, an internal certification process may be used to designate selected personnel who have achieved the competence needed to perform specific complex, high-risk, or problem-prone clinical functions.

*c.* Special privileging considerations are as follows.

(1) *Commander and deputy commander privileges.* Approval of privileges (to include periodic privilege renewal) and appointment to the medical staff for the DCCS and the commander (and comparable dental positions) will be as follows.

*(a)* The commander/DCCS will submit his/her application for privileges and request for medical/dental staff appointment (DA Form 4691–1 (Application for Renewal of Clinical Privileges and Staff Appointment)) through the appropriate department chief.

*(b)* The DCCS is excused from the credentials committee meeting (if he/she is being reviewed), and the remaining senior member of the credentials committee will act as chairperson.

*(c)* The credentials committee recommendations regarding clinical privileges and medical/dental staff appointment for the DCCS (or like DC position) will be submitted through the ECMS/ECDS (AA facilities and USAR/ARNG units wherever feasible) to the local MTF commander for approval/disapproval.

*(d)* For commanders, the credentials committee recommendations regarding clinical privileges and medical/dental staff appointment and all supporting provider documentation will be forwarded by certified return receipt requested mail as noted below (by health care facility type)—

*1. Freestanding ambulatory/health clinic, MEDDAC, and dental activity (DENTAC).* Documents will be forwarded to the responsible RMC/RDC commander.

*2. 121 General Hospital.* Documents will be forwarded to Commander, 18th Medical Command, Unit 15281, APO AP 96205–0054.

*3. MEDCEN, RMC/RDC, and major subordinate command.* Documents will be forwarded to the Commander, USAMEDCOM, ATTN: MCHO–CL–Q, 2050 Worth Road, Fort Sam Houston, TX 78234–6010 or the Commander, USADENCOM, ATTN: MCDS, 2050 Worth Road, Fort Sam Houston, TX 78234–6004.

*4. 18th Medical Command.* Documents will be forwarded to TSG, 5109 Leesburg Pike, Skyline 6, Room 684, Falls Church, VA, 22041–3258.

(2) *Emergency or disaster situations.* Scope of practice limitations as defined by the clinical privileges granted by the MTF may be ignored only in bona fide emergency circumstances (see glossary) or disaster situations. In such cases, providers are expected to intervene and to do everything possible to save the patient's life or to prevent injury, or to effectively respond to a significant increase in demand for medical treatment. This includes requesting consultation with available medical resources and coordinating care and services as appropriate.

(3) *The Armed Forces Medical Examiner System.* This system, as addressed in DODD 5154.24, authorizes medico-legal death investigations for all DOD MTFs. The range of support includes onsite autopsies by deputy or regional medical examiners, telephonic consultations, and written reports. Deputy and regional medical examiners generally hold privileges granted by the AFIP. Deputy and regional medical examiners are authorized to perform autopsies upon presentation of their Armed Forces Medical Examiner credentials to the commanding officer. An application for medical staff appointment with clinical privileges is not required for this service.

(4) *The Organ and Tissue Procurement Program and the Armed Services Medical Regulating System.* Organ donation and transplant conducted by organ and tissue procurement teams, and the related treatment provided within MTFs by personnel assigned to the Armed Forces Medical Regulating System, is addressed in DODD 6465.3. These personnel are authorized to perform their duties in Federal facilities without formal credentials review and privileging. However, the individuals assigned to support these programs will present sufficient documentation (for example, official orders, assignment letter, or identification card) to the MTF commander to establish their authorization to perform these services.

(5) *Musculoskeletal manipulations.* Musculoskeletal manipulations involve palpation and other manual techniques used to evaluate and correct somatic dysfunction that impairs or alters function of the somatic systems. These include the skeletal, arthrodial, myofascial, vascular, lymphatic, and neural systems. This does not refer to the spinal or peripheral joint manipulations commonly used by PTs that are included in their accepted standard scope of practice as defined by the American Physical Therapy Association. The following policy guidance applies to the performance of musculoskeletal manipulation procedures.

*(a)* Privileged providers—other than doctors of osteopathy, PTs, and chiropractors for whom manipulation is

considered part of their routine scope of practice—with evidence of appropriate education, training, and experience acceptable to the credentials committee may be granted specific privileges to perform musculoskeletal manual manipulations. For PTs who perform NMSEs, see paragraph 7–17*c*(2)(*a*).

*(b)* Only specifically privileged physicians (Doctor of Medicine or Osteopathy) may perform manipulation procedures using general anesthesia or intravenous medications. An appropriately privileged anesthesiologist or nurse anesthetist will administer the required anesthesia or sedation for these procedures.

(6) *Privileging for new medical procedures and technology.* The privileging process remains the same. Particular attention will be focused on provider training, experience, and competence and MTF capabilities in granting privileges for use of recently developed or approved technologies and equipment.

*(a) New procedure.* Prior to the introduction of a substantially new and innovative procedure into an MTF, the commander will ensure that privileging criteria are developed at the departmental level and endorsed by the credentials committee. The criteria will include the specific preparatory training that providers must complete prior to being granted the privilege to perform the new procedure. The privileging process for providers will be accomplished prior to the procedure being performed on eligible beneficiaries.

*(b) New technology.* MTF commanders will ensure that new technology (for example, excimer lasers) does not surpass the staff's abilities. MTF commanders will establish safety protocols for an instrument's use and provide for proper privileging procedures prior to the application or use of the new technology. The plan for implementation of new technology must include training of nonprivileged support staff. Adverse patient outcomes involving equipment malfunction will be reported according to MTF policy and will include notification of the PS manager/risk manager. (See para 12–10.)

(7) *Miscellaneous privileging issues.*

*(a) Telemedicine.* Telemedicine involves electronic communication or other communication technologies to provide or support clinical care at a distance.

*1.* The medical/dental staff will determine which clinical services are appropriately delivered via telemedicine link.

*2.* If an individual prescribes, renders a diagnosis, or otherwise provides clinical treatment to a patient via telemedicine link, the provider will be credentialed and privileged by the organization receiving the service(s). The organization may use the credentials information provided on the ICTB and appropriate attachments (see para 8–10*b* (AA) or 8–11*b* (USAR/ARNG)) as the basis for provider privileging, as long as the decision to delineate privileges is made at the facility receiving the telemedicine service. Appropriate use of the telemedicine equipment by the provider must be considered in clinical privileging decisions.

*(b) Management of impaired providers.* A physical or psychological condition that adversely affects (or has the potential to adversely affect) or limits an individual's ability to safely execute his/her responsibilities in providing health care can be considered an impairment. This includes alcohol or other drug dependency/abuse or mental health disorders. Typically, acute or chronic medical conditions will require a limited-duty profile or medical evaluation board (MEB) to decide fitness for duty of the military member. Comparable processes exist for the civilian employee with duty restrictions related to health problems. Such circumstances are managed as medical problems (short or long term) and are not considered impairments. The credentials committee/function will review the performance of privileged providers who are impaired to determine to what extent their impairment hampers their ability to safely practice the privileges they have been granted. The provider's condition or impairment may require modification of his/her clinical privileges, as appropriate. For further information, see chapters 10 and 11.

*(c) Providers assigned to a geographically separated unit.* The host unit with privileging authority is responsible for maintaining the provider's PCF and for awarding clinical privileges and a medical staff appointment if requested by the provider.

*(d) Oral surgeons.* The organization (AA/USAR/ARNG) to which a dental officer is assigned has primary responsibility for managing the oral surgeon's PCF, verifying credentials, and awarding clinical privileges and dental staff appointment, as appropriate. For the oral surgeon with duty at a facility other than the dental unit of assignment (that is, a MEDDAC or MEDCEN), an ICTB and all appropriate attachments (para 8–10*b* (AA) or 8–11*b* (USAR/ARNG)) will be provided for use by that organization in awarding clinical privileges/staff appointment.

*(e) Dentists administering conscious sedation.* As with all procedures, the award of specific privileges to a dentist to perform conscious sedation is based upon appropriate education, training, and experience. Because this skill is not part of basic dental education, specific training in this procedure must be obtained and documented before dentists can be authorized to administer conscious sedation.

*(f) Complementary and alternative medicine.* Application and/or use of these techniques and therapies (acupuncture, homeopathy, massage therapy, and so forth) are gaining acceptance within the MHS. With the approval of the commander, these may be integrated into the broad array of health care and services offered to DOD beneficiaries by qualified providers. Privileges may be granted following the guidance relative to new procedures detailed in paragraph (6)(*a*) above.

## 9–3. Categories of clinical privileges

Clinical privileges define the scope and limits of independent patient care services that a provider may render within

Sangar v. Harvey, C.A. No. 06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 19

Army Regulation 623-3 "Evaluation Reporting System" ¶1-8 and Appendix E

Army Regulation 623–3

Personnel Evaluation

# Evaluation Reporting System

Headquarters
Department of the Army
Washington, DC
15 May 2006

# UNCLASSIFIED

(9) Each rated Soldier is provided a copy of their rater's and senior rater's support forms at the beginning of the rating period and the rated Soldier's completed evaluation report at the end of the rating period.

(10) If applicable, referred reports (OER and AER only) are provided to the rated Soldier for acknowledgment or comment before being sent to Headquarters, Department of the Army (HQDA). This also applies to an OER addendum containing unfavorable information and submitted under the provisions of chapter 3. In such instances, commanders will ensure that the rated officer understands their comments do not constitute an OER appeal or request for Commander's/Commandant's Inquiry.

(11) Each rating official is fully qualified to meet their responsibilities.

(12) Reports are prepared by the rating officials designated in the published rating scheme.

(13) Soldiers have access to or are provided a copy of their completed evaluation report.

(14) Soldiers receive assistance, if requested, in preparing and submitting appeals.

(15) Completed OER reports arrive at HQDA not later than 90 calendar days and completed NCOER reports arrive at HQDA not later than 60 calendar days after the THRU date of the report for Active Duty evaluations, 120 days for the U.S. Army Reserve (USAR) and ARNGUS evaluations (see appendix F for addresses). The importance of the evaluation report to many personnel actions, especially those involving DA selection boards, requires that this suspense be met.

(16) The duties described in chapter 6 are performed when a report rendered by one of their subordinates appears illegal, unjust, or otherwise in violation of this regulation.

(17) Clarification of policies, exceptions to policies, or new policies are requested from the Commander (CDR), USA HRC and his or her attention is brought to situations that—

*(a)* Are not clearly and adequately covered by this regulation.

*(b)* Would result in an injustice to an individual or a disservice to the Army if a new policy is not made or an exception not granted.

## 1–5. Manpower resources
The evaluation function is the responsibility of the Brigade S–1 (BDE S–1), Battalion S–1 (BN S–1), or unit personnel administration office, as well as the rating officials, rated Soldiers and Headquarters, Department of the Army (HQDA). Manpower officials will use the workload factors (obtained in Manpower Staffing Standards Systems) to determine the manpower authorizations.

## 1–6. Levels of work
*a.* The focus of this regulation is on the rating chain's adherence to ERS requirements at any level as supported by a human resources manager.

*b.* Senior raters of OERs and NCOERs, or the senior rater's representative, regardless of component (Active, USAR, or ARNGUS) are required to assure compliance with standards of preparing and forwarding evaluations prescribed by the regulation or DA Pam 623–3.

*c.* The appropriate authenticating official, commandant, or civilian academic official is required to assure compliance with standards of preparing and forwarding AERs as prescribed by the regulation or DA Pam 623–3.

## Section II
## Principles and Standards

## 1–7. Principles of support
The military personnel system will—

*a.* Evaluate the performance and potential of officers warrant officer 1 (WO1) through major general (MG) in peacetime and wartime.

*b.* Evaluate the performance and potential of noncommissioned officers (NCOs), sergeant (SGT) through command sergeant major (CSM) in peacetime and wartime.

*c.* Evaluate the performance and compliance of Soldiers during Department of Defense (DOD), Civilian Educational, Medical or Industrial Institution programs.

*d.* Support the Army's personnel professional development life-cycle function.

## 1–8. Standards of service
*a. ERS overview.*

(1) The ERS identifies Soldiers who are best qualified for promotion and assignments to positions of greater responsibility. ERS also identifies Soldiers who will be kept on active duty, be retained in grade, and eliminated from service.

(2) What and Why: The ERS is a robust entity with major elements of counseling, assessment, documentation, and integration with other personnel functions. The ERS has several formal functions which are explained in subsequent paragraphs in detail.

*(a)* While the day-to-day execution is not always flexible, the ERS will remain effective and relevant on a larger scale.

*(b)* It will always meet the needs of the Army, of rating officials, and of rated Soldiers in their current environment.

*(c)* It will be poised for the future—the ERS will change as that environment changes. But the basic foundation is consistent—evaluate today's Soldier to select and develop tomorrow's leaders.

*(d)* Today, rating officials make assessments of performance and potential against a standard – Army values, the Army's leadership doctrine framework, the organization's mission, and a Soldier's particular set of duties, responsibilities, tasks, and objectives using a series of box checks, narratives, bullet comments, and evaluation rating techniques.

*(e)* Tomorrow, those standards or techniques may change. However, the ERS will continue to be the most accurate and effective assessment tool and development system possible at this moment. At all times it will remain synchronized with Army doctrine and a multitude of personnel functions (themselves adapting and transforming to new conditions and environments).

*(f)* The ERS will accomplish its mission. Most importantly, the ERS is not merely a set of forms, requirements, and processes. These words describe the means and methods for execution of what is at the heart of this subject—developing people and leaders.

*(g)* The ERS must work instilling Army Values, infusing the Warrior Ethos into our labors, and inspiring individual and unit commitment to protect and serve our Nation. The people most affected are Soldiers who receive evaluations, Soldiers and civilians who serve as rating officials, and Soldiers, civilians, contractors, and family members who know, are positively impacted, developed, or otherwise individually benefited by the leadership of a future generation of Soldiers in the evaluation circle and being selected or assigned to positions and ranks of increased responsibility today.

*(h)* This circle expands to include other members of the Armed Forces, citizens in local communities and in host nations, and federal and nongovernmental organizations and those who know Soldiers by reputation only.

*(i)* It is easy to speak of "getting an OER" or "giving an NCOER," but it is hard work to execute the leadership, the involvement, the developmental counseling, and the personal relationships necessary for an effective ERS. Fortunately, the rewards at the end—a Soldier, a unit, a team—serving the Nation in a relevant and ready force make that hard work worth the effort.

(3) Under the ERS, a Soldier is evaluated on his or her performance and potential. In this system, three kinds of evaluations exist:

*(a) Performance evaluations.* The applicable evaluation is either the DA Form 67–9 or DA Form 2166–8.

*(b) School evaluations.* The two AERs are DA Form 1059 for military institutions or DA Form 1059–1 for civilian institutions

*Note.* Evaluated time reported on academic evaluations is counted as nonrated time on OERs and NCOERs.

*(c) DA evaluations.* Selection boards and personnel management systems will be used for these evaluations. Duty and school evaluations are single time-and-place evaluations which are used when making DA evaluations. DA evaluations cover the Soldier's entire career and personnel file. DA evaluations will focus on a Soldier's potential. There are judgments on their ability to perform at current and higher grades, and they are also made to judge whether Soldiers will be retained and given greater responsibility in their present grade. In making DA evaluations, three factors will be considered:

*1. Army requirements for Soldiers.* Army requirements for Soldiers frequently change. At times, the Army has a need for leaders with certain backgrounds, experience, and expertise. The size of the Army leader corps is limited by law in terms of strength by grade, and the Army limits the number of selections and assignments that can be made. Thus, a leader's potential is partially determined by how they compare with their peers.

*2. Duty performance.* Performance of duty is an extremely important factor in determining a leader's potential. Duty performance is judged by how well a Soldier performs assigned tasks and how well each meets Army professional values uniquely established for each respective corps.

*3. Leader qualifications.* Qualifications are required to maintain outstanding leaders of troop or technical units, supporting staff managers, and technical specialists. There are different skills and backgrounds required by different specialties. A Soldier's individual progress through specialized fields to positions of greater responsibility is a consideration, as well as length of service, civil schooling, military schooling, or other unique skills required by the Army.

*b. ERS principles.*

(1) The ERS largely determines the quality of the Soldier, the selection of future Army leaders, and the course of their individual career. It supports many current Army and Joint personnel management programs.

*(a)* The OER, NCOER, and AER ensure that an individual leader's specialties are considered along with the specialty requirements of their duty position when they are evaluated.

*(b)* The emphasis on senior/subordinate communication supports the Army's "people-oriented programs." It is intended to focus attention on constructive problem solving and the importance of sound working relationships.

(2) ERS is a multifunctional system with a basic structure that will—

*(a)* Allow the rater to give shape and direction to the rated Soldier's performance.

*(b)* Provide a chain-of-command or supervision evaluation of an individual Soldier's performance and potential.

*(c)* Allow the entire evaluation reporting process to be reviewed.

*c. ERS functions.*

(1) The primary function of ERS is to provide information to HQDA for use in making personnel management decisions. This information is supplied to HQDA by the rating chain in the Soldier's assigned or attached organization. Components of this information include—

*(a)* Evaluation reports, which will be accurate and complete to ensure that sound personnel management decisions can be made and that a rated Soldier's potential can be fully developed. Each report will be a thoughtful, fair appraisal of a Soldier's ability and potential. Reports that are incomplete or fail to provide a realistic and objective evaluation will make personnel management decisions difficult.

*(b)* Strengthening the ability of the Army to meet the professional challenges of the future through the indoctrination of Army values and basic Soldier responsibilities. The continued use of Army values and Soldier responsibilities as evaluation criteria will provide and reinforce a professional focus for the rating chain's view of performance. Over time, this will result in acceptance of the values and Soldier responsibilities, better performance, and stronger Army leaders.

*(c)* Being part of a "whole file" concept and continuous growth philosophy. A single report will not, by itself, determine a Soldier's Army career. An appraisal philosophy that recognizes continuous professional development and growth (rather than one that demands immediate, uncompromising perfection) will best serve the Army and the rated Soldier.

*(d)* Ensuring the selection of the best qualified Soldiers to serve in positions of increasing responsibility by providing rating chain view of performance/potential for use in centralized selection, assignment, and other personnel management. The information in evaluation reports, the Army's needs, and the individual Soldier's qualifications will be used together as a basis for such personnel actions as school selection, promotion, assignment, military occupational specialty (MOS) classification, command sergeant major (CSM) designation, and qualitative management.

(2) The secondary function of ERS is to encourage leader professional development and enhance mission accomplishment, to include—

*(a)* Stressing the importance of sound senior/subordinate relationships. It also stresses the importance of setting standards and giving direction to the performance of subordinate officer and noncommissioned officer leaders. Properly used, ERS can be a powerful leadership and management tool for the rating chain.

*(b)* Contributing to Army-wide improved performance and professional development by increased emphasis on performance counseling. Evaluation reports will provide the rated Soldier formal recognition for performance of duty, measurement of professional values and personal traits, and along with the required support forms is the basis for performance counseling by rating officials. Senior/subordinate communication is necessary to maintain high professional standards and is key to an effective evaluation system.

*(c)* Senior/subordinate communication, to make career development information, advice, and guidance readily available to the rated officer or NCO. This is necessary to maintain high professional standards.

*d. ERS process.*

(1) Officer rating officials will use DA Form 67–9; DA Form 67–9–1; DA Form 67–9–1a (Developmental Support Form (DSF)); and the electronically generated DA Form 67–9–2 (Senior Rater Profile Report).

(2) NCOs and appropriate rating officials use DA Form 2166–8 and DA Form 2166–8–1 (NCOER Counseling and Support Form).

(3) The rating period, development of support forms and counseling will support a final evaluation:

*(a)* The evaluation process will start before the rating period, when the rated Soldier's rating chain is established. AER rating chains will be established by the appropriate school or unit admin with oversight to ensure adequate evaluation.

*(b)* The rater will ensure that the rated officer or rated NCO receives a copy of the rater and senior rater's support form. This will provide the rated Soldier essential rating chain direction and focus to aid in developing subsequent support form. A face-to-face discussion of duties, responsibilities, and objectives between the rater and the rated Soldier assists in drafting support form.

*e. Counseling.* Counseling will be conducted within 30 days after the beginning of the rating period and quarterly thereafter for NCOs, WO1s, chief warrant officers 2 (CW2s), lieutenants (LTs) and captains (CPTs). Quarterly counseling for all other ranks will be on an as-needed basis. It develops a duty description for the Soldier and major performance objectives to accomplish during the rating period. It will also be used to guide the rated leader's performance during the early part of the rating period.

*f. Rating chain process.* Procedures in DA Pam 623–3 for each form explain what information is requested and how rating officials can complete the process from counseling to HQDA submission. Support forms and evaluations will reflect the rating officials published in the official rating scheme (see para 2–3).

others. As lawyers, they are bound by a strict code of professional responsibility that provides standards for the legal profession. Rating officials will be mindful of these responsibilities and evaluate JAGC officers accordingly.

### D–2. Evaluation of Judge Advocate General Corps officers
*a.* Only TJAG, the Assistant JAG, and commissioned officers of the U.S. Army judiciary may serve as rater, intermediate rater, or senior rater of a JAGC officer assigned to the U.S. Army judiciary as a military judge or to the U.S. Army Legal Services Agency as a military magistrate.

*b.* No convening authority or any member of his or her staff may evaluate a JAGC officer assigned additional duties as a military judge or as military magistrate on the performance of his or her duties in that capacity.

*c.* No rating official will give an adverse or less favorable rating or comment regarding a rated officer because they zealously represented as counsel any accused or respondent before court-martial or administrative board proceedings.

### D–3. Evaluating officer detailed to on-the-job training
*a.* Officers attending law school under the TJAG Funded Legal Education Program will be evaluated for periods of on-the-job training, as described in para 3–56. When evaluating these officers, consider their grade, experience, and schooling. They will not be compared with experienced lawyers.

*b.* For officers taking part in the Funded Legal Education Program, the following entry will be placed in DA Form 67–9, Part III.e: "Officer is a full-time, active-duty student attending law school at Government expense under AR 27–1. On-the-job training continues in the summer when school is not in session."

*c.* Upon completion of the Funded Legal Education Program, and still affiliated with a University Education Program pending successful completion of a State bar exam, DA Form 1059–1 will be used to cover this rating period.

### D–4. Initial tour of extended active duty
A report will be rendered upon completion of 120 duty days as a JAGC officer, regardless of prior service in other than JAGC, in a principal duty assignment under a single rater as detailed in paragraph 3–54. This applies only if no report has been made during the current period of service. This applies to officers who complete law school under TJAG's Funded Legal Education Program (AR 27–1). Officers programmed for attendance at an officer basic course will not be rated under this paragraph before attending the course.

### D–5. JAGC officers assigned to the U.S. Army Trial Defense Service
These officers are not considered to be under dual supervision paragraph 2–22.


# Appendix E
# Evaluation of U.S. Army Medical Department Officers

### E–1. Evaluation of Army Medical Department residents, interns, and fellowship students
The OER has a unique purpose when used to evaluate the performance and potential of Medical Corps (MC), Dental Corps (DE), Veterinary Corps (VC), Army Nurse Corps (AN), Medical Specialist Corps (SP), Medical Service Corps (MS) resident, intern, and fellowship students in Graduate Health Education (also referred to as Long Term Health Education and Training). Therefore, it will be given primary emphasis in the evaluation process. Special instructions for rating MC, DE, VC, AN, SP, and MS residents, interns, and fellowship students are specified below. The evaluation forms will be completed as prescribed in chapter 3, unless indicated otherwise in this appendix.

*a. DA Form 67–9–1.*

(1) Part I will be completed by servicing administrative office. The duty title will be specific (for example, intern, first-year surgical resident, dietetic intern, dental general practice resident, veterinary preceptorship, clinical pathology).

(2) Part II will be completed by the servicing administrative office. The duty AOC for this assignment will reflect the specialty for which the rated officer is being trained.

(3) Part III will describe the program goals (to include academic and practicum requirements) and achievements during the rating period.

*b. DA Form 67–9.* This will be completed in accordance with DA Pam 623–3, chapter 2.

(1) Part I, item f, Designated Specialty, will be the specialty for which the rated officer is being trained.

(2) Part II, Authentication, will be completed in accordance with DA Pam 623–3, paragraph 2–5.

(3) Part III, Duty Description, comprises 3 parts:

*(a) Item a, Principal Duty title.* The duty title will parallel the duty title shown on the DA Form 67–9–1.

*(b) Item b, Duty AOC.* Enter the specialty for which the rated officer is being trained.

*(c) Item c, Significant Duties and Responsibilities.* Refer to DA Form 67–9–1, Part IVa. This portion allows the rater to describe the rated officer's program, to include academic and practicum requirements during the rated period. Most

raters will use Part IIIa of DA Form 67–9–1 to help them complete this section. This information is particularly important to DA selection boards; therefore, raters will record it with thought and detail.

(4) Part IV, Performance Evaluation-Professionalism comprise 2 parts:

(a) *Item a, Army Values.* The rater completes this item. It lists values that define professionalism for the Army officer (DA Pam 623–3, para 2–7). Evaluation of each value will be in the context of the graduate health education experience, to include clinical and academic environments. A list of these values and their definitions is provided in DA Pam 623–3, table 2–4.

(b) *Item b.* Leader attributes/skills/actions. Complete by placing an "x" in either the "yes" or "no" box and selecting six, one from attributes, two from skills, and three from actions, which provide the best leader word picture of that rated officer. Comments may also be provided in Part Vb. Comments on "no" entries are mandatory.

(5) Part V, Performance and Potential Evaluation (rater) comprises three parts:

(a) *Item a.* Complete as prescribed.

(b) *Item b.* Comment on specific aspects of performance and potential. This portion is most significant because it provides DA with a detailed account of the participant's progress in their graduate health education. These comments will describe the rated officer's academic and practicum achievements. In the case of Medical and Dental Corps officers, the House Staff Evaluation Report, as required by AR 351–3, will assist the rating official. These comments will be brief but will provide DA with a clear description of the officer's graduate education progress.

(c) *Item c.* Complete as prescribed.

(6) Part VI, Intermediate Rater will be completed as directed in DA Pam 623–3.

(7) Part VII, Senior Rater, will be completed as directed in DA Pam 623–3.

*c. Rating officials for MC, DE, VC, AN, SP, and MS resident, intern, and fellowship students in Graduate Health Education. .*

(1) *Medical Corps and Dental Corps officers.* Commanders will designate as rating officials those staff officers directly responsible for the education program of the rated officer at the lowest practical level. As an exception to paragraph 2–5, 2–6, and 2–7—

(a) The rating officials need not be senior to the rated officer; however, the senior rater will be senior in grade or date of rank to the rater.

(b) The teaching chiefs for Dental Graduate Education Programs are authorized to rate officers senior to them in grade and date of rank. This exception will be used only when the teaching chief totally supervises the student's graduate level instructions and day-to-day duties in the educational environments.

(2) *Other AMEDD officers.* These evaluations are completed as directed by proper authority.

*d. Submission of Reports-Change in type of internship.* If an officer changes from a rotating (or flexible) internship to a straight internship in an expanded residency specialty after 90 days but before completion of the internship year, a report will be submitted. If the officer has already been selected for a residency in the specialty to which the internship is changed, submit a change of duty report showing the new duty as first-year graduate medical education; otherwise, submit a change of rater report.

## E–2. Rating officials for military physician assistants

Military physician assistants work directly under the control of a supervising physician in performing their patient care duties. This supervising physician will be included as either the rater or the senior rater of the physician assistant in all cases. If serving as the rater, the supervising physician may be equal in rank but not necessarily senior by date of rank to the PA. When the supervising physician is not assigned to the same organizational element, a case of dual supervision may exist. In this case, the commander will designate the other rating official (rater or senior rater), as indicated in paragraph 2–22.

## E–3. Junior Army Medical Department colonel commanders as senior raters or reviewers

The following conditions will be met in order for a junior AMEDD colonel commander to senior rate or review officers and NCOs in their command.

*a. OERs.* As an exception to paragraph 2–7*a*(9) and table 2–1, commanders junior by DOR to the rated officer and rating chain may serve as senior raters, provided—

(1) They have been appointed as a commander by the direction of the president (see AR 600–20).

(2) They are authorized to rate the rated officer's rater and/or intermediate rater in accordance with this regulation (see para 2–5).

*b. NCOERs.* Commanders junior by DOR to the rater may serve as senior raters. Commanders junior by DOR to the rater and senior rater may serve as the reviewer. These provisions apply only if the requirement of paragraph E–3*a*(1) is met and they are authorized to rate the rated NCO's rater and/or senior rater.

## E–4. Rating officials for U.S. Army Medical Command, subordinate Army Medical commands, activities, and field operating agencies

The following rules apply to US Army Medical Command (MEDCOM) and its field operating agencies, Regional

Medical Commands (RMCs), U.S. Army Medical Department Center and School, U.S. Army Medical Research and Materiel Command, U.S. Army Center for Health Promotion and Preventive Medicine, U.S. Army Dental Command (DENCOM), U.S. Army Aeromedical Center (USAAMC), U.S. Army Veterinary Command (VETCOM), U.S. Army Regional Veterinary Command, U.S. Army District Veterinary Command (DVC), and their respective subordinate activities.

*a.* Major subordinate commanders, MEDCOM, will be evaluated as follows:

(1) The commanders, North Atlantic RMC, U.S. Army Medical Department Center and School, U.S. Army Center for Health Promotion and Preventive Medicine, Medical Research and Materiel Command, DENCOM, and VETCOM will be rated and senior rated by the CG, MEDCOM.

(2) The commanders, Great Plains RMC, Southeast RMC, and Western RMC, will be rated by the installation commander and senior rated by the CG, MEDCOM.

(3) The Deputy Commander-in-Chief, U.S. Army Europe, will rate the European RMC Commander. The senior rater will be the CG, MEDCOM, regardless of date of rank.

(4) The Pacific RMC Commander will be rated by the Commander, U.S. Army Pacific, and senior rated by CG, MEDCOM regardless of date of rank.

(5) The Commander, Walter Reed Army Medical Center, will be rated by the North Atlantic RMC Commander and senior rated by the CG, MEDCOM.

*b.* When none of the above rules can be applied, the CG, MEDCOM, will be the rater and senior rater for the major subordinate commander concerned. The installation commander will submit written comments concerning the rated officer's duty performance to the CG, MEDCOM, in accordance with paragraph 2–21.

*c.* As an exception to paragraph 2–7*a*(9) and table 2–1, officers in the following positions when senior in date of rank to both the rated officer and the rater, may serve as senior rater for all AMEDD colonels assigned to HQ, MEDCOM, and colonels rated by MEDCOM subordinate commanders (this exception does not permit these officers to rate colonels in command positions, or to serve as both rater and senior rater for the same rated officer):

(1) The Assistant Chief of Staff for Health Policy and Services, MEDCOM, for all assigned or attached AMEDD Corps colonels, except Dental and Veterinary Corps.

(2) A Colonel serving as Chief of Staff, MEDCOM, for all assigned or attached AMEDD colonels.

(3) The Chief of Staff, AMEDD C&S, for all assigned or attached colonels.

*d.* The installation/community commanders and the RMC commanders will rate and senior rate the U.S. Army Medical Department Activity (MEDDAC) and USAAMC commanders. The senior officer will serve as the senior rater.

*e.* Following is the rating chain rules for the DENCOM, RDC, U.S. Army Dental Activity (DENTAC), ADL commanders, and executive officers:

(1) The DENCOM commander will be rated and senior rated by the CG, MEDCOM.

(2) The DENCOM commander will establish the rating schemes for the RDC, DENTAC, ADL commanders, and executive officers.

*f.* Rating chain rules for VETCOM, RVC, DVC commanders, and Veterinary Corps (VC) officers are as follows:

(1) The VETCOM commander will be rated and senior rated by the CG, MEDCOM.

(2) The VETCOM commander will rate the RVC commanders. The senior rater will be the RMC commander, grade or date of rank permitting.

(3) The RVC commander will rate DVC commanders. The senior rater will be the VETCOM commander.

(4) The DVC commander will rate branch VC officers. The senior rater will be the RVC commander.

(5) The branch VC officers will rate section VC officers. The senior rater will be the DVC commander, grade or date of rank permitting.

(6) HQ, VETCOM will establish rating schemes not fitting into the categories listed above.

*g.* Deputy Commanders for Administration (DCA) are rated by—

(1) The RMC commanders for DCAs assigned to RMCs. RMC commanders of general officer grade will also senior rate.

(2) The MEDDAC/field grade RMC commander for DCAs assigned to MEDDACs or RMCs without general officer commander. At the discretion of the commander, the senior rater will be the RMC commander or the installation commander, grade or date of rank permitting.

*h.* Deputy commanders for clinical services (DCCS) are rated by—

(1) The general officer RMC commander, who will also senior rate.

(2) The field grade RMC commanders with the MEDCOM commander or a designated member of the HQ MEDCOM staff senior rating.

(3) The MEDDAC commander and senior rated by the RMC commander or a member of the RMC staff, grade or date of rank permitting. HQ MEDCOM will designate the senior rater for those DCCSs who cannot be senior rated within the RMC.

*i.* Chief Nurse is rated by—

(1) The RMC DCCS (if senior by date of rank) or RMC commander for the RMC chief nurse. If rated by the

DCCS, the RMC commander will senior rate. Those rated by the commander will also be senior rated by the commander, if of General Officer grade. The MEDCOM commander or a member of the HQ MEDCOM staff will senior rate those rated by a field grade RMC commander.

(2) The DCCS (if senior by date of rank) or commander will rate MEDDAC chief nurses. If rated by the DCCS, the commander will senior rate. If rated by the commander, the RMC chief nurse will intermediate rate, grade or date of rank permitting, and the RMC commander (General Officer) will senior rate.

*j.* Certified registered nurse anesthetists are rated by supervisory personnel in the Departments of Nursing and Surgery. Seniority will determine the rater and senior rater responsibilities.

*k.* Commanders, chiefs, or officers-in-charge of health clinics or installations where there is no RMC or MEDDAC, who also serve the installation commander as director of health services, are rated by—

(1) The installation commander when senior to the rated officer, and junior in grade or date of rank to the RMC or MEDDAC commander, exercising command control over the health clinic. The senior rater is the RMC or MEDDAC commander.

(2) A member of the installation commander's staff senior to the rated officer, when the installation commander is senior to the RMC and/or MEDDAC commander exercising command control over the health clinic. The senior rater is the RMC or MEDDAC commander.

(3) The RMC or MEDDAC commander exercising command control over the health clinic when the installation commander is junior to the rated officer. The installation commander will provide a letter of input for the rater's use in preparing the OER. The general officer RMC commanders will also senior rate. In cases where the MEDDAC/field grade RMC commander is the rater, the CDR, MEDCOM will designate the senior rater.

*l.* Rating schemes for Chiefs of Departments of Dentistry in RMC and/or MEDDAC will be established as follows:

(1) For RMC, the deputy DENTAC commander will be the rater; the DCCS or Chief, Department of Surgery, the intermediate rater, date of rank permitting; and the DENTAC commander, the senior rater.

(2) For MEDDAC, the deputy DENTAC commander will be the rater; the MEDDAC DCCS or the Chief of Surgery, the intermediate rater, date of rank permitting; and the DENTAC commander, the senior rater.

*m.* The OER rating scheme for Dental Corps officers assigned to a DENTAC will include only Dental Corps officers, except as indicated otherwise in this appendix.

*n.* Except as indicated in this appendix, the rating chain for all MEDCOM personnel will be in MEDCOM channels.

*o.* Where compliance with paragraph E–3 cannot be accomplished because of grade or DOR structure, contact the Deputy Chief of Staff for Personnel, MEDCOM, for assistance in establishing the proper rating scheme.

*p.* Because of the unusually large number of AMEDD colonels assigned to the United States Forces Korea, the Commander, 18th Medical Command may serve as senior rater for all AMEDD colonels in that organization.

### E–5. Rating officials for Army Reserve and Army National Guard/Army National Guard of the United States Army Medical Department officers

The following rules apply to AMEDD IMA, DIMA, TPU, IRR, and Standby Reserve AMEDD officers assigned or attached to Active Army AMEDD units for AT, ADT, ADSW, TTAD, or IDT:

*a.* An exception to the requirement that a rater be senior by date of rank to the rated officer is granted provided the rater is the immediate supervisor and the remaining conditions of paragraph 4–4c are met.

*b.* The senior rater will be senior to the rated officer and the rater, except as indicated below:

(1) Colonel commanders may serve as senior raters for colonel USAR and ARNG/ARNGUS AMEDD officers assigned or attached to their unit for duty.

(2) In instances where the Commander, VETCOM or DENCOM is serving as the rater, the senior rater will be the CG, MEDCOM.

*c.* Colonel commanders serving as senior raters for colonel USAR and ARNG/ARNGUS AMEDD officers will cite this paragraph as authority to senior rate on DA Form 67–9, Part VIIc. Under no circumstances will a colonel commander serve as both rater and senior rater.

## Appendix F
## Human Resource Command Addresses

### F–1. Addresses for various applications
Table F–1 provides HRC addresses for submitting various forms for certain circumstances.

### F–2. Official Military Personnel File
OMPFs are available at the following Web addresses:
*a.* For Active Duty personnel, https://iperms.army.mil/rms/login.jsp.

Sangar v. Harvey, C.A. No.  06-2015 (CKK)

Plaintiff's Motion for Summary Judgment

Exhibit 20

Army Regulation 623-8-24 "Officer Transfers and Discharges"
¶¶4-1 to 4-19 Eliminations

Army Regulation 600–8–24

Personnel–General

# Officer Transfers and Discharges

Headquarters
Department of the Army
Washington, DC
12 April 2006

## UNCLASSIFIED

## Chapter 4
## Eliminations

### Section I
### Scope

### 4–1. Overview

*a.* An officer is permitted to serve in the Army because of the special trust and confidence the President and the nation have placed in the officer's patriotism, valor, fidelity, and competence. An officer is expected to display responsibility commensurate to this special trust and confidence and to act with the highest integrity at all times. However, an officer who will not or can not maintain those standards will be separated.

*b.* Every officer deserves a fair chance to demonstrate their capabilities. When an officer shows ineffective tendencies (especially if the officer is inexperienced) when practicable, they will be given another chance under another commander. The officer's ineffectiveness will be systematically recorded in documents that specify each period covered, duties observed, and defects noted. Recommendations for elimination action will not be based on generalities and vague impressions. It is necessary to document, in writing, the precise reasons an officer is considered ineffective.

*c.* A U.S. Army Reserve or Army National Guard officer must hold, or be capable of holding, a security clearance of at least secret. An Active Army officer must hold a security clearance of at least secret. This requirement may not be waived. The final denial or revocation of an officer's Secret security clearance by appropriate authorities acting pursuant to DODD 5200.2-R and AR 380-67 requires the discharge of that officer from the service." An officer whose security clearance has been withdrawn or withheld due to unfavorable information regarding loyalty, subversion, or security violations may be processed for involuntary separation under AR 380-67, paragraph 8-201.2. In accordance with AR 380-67, paragraph 8-103, however, the officer should first be considered for discharge under this regulation. The administrative procedures prescribed in AR 380-67, chapter 8, will be followed until the case is referred to HRC-Alexandria (AHRC-OPD-A).

*d.* This chapter prescribes the tasks, rules, and steps for eliminating officers in the Active Army for substandard performance of duty, misconduct, moral or professional dereliction, and in the interests of national security.

### 4–2. Reasons for elimination

While not all inclusive, when one of the following or similar conditions exist, elimination action may be or will be initiated as indicated below for—

*a.* Substandard performance of duty.

(1) A downward trend in overall performance resulting in an unacceptable record of efficiency, or a consistent record of mediocre service.

(2) Failure to keep pace or to progress with contemporaries, as demonstrated by a low record of efficiency when compared with other officers of the same grade and competitive category.

(3) Failure to exercise necessary leadership or command expected of an officer of their grade.

(4) Failure of an officer to absorb technical proficiency required for grade and competitive category.

(5) Failure to properly perform assignments commensurate with an officer's grade and experience.

(6) Apathy, defective attitudes, or other characteristic disorders to include inability or unwillingness to expend effort.

(7) Failure to respond to alcohol or drug problem rehabilitation efforts in a reasonable length of time. (See AR 600–85 for further explanation.) Elimination action will be initiated. Care should be taken to avoid the inclusion of limited-use evidence, as defined in AR 600–85, chapter 6.

(8) Failure to conform to prescribed standards of dress, personal appearance, or military deportment.

(9) Failure to achieve satisfactory progress after enrollment in the Army weight control program or failure to maintain the weight/body fat standards established under the provisions of AR 600–9 after removal from an established weight control program. Elimination action will be initiated. This provision does not include those judge advocates and AMEDD officers who have incurred a statutory ADSO for participating in Army sponsored education and training programs such as the Funded Legal Education Program (10 USC 2004), Armed Forces Health Professions Scholarship Program, or the Uniform Services University of the Health Sciences (10 USC, chapters 104, 105).

(10) When no medical problems exist, and an officer has two consecutive failures of the APFT, elimination action will be initiated. This provision does not include those judge advocates and AMEDD officers who have incurred a statutory ADSO for participating in Army sponsored education and training programs such as the Funded Legal Education Program (10 USC 2004), Armed Forces Health Professions Scholarship, or the Uniform Services University of the Health Sciences (10 USC, chapters 104, 105).

(11) Failure of a course at a service school for academic reasons by a probationary or nonprobationary RA officer. For failure by an RC officer, see paragraph 2–33.

(12) Failure of a probationary officer to resign under paragraph 3–9 when their commander determines the best interest of the Government and the individual can be served by the officer's discharge.

(13) The discovery of other conditions concerning a probationary officer that, had they been known at the time of appointment, would have precluded appointment.

(14) The discovery of any other condition concerning a probationary officer that indicates the officer's retention in the Army would not be in the best interest of the United States.

(15) Probationary RA commissioned and warrant officers entering AD who are confirmed Human Immunodeficiency Virus (HIV) positive within 180 calendar days of their original appointment or probationary USAR, ARNG commission and warrant officers who report for initial entry training in an AD (other than ADT) status and are confirmed HIV positive within 180 calendar days of reporting to AD will be processed for elimination.

(16) Failure to establish an adequate Family Care Plan in accordance with AR 600-20, paragraph 5-5.

*b.* Misconduct, moral or professional dereliction, or in the interests of national security.

(1) Discreditable or intentional failure to meet personal financial obligations.

(2) Mismanagement of personal affairs that are unfavorably affecting an officer's performance of duty.

(3) Mismanagement of personal affairs to the discredit of the Army.

(4) Intentional omission or misstatement of fact in official statements or records for the purpose of misrepresentation.

(5) Acts of personal misconduct (including but not limited to acts committed while in a drunken or drug intoxicated state).

(6) Homosexual conduct (see para 4–22).

(7) Intentional neglect of or failure to perform duties.

(8) Conduct unbecoming an officer.

(9) Conduct or actions that result in the loss of a professional status, such as withdrawal, suspension or abandonment of professional license, endorsement, or certification that is directly or indirectly connected with or is necessary for the performance of one's military duties. (For AMEDD officers, this includes the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges.)

(10) The final denial or revocation of an officer's Secret security clearance by appropriate authorities acting pursuant to DODD 5200.2-R and AR 380-67.

(11) Unless precluded by paragraph 4–18*d*(4), elimination action will be initiated against an officer who is medically diagnosed as drug dependent or identified as having committed an act of personal misconduct involving drugs.

(12) Conduct or actions by a warrant officer resulting in a loss of special qualifications (such as withdrawal/ revocation of CID accreditation, revocation of marine qualification license, removal from the PRP, withdrawal of clinical privileges or loss of flying status) that directly or indirectly precludes a warrant officer from performing in MOS and is necessary for the performance of those duties. Eliminations based on these reasons may not be utilized if reclassification action is feasible and in the best interest of the Service or if the loss of special qualifications was due to medical reasons beyond the control of the warrant officer.

(13) Failure to respond in a reasonable length of time to rehabilitation efforts regarding repeated acts of child/spouse maltreatment or abuse and/or other acts of family violence.

(14) Failure of a course at a service school by an RA officer because of misconduct, moral or professional dereliction. For failure by an RC officer, see paragraph 2–33.

(15) Conviction by court martial that did not impose a punitive discharge for a sexually violent offense listed in AR 27-10, chapter 24.

*c. Derogatory information.* The following reasons (or ones similar) require an officer's record to be reviewed for consideration of terminating appointment. Standing alone, one of these conditions may not support elimination, however, this derogatory information combined with other known deficiencies form a pattern that, when reviewed in conjunction with the officer's overall record, requires elimination.

(1) Punishment under UCMJ, article 15.

(2) Conviction by court-martial.

(3) The final denial or revocation of an officer's Secret security clearance by appropriate authorities acting pursuant to DODD 5200.2-R and AR 380-67.

(4) A relief for cause officer evaluation report (OER) (DA Form 67–9, (Officer Evaluation Report)) under AR 623–105, paragraph 3–32.

(5) Adverse information filed in the OMPF in accordance with AR 600-37.

(6) Failure of a course at a service school.

## 4–3. Medical condition

*a.* An officer referred or recommended for elimination under this chapter who does not meet medical retention

standards will be processed through both the provisions of this regulation and through the MEB/PEB process as described in paragraph 1–22.

*b.* When it is determined the officer's mental condition contributed to military inefficiency or unsuitability, the medical evaluation will include a psychiatric study of the officer. This study will indicate whether the officer was able to distinguish right from wrong and whether the officer currently has the mental capacity to understand board and judicial proceedings and participate in defense. When applicable, the report will also indicate whether the incapacitating mental illness could have been the cause of the conduct under investigation.

*c.* At the time an officer is to appear before the Board of Inquiry, if he or she does not possess sufficient mental capacity to understand the nature of the proceedings or does not behave or cooperate intelligently in defense, the proceedings will be delayed until the officer recovers, or the officer will be processed through medical channels, whichever applies.

*d.* If a physical or mental condition develops after an officer has been recommended for involuntary separation or after the Board of Inquiry proceedings are completed, the officer's commander will immediately notify HRC–Alexandria (AHRC–OPD–A).

## 4–4. Limitations

*a.* An officer will not be considered for involuntary separation because of conduct that has been the subject of judicial proceedings that resulted in an acquittal.

*b.* Except as provided in *d*, below, no officer will be considered for elimination for reasons stated in paragraph 4–2 because of conduct that has been the subject of administrative elimination proceedings that resulted in final determination that the officer should be retained in the Service. For purposes of this paragraph, an officer will be considered to have been the subject of elimination proceedings only if allegations against the officer were acted on by a Board of Inquiry convened under this chapter.

*c.* The limitations set forth in *b* above are not applicable when—

(1) Substantial new evidence is discovered that was not known at the time of the original proceedings despite the exercise of due diligence and that would probably produce a result significantly less favorable for the officer at a new hearing.

(2) Subsequent conduct by the officer warrants considering him or her for discharge. Such conduct need not independently justify the member's elimination but must be sufficiently serious to raise a substantial question as to the officer's potential for further useful military service. However, this exception does not permit further consideration of conduct of which the officer has been absolved in a prior final factual determination based on the merits by a judicial body.

(3) An express exemption has been granted by HRC, in writing, upon a determination that administrative separation should be effected because of the unusual circumstances of the case.

*d.* Under the circumstances in (1) through (4) below, an officer who has been considered for elimination and retained on AD may again be required to show cause for retention:

(1) An officer may be again considered for elimination because of lack of proficiency or recurrent misconduct subsequent to the earlier consideration.

(2) An officer may be again considered for elimination because of misconduct that occurred prior to that alleged in the earlier proceedings but that was not sooner discovered despite the exercise of due diligence.

(3) An officer who has been considered for elimination for substandard performance of duty and retained may again be considered for elimination for substandard performance of duty at any time 1 year after the prior case has been closed.

(4) An officer may be considered for elimination for misconduct, moral or professional dereliction, or in the interest of national security at any time subsequent to the closing of the prior case that resulted in the officer's retention on AD. However, an officer may not again be required to show cause for retention on AD solely because of conduct that was the subject of the previous proceedings, unless the findings and recommendations of the Board of Inquiry or the Board of Review that considered the case are determined to have been obtained by fraud or collusion. The grounds for elimination in the earlier case may be joined with new grounds in the later case, provided the earlier elimination proceedings does not include a factual determination specifically absolving the member of the allegations then under consideration. If the grounds for elimination in the earlier proceedings are joined, the additional grounds considered in the subsequent proceedings need not independently justify the member's discharge but must be sufficiently serious to raise a substantial question as to the member's potential for further useful military service.

*e.* Punishment resulting from trial by court-martial or under the provisions of UCMJ, article 15, for misconduct and subsequent use of this fact in support of elimination under this regulation do not constitute double jeopardy.

## 4–5. Separation date

An officer approved for involuntary separation by the Secretary of the Army or their designee or whose request for resignation or discharge in lieu of elimination is approved will be separated accordingly.

*a.* For misconduct, moral, or professional dereliction, or in the interest of national security.

(1) In CONUS, an officer will be separated no earlier than 5 calendar days and not later than 14 calendar days after the officer receives written notification.

(2) Outside CONUS, an officer will be returned to the CONUS separation TP/TA no later than 21 calendar days after the officer receives written notification. Separation will occur no later than 5 calendar days after arriving at the CONUS TP/TA.

*b.* Solely substandard performance of duty. Not later than the 30th calendar day after receipt of notification by the officer concerned; the officer will not be released prior to the 30th calendar day, however, without consent.

## Section II
## Boards

### 4–6. Board of Inquiry

*a.* The Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army. Through a formal administrative investigation conducted under AR 15-6 and this regulation, the Board of Inquiry establishes and records the facts of the Respondent's alleged misconduct, substandard performance of duty, or conduct incompatible with military service. Based upon the findings of fact established by its investigation and recorded in its report, the board then makes a recommendation for the officer's disposition, consistent with this regulation. The Government is responsible to establish, by preponderance of the evidence, that the officer has failed to maintain the standards desired for their grade and branch or that the officer's Secret-level security clearance has been permanently denied or revoked by appropriate authorities acting pursuant to DODD 5200.2-R and AR 380-67. In the absence of such a showing by the Government, the board will retain the officer. However, the respondent is entitled to produce evidence to show cause for his retention and to refute the allegations against him. The Respondent's complete OMPF will be entered in evidence by the Government and considered by the Board of Inquiry.

*b.* Boards of Inquiry are appointed by the appropriate GOSCA. Concurrence must be obtained from the appropriate commander when an officer assigned to a different command is used on a Board of Inquiry. The local installation convening the Board of Inquiry will fund the travel of board members from other installations.

*c.* The GOSCA will advise members of a Board of Inquiry that duty on the board takes priority over all other duties unless properly excused by the appointing authority.

*d.* The Board of Inquiry will be completed no later than 120 calendar days from the date the GOSCA is notified by HRC to conduct the Board of Inquiry or on a GOSCA initiated elimination, 90 days from the date the GOSCA directs that a Board of Inquiry be conducted. Whenever completion of the Board of Inquiry is delayed beyond the established time, the GOSCA will notify CDR, HRC–Alexandria (AHRC–OPD–A) by electronic message of the reason for the delay and the projected date for the Board of Inquiry to be completed.

*e.* The CG, U.S. Army Military District of Washington, will have jurisdiction as GOSCA for all personnel assigned or attached to the U.S. Army, Military District of Washington. This authority may be delegated by the CG, U.S. Army, Military District of Washington, in appropriate cases to officers who could otherwise act as GOSCAs.

*f.* The GOSCA will issue the orders appointing the Boards of Inquiry.

*g.* Except as modified by this regulation, the board will conform to the provisions of AR 15–6 applicable to formal proceedings with respondents.

### 4–7. Board membership

*a.* Boards will consist of at least three voting members and a recorder, legal advisor, and respondent's counsel without vote. The president of the board of inquiry will be the grade of colonel or above and senior in grade to the respondent. Other voting members will be RA officers on AD (unless the respondent is a RC officer) in the grade of lieutenant colonel or above and senior in grade and rank to the respondent. When the respondent is an RC officer, one or more of the voting members will be an RC officer, preferably the same component.

*b.* When an RC officer on AD is not reasonably available, the GOSCA will, through the MACOM, advise HRC–Alexandria (AHRC–OPD–A) and request that a retired RC (10 USC 1187) officer in the grade of lieutenant colonel or above be ordered to AD to serve on the Board of Inquiry. When the GOSCA knows that an eligible and qualified retired RC officer is located in the area of responsibility, that officer's name, rank, date of rank, and address will be furnished the MACOM and to HRC–Alexandria (AHRC–OPD–A). The GOSCA will also include the respondent's rank and date of rank and the approximate convene date of the Board of Inquiry.

*c.* The MACOM, if possible, or the CG, HRC, will make the final selection of the officer and if necessary coordinate with CG, HRC–St. Louis, to issue the AD orders. The CG, HRC, or the MACOM will notify the GOSCA (by electronic message) of the selected officer, including the officer's AD entry date.

*d.* When the respondent is a minority, female, or special branch (10 USC 3064), the board will (upon the officer's written request) include a minority, female, or special branch as voting member (if reasonably available, as this provision is not an entitlement). If an officer is in more than one category and he or she requests officers from all or two categories, the board membership may be met by one or more officers (if reasonably available, as this provision is

not an entitlement). The request for these members, if desired, will be submitted 7 days from the date that the respondent receives the notification or else the right to request is waived.

*e.* When the reasons for elimination include substandard performance of duty (para 4–2, except 4–2a(9)), the board membership will include an officer of the same branch as the respondent (if reasonably available, as this is not an entitlement). Normally, this is the only time a Chaplain, AMEDD, or JAGC officer serves as a board member unless he or she is the only available RC colonel in the area and the respondent is an RC officer.

*f.* No officer will be a voting member of a Board of Inquiry who—

(1) Is serving (or has previously served) as a witness for the respondent.

(2) Served as a member of the selection board in the particular case or served as a member on any previous Board of Inquiry, Review, or other board of officers with respect to the respondent.

(3) Was a member (or was the reviewing authority) of a previous court-martial in which the respondent was the accused.

(4) Previously recommended (or participated in recommending) the respondent for elimination from active duty.

(5) Rendered a derogatory evaluation report on the respondent.

(6) Otherwise considered the respondent's case.

*g.* In addition to the reasons stated in *f* above, voting members and the legal advisor may be challenged for cause for any reason that indicates they can not participate in the case in a fair and impartial manner. The challenge will be determined by the senior unchallenged board member.

*h.* Except for the legal advisor and the recorder, only voting members may attend a closed session.

## 4–8. President of the Board of Inquiry
The board's president—

*a.* Ensures the respondent is granted reasonable time to prepare and present their case. Undue delay will not be permitted and the case will be conducted as expeditiously as possible.

*b.* Determines the board's convene date (not earlier than 30 calendar days from the officer's receipt of notification to show cause by CG, HRC, or GOSCA).

*c.* Will make every effort to ensure Board of Inquiry is completed no later than 90 calendar days from the date the GOSCA directs that a Board of Inquiry be conducted.

*d.* Secures a proper location with an atmosphere consistent with the spirit and seriousness of the proceedings.

*e.* Calls each session to order formally.

*f.* Administers the oath to the recorder.

*g.* Ensures the board members are familiar with the elimination policy of this regulation and have been afforded the opportunity to examine and study the respondent's elimination packet and complete OMPF prior to convening the Board of Inquiry and asked if they are aware of any grounds that might be the basis for challenge for cause.

*h.* Advises the respondent of responsibilities, rights, and options as outlined in paragraph 4–11.

## 4–9. Recorder of the Board of Inquiry
*a.* The board recorder will be a Judge Advocate or Department of the Army civilian attorney who is permanently assigned to the board. The board service will constitute the recorder's primary duty; however, it will not preclude other duties when the workload permits. (Alternate or assistant recorders may be detailed to the Board of Inquiry.)

*b.* The recorder is responsible for the proper presentation and handling of the Government case, to include the development of new evidence pertinent to the factual allegations in the case. The recorder's duties are not discharged by a perfunctory entering in the record of evidence provided by the Department of the Army. The recorder will investigate the case, seek new evidence that may be locally available, and become thoroughly familiar with the respondent's history and the deficiencies or conduct (as appropriate) that led the selection board, CG, HRC, or GOSCA to conclude that the officer fails to meet prescribed standards or has been derelict in moral professional duties. The recorder will also be able to place evidence offered by the respondent in perspective with the remainder of the officer's military record.

*c.* If during the course of the recorder's investigation of the case, the recorder finds additional evidence similar in nature to that previously presented to the officer under paragraph 4–2, that evidence is admissible. This additional evidence may be considered by the Board of Inquiry as proof of an amended or new factual allegation in support of a reason for elimination.

(1) Only in those instances where the newly discovered evidence results in the addition of a reason for elimination (not included in the officer's notification memorandum (see para 4–18)) is it necessary to return the case to the CG, HRC, or GOSCA for issuance of a new notification memorandum.

(2) The fact that the additional evidence may support the stated reason of conduct unbecoming an officer (see para 4–2b(8)) does not in itself allow its consideration unless it can also be related to another enumerated reason for elimination in paragraph 4–2, which was included in the officer's notification memorandum.

(3) If such additional evidence is considered and if the board determines that the officer has not had a reasonable period of time to prepare a response to such evidence, reasonable delay must be granted on the officer's request.

*d.* The recorder will not assist the board in drafting its findings and recommendations but will, in addition to the above mentioned duties, comply with AR 15–6, paragraph 5–3, and complete the following:

(1) Notify the officer (in writing and not less than 10 calendar days before the convene date) of the time and location where the Board of Inquiry will convene.

(2) Allow the officer access to releasable records and furnish copies (if desired) prior to the hearing, as is reasonably necessary, for the respondent to prepare and present the case.

(3) Obtain two copies of the respondent's OMPF (microfiche) and ORB from HRC–Alexandria (AHRC–MSR), HRC–St. Louis, or the NGB, as appropriate.

(4) At the initial session, read the order/letter appointing the board.

(5) Enter in the record the time, date, place, and station and indicate the presence of the board members, respondent and counsel (if any).

(6) Administer the oath to board members, legal advisor, witnesses, and reporter.

(7) Ensure all records and documents relating to the case are provided to the board members.

(8) Verbally present to the board a synopsis of the entire case when appropriate.

(9) Cross-examine the witnesses called by the respondent or their counsel.

## 4–10. Legal advisor

The legal advisor is a Judge Advocate or Department of the Army civilian attorney assigned by the appointing authority to the Board of Inquiry to serve only as an advisor, not a voting member. The legal advisor—

*a.* Will be present at all open sessions and may be called on to advise on the admissibility of evidence, arguments, motions or other contentions of counsel, procedures, and any other matter determined appropriate by the president of the board.

*b.* Is prohibited from taking part in presenting the case or cross-examining witnesses.

*c.* Will not give *ex parte* advice, except as provided for during deliberation (see para 4–15*a*), in a closed session of the Board of Inquiry.

*d.* May not dismiss any factual allegation, reason for elimination, or recommendation for elimination against the respondent but will advise the board as to the proper form of such, paying special attention to procedures for the findings and recommendation of the board (see para 4–15*b*) and the legal sufficiency thereof.

## 4–11. Respondent

When a Board of Inquiry convenes to consider an officer's recommendation for involuntary separation, the board will determine whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence. The respondent will be present at all open sessions of the board unless he or she is excused by the president of the board and expressly waives the right to attend. Additionally, the respondent—

*a.* Will be provided with counsel who is an officer of the JAGC or be allowed to obtain civilian counsel of own selection without expense to the Government, provided that procurement of their own counsel does not result in an unreasonable delay. The GOSCA will determine whether a requested delay to obtain civilian counsel is reasonable. If a requested delay is denied, the determination and the reasons will be stated in writing and made a part of the records of proceedings by the GOSCA.

*b.* Will be allowed reasonable time, as determined by the Board of Inquiry, to prepare case. The respondent may submit a written request (citing the specific reasons) for continuance to the Board of Inquiry. In no instance will the officer have less than 30 calendar days from the date of notification of requirement to show cause for retention on AD.

*c.* Will be allowed, at all stages of the proceedings, full access to the records of the hearings, including all documentary evidence referred to the board, except when protection of classified documents is clearly consistent with the interests of national security. In such cases, the respondent will be furnished, to the extent that the national security permits, as determined by the Secretary of the Army, a summary of the information contained in the documents withheld.

*d.* May challenge for cause any member of the board. The convening authority will appoint additional members if necessary to ensure that the board membership is not reduced to fewer than three officers.

*e.* Will be allowed to appear in person and present evidence or be represented by counsel, before a Board of Inquiry. The respondent—

(1) Will not be reimbursed for expenses incident to the appearance or assistance of civilian counsel.

(2) At any time after the appointment of the board and before the close of the proceedings, may submit documents to the Board of Inquiry from record of service, letters, answers, depositions, sworn or unsworn statements, affidavits, certificates, or stipulations. This includes but is not limited to, depositions of witnesses not deemed to be reasonably available or witnesses unwilling to appear voluntarily.

(3) Will be allowed to present case without undue interference by the board. However, unreasonable delays will not

be tolerated. Such presentations may include any evidence relevant to a respondent's rehabilitation or reformation as well as any matters in extenuation or mitigation that the respondent desires to present.

(4) May testify in person by sworn or unsworn statement or elect to remain silent. Should the respondent elect to testify, he or she may be required to submit to examination by the board as to any matter concerning which he or she testified but not in contravention of the UCMJ, Article 31. When electing to testify, the respondent is entitled to an explanation of rights regarding self-incrimination under UCMJ, article 31, and a Privacy Act statement will be prepared and signed. (See AR 15–6, app B.)

*f.* May request that witnesses, whose testimony is relevant to the case, appear before the Board of Inquiry.

*g.* May question any witness brought before the board.

*h.* In accordance with paragraph 4-24, may at any time prior to final action in their case—

(1) Apply for voluntary retirement, if eligible.

(2) Tender resignation.

(3) Request discharge (RA officers—10 USC 1186; OTRA officers—10 USC 14905).

*i.* Will be asked before the hearing is terminated to state for the record whether he or she has presented all available evidence in behalf. If not, the respondent will be required to make a concise statement of the substance of the expected evidence. The statement and any documentary evidence referred to the board will be included in the record of hearing. The board will then determine whether the respondent will be granted additional time to produce such evidence.

*j.* Will be furnished a copy of the proceedings less classified documents if requested.

*k.* Will have the right to submit to the GOSCA a statement or brief within 7 calendar days after receipt of the Board of Inquiry report of proceedings of the case.

## 4–12. Respondent's counsel

*a.* A Judge Advocate or Department of the Army civilian attorney will be assigned to each Board of Inquiry as the respondent's counsel.

*b.* The respondent is also entitled to retain civilian counsel at own expense. If civilian counsel is retained, the assigned military counsel will be relieved of duties and responsibilities in connection with the case unless the respondent chooses to use any services of the assigned counsel.

*c.* The respondent's counsel may request, on the respondent's behalf, copies of documents contained in the respondent's OMPF and/or evaluation report files that may assist in preparing the case. These documents will be specifically identified and limited to documents relevant to the case. Forward requests (by electronic message) to HRC–Alexandria (AHRC–OPD–A).

*d.* The respondent's counsel will be present at all open sessions of the board unless absence is expressly excused by the president of the board.

## 4–13. Witnesses

To the maximum extent possible, the respondent has the right to be confronted with the witnesses against him or her.

*a.* The personal appearance of witnesses should be obtained whenever practicable in preference to the use of depositions, affidavits, or written statements. Accordingly, such requests will be honored by the board if the requested witness is considered reasonably available and testimony will add materially to the case. Requests for witnesses will include a statement specifying the substance of expected testimony.

*b.* The president of the Board of Inquiry will request the commander or Government agency to order witnesses to appear as witnesses for the Government that are members of the Armed Forces or civilian employees of the Government. The availability of the witness is determined by the appropriate commander. If the commander determines that a requested witness is not reasonably available, the reasons will be furnished to the president of the board, who will have this determination appended to the record of proceedings.

*c.* Military members and civilian employees of the Army, called as witnesses on behalf of the Government and required to travel are entitled to temporary duty allowance as prescribed in the JFTR and DFAS-IN Regulation 37–1, chapter 10. Other witnesses requested by the respondent will not be reimbursed for expenses relating to their appearance unless they qualify for invitational travel orders under JFTR.

*d.* Witnesses appearing before the board will be sworn.

*e.* Boards of Inquiry may call witnesses on their own motion.

## 4–14. Spectators

At the respondent's request, the board president may permit the respondent's personal friends or relatives to be present during open board hearings. However, the respondent will be advised the presence of these spectators terminates the confidential status of the proceedings. The board president may exclude any spectator when (in the opinion of the board) presence interferes with the proceedings. Any person called as a witness will not be present as a spectator.

## 4–15. Conclusion of hearing

*a. Deliberation.* After the closing arguments, only the voting members of the Board of Inquiry will meet in the

closed sessions of deliberations. The board may seek the advice of the legal advisor whenever necessary. However, the board will be opened, and the advice will be obtained in open session (and incorporated in the record) with the recorder, respondent, and counsel present.

*b. Findings and recommendations.*

(1) The Board of Inquiry determines its findings and recommendation by secret written ballot in closed session, with a majority vote deciding any issue.

(2) Based on the evidence (presented at the hearings), the board will make a separate finding (including a brief statement) on each factual allegation and reason for involuntary separation. The Board will render findings of fact, supported by a preponderance of the evidence, that describe specific relevant conduct by the Respondent in sufficient detail to support the Board's recommendation. The findings will address each separate reason for separation and each separate factual allegation. The Board may choose to address mitigating, extenuating or aggravating factors in its findings where the Board believes that such findings are necessary to support or explain the Board's recommendation. The board may (based on the evidence) present findings that amend or specify new allegations. However, new allegations must support a reason for elimination that was included in the findings of the selection board or in the officer's notification memorandum. The board may recommend retention (with or without reassignment) or involuntary separation (see para 4–22 for homosexual conduct cases). The board will include the type of discharge certificate and characterization to issue, when elimination is recommended (and the officer is not retirement eligible (10 USC 3911)) for misconduct, moral or professional dereliction, or in the interest of national security.

(3) The board may not recommend removal of documents such as OERs, article 15s, and Memoranda of Reprimand from an officer's OMPF. The board recommendations are limited to either retention (with or without reassignment) or elimination.

(4) After the board determines its findings and recommendations, the board members may request the presence of the legal advisor and reporter at the closed session to assist with compiling the board's findings and recommendation in the acceptable format.

(5) The board's findings and recommendations will be announced to the respondent.

*c. Report of proceedings.*

(1) The record of proceedings will be kept in summarized form unless a verbatim record is required by the appointing authority after consultation with the servicing judge advocate or legal advisor concerning the availability of verbatim reporters. The summarized transcript will include the following:

*(a)* A copy of the order appointing the Board of Inquiry and amending orders (if any).

*(b)* A copy of the documents showing initiation of the elimination action and the decision to refer the case to a Board of Inquiry.

*(c)* Names and appropriate identifying information, such as rank and unit of assignment for military members or city and state of residence for civilians, of all witnesses called before the board. Extraneous and easily abused identifying information, such as a Social Security number, date of birth, driver's license number, or residential address will not be entered into the record of a Board of Inquiry to identify witnesses appearing before the Board, nor will they be used to identify board members or support personnel.

*(d)* A verbatim transcript of the findings and recommendations of the Board of Inquiry.

*(e)* Other information as is deemed appropriate by the appointing authority. The board president, legal advisor, recorder, or respondent's counsel may recommend other information for inclusion.

*(f)* An accurate account of the board's proceedings, insofar as practicable, will be prepared according to the general instructions set forth in AR 15–6, chapter 3, section III. A DA Form 1574 (Report of Proceedings by Investigating Officer/Board of Officers) will be prepared to accompany the verbatim or summarized proceedings. If a Reserve Component officer is appointed to the Board when required by paragraph 4-7a, or a minority, female or special-branch officer is appointed when requested under paragraph 4-7d, the Reserve Component, minority, female, or special-branch officer will be identified as such in the listing of persons present in section II of DA Form 1574.

*(g)* A summarized record of testimony presented and heard and of all other formal conversations that took place during all open sessions of the Board of Inquiry.

*(h)* A summarized record of any closed session that required the presence of the legal advisor and the reporter.

*(i)* True copies or true extract copies of all documents used as a basis for requiring the respondent to show cause and all other documents that are accepted as evidence in the case. These documents must be legible and reproducible. Copies that are illegible will not be used.

*(j)* A statement that the findings and recommendations were determined by secret written ballot in closed session. The members of the Board of Inquiry who did not concur in the findings and/or recommendations of the Board of Inquiry may file a statement of their nonconcurrence and the reasons therefore for inclusion in the record.

(2) Guidance for the preparation of a verbatim report of a Board of Inquiry is contained in figure 4–1. This text should be modified freely when preparing a summarized transcript.

(3) A Board of Inquiry data sheet (see fig 4–2) will be used as a final check of the report of proceedings only

insofar as it is consistent with the elimination procedures established by this regulation. Figure 4–2 is only intended to provide guidance.

(4) Clemency may not be concurrently recommended by a Board of Inquiry when the board has concluded that an officer should be eliminated. Clemency can only be exercised by the Secretary of the Army or their designee.

## 4–16. Actions concerning Board of Inquiry defects

At any time after receipt and review of a case by the GOSCA or HRC, the following actions may be taken with respect to substantial defects that may be noted:

*a.* The retention of the officer may be directed.

*b.* If the Board of Inquiry has failed to make findings or recommendations required by the applicable regulations, the case may be returned to the same board for compliance with the regulations concerned.

*c.* If there is an apparent procedural error or omission in the record of proceedings that may be corrected without reconsideration of the findings and recommendations of the board, the case may be returned to the same board for corrective action.

*d.* If the Board of Inquiry committed an error, other than as is dictated in *b* and *c*, above, that substantially prejudiced a substantial right of the officer, the case may be returned for a rehearing by a new board. The new board may be furnished the evidence properly considered by the previous board, including extracts from the record of testimony of those witnesses not deemed reasonably available to testify at the rehearing. The new board may call additional witnesses. New allegations that could form the basis for an elimination under paragraph 4–2 may be presented to the new Board of Inquiry. First, however, the officer will be given notice of the new allegations and provided an opportunity to respond. The case will then be processed as stated in paragraph 4–18. The new board will not be advised of the findings and recommendations of the previous board. The new board's findings and recommendations may not be less favorable than that of the previous board unless additional allegations are considered. Likewise, the recommendation of the appointing authority may not be less favorable than initial recommendation, unless additional allegations are considered by the subsequent board.

*e.* When a case is returned to the board pursuant to *b* or *c*, above, and one or more members of that board are unavailable because of factors such as death, hospitalization, or PCS, new members may be appointed. The case may proceed with an opportunity to challenge the members and after the substance of all proceedings is made known to the new member or members and the recorded testimony of each witness previously examined is made known to the new member. No more than one rehearing may be directed by the GOSCA without approval from DASA–RB.

## 4–17. Board of review

*a.* An officer recommended for elimination by a Board of Inquiry will have their case referred to a Board of Review. The Board of Review is appointed by the Secretary of the Army or their designee and has the same board composition as the Board of Inquiry. The Board of Review, after thorough review of the records of the case, will make recommendations to the Secretary of the Army or their designee as to whether the officer should be retained in the Army. Appearance by the respondent (or the counsel) is not authorized. The Board of Review will refer to paragraph 4–22 for homosexual conduct cases.

*b.* No officer will sit as a member of the Board of Review who—

(1) Has been called as a witness.

(2) Was a member of the selection board for respondent.

(3) Appeared as a witness before or was a member on any previous Board of Inquiry, Board of Review, or board of officers with respect to the respondent.

(4) Was a member or was the reviewing authority in a court-martial before which the respondent was the accused.

(5) Previously has recommended or participated in recommending elimination or REFRAD of the officer concerned.

(6) Rendered a derogatory evaluation report on the accused.

(7) Otherwise has considered the case of the accused.

(8) Does not meet the board membership requirements.

*c.* When the board recommends—

(1) Retention in the Army (with or without reassignment), the proceedings will be forwarded to HRC–Alexandria (AHRC–OPD–A) and the case will be closed.

(2) Elimination from the Army (to include type of discharge and characterization, if applicable), the recommendation will be transmitted to the Secretary of the Army or their designee, who makes the final decision.

*d.* An officer discharged solely for substandard performance of duty will receive an honorable discharge. The Board of Review may recommend the characterization of discharge to be more favorable than recommended by the Board of Inquiry but not less favorable.

*e.* When the Board of Review recommends elimination, it may also recommend clemency, stating the reasons. However, only the Secretary of the Army or their designee may grant clemency.

*f.* The Board of Review will furnish the respondent a copy of the board proceedings.

## Section III
## Task: Process Elimination of a Nonprobationary Officer

### 4–18. Rules for processing an elimination of a nonprobationary officer
*a.* Elimination action may be initiated by—

(1) Commanding General, HRC. Such notification will be sent by certified mail.

(2) A GOSCA, for an officer assigned or attached to command (see glossary) (unless specifically withheld by HQDA.)

(3) The Deputy Chief of Staff, G-1, when recommendations are made by HQDA promotion, school, and command boards and career field designation boards that an officer should be required to show cause for retention on active duty. The DCS, G–1 or their designated representative in the grade of major general or above will review such names and decide if initiation of elimination is appropriate. If initiation of elimination is appropriate, the action will be processed according to the rules and steps of the applicable sections of this chapter.

(4) The Secretary of the Army, the Chief of Staff, and such officials in their offices as are designated by them. The action will be processed according to the rules and steps of the applicable sections of this chapter.

*b.* Unless precluded by *d*(4) below, elimination action will be initiated against an officer who is identified by one or more of the reasons outlined in paragraph 4–2.

*c.* Any subordinate commander may recommend to the GOSCA the initiation of elimination proceedings for an officer in command.

*d.* The commander has the discretion to initiate disciplinary action under the UCMJ or to recommend or initiate elimination proceedings under the provisions of this regulation.

(1) The fact that elimination proceedings were initiated when disciplinary action could have been taken will not affect the validity of the elimination proceedings.

(2) Elimination action will not be used in lieu of disciplinary action solely to spare an officer who may have committed serious misconduct from the harsher penalties that may be imposed under the UCMJ.

(3) Conduct that was the subject of judicial or nonjudicial punishment may be the basis for elimination proceedings under this regulation. (See para 4–4*b.*)

(4) Elimination proceedings, however, will not be initiated with respect to conduct that is the subject of UCMJ charges unless the charges are dismissed or appellate review has been completed.

*e.* Regardless of who initiates the elimination action, the initiating official will furnish the appropriate MACOM a copy of the notification memorandum. The GOSCA will ascertain the identity and location of Government witnesses and make reasonable efforts to ensure their availability to appear before a Board of Inquiry.

*f.* On receipt of elimination actions from the GOSCA, CG, HRC may take the following actions prior to the Board of Review:

(1) Close the case (prior coordination with the initiating official required for an elimination initiated under *a*(3) and (4) above, and, through channels, notify the officer.

(2) Forward the case to a Board of Review.

*g.* When the Board of Review recommends elimination, the board will forward the case directly to the Secretary of the Army or their designee for the final decision.

*h.* When the Board of Review recommends retention (with or without reassignment), HRC–Alexandria (AHRC–OPD–A) will close the case and, through channels, notify the officer.

*i.* When the Secretary of the Army or their designee approves elimination, HRC–Alexandria (AHRC–OPD–A) will forward separation instructions to the appropriate PSC/MPD.

### 4–19. Steps for processing an elimination of a nonprobationary officer
The required steps for processing an elimination of a nonprobationary officer are as shown in table 4–1.

**Table 4–1**
**Processing elimination of a nonprobationary officer**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 1 | PPAA<br>BN S–1<br>C&S | The initiating official (see para 4–18a(1) or (2) or (3) or (4) above) notifies the officer in writing that elimination action has been initiated and that he or she is required to show cause for retention on AD (fig 4–1). Initiates a DA Form 268. (See AR 600–8–2.) |
| 2 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer of the reasons supporting the elimination action and the factual allegations supporting the reasons. Only applicable reasons as outlined in paragraph 4–2 (or para 4–22 for homosexual conduct) that can be supported by specific factual allegations and evidence may be the basis for elimination. Evidence to support the elimination must be able to stand on its own merits. Prior coordination with the servicing judge advocate or legal advisor is required for actions initiated by the GOSCA. Advises the officer that he or she may—<br>*a.* Tender resignation in lieu of elimination (para 4–24).<br>*b.* Request discharge in lieu of elimination (para 4–24).<br>*c.* Apply for retirement in lieu of elimination if otherwise eligible for voluntary retirement as stated in chapter 6, paragraph 6–17d. Voluntary retirement application will be amended to specifically state that the application is submitted in lieu of elimination.<br>*d.* Appear before a Board of Inquiry to show cause for retention. |
| 3 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that he or she has 30 calendar days to acknowledge receipt in writing, to prepare a written statement or rebuttal or elect one of the options as stated in *a, b, c,*and *d* above. |
| 4 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer of the least favorable discharge that he or she may receive. (An officer separated solely for substandard performance (para 4–2a) will receive an Honorable Discharge. If separated for reason(s) under paragraph 4–2b or 4–22h (homosexual conduct) an officer may receive an Under Other Than Honorable Discharge. |
| 5 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that he or she may consult with the local finance and accounting officer concerning possible entitlement to separation pay. |
| 6 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that if he or she requests resignation or discharge in lieu of elimination action, he or she will be separated as stated below.<br>*a.* Not later than 30 calendar days after receipt of notification that request for resignation or discharge was approved (only when separated solely for substandard performance). Release will not be prior to the 30th day without the officer's consent.<br>*b.* Not later than 14 calendar days and no earlier than 5 calendar days after receipt of notification that the request for resignation or discharge was approved when stationed in CONUS.<br>*c.* For an officer assigned OCONUS, he or she will be returned to the CONUS separation TP/TA no later than 21 calendar days after receipt of written notification that the request for resignation or discharge was approved, and separated no later than 5 calendar days after arrival at the CONUS TP/TA. |
| 7 | C&S | The initiating official personally signs the memorandum. |
| 8 | PPAA<br>BN S–1<br>C&S | The GOSCA furnishes a copy of the notification memorandum directly to CDR, HRC–Alexandria (AHRC–OPD–A). |
| 9 | SLDR | Officer responds with acknowledgement of receipt (fig 2–4). Submits a written statement or rebuttal or elects one of the options in step 2 above within 30 calendar days.<br>*a.* The statement or rebuttal may be prepared with the assistance of an officer of the JAGC or civilian counsel obtained by the officer at no expense to the Government.<br>*b.* The statement or rebuttal should contain any pertinent facts bearing on the question of the officer's elimination. Documents submitted must be legible and reproducible. They may be sworn or unsworn.<br>*c.* The officer submits the appropriate application for separation if in lieu of elimination option is selected.<br>*d.* The officer undergoes a separation physical examination within 5 duty days from the date the option is chosen. |

**Table 4–1**
**Processing elimination of a nonprobationary officer—Continued**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 10 | C&S | The initiating official (CG, HRC or GOSCA, as appropriate), on receipt of the officer's statement or rebuttal and/or option selection, will act as follows—<br>*a.* Closes the case (see para 4–22 and 4–23 for homosexual conduct). (Prior to closing cases initiated under para 4–18*a*(3) or (4), CG, HRC, will coordinate with the initiating official.) (The GOSCA may only close a case that he or she initiated.)<br>*b.* Expeditiously forwards the appropriate application and all elimination papers directly to CDR, HRC–Alexandria (AHRC–OPD–A), if the officer elects one of the options in step 2*a* through *c*of this table. (When the GOSCA is not the GCMCA, furnishes a copy to the GCMCA.) The forwarding endorsement includes the direct point of contact for the elimination action (to include name and telephone number).<br>*c.* If the officer declines to elect an option, refer the case to a Board of Inquiry. The GOSCA is authorized to appoint a field Board of Inquiry without referral to HRC. The GOSCA notifies CDR, HRC–Alexandria (AHRC–OPD–A), by electronic message that a Board of Inquiry is being appointed and requests that two copies of the officer's OMPF and ORB be provided.<br>*d.* Determines whether medical board or physical evaluation board proceedings are pending or appropriate (para 4–3*a*) if the case is not closed. |
| 11 | C&S | The GOSCA, prior to forwarding the case to the Board of Inquiry, ensures that—<br>*a.* All evidence considered by the board is included, and that the report of investigation is complete.<br>*b.* Documents are legible and reproducible.<br>*c.* The statement submitted by the officer is made a part of the record. |
| 12 | C&S | The GOSCA forwards the case to the Board of Inquiry. The Board of Inquiry will be completed no later than 90 calendar days from the date that the GOSCA directs that a Board of Inquiry be conducted. |
| 13 | C&S | The GOSCA forwards the Board of Inquiry proceedings to the CDR, HRC (AHRC–OPD–A) no later than 30 calendar days after the board's adjournment. This time limit must be met. |
| 14 | C&S | The GOSCA, when a Board of Inquiry recommends retention, closes the case, notifies the officer in writing, and notifies CDR, HRC–Alexandria (AHRC–OPD–A), that the officer has been retained by the Board of Inquiry and of the date of the officer's notification. Forwards the board's proceedings (original copy only, either verbatim or summarized transcript) with a copy of the officer's notification memorandum to CDR, HRC–Alexandria (AHRC–OPD–A). |
| 15 | C&S | The GOSCA, when a Board of Inquiry recommends elimination, closes the case if retention is appropriate (only for eliminations initiated by a GOSCA for an officer assigned or attached to command (unless specifically withheld by HQDA)) and complies with step 14 above. |
| 16 | C&S | The GOSCA, when the Board of Inquiry recommends elimination or it was initiated under paragraph 4–18*a*(1), (3), or (4), completes the following administrative actions:<br>*a.* Furnishes the officer a copy of the Board of Inquiry report and obtains a receipt of acknowledgement.<br>*b.* Gives the officer the options listed in step 2*a* through *c* of this table.<br>*c.* Advises the officer that—<br>(1) He or she may submit an appellate brief and statement within 7 calendar days after receipt of the Board of Inquiry report or proceedings.<br>(2) The entire case will be considered by a Board of Review and the officer will be entitled to a copy of the Board of Review report.<br>(3) If the Board of Review determines that the officer should not be retained, the case will be referred to the Secretary of the Army or their designee for final action. If the Board of Review determines the case should be retained, the case will be closed. In either event, the officer will be notified at the earliest and practicable time by CG, HRC.<br>*d.* Have the officer undergo a separation physical examination (para 1–22).<br>*e.* Establish internal suspense controls to ensure expeditious processing of the separation physical examination. |

**Table 4–1**
**Processing elimination of a nonprobationary officer—Continued**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 17 | C&S | The GOSCA, when a Board of Inquiry recommends elimination (after completing the administrative action required in step 16 above), forwards by personal endorsement the original report of the Board of Inquiry proceedings to HRC commander including— |
| | | *a.* Recommendation of approval or disapproval of the Board of Inquiry's recommendation (state reason(s) when disapproval is recommended). The GOSCA may recommend retention when elimination is recommended by the board. |
| | | *b.* A statement that the officer was furnished a copy of the Board of Inquiry report and whether the officer desires a copy of the Board of Review report. |
| | | *c.* A recommendation of the type of discharge to be issued. (Only applicable where the officer was required to show cause for retention for reasons indicated in paragraph 4–2*b* and provided the officer is not eligible for retirement under chap 6.) The recommendation of the type of discharge may be more favorable but may not be less favorable than that recommended by the board. |
| | | *d.* The officer's appellate brief (if submitted). The GOSCA must include a statement in the forwarding memorandum that the brief was reviewed and may submit any other appropriate comments concerning the brief. Derogatory information that has not been previously provided to the respondent will not be added to the forwarding memorandum. If the GOSCA believes it necessary to include in his endorsement derogatory information that was not previously made part of the action, the Respondent will be served with a copy of the derogatory information and will be provided with a reasonable opportunity to rebut the information. |
| | | *e.* All rebuttals and resignations or requests for discharge in lieu of elimination will have the GOSCA's personal endorsement. |
| 18 | PPAA (TP/TA) | On receipt of separation instructions, takes action to separate the officer. Final release orders and forms cite regulatory authority and SPD as shown in AR 635–5–1. |

## Section IV
## Task: Process Elimination of a Probationary Officer

### 4–20. Rules for processing an elimination of a probationary officer

*a.* The rules for a nonprobationary officer (see para 4–18) also apply to a probationary officer.

*b.* A probationary officer is—

(1) An RA commissioned officer with fewer than 5 years of ACS (10 USC 630).

(2) An RC officer who has fewer than 5 years commissioned service.

(3) A warrant officer who has fewer than 3 years service since original appointment in present component.

*c.* If at any time during the processing of the recommendation, the officer no longer meets the probationary criteria stated above, the case will be processed under paragraph 4–18.

*d.* An officer identified for elimination may—

(1) Tender a resignation in lieu of elimination.

(2) Request discharge in lieu of elimination.

(3) Apply for retirement in lieu of elimination if otherwise eligible. (Format for voluntary retirement will be amended to specifically state that the application is submitted in lieu of elimination.)

*e.* Processing an officer's recommendation for elimination under this paragraph does not require referral to a Board of Inquiry or a Board of Review unless the officer declines to elect one of the options listed above and an Other Than Honorable Discharge is recommended.

*f.* If the officer declines to elect one of the options listed in *d* above and if an Honorable or General Discharge (Under Honorable Conditions) is recommended, CG, HRC, will forward the case to the Secretary of the Army for final decision. The GOSCA will make a formal recommendation concerning the options submitted by the officer.

*g.* If the officer declines to elect one of the options listed in *d*, above, and if an Other Than Honorable Discharge is recommended, the case will be processed as if the officer was a nonprobationary officer.

*h.* CG, HRC, will forward the case to the DASA-RB.

*i.* The DASA-RB or ASA(M&RA) may direct—

(1) Retention.

(2) Discharge.

(3) Referral to a Board of Inquiry.

*j.* Action by the DASA-RB or ASA(M&RA), as appropriate, acting for the Secretary of the Army, is final.

*k.* When the DASA-RB or ASA(M&RA), as appropriate, directs the officer's retention, HRC–Alexandria (AHRC–OPD–A) will close the case and notify the officer through the GOSCA.

*l.* When the DASA-RB or ASA(M&RA), as appropriate, approves the elimination, HRC–Alexandria (AHRC–OPD–A) will forward separation instructions to the appropriate PSC/MPD.