# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VIJAY SANGAR,                   )
                                 )
          **Plaintiff,**       )
                                 )
          **v.**              )  **Civil Action No. 1:06-cv-02015 (CKK)**
                                 )
THE HONORABLE PETE GEREN[1]  )
Acting Secretary of the Army,     )
                                 )
          **Defendant.**     )
_____)

## DEFENDANT'S CONSOLIDATED MOTION TO DISMISS, IN PART, AND FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant hereby moves to dismiss Plaintiff's Complaint, in part, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Defendant moves for summary judgment on Plaintiff's remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law. Defendant also submits this consolidated brief in opposition to Plaintiff's motion for summary judgment. In support of this motion, Defendant respectfully submits the attached memorandum of points and authorities, statement of material facts not in genuine dispute, response to Plaintiff's statement of facts, the administrative record, and a proposed order.

Respectfully submitted,


_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610

---

[1] On March 10, 2007, the Honorable Pete Geren became the acting Secretary of the Army and is substituted for Francis J. Harvey pursuant to Fed. R. Civ. P. 25(d)(1).

United States Attorney


_____/s_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895


Of Counsel:

Major Rebecca E. Ausprung
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203-1837
703-696-1627

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VIJAY SANGAR,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No. 1:06-cv-02015 (CKK)** |
| | ) |
| **THE HONORABLE PETE GEREN** | ) |
| **Acting Secretary of the Army,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

---

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CONSOLIDATED MOTION TO DISMISS, IN PART, AND FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR <u>SUMMARY JUDGMENT</u>

Defendant files this Memorandum in support of Defendant's Motion to Dismiss, in part, and for Summary Judgment. Plaintiff's Complaint should be dismissed, in part, pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that Plaintiff fails to state a claim for habeas corpus or mandamus relief. Defendant is entitled to judgment as a matter of law on Plaintiff's remaining claims pursuant to Fed. R. Civ. P. 56, because there is no genuine issue as to any material fact. Plaintiff has failed to demonstrate that the decision of the Army Board for Correction of Military Records ("ABCMR") rejecting the challenge to his administrative elimination was arbitrary, capricious, unsupported by substantial evidence or contrary to law. Moreover, Plaintiff has received the relief sought as the reference to misconduct has been removed from his discharge certificate and he has received separation pay. Defendant therefore agrees that summary judgment is appropriate in this case; however, judgment should be entered in favor of the Defendant on Plaintiff's claims. Defendant's statement of material facts not in genuine dispute and the Administrative Record ("AR") support this memorandum.

## I. <u>INTRODUCTION</u>

Plaintiff, Dr. Vijay Sangar, was a Medical Corps Officer in the United States Army. In 1997, while assigned to Walter Reed Army Medical Center ("Walter Reed") as a Nuclear Medicine Physician, he was diagnosed with Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP"). In November 1998, Dr. Sangar underwent a Physical Evaluation Board ("PEB") which determined that despite his CIDP, he did not have any functional impairment that would prevent the satisfactory performance of duty. In November 1999, Dr. Sangar received a relief for cause evaluation report due to poor performance of duty, and Walter Reed revoked his clinical practice privileges.

In February 2002, Dr. Sangar was found to have fully recovered from his neurological condition that was present in 1998/1999. In December 2002, Dr. Sangar was considered for elimination for a downward trend in overall performance. A Board of Inquiry concluded that the downward trend in Dr. Sangar's evaluations from July 1997 through November 1999 was potentially attributable to his diagnosis with CIDP, and his evaluations from November 1999-2001 did not address a downward trend, but addressed the fact that he was not serving as a nuclear medicine physician. The Board of Inquiry therefore recommended that Dr. Sangar be retained in service with reassignment with a period of supervision to assess his suitability to be credentialed and practice as a nuclear medicine physician.

In September 2003, Dr. Sangar was sent to Madigan Army Medical Center ("Madigan") and completed ten weeks of refresher training in nuclear medicine. Madigan concluded after his refresher training that he was unable to practice independently, and they were unsure that a formal, structured mentoring program would be sufficient to improve his performance.

2

In March 2005, Dr. Sangar was again considered for elimination for "partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges" based upon his failure to complete the refresher training at Madigan. After a hearing on all of the evidence, a Board of Inquiry recommended separation, and Dr. Sangar was discharged from service with an honorable discharge certificate.

Dr. Sangar challenged this decision before the ABCMR. While his application was pending at the ABCMR, Dr. Sangar was issued a corrected discharge certificate ("DD 215") deleting the reference to misconduct from his discharge certificate. Dr. Sangar also received $66,561.89 in separation pay. Shortly thereafter, the ABCMR denied him relief.

Plaintiff has filed the instant action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); Mandamus, 28 U.S.C. § 1361; the Declaratory Judgment Act, 28 U.S.C. § 2201; Habeas Corpus, 28 U.S.C. § 2241; and the Federal Question statute, 28 U.S.C. § 1331. Complaint ("Compl.") p. 1.

## II. <u>SUMMARY OF THE ARGUMENT</u>

Plaintiff contends that this Court has jurisdiction based upon Habeas Corpus, 28 U.S.C. § 2241. Dr. Sangar was discharged from the Army on October 28, 2005. As Dr. Sangar is no longer in military service, he fails to state a claim for habeas relief. Dr. Sangar also fails to state a claim for mandamus relief. Dr. Sangar does not have a clear right to the relief sought, and the Defendant does not have a clear, non-discretionary duty to provide him the relief he seeks. Moreover, Dr. Sangar has other adequate remedies, to include relief under the Administrative Procedure Act ("APA"), 28 U.S.C. §§ 701-706. Accordingly, Plaintiff fails to state a claim for mandamus relief and that claim should be dismissed.

3

While the Defendant agrees with Plaintiff that summary judgment is appropriate in this case as there is no genuine issue of material fact, the Court should enter judgment in favor of the Defendant on Dr. Sangar's claims. Dr. Sangar cannot demonstrate by cogent and clearly convincing evidence that the ABCMR's decision was arbitrary, capricious, unsupported by substantial evidence or contrary to law. Dr. Sangar was properly eliminated from service as his clinical practice privileges were limited because he could not perform independent patient care, and he failed a course of refresher training aimed at restoring him to independent clinical practice. The Board of Inquiry that recommended his elimination considered this evidence in accordance with the applicable regulation, and properly determined that he should be separated from service. Moreover, Plaintiff has already received the relief he sought from the ABCMR as the reference to misconduct has been deleted from his discharge certificate, and he has been awarded separation pay. The Court should therefore enter judgment in favor of the Defendant on these claims.

## III. STATEMENT OF FACTS

Defendant respectfully refers the Court to Defendant's Statement of Material Facts to Which There is No Genuine Dispute filed simultaneously herewith.

## IV. ARGUMENT

**A.    Plaintiff Fails to State A Claim for Habeas Corpus or Mandamus Relief.**

**1.    Standard of Review.**

A Plaintiff must state a claim upon which relief can be granted. District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428, 433 (D.D.C. 1987). A court must accept the allegations of the complaint as true in determining whether to grant a Rule 12(b)(6) motion to

dismiss for failure to state a claim. Scolaro v. D.C. Bd. of Elections and Ethics, 104 F. Supp. 2d

18, 22 (D.D.C. 2000). See, e.g., Croixland Properties Ltd. Partnership v. Corcoran, 174 F.3d 213,

215 (D.C. Cir.1999). All reasonable inferences must be drawn in favor of the Plaintiff and a

court should only dismiss a complaint for failure to state a claim "'if it is clear that no relief

could be granted under any set of facts that could be proved consistent with the allegations.'" Id.

(quoting Hishon v. King & Spalding, 467 U.S. 69, 73(1984)); see also Price v. Crestar Secs.

Corp., 44 F.Supp.2d 351, 353 (D.D.C.1999). A court "does not test whether the Plaintiff will

prevail on the merits, but instead whether the claimant has properly stated a claim." Price at 353.

**2.    Plaintiff Fails to State a Claim for Habeas Relief.**

A person who is "in custody in violation of the Constitution or laws or treaties of the

United States" may petition for a writ of habeas corpus in district court. 28 U.S.C. § 2241(c)(3).

Writs of habeas corpus may be granted for "members of the armed services who have been

unlawfully detained, restrained or confined." Blackmon v. England, 323 F. Supp. 2d 1, 6

(D.D.C. 2004), (quoting Schlanger v. Seamans, 401 U.S. 487, 489 (1971)). Dr. Sangar is not

unlawfully being detained, restrained or confined by the military. Dr. Sangar was discharged

from the Army on October 28, 2005. AR 185. As he is no longer under the custody or control of

the military, he cannot state a claim for this Court to provide him habeas relief. Plaintiff fails to

state a claim for habeas relief, therefore any portion of his complaint relating to such relief

should be dismissed.

**3.    Plaintiff Fails to State a Claim for Mandamus Relief.**

Plaintiff attempts to invoke jurisdiction of the Court under the Mandamus Act, 28 U.S.C.

§ 1361. Compl. at 1. Plaintiff has failed to set forth the necessary prerequisites for mandamus

relief in his complaint.  "The mandamus remedy is an extraordinary one, and it is to be utilized

only under exceptional circumstances..."  Haneke v. Secretary of Health, Education and Welfare,

535 F.2d 1291 (D.C. Cir. 1976).  To qualify for the extraordinary remedy of mandamus relief,

Plaintiff must show: 1) a clear right to the relief sought; 2) the defendant has a clear duty to act;

and 3) the absence of any other adequate remedy.  Swan v. Clinton, 100 F.3d 973, 977 (D.C. Cir.

1996) (quoting American Cetacean Society v. Baldridge, 768 F.2d 426, 433 (D.C. Cir. 1985);

Atlantic Tele-Network Inc. V. Inter-American Development Bank, 251 F. Supp. 2d 126, 131

(D.D.C. 2003).  Furthermore, the Defendant's duty to act must be clear, ministerial and

non-discretionary.  NTEU v. Bush, 715 F.Supp. 405, 407 (D.D.C. 1989).

      Plaintiff does not have a clear right to the relief he seeks.  The composition of the force is

one of the most fundamental military decisions.  Courts simply are not competent to "detemin[e]

who is fit or unfit to serve in the armed forces."  Heisig v. United States, 719 F.2d 1153, 1156

(Fed. Cir. 1983).  In Cargill v. Marsh, 902 F.2d 1006 (D.C. Cir. 1990), the Court of Appeals for

the District of Columbia Circuit held that a service member's petition seeking writ of mandamus

to compel the Army to reassign him from the Judge Advocate General's Corps to the Army's

Corps of Engineers was nonjusticiable as the order to grant transfer would require the court to

second-guess the Army's decision on how to allocate military personnel.  Likewise, an order by

this Court that the Defendant reinstate Plaintiff would intrude upon a military decision regarding

the composition of the force.  Plaintiff cannot demonstrate he has a clear right to the relief he

seeks, therefore he has failed to satisfy the first prerequisite for mandamus relief.

      Furthermore, Plaintiff has failed to show that the Defendant has a clear, ministerial,

non-discretionary duty to perform any acts other than those already performed on his behalf.

ABCMR decisions are purely discretionary.  10 U.S.C. § 1552(a)(1) ("The Secretary of a military department <u>may</u> correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice.") (Emphasis added). Accordingly, plaintiff's reliance on the Mandamus Act as a basis for invoking this Court's jurisdiction is erroneous.  Plaintiff therefore fails to meet the second prerequisite for mandamus relief.

Finally, Plaintiff has another adequate remedy which precludes the availability of mandamus relief.  Plaintiff has the ability to obtain relief from this Court under the APA.  Given the existence of relief under the APA, mandamus relief is unavailable.

Plaintiff has failed to establish a clear right to the relief sought, or that the Defendant had a non-discretionary duty to provide the relief he seeks, therefore mandamus is improper.  Plaintiff fails to state a claim for mandamus relief, thus this claim should be dismissed.

**B.** **The Court Should Grant Summary Judgment in Favor of the Defendant as There is No Genuine Issue of Material Fact**.

    **1**.       **Standard of Review for Summary Judgment**.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Diamond v. Atwood</u>, 43 F.3d 1538, 1540 (D.C. Cir. 1995); <u>Molerio v. FBI</u>, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no genuine dispute exists as to any material fact, summary judgment is required.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

A genuine issue of material fact is one that could change the outcome of the litigation.  <u>Id.</u> at 247.  "The burden on the moving party may be discharged by 'showing' - - that is, pointing out to the [Court] - - that there is an absence of evidence to support the non-moving party's case."  <u>Celotex</u>, at 325.  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Thus to avoid summary judgment, the Plaintiff must state specific facts or present some objective evidence that would enable the court to find he is entitled to relief.

In an opinion issued the same day as <u>Celotex</u>, the Supreme Court explained the circumstances in which summary judgment is appropriate:

> If the evidence is merely colorable . . . or is not sufficiently probative . . . summary judgment may be granted . . . [T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252.  Unsupported speculation is not enough to defeat a summary judgment motion; the existence of specific material evidentiary facts must be shown.  Fed. R. Civ. P. 56(e)(the nonmoving party may not rest on mere allegations but "must come forward with 'specific facts showing there is a genuine issue for trial.'").  <u>See</u> <u>also</u> <u>Hayes v. Shalala</u>, 902 F.Supp. 259, 263 (D.D.C. 1995)(opposition to summary judgment must consist of more than mere unsupported allegations or denials); <u>Johnson v. Digital Equip. Corp.</u>, 836 F.Supp. 14, 18 (D.D.C. 1993)(evidence that is merely colorable or not sufficiently probative is insufficient to defeat summary judgment); <u>Batson v. Powell</u>, 912 F.Supp. 565, 578 (D.D.C. 1996).

8

In <u>Celotex</u>, the Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at 327, <u>quoting</u> Fed. R. Civ. P. 1.

## 2.    <u>Review Is Limited Under the Administrative Procedures Act</u>.

To prevail in this Court, Plaintiff "must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." <u>Frizelle v. Slater</u>, 111 F.3d 172, 177 (D.C. Cir 1997) (<u>quoting</u> <u>Sanders v. United States</u>, 594 F.2d 804, 813 (Cl. Ct. 1979)).  To rebut this presumption, Plaintiff must establish through "cogent and clearly convincing evidence" that the ABCMR's findings were arbitrary, capricious, unsupported by substantial evidence, or contrary to law or regulations. <u>McDougall v. Widnall</u>, 20 F.Supp. 2d 78, 82 (D.D.C. 1998).  Due to this very high standard, only the most egregious agency decisions do not satisfy this very deferential standard of review.  <u>Kreis v. Air Force</u>, 866 F.2d 1508, 1515 (D.C. Cir. 1989).

In reviewing an agency's action under the APA standard, the Court is limited to reviewing the administrative record that was in front of the agency when it made its decision, <u>Commercial Drapery v. United States</u>, 133 F.3d 1, 7 (D.C. Cir. 1998), and it "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>MD Pharmaceutical, Inc. v. Drug Enforcement Administration</u>, 133 F.3d 8, 16 (D.C. Cir. 1998).  The explanation for its action "does not mean that an agency's decision must be a model of analytic precision to survive a challenge." <u>Dickson v. Secretary of Defense</u>, 68 F.3d 1396,

9

1404 (D.C. Cir. 1995).  A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Id.  Even if reasonable minds might reach differing conclusions, the court is not empowered to substitute its judgment for that of the agency. U.S.P.S. v. Gregory, 534 U.S. 1, 11 (2001).

   **3.    Regulatory Framework for Officer Eliminations**[2]

   Elimination of officers is governed by Army Regulation ("Army Reg.") 600-8-24, chapter 4, Exhibit A.  There are three bases for involuntary elimination under the regulation: (1) substandard performance of duty; (2) misconduct, moral or professional dereliction, or in the interest of national security; and (3) derogatory information.  Id. at para. 4-2(a)-(c).  Elimination under para. 4-2(b) for misconduct, moral or professional dereliction, or in the interest of national security, includes:

> Conduct or actions that result in the loss of a professional status, such as withdrawal, suspension or abandonment of professional license, endorsement, or certification that is directly or indirectly connected with or is necessary for the performance of one's military duties. (For AMEDD [Army Medical Command] officers, this includes the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges.)

Id. at para. 4-2(b)(9).

   A nonprobationary officer being recommended for involuntary separation pursuant to chapter 4 of the regulation is entitled to a Board of Inquiry.  The purpose of the Board of Inquiry is to provide a fair and impartial hearing to determine if the officer should be retained in the Army.  Id. at para. 4-6(a).  The Board of Inquiry is comprised of three voting members, the

---

[2]The procedure outlined in this brief is for the elimination of a nonprobationary officer, such as Plaintiff.  Probationary officers are defined as Regular Army commissioned officers with less than five years of commissioned service.  10 U.S.C. § 630.

President of which will be in the grade of colonel or above and senior in grade to the officer being recommended for elimination.  Id. at para. 4-7.

During the hearing, the government is responsible for establishing by a preponderance of the evidence that the officer has failed to maintain the standards for his or her grade or branch of service.  Id. at para. 4-6.  The officer is entitled to appear in person and present evidence, and will be provided with representation by counsel.  Id. at para. 4-11.  At the conclusion of all of the evidence, the board members will make findings and recommendations by secret written ballot in a closed session.  Id. at para. 4-15(b).  The board recommendations are limited to either retention (with or without reassignment) or elimination.  Id.

An officer recommended for elimination by a Board of Inquiry will have his or her case referred to a Board of Review.  Id. at para. 4-17.  A board of review is appointed by the Secretary of the Army and has the same board composition as the Board of Inquiry.  Id. The Board of Review will make recommendations to the Secretary of the Army as to whether the officer should be retained in the Army.  Id.  If the Board of Review recommends elimination, the case is forwarded directly to the Secretary of the Army for a final decision.  Id. at para. 4-18(g).  If the Board of Review recommends retention, the officer is notified of that recommendation and the case is closed.

Generally, an officer will not be considered for elimination due to conduct that has already been the subject of administrative elimination proceedings that resulted in retention in service.  Army Reg. 600-8-24, para. 4-4(b).  However, the regulation provides four explicit exceptions to that general rule.  An officer who has been considered for elimination and retained may again be required to show cause for retention:

11

(1) because of lack of proficiency or recurrent misconduct subsequent to the earlier consideration;

(2) because of misconduct that occurred prior to that alleged in the earlier proceedings but that was not sooner discovered despite the exercise of due diligence;

(3) an officer considered for elimination for substandard performance of duty and retained may be considered for elimination for substandard performance of duty at any time one year after the prior case has been closed; or

(4) an officer may be considered for elimination for misconduct, moral or professional dereliction, or in the interest of national security at any time subsequent to the closing of the prior case that resulted in the officer's retention on active duty.  However, an officer may not again be required to show cause for retention on AD solely because of conduct that was the subject of the previous proceedings, unless the findings and recommendations of the Board of Inquiry were obtained by fraud or collusion.  The grounds for elimination in the earlier case may be joined with the new grounds, provided the earlier elimination proceedings does not include a factual determination specifically absolving the member of the allegations then under consideration.  If the grounds for elimination in the earlier proceedings are joined, the additional grounds considered in the subsequent proceedings need not independently justify the member's discharge, but must be sufficiently serious to raise a substantial question as to the member's potential for further useful military service.

Id. at para. 4-4(d)(1)-(4).

4.    **The ABCMR Fully Considered Plaintiff's Claims and Properly Upheld the Administrative Elimination Proceedings.**

a.    **Dr. Sangar was Properly Eliminated Under Army Reg. 600-8-24, Para. 4-2(b)(9)**

Dr. Sangar was recommended for elimination under Army Reg. 600-8-24, para. 4-2(b)(9),

which provides that an officer may be eliminated for:

Conduct or actions that result in the loss of a professional status, such as withdrawal, suspension or abandonment of professional license, endorsement, or certification that is directly or indirectly connected with or is necessary for the performance of one's military duties. (For AMEDD [Army Medical Command] officers, this includes the partial or complete suspension, limitations, withdrawal,

or denial of clinical practice privileges.)

Id. Dr. Sangar's clinical practice privileges were limited in that he could not practice

independently and without supervision. Following the recommendation of the 2002 Board of

Inquiry, Dr. Sangar was granted supervised privileges by Walter Reed for the period May 6,

2003, through May 5, 2004. AR 6. Dr. Sangar was then sent to Madigan for refresher training in

Nuclear Medicine. In order to complete his refresher training, Madigan granted him regular

privileges under supervision from September 23, 2003, to May 5, 2005. AR 461. Dr. Sangar

then received ten weeks of refresher training, and Madigan determined that Dr. Sangar still could

not practice independently. AR 488-489. The Army returned Dr. Sangar to Walter Reed and his

clinical practice privileges expired on May 5, 2005. Dr. Sangar was informed of the procedure

for requesting renewal of his clinical practice privileges, but he failed to do so, therefore

elimination proceedings were initiated. AR 281. In short, Dr. Sangar was not in possession of

any clinical practice privileges at his assigned place of duty; therefore, he was properly

eliminated under this provision of Army regulation.

Dr. Sangar argues that because he possessed supervised clinical privileges from Madigan,

he could not be eliminated under this provision of Army Regulation. Compl. at 7. Dr. Sangar

ignores the language "partial" and "limitations" in this provision of the regulation. Dr. Sangar's

privileges were clearly limited as he could not provide independent patient care.[3] The Army was

---

[3]Indeed, the regulation provides that a warrant officer can be separated for loss of special
privileges, such as withdrawal of clinical privileges or loss of flying status. Army Reg. 600-8-24,
para. 4-2(b)(12). However, the regulation provides that elimination for these reasons may not be
utilized if reclassification action is feasible and in the best interest of the service, or if the loss
was due to medical reasons beyond the control of the warrant officer. Id. No such corresponding
exception is made by the regulation for medical officers who have limitations on their clinical
practice privileges. Id. at para. 4-2(b)(9). Moreover, there was no field available in which to re-
classify Dr. Sangar. AR 218.

not obliged to continue to employ the services of Dr. Sangar, receiving pay as a Lieutenant Colonel, for performing administrative tasks normally performed by a General Schedule 6 level employee.

Moreover, the failure to complete the requisite refresher training is the sin qua non of separation under this provision of the regulation. Army Reg. 40-68, entitled "Clinical Quality Management," dated February 26, 2004, states that providers who do not successfully complete remedial training may be processed for separation under the provisions of Army Reg. 600-8-24. Id. at para. 9-4(f)(8), Exhibit B. Walter Reed sent Dr. Sangar to Madigan for refresher training in Nuclear Medicine and Dr. Sangar did not successfully complete that training. While the final report on his performance noted that while he was a pleasant physician who availed himself of the learning opportunities at Madigan, he submitted multiple erroneous reports, his knowledge of anatomy and current pharmaceuticals was weak, he struggled while performing physical exams, and had difficulty dealing with the details of scan interpretation. AR 487-489. The report noted that Dr. Sangar "still omitted subtle findings in bone scans that one would not expect an experienced physician to omit after intensive mentoring, even after a sabbatical from practice," and they were "unsure that a formal, structured mentoring program would be sufficient to improve his performance." AR 488-489.

Dr. Sangar claims that his clinical practice privileges were never limited. Compl. at 7; Plaintiff's Motion for Summary Judgment ("Pl. Brief") at 16. This statement is simply untrue. Dr. Sangar was granted supervised privileges by Walter Reed for the period May 6, 2003, through May 5, 2004. AR 6. Supervised privileges are by their very nature limited privileges. Moreover, those privileges expired on May 5, 2004; nearly five months before the initiation of the second elimination proceedings. Thus, Dr. Sangar was not in possession of any clinical

14

practice privileges at Walter Reed at the time that the elimination action was initiated.

Dr. Sangar alleges that his elimination was improper because his rater, Colonel Thomas M. Fitzpatrick, had requested in April 2004 that he voluntarily relinquish all clinical privileges. Pl. Brief at 14, 17.  A review of the time line of events demonstrates that this action was not inappropriate.  Dr. Sangar had been granted supervised privileges by Walter Reed extending through May 5, 2004.  After Madigan determined that Dr. Sangar had failed to successfully complete his refresher training and he returned to Walter Reed, he was asked to voluntarily relinquish the supervised clinical privileges which extended through May 5, 2004.  Dr. Sangar failed to do so, and those privileges expired on May 5, 2004.  On August 20, 2004, Dr. Sangar, through his attorney, was informed that he was no longer credentialed at Walter Reed, and he was advised of the procedure for requesting reinstatement of his privileges.  AR 281.  Dr. Sangar failed to request reinstatement of his clinical practice privileges, therefore on September 24, 2004, he was notified that elimination proceedings were being initiated.  AR 227.  Dr. Sangar wants it to appear that Walter Reed was attempting to trick him into relinquishing his privileges so that he could be eliminated.  To the contrary, he was informed of the procedure for requesting reinstatement of his privileges, he failed to do so, therefore he was processed for elimination.

Dr. Sangar alleges that his failure to seek out clinical practice privileges is "legally of no moment."  Pl. Brief at 17.  To the contrary, the applicable Army regulation provides that it is the responsibility of each provider to request renewal of his or her privileges.  Army Reg. 40-68, para. 9-4(c)(2).  Although Dr. Sangar was assigned to the Tumor Registry due to his lack of credentials, that was not the job for which he was being employed.  Indeed, Dr. Sangar did not even possess the necessary certification for the position he occupied at the Tumor Registry.  AR 218.  Dr. Sangar's failure to seek renewal of his privileges was a proper consideration for his

15

elimination from service.

Dr. Sangar contends that following his separation board, Walter Reed "added" the specification of misconduct to his separation documents. Compl. at 9. This allegation is incorrect as the reference to misconduct was present throughout the elimination proceedings. The notification memorandum provided to Dr. Sangar on September 24, 2004, states that he was being recommended for elimination under Army Reg. 600-8-24, para. 4-2(b)(9). Paragraph 4-2(b) is entitled: "Misconduct, moral or professional dereliction, or in the interests of national security." Exhibit A.

Dr. Sangar was properly eliminated from service under the provisions of Army Reg. 600-8-24, para. 4-2(b)(9) for partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges.

> **b.      The ABCMR Properly Concluded There Were No Regulatory Violations in Dr. Sangar's Elimination Proceedings.**

The ABCMR properly upheld Dr. Sangar's administrative separation proceedings as there were no regulatory violations which invalidated the conclusions of the Board of Inquiry. Dr. Sangar was notified that he was being considered for elimination in accordance with the regulation. Compare AR 227-228 and Army Reg. 600-8-24, Figure 4-3. He appeared at his Board of Inquiry with the assistance of both privately retained counsel and counsel provided for by the Army. AR 214. He had the opportunity to cross-examine the government's witnesses, present his own witnesses and evidence, and he even testified on his own behalf. AR 216-223. All proper procedures were observed in the action to eliminate Dr. Sangar from service.

Dr. Sangar complains that the notification memorandum that he received for the 2005 elimination proceedings was deficient in four ways. Dr. Sangar alleges that the notification

memorandum did not: (1) identify a specific instance in which he lost his professional status; (2) state that Dr. Sangar was not assigned as a nuclear medicine physician; (3) state that his performance problems had already been the subject of elimination proceedings in 2002; and (4) state that Dr. Sangar was under a permanent profile for an organic brain disorder. Compl. at 7-8. None of these factors is required information in the notification memorandum. Army Reg. 600-8-24, figure 4-3, outlines the requirements for the notification memorandum. Dr. Sangar's notification memorandum complied with all regulatory requirements for the composition of this memorandum.

Dr. Sangar contends that the notification of elimination did not cite to any specific instance of conduct in support of the elimination action. To the contrary, the notification memorandum stated:

> My action is based on the following specific reasons for elimination: On 23 January 2004, the Madigan Army Medical Center Nuclear Medicine Service and Nuclear Medicine Consultant to the Surgeon General concluded that you could not practice independently as a nuclear medicine physician after your completing six weeks of refresher training and familiarization followed by four weeks of assessment of your potential to practice independently. This independent training and evaluation was performed following several years of performance problems at Walter Reed Army Medical Center.

AR 227. As noted above, providers who do not successfully complete remedial training may be processed for separation under the provisions of Army Reg. 600-8-24. Army Reg. 40-68. para. 9-4(f)(8); Exhibit B. The notification memorandum specifically provided that Dr. Sangar failed to successfully complete remedial training, a regulatory basis for elimination. Accordingly, the notification memorandum fully complied with the regulatory requirement to provide notice of the basis for the elimination proceedings.

Dr. Sangar argues that his physical profile should have been mentioned in the notification

memorandum.  There is no regulatory requirement for such a notation in the memorandum

initiating elimination proceedings.  See Army Reg. 600-8-24, figure 4-3.  Moreover, Dr. Sangar

presented extensive evidence to the Board that there was no evidence to support his diagnosis

with a cognitive disorder.  For example, Dr. Sangar presented the report of forensic psychological

consultation by Dr. Rex Frank, a forensic psychologist.  AR 284-303.  In that report, Dr. Frank

stated: "There is no medical support for the diagnosis of 'Cognitive Disorder NOS'."  AR 288.

Throughout this report, Dr. Frank argues that Dr. Sangar's diagnosis with CIDP was unfounded,

and outlines numerous factors he contends contradict this diagnosis.  AR 284-303.  Dr. Sangar

had every opportunity to introduce evidence regarding his physical profile to the Board of

Inquiry.  Under the regulation, Dr. Sangar was entitled to "present his...case without undue

interference by the board."  Army Reg. 600-8-24, para. 4-11(f)(3).  Dr. Sangar chose to argue to

the Board that he did not suffer from any organic brain disorder.[4]

Additionally, the fact that Dr. Sangar had a physical profile was irrelevant as he had been

found fit for duty by a Physical Evaluation Board ("PEB").  On November 30, 1998, and again

on February 8, 2002, a PEB concluded that Dr. Sangar did not possess any functional impairment

that prevented his satisfactory performance of duty.  AR 174, 490.  On at least two separate

occasions, Dr. Sangar's condition had been evaluated and it was determined that he was fit to

perform his duties.  As Dr. Sangar had been deemed fit to perform his duties, his physical profile

---

[4]Dr. Sangar alleges that Walter Reed discharged him for "the 'misconduct' of having gotten ill."
Pl. Brief at n. 4.  The record shows that over the years, Dr. Sangar repeatedly denied that he
suffered from any illness at all.  AR 134, 284-303.  Now he attempts to use that illness to allege
an improper motive behind his discharge by the chain of command.  The record demonstrates
that Dr. Sangar had been found fit for duty despite his illness, and that he had fully recovered
from his illness years before his refresher training failure and his second elimination proceedings.
AR 174-175, 490.

was irrelevant to his elimination proceedings for limitations on his clinical practice privileges.

In short, there were no procedural violations in either the notification memorandum or the conduct of the administrative elimination proceedings.  As such, the ABCMR correctly denied Dr. Sangar his requested relief.

### c.    Dr. Sangar was Properly Considered for Elimination in 2005

Dr. Sangar was properly considered for elimination in 2005, and was not subject to "administrative double jeopardy."  Compl at 9-10.  Dr. Sangar is correct that the applicable regulation provides that officers will *normally* not be considered for elimination for conduct that has been the subject of a prior administrative elimination proceeding that resulted in retention in service.  Army Reg. 600-8-24, para. 4-4(b).  However, the regulation also provides four explicit exceptions to this general policy.  Dr. Sangar acknowledges these four exceptions, but states, without analysis, that none of them are applicable to his case.  Compl. at n.1; Pl. Brief at n. 5.  However, the exceptions are directly applicable to his case, and specifically authorize the second administrative elimination proceedings.

The regulation provides that an officer may be considered for elimination for misconduct, moral or professional dereliction, or in the interest of national security, at any time subsequent to the closing of the prior case.  Army Reg. 600-8-24, para. 4-4(d)(4).  The regulation goes on to provide that the grounds for elimination in the present case can be joined with the grounds for elimination in the prior case so long as there was no factual determination specifically absolving the officer of the allegations in the prior case.  Id.  No factual determination specifically absolving Dr. Sangar was ever made during the initial elimination proceedings.  See AR 414.  Indeed, the Board of Inquiry never found that Dr. Sangar possessed clinical privileges; it specifically recommended that he be reassigned with a period of supervision to assess his

suitability to be credentialed and practice as a nuclear medicine physician.  Id.

Dr. Sangar contends that the ABCMR did not even consider his argument that he was subject to "administrative double jeopardy."  Compl.at 12; Pl. Brief at 21.  The ABCMR addressed this issue, and properly rejected this claim.  At the outset of its opinion, the ABCMR stated:

> Counsel states that the March 2005 board of inquiry improperly considered information and records that were presented to the December 2002 board of inquiry that had voted to retain the applicant, thereby making the applicant's discharge illegal and contrary to Army Regulation 600-8-24 (Officer Transfers and Discharges).

AR 3.

After a detailed recital of all of the facts in Dr. Sangar's case, the ABCMR specifically addressed his contention that he was subject to administrative double jeopardy.  The board stated:

> In determining whether or not to retain an officer, a board of officers has to determine if, based on the totality of his or her record, it is in the best interest of the Army to retain that officer.  The use of the same information as was used by the earlier board was appropriate since it was germane to whether or not the applicant was qualified to practice in his medical speciality.
>
> While the earlier board of officers voted to retain the applicant, that board did not give an unqualified retention decision.  It recommended a qualified retention and that he be given a period of supervision to assess his suitability to be credentialed and to practice as a Nuclear Medicine Physician.

AR 8.

Under the applicable regulation, Dr. Sangar could be again considered for elimination after his retention in 2002.  He was not the subject of "administrative double jeopardy," but was properly considered for elimination due to his loss of clinical practice privileges.  The ABCMR

addressed this contention in its opinion, and it was properly rejected.  The ABCMR's decision on this matter should therefore be upheld.

### d.    The ABCMR Properly Concluded that Dr. Sangar's Lack of OERs Did Not Invalidate the Board of Inquiry's Findings

The ABCMR fully considered Dr. Sangar's contentions regarding his lack of OERs for the years 2002-2005 and properly concluded that this did not invalidate the Board of Inquiry's findings.  Dr. Sangar argues that the absence of OERs for 2002-2005 "fails to establish any requirement for continuing medical clinical credentialing."  Compl. at 12.  As the ABCMR properly held, the lack of OERs was irrelevant to board proceedings as Dr. Sangar was ineligible for retention in his medical speciality.  AR 9.  Dr. Sangar was a medical officer, and while the Army placed him in an administrative position following the loss of his clinical practice privileges, that does not negate the fact that he was required to possess clinical practice privileges to perform the duties for which he was being employed.

Dr. Sangar contends that the government failed to introduce any documentary exhibits such as OERs for the years 2003, 2004 or 2005 that would demonstrate his poor performance during those years.  Compl. at 10.  Army Reg. 600-8-24, Chapter 4, does not require that the government introduce an officer's OERs as evidence at elimination proceedings.  It simply requires that the government establish by a preponderance of the evidence that the officer has failed to maintain the standards desired of his or her grade and branch as set forth in the notification of elimination.  Army Reg. 600-8-24, para. 4-6(a).  The government presented evidence concerning Dr. Sangar's lack of clinical practice privileges and failure to successfully complete a course of refresher training both through testimonial and documentary evidence.  Dr. Sangar's performance as a Medical Abstraction Physician/Tumor Registry Clerk during the years

2003-2005 was not germane to the basis for the elimination action, namely his limited clinical practice privileges.

Dr. Sangar contends that had he been properly evaluated, the record would have demonstrated to the Board of Inquiry that he was performing his duties at the Tumor Registry in an acceptable manner. The record demonstrates just the opposite. Colonel Fitzpatrick testified at the Board of Inquiry that Dr. Sangar was not even performing his duties in the Tumor Registry at the time of the second elimination proceedings. AR 218. Dr. Sangar himself testified that he did not seek out work to do on his own. AR 222. Thus, the Board of Inquiry was fully informed of the quality of services that Dr. Sangar was providing to the Army, and undoubtably took that into consideration when it recommended his separation from service.

Dr. Sangar argues that the presentation of OERs is required at a Board of Inquiry, but cites to the provision of the regulation that refers to officers separated for ineffectiveness. Pl. Brief at 15. Dr. Sangar was not eliminated in 2005 for ineffectiveness. He was separated for "Misconduct, Moral or Professional Dereliction, or in the Interests of National Security" under the provisions of Army Reg. 600-8-24, para. 4-2(b)(9). AR 227. Other bases for separation under this paragraph include indebtedness, drug addiction, or failure of a course at a service school. Id. at para. 4-2(b). Under Plaintiff's reasoning, the Army would be required to demonstrate that an individual was not performing his assigned duties satisfactorily in order to discharge him for drug addiction. There is no such requirement mandated by the regulation, therefore this argument should be rejected.

Plaintiff cites to Godwin v. United States, 338, F.3d 1374 (Fed. Cir. 2003), claiming it stands for the proposition that "failure to make OER for a six-month period is a legal error sufficient to set aside discharge." Pl. Brief at 15. In Godwin, the court held that the plaintiff had

to demonstrate both legal error in failing to provide an officer with an OER prior to a promotion board, and a nexus between that error and the failure to promote. The court did not hold that the absence of the OER, in and of itself, was sufficient to set aside a discharge action. Moreover, Godwin dealt with the sufficiency of evidence to withstand a motion to dismiss for failure to state a claim, and the court specifically took no position on the nexus issue as the court found that was more properly considered in a summary judgment motion. Hence, Godwin does not stand for the cited proposition, nor does it support Plaintiff's claim. In this case, there is no nexus between the lack of OERs and Dr. Sangar's elimination. As the ABCMR concluded, Dr. Sangar was separated for the limitations on his clinical practice privileges.

Finally, while Dr. Sangar's chain of command did not provide him evaluation reports for 2003-2005, Dr. Sangar did not comply with his responsibilities under the regulation to provide a support form at the beginning of each rating period discussing his duties, responsibilities and performance objectives; or a final support form at the end of each rating period discussing his contributions during the evaluation period. Army Reg. 623-105, para. 3-6, AR 222. Dr. Sangar is accountable as well for the lack of written performance evaluations during the period in question.

In short, the ABCMR properly concluded that Dr. Sangar's lack of OERs for the years 2002-2005 does not invalidate the findings of the Board of Inquiry that he should be separated for limitations on his clinical practice privileges.

## 5.    Plaintiff Has Already Received His Requested Relief

Dr. Sangar has already received the relief that he requested from the ABCMR. In his application to the ABCMR, Dr. Sangar requested that the ABCMR either reinstate him in service, or alternatively, remove all allegations of "misconduct" from the characterization of his

service and make him eligible for separation pay.  AR 12.  On June 8, 2006, Dr. Sangar was

issued a correction to his discharge certificate, a form DD 215, that deleted the reference to

misconduct in the characterization of his service.  AR 186.  Additionally, Dr. Sangar received

$66,561.89 in separation pay.  Id.  Thus, Dr. Sangar has already received his requested relief.

Moreover, this is the only relief that is appropriate in this case.  Dr. Sangar requests that

this Court reinstate him to active duty.  However, 10 U.S.C. § 1251 provides that each regular

commissioned officer of the Army serving in a grade below brigadier general shall be retired at

62 years of age.  Id.  The Secretary of the Army may defer this retirement until age 68 for a

medical officer who is performing duties consisting primarily of providing patient care or

performing other clinical duties.  Id.  Dr. Sangar was a lieutenant colonel at the time of his

separation, and was born on January 3, 1944.  AR 185.  Dr. Sangar is currently 63 years of age

and is therefore past the mandatory retirement age.  The Secretary of the Army holds the

discretion as to whether Dr. Sangar would be permitted to serve beyond age 62.  He can only do

so for an officer performing patient care or other clinical duties, which Dr. Sangar was not doing

at the time of his separation from service.  Thus, it would be entirely inappropriate for Dr. Sangar

to be reinstated in service and the records correction and separation pay that he received are the

full measure of relief that is appropriate in this case.

As Dr. Sangar has already received the relief he requested for the ABCMR, and the Court

should not reinstate him to active duty as he is past the mandatory retirement age, there is no

genuine issue of material fact and the government is entitled to judgment as a matter of law.

## V.  CONCLUSION

For the foregoing reasons, the Defendant respectfully requests that this Court enter

judgment in favor of the Defendant on Plaintiff's claims.

Respectfully submitted,


_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895

Of Counsel:

Major Rebecca E. Ausprung
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203-1837
703-696-1627

25

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VIJAY SANGAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-02015 (CKK) |
| | ) | |
| THE HONORABLE PETE GEREN | ) | |
| Acting Secretary of the Army, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to LCvR 7(h) and in support of Defendant's Motion for Summary Judgment, the Defendant respectfully submits this statement of material facts as to which there are no genuine dispute. The Administrative Record ("AR") supports this statement.

1. Plaintiff, Dr. Vijay Sangar, entered active duty in the United States Army Medical Corps in July 1988. AR 178. On July 18, 1994, he was promoted to the rank of Lieutenant Colonel. AR 399.

2. In August 1995, Dr. Sangar was assigned to Walter Reed Army Medical Center ("Walter Reed") as a Nuclear Medicine Physician. AR 399.

3. On June 30, 1997, Dr. Sangar received an Officer Evaluation Report ("OER") in his position as a Nuclear Medicine Physician. AR 135-136. In Part IV(a) of the OER, entitled Performance Evaluation-Professionalism, Professional Competence, Dr. Sangar received a rating of "2" (on a scale of 1 to 5, 1 being highest and 5 being lowest) in the categories of "Demonstrates appropriate knowledge and expertise in assigned tasks" and "Motivates, Challenges and Develops Subordinates." AR 135. Due to these ratings, Dr. Sangar's OER was

referred to him for comment.  AR 137.

4.  In 1997, Dr. Sangar was diagnosed with Chronic Inflammatory Demyelinating

Polyneuropathy ("CIDP").  AR 3.  CIDP is a neurological disorder characterized by progressive

weakness and impaired sensory function in the arms and legs.  AR 3-4.  On September 30, 1998,

Dr. Sangar received an OER in which he was rated Below Center of Mass, however it was

recommended that he be retained due to his medical condition.  AR 131-132.  Dr. Sangar

submitted a rebuttal to this evaluation.  AR 134.   In his rebuttal, he stated that he believed he did

not possess any medical condition.  Id.

5.  On November 30, 1998, Dr. Sangar underwent a Physical Evaluation Board ("PEB").[5]

AR 174-175.  The PEB determined that he did not have any functional impairment that would

prevent the satisfactory performance of duty, and he was returned to duty as fit.  Id.  Dr. Sangar

concurred with the PEB's findings.  AR 175.

6.  On February 5, 1999, Walter Reed suspended Dr. Sangar's clinical privileges.  AR

273.  On September 14, 1999, a hearing was held concerning Dr. Sangar's credentials.  AR 276.

Based upon the evidence presented at that hearing, on November 3, 1999, Dr. Sangar's clinical

privileges were revoked for poor clinical practices.  Id; 217.

---

[5]A Physical Evaluation Board ("PEB") is responsible for evaluating cases of physical disability.
Army Reg. 635-40, para. 4-17(a) and (b).  PEBs are fact-finding boards responsible for: (1)
investigating the nature, cause, degree of severity and probable permanency of the disability of
soldiers whose cases are referred to the PEB; (2) evaluating the physical condition of the soldier
against the physical requirements of the soldier's duty; (3) providing a full and fair hearing; and
(4) making findings and recommendations to establish the eligibility of a soldier to be separated
or retired due to physical disability.  Id. at para. 4-17(a)(1)-(4).  The PEB makes findings and
recommendations and determines, among other things: whether the soldier is physically fit to
perform duty; whether the disability is of a permanent nature; and whether the disability meets
the criteria established by law for compensation.  Id. at para. 4-19(a)-(g).

7. On November 11, 1999, Dr. Sangar was given a relief for cause OER.[6] AR 127-128. His rating stated that a peer review committee found his cases to be unacceptable and in an oral examination it was found that he did not have the expected knowledge and skills for his speciality. AR 128. As a result of the loss of his credentials to practice medicine, Dr. Sangar was assigned to duties as a tumor registry clerk. AR 383-384. A tumor registry clerk is a position normally held by a General Schedule 6 level employee with a specific certificate of training, not by a lieutenant colonel physician. AR 7.

8. On September 9, 2000, Dr. Sangar passed the nuclear medicine certifying examination. AR 48. He exceeded the mean percentage correct for all takers in three areas, equaled the mean percentage in one area, and scored below the mean percentage correct in six areas. Id.

9. On November 11, 2000, Dr. Sangar received an OER in which his potential compared to other officers rated in his same grade was rated as "Below Center of Mass." AR 125-126. It was recommended that he not be retained. Id.

10. From April 2-6, 2001, Dr. Sangar underwent a Medical Evaluation Board ("MEB").[7] Plaintiff's Motion for Summary Judgment ("Pl. Brief"), Exhibit 1. On May 8, 2001, Dr. Sangar

---

[6]Relief for cause is defined as an early release of an officer from a specific duty or assignment directed by superior authority and based on a decision that the officer has failed in his or her performance of duty. Army Reg. 623-105, para. 3-50(a) (1 October 1997).

[7]A Medical Evaulation Board ("MEB") is convened to document a soldier's medical status and duty limitations insofar as duty is affected by the soldier's status. Army Reg. 635-40, para. 4-10. The MEB will render a decision regarding whether the soldier is medically qualified for retention based upon the criteria set forth in Army Reg. 40-501, Chapter 3. Id. The MEB will prepare a Narrative Summary ("NARSUM") describing the soldier's medical condition and its effect upon his or her ability to perform military duties. Id. at para. 4-11. If the MEB determines that a soldier does not meet retention standards, the MEB will recommend referral of the soldier to a PEB. Id. at para. 4-13.

was issued a physical profile which stated that he was suffering from a moderate cognitive

disorder, decreased visual acuity in the left eye, and cervical spondylosis.  Pl. Brief, Exhibit 3.

    11.  On November 11, 2001, Dr. Sangar received an OER in which his potential

compared to other officers rated in his same grade was rated as "Below Center of Mass."  AR

123-124.  It was recommended that he not be retained.  Id.

    12.  On February 8, 2002, a formal PEB[8] concluded that Dr. Sangar did not have any

functional impairments which would prevent the satisfactory performance of his duties.  AR 490.

The PEB noted that the most recent examination by a psychiatrist/neurologist indicated that Dr.

Sangar had fully recovered from his neurological condition that was present in 1998/1999.  Id.

    13. On October 8, 2002, Dr. Sangar underwent a mental status evaluation and a focused

nuerological examination.  Both were normal with the exception of subtle weakness in the

interosseous muscle of his non-dominant hand.  AR 490.

    14.  On November 11, 2002, Dr. Sangar received an OER in which his potential

compared to other officers rated in his same grade was rated as "Below Center of Mass."  AR

121-122.  It was recommended that he not be retained.  Id.

    15.  On December 16, 2002, a board of inquiry convened at which Dr. Sangar was

---

[8]Each case is first considered by an informal PEB.  Army Reg. 635-40, para. 4-20.  The soldier
may concur with the findings of the informal PEB, at which point the Secretary of the Army will
approve the findings of the board and it will be forwarded for final disposition.  Id. at para. 4-
20(e).  If found unfit by the informal PEB, the soldier may demand a formal hearing by the PEB.
Id.  A formal hearing of the PEB is normally conducted before a board composed of the same
members who considered the case informally.  Id. at para. 4-21(b).  The soldier is entitled to
representation by counsel at the formal hearing, and may appear in person, testify, present
evidence and witness testimony, cross-examine witnesses, and submit oral and written argument.
Id. at para. 4-21.  At the conclusion of its analysis, the PEB will issue its findings and
recommendations along with a statement of the reasons for finding a soldier is fit or unfit, and if
unfit, the basis for the rating.  Id. at para. 4-19, 4-21.

required to show cause for his retention on active duty.  AR 405-415.  Dr. Sangar was considered

for elimination under the provisions of Army Reg. 600-8-24, para. 4-2(a)(1)(5) for a: "downward

trend in overall performance resulting in an unacceptable record of efficiency, or a consistent

record of mediocre service, and failure to perform assignments commensurate with your grade

and experience." AR 425.  The Board of Inquiry concluded that the downward trend in Dr.

Sangar's OERs from July 1997 through November 1999 was potentially attributable to his

diagnosis with CIDP, and his OERs from November 1999-2001 did not address a downward

trend, but addressed the fact that he was not serving as a nuclear medicine physician.  AR 414.

The Board of Inquiry recommended that Dr. Sangar be retained in service with reassignment with

a period of supervision to assess his suitability to be credentialed and practice as a nuclear

medicine physician.  Id.

    16.  On May 16, 2003, Dr. Sangar was granted supervised privileges by Walter Reed for

the period May 6, 2003, through May 5, 2004.  AR 6.

    17.  In September 2003, Dr. Sangar was sent to Madigan Army Medical Center

("Madigan") for six weeks of refresher training and familiarization in nuclear medicine, to be

followed by six weeks of assessment of his potential to practice independently.  AR 487.

Madigan determined that he could not practice medicine independently, and granted him regular

privileges under supervision from September 23, 2003 to May 5, 2005.  AR 461.  Dr. Sangar

received ten weeks of refresher training at Madigan, missing the last two weeks of training due to

the death of his father in India.  AR 487.  The final report on his performance, issued January 23,

2004, noted that while he was a pleasant physician who availed himself of the learning

opportunities at Madigan, he submitted multiple erroneous reports, his knowledge of anatomy

and current pharmaceuticals was weak, he struggled while performing physical exams, and had

5

difficulty dealing with the details of scan interpretation.  AR 487-489.  The report noted that Dr.

Sangar "still omitted subtle findings in bone scans that one would not expect an experienced

physician to omit after intensive mentoring, even after a sabbatical from practice," and they were

"unsure that a formal, structured mentoring program would be sufficient to improve his

performance."  AR 488-489.

18.  On June 1, 2004, the Department of the Army Inspector General concluded an

investigation into whether Walter Reed had improperly directed a show cause board for Dr.

Sangar, or improperly failed to return him to clinical practice.  AR 372.  The Inspector General

found that no impropriety had occurred.  Id.  The Inspector General noted that the Walter Reed

credentialing committee had declined to return Dr. Sangar's clinical privileges after his

unsuccessful retraining at Madigan, and urged the Surgeon General to consider whether an

officer show cause board should be reconvened to assess Dr. Sangar's suitability for continued

active duty.  Id.

19.  On September 9, 2004, Dr. Sangar filed his first application to the ABCMR.  AR 39-

89.  In his application, Dr. Sangar requested Multi-Year Incentive Special Pay ("MISP") and

Multi-Year Special Pay ("MSP") for the years beginning January 2001 through 2003.  AR 40.

He also requested that he be reinstated in the MISP and MSP for the periods January 2004

through 2006.  Id.  The ABCMR requested an advisory opinion from the Army Medical

Command ("AMEDD") Special Pay Branch, Officer of the Surgeon General.  AR 34.  The

advisory opinion stated that Dr. Sangar had been paid MSP at $8000 per year effective October

1, 1998, through September 30, 2002, and MISP at $30,000 per year effective 1 October 1998

through 30 September 2002.  Id.  The AMEDD Special Pay Branch additionally opined that

Walter Reed should have requested stop payment and termination of the MSP and MISP

6

agreements as of the date Dr. Sangar's privileges were initially suspended in February 1999 as he

no longer me the criteria for the program.  Id.  Specifically, the program required that the officer

perform patient care and remain privileges, in accordance with Army Regulation 40-68 without

prejudicial restriction to the standards of the speciality for which the agreement is executed.  Id.

The ABCMR concluded that because Dr. Sangar did not have privileges to practice,

unsupervised, nuclear medicine during the period in question, he was not eligible for MSP or

MISP. AR 37.

     20. On September 24, 2004, Dr. Sangar was notified that he was being required to show

cause for retention on active duty under the provisions of Army Reg. 600-8-24, para. 4-2(b)(9),

for:

> Conduct or actions that result in the loss of a professional status,
> such as withdrawal, suspension or abandonment of professional
> license, endorsement, or certification that is directly or indirectly
> connected with or is necessary for the performance of one's
> military duties. (For AMEDD [Army Medical Command] officers,
> this includes the partial or complete suspension, limitations,
> withdrawal, or denial of clinical practice privileges.)

AR 227.  On March 28, 2005, a Board of Inquiry convened.  AR 214-224.  After consideration of

testimonial and documentary evidence, the Board of Inquiry found that:

> after the loss of your credentials to practice Nuclear Medicine, you
> failed to perform to the standards expected of a Lieutenant Colonel
> in the United States Army.  This includes your lack of initiative to
> become recredentialed, your apparent lack of insight in recognizing
> your clinical limitations and deficiencies and how to pursue
> correcting them since January 2004.  Without these credentials
> you are unable to perform the duties for which you were employed.

AR 223-223.  The Board of Inquiry recommended that Dr. Sangar be separated from service.  AR

224.

     21. As the Board of Inquiry recommended separation, Dr. Sangar's case was forwarded to

a Board of Review.  AR 91-95.  On July 8, 2005, the Board of Review recommended separation.

AR 95.  On July 11, 2005, the Secretary of the Army approved the recommendation of the Board

of Review. AR 90.

22.  On October 28, 2005, Dr. Sangar was discharged from the Army with an Honorable

discharge.  AR 185.

23.  On October 16, 2005, Dr. Sangar filed his second application with the ABCMR.  AR

11-26.  In that application, he requested that the ABCMR either reinstate him in service, or

alternatively, remove all allegations of "misconduct" from the characterization of his service and

make him eligible for separation pay.  AR 12.

24.  On April 18, 2006, Dr. Sangar's discharge orders were amended to reflect that he was

entitled to separation pay.  AR 194.  On June 8, 2006, Dr. Sangar was issued a correction to his

discharge certificate, a form DD 215, which deleted the reference to misconduct in the

characterization of his service.  AR 186.  The DD 215 also reflected Dr. Sangar was to receive

$66,561.89 in separation pay.  Id.

25.  On August 31, 2006, the ABCMR denied Dr. Sangar's application for relief.  AR 1-

10.  The board found that the second Board of Inquiry properly used the same information as the

earlier board of inquiry because it was germane as to whether Dr. Sangar was qualified to

practice in his medical speciality, and that the earlier Board of Inquiry had not made an

unqualified retention decision.  AR 8.  The ABCMR also found that Dr. Sangar was properly

eliminated because he did not possess full, regular clinical practice privileges, but was awarded

only supervised privileges.  AR 9.  Finally, the ABCMR concluded that Dr. Sangar's lack of

OERs before the Board of Inquiry did not invalidate its findings that he was not qualified for

retention in his medical speciality.  Id.

Respectfully submitted,


_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895

Of Counsel:

Major Rebecca E. Ausprung
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203-1837
703-696-1627

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VIJAY SANGAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No.  1:06-cv-02015 (CKK) |
| | ) |
| THE HONORABLE FRANCIS J. HARVEY | ) |
| Secretary of the Army, | ) |
| | ) |
| Defendant. | ) |
|   | ) |

**ORDER**

This matter comes before the Court on Defendant's Motion to Dismiss and for Summary

Judgment.  Based upon the motion, the opposition thereto, and the entire record herein, it is this

_____ day of _____, 20___ hereby

**ORDERED** that Defendant's motion is **GRANTED**, and it is further

**ORDERED** that judgment shall be entered for Defendant, and that this matter is

hereby **DISMISSED WITH PREJUDICE**.

This is a final, appealable order.

**SO ORDERED**.


_____
Colleen Kollar-Kotelly
United States District Judge


Copies to:
Parties via ECF

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VIJAY SANGAR,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 1:06-cv-02015 (CKK)** |
| | ) |
| **THE HONORABLE PETE GEREN** | ) |
| **Acting Secretary of the Army,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## STATEMENT OF FACTS

Pursuant to LCvR 7(h), the Defendant respectfully submits the following response to the statement of facts submitted by Plaintiff, Dr. Vijay Sangar, in support of his motion for summary judgment.

1.    There is no disagreement between the parties regarding these facts.

2.    There is no disagreement between the parties regarding these facts.

3.    There is no disagreement between the parties regarding these facts.

4.    There is no disagreement between the parties regarding these facts.

5.    There is no disagreement between the parties regarding these facts.

6.    There is no disagreement between the parties regarding these facts.

7.    There is no disagreement between the parties regarding these facts.

8.    The Defendant disagrees that the commander of Walter Reed permanently revoked Plaintiff's clinical practice privileges in November 1999 due to his illness.  On November 30, 1998, a Physical Evaluation Board concluded that Dr. Sangar did not possess any functional

impairment that prevented his satisfactory performance of duty, and he was found fit for duty.

AR 174.   Dr. Sangar's clinical practice privileges were permanently revoked based upon poor

clinical practices.  AR 217.

9.      The Defendant disputes that Plaintiff was not required to possess clinical practice

privileges.  There is no disagreement between the parties as to the remaining facts in this

paragraph.

10.     There is no disagreement between the parties regarding these facts.

11.     There is no disagreement between the parties regarding these facts.

12.     There is no disagreement between the parties regarding these facts.

13.     There is no disagreement between the parties regarding these facts.

14.     The Defendant disagrees that Plaintiff was never transferred from his assignment at

Walter Reed as he was assigned to Madigan Army Medical Center for twelve weeks of refresher

training in Nuclear Medicine.  AR 487-489.  The Defendant agrees that the appointing authority

approved the board's findings on February 26, 2003.

15.     There is no disagreement between the parties regarding these facts.

16.     There is no disagreement between the parties regarding these facts.

17.     There is no disagreement between the parties regarding these facts.

18.      The Defendant agrees that Colonel Fitzpatrick admitted under oath that he solicited

Plaintiff to surrender any clinical practice privileges in April 2004.  The Defendant disagrees

with the remaining allegations contained in this paragraph.  Dr. Sangar's clinical practice

privileges granted by Walter Reed expired on May 5, 2004.  Dr. Sangar was informed that he did

not possess privileges and was required to request them.  AR 281.  Dr. Sangar failed to request

renewal of those privileges.  AR 222.

19.     The Defendant disagrees with Plaintiff's characterization of the refresher training as "brief" as this argument, not facts.  There is no disagree between the parties concerning the remaining facts in this paragraph.

20.     The Defendant disputes that Plaintiff was not required to possess clinical practice privileges while in the Tumor Registry at Walter Reed.  There is no disagreement between the parties concerning the remaining facts in this paragraph.

21.     The Defendant disagrees with Plaintiff's characterization of the refresher training as "brief" as this is argument, not facts.  There is no disagree between the parties concerning the remaining facts in this paragraph.

22.     The Defendant disagrees that "many" physicians and health care practitioners within the Army's health care system do not practice medicine independently.  There is no disagreement between the parties regarding the remaining facts in this paragraph.

23.     The Defendant disagrees with the facts contained in this paragraph.  The regulation does not provide that the typical period of refresher training is six months.  It provides that enhanced supervision for *up to 6 months* may be required.  Army Reg. 40-68, ¶ 9-4(e)(2) (emphasis added).

24.     There is no disagreement between the parties regarding these facts.

25.     There is no disagreement between the parties regarding these facts.

26.     There is no disagreement between the parties regarding these facts.

27.     There is no disagreement between the parties regarding these facts.

28.     There is no disagreement between the parties regarding these facts.

29.     The Defendant disagrees that if an officer is subjected to a Board of Inquiry, this

provision of the regulation applies.  The Defendant agrees that this provision is applicable to an officer being separated for ineffectiveness.

30.     There is no disagreement between the parties regarding these facts.

31.     The Defendant disagrees that the notice of the initiation of elimination proceedings dated September 24, 2004, contained no specific instance.  The notification memorandum stated:

> My action is based on the following specific reasons for elimination: On 23 January 2004, the Madigan Army Medical Center Nuclear Medicine Service and Nuclear Medicine Consultant to the Surgeon General concluded that you could not practice independently as a nuclear medicine physician after your completing six weeks of refresher training and familiarization followed by four weeks of assessment of your potential to practice independently.  This independent training and evaluation was performed following several years of performance problems at Walter Reed Army Medical Center.

AR 227.   There is no disagreement between the parties regarding the remaining facts in this paragraph.

32.     The Defendant disagrees that subsequent to the first Board of Inquiry in 2002, Plaintiff was not subject to partial or complete suspension, limitations, withdrawal or denial of clinical practice privileges.  On May 16, 2003, Dr. Sangar was granted supervised privileges by Walter Reed for the period May 6, 2003, through May 5, 2004.  AR 6.  Those privileges expired on May 5, 2004; nearly five months before the initiation of the second elimination proceedings.  AR 281.  Thus, Dr. Sangar was not in possession of any clinical practice privileges at Walter Reed at the time that the elimination action was initiated

33.     The Defendant disagrees with Plaintiff's characterization of the documentation as "voluminous" as this is argument, not fact.  There is no disagreement between the parties

regarding the remaining facts in this paragraph.

34.     The Defendant disagrees that Ms. Susan Reed extensively referenced Dr. Sangar's 1999-

2000 performance of duty.  Ms. Reed testified: "I am not sure what he has been doing since his

privileges were revoked in 1999."  AR 217.

35.     The Defendant disagrees that the 2005 Board of Inquiry simply reconsidered the same

evidence as the 2002 Board of Inquiry, as this is argument, not facts.  There is no disagreement

between the parties as to the remaining facts in this paragraph.

36.     The Defendant disagrees that "almost all" of the government's documentary exhibits and

witness testimony concerned conduct and performance of duty that occurred prior to the show

cause board held in December 2002.

37.      The Defendant agrees that the government did not provide Officer Evaluation Reports

for the years 2003, 2004, and 2005 at Dr. Sangar's elimination proceedings in 2005.  The

Defendant disagrees with the remaining allegations contained in this paragraph as Dr. Sangar's

performance as a Medical Abstraction Physician/Tumor Registry Clerk during the years 2003-

2005 was not germane to the basis for the elimination action, namely his limited clinical practice

privileges.

38.     There is no disagreement between the parties regarding these facts.

39.     The Defendant disagrees with the allegations contained in this paragraph.  In post-board

processing, Walter Reed did not "add" the specification of misconduct to Plaintiff's separation

documents.  The reference to misconduct was present throughout the elimination proceedings.

The notification memorandum provided to Dr. Sangar on September 24, 2004, states that he was

being recommended for elimination under Army Reg. 600-8-24, para. 4-2(b)(9).  Paragraph 4-

2(b) is entitled: "Misconduct, moral or professional dereliction, or in the interests of national

security."  Defendant's Motion for Summary Judgment, Exhibit A.

40.     There is no disagreement between the parties regarding these facts.

41.     There is no disagreement between the parties regarding these facts.

Respectfully submitted,

_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895

Of Counsel:

Major Rebecca E. Ausprung
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400
Arlington, Virginia 22203-1837
703-696-1627_____
_____

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VIJAY SANGAR,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   **Civil Action No.  1:06-cv-02015 (CKK)** |
| | ) |
| **THE HONORABLE FRANCIS J. HARVEY** | ) |
| **Secretary of the Army,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER

This matter comes before the Court on Defendant's Motion to Dismiss and for Summary

Judgment.  Based upon the motion, the opposition thereto, and the entire record herein, it is this

_____ day of _____, 20___ hereby

**ORDERED** that Defendant's motion is **GRANTED**, and it is further

**ORDERED** that judgment shall be entered for Defendant, and that this matter is

hereby **DISMISSED WITH PREJUDICE**.

This is a final, appealable order.

**SO ORDERED**.


_____
Colleen Kollar-Kotelly
United States District Judge

Copies to:
Parties via ECF

Headquarters
Department of the Army
Washington, DC
29 June 2002

**\*Army Regulation
600–8–24**

**Effective 29 July 2002**

Personnel–General

# Officer Transfers and Discharges

By Order of the Secretary of the Army:

ERIC K. SHINSEKI
*General, United States Army
Chief of Staff*

Official:

*Joel B. Hudson*

JOEL B. HUDSON
*Administrative Assistant to the
Secretary of the Army*

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised, the changed portions have not been highlighted.

**Summary.** This regulation prescribes policies and procedures governing transfer and discharge of Army officer personnel. This regulation includes policy statements, operating tasks, rules in support of operating tasks, and sequential steps of each operating task.

**Applicability.** This regulation applies to all commissioned and warrant officers of the Active Army, the Army National Guard of the United States, and the U.S. Army Reserves when serving on active duty for a period of 30 or more consecutive days.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G-1. The proponent has the authority to approve exceptions to this publication that are consistent with controlling law and regulation. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent.

**Army management control process.** This regulation contains management control provisions but does not contain checklists for conducting management control reviews used to accomplished assessment of management controls.

**Supplementation.** Supplementation of

this regulation and establishment of command or local forms are prohibited without prior approval from The Deputy Chief of Staff, G-1, through CDR PERSCOM (TAPC–PDT–PM), ALEXANDRIA VA 22332–0478.

**Suggested Improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to CDR PERSCOM (TAPC–PDT–PM), ALEXANDRIA VA 22332–0478.

**Distribution.** Distribution of this publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard, and the U.S. Army Reserve.

---

**Contents** (Listed by paragraph and page number)

**Chapter 1
Introduction,** *page 1*

*Section I
Overview, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Manpower requirements • 1–5, *page 1*
Levels of work • 1–6, *page 1*
The officer transfer/discharge process • 1–7, *page 2*
Headquarters, Department of the Army (HQDA), addresses for officers • 1–8, *page 2*

*Section II
Principles and Standards, page 2*
Principles of support • 1–9, *page 2*

---

\*This regulation supersedes AR 600–8–24, 21 July 1995.

# UNCLASSIFIED

**Chapter 4**
**Eliminations**

**Section I**
**Scope**

**4–1. Overview**

*a.* An officer is permitted to serve in the Army because of the special trust and confidence the President and the nation have placed in the officer's patriotism, valor, fidelity, and competence. An officer is expected to display responsibility commensurate to this special trust and confidence and to act with the highest integrity at all times. However, an officer who will not or can not maintain those standards will be separated.

*b.* Every officer deserves a fair chance to demonstrate his or her capabilities. When an officer shows ineffective tendencies (especially if the officer is inexperienced) when practicable, he or she will be given another chance under another commander. The officer's ineffectiveness will be systematically recorded in documents that specify each period covered, duties observed, and defects noted. Recommendations for elimination action will not be based on generalities and vague impressions. It is necessary to document, in writing, the precise reasons an officer is considered ineffective.

*c.* An officer who has his or her security clearance withdrawn or withheld due to unfavorable information regarding loyalty, subversion, or security may be processed for involuntary separation according to AR 604–10. The exception is a nonprobationary RA commissioned officer, who by law may be involuntarily separated under this regulation. However, the administrative procedures prescribed in AR 604–10 will be followed for a nonprobationary RA commissioned officer until the case is referred to PERSCOM (TAPC–PDT–PM).

*d.* This chapter prescribes the tasks, rules, and steps for eliminating officers in the Active Army for substandard performance of duty, misconduct, moral or professional dereliction, and in the interests of national security.

**4–2. Reasons for elimination**

While not all inclusive, when one of the following or similar conditions exist, elimination action may be or will be initiated as indicated below for—

*a.* Substandard performance of duty.

(1) A downward trend in overall performance resulting in an unacceptable record of efficiency, or a consistent record of mediocre service.

(2) Failure to keep pace or to progress with contemporaries, as demonstrated by a low record of efficiency when compared with other officers of the same grade and competitive category. An officer who is identified by an ADL promotion board (convened in accordance with 10 USC 611a) as "not fully qualified" for promotion will be recommended for elimination under this paragraph as provided for by the Secretary of the Army in memorandum of instructions to the promotion board.

(3) Failure to exercise necessary leadership or command expected of an officer of his or her grade.

(4) Failure of an officer to absorb technical proficiency required for his or her grade and competitive category.

(5) Failure to properly perform assignments commensurate with an officer's grade and experience.

(6) Apathy, defective attitudes, or other characteristic disorders to include inability or unwillingness to expend effort.

(7) Failure to respond to alcohol or drug problem rehabilitation efforts in a reasonable length of time. (See AR 600–85 for further explanation.) Elimination action will be initiated.

(8) Failure to conform to prescribed standards of dress, personal appearance, or military deportment.

(9) Failure to achieve satisfactory progress after enrollment in the Army weight control program or failure to maintain the weight/body fat standards established under the provisions of AR 600–9 after removal from an established weight control program. Elimination action will be initiated. This provision does not include those judge advocates and AMEDD officers who have incurred a statutory ADSO for participating in Army sponsored education and training programs such as the Funded Legal Education Program (10 USC 2004), Armed Forces Health Professions Scholarship Program, or the Uniform Services University of the Health Sciences (10 USC, chapters 104, 105).

(10) When no medical problems exist, and an officer has two consecutive failures of the Army Physical Fitness Test (APFT), elimination action will be initiated. This provision does not include those judge advocates and AMEDD officers who have incurred a statutory ADSO for participating in Army sponsored education and training programs such as the Funded Legal Education Program (10 USC 2004), Armed Forces Health Professions Scholarship, or the Uniform Services University of the Health Sciences (10 USC, chapters 104, 105).

(11) Failure of a course at a service school for academic reasons by a probationary or nonprobationary RA officer. For failure by an RC officer, see paragraph 2–37.

(12) Failure of a probationary officer to resign under paragraph 3–9 when his or her commander determines the best interest of the Government and the individual can be served by the officer's discharge.

(13) The discovery of other conditions concerning a probationary officer that, had they been known at the time of appointment, would have precluded appointment.

(14) The discovery of any other condition concerning a probationary officer that indicates the officer's retention in the Army would not be in the best interest of the United States.

(15) Probationary RA commissioned and warrant officers entering AD who are confirmed Human Immunodeficiency Virus (HIV) positive within 180 calendar days of their original appointment or probationary USAR, ARNG commission and warrant officers who report for initial entry training in an AD (other than ADT) status and are confirmed HIV positive within 180 calendar days of reporting to AD will be processed for elimination.

*b.* Misconduct, moral or professional dereliction, or in the interests of national security.

(1) Discreditable or intentional failure to meet personal financial obligations.

(2) Mismanagement of personal affairs that are unfavorably affecting an officer's performance of duty.

(3) Mismanagement of personal affairs to the discredit of the Army.

(4) Intentional omission or misstatement of fact in official statements or records for the purpose of misrepresentation.

(5) Acts of personal misconduct (including but not limited to acts committed while in a drunken or drug intoxicated state).

(6) Homosexual conduct (see para 4–22).

(7) Intentional neglect of or failure to perform duties.

(8) Conduct unbecoming an officer.

(9) Conduct or actions that result in the loss of a professional status, such as withdrawal, suspension or abandonment of professional license, endorsement, or certification that is directly or indirectly connected with or is necessary for the performance of one's military duties. (For AMEDD officers, this includes the partial or complete suspension, limitations, withdrawal, or denial of clinical practice privileges.)

(10) Acts or behavior not clearly consistent with the interests of national security. (See AR 604–10 for criteria.)

(11) Unless precluded by paragraph 4–18d(4), elimination action will be initiated against an officer who is medically diagnosed as drug dependent or identified as having committed an act of personal misconduct involving drugs.

(12) Conduct or actions by a warrant officer resulting in a loss of special qualifications (such as withdrawal/ revocation of CID accreditation, revocation of marine qualification license, removal from the PRP, withdrawal of clinical privileges or loss of flying status) that directly or indirectly precludes a warrant officer from performing in his or her MOS and is necessary for the performance of those duties. Eliminations based on these reasons may not be utilized if reclassification action is feasible and in the best interest of the Service or if the loss of special qualifications was due to medical reasons beyond the control of the warrant officer.

(13) Failure to respond in a reasonable length of time to rehabilitation efforts regarding repeated acts of child/spouse maltreatment or abuse and/or other acts of family violence.

(14) Failure of a course at a service school by an RA officer because of misconduct, moral or professional dereliction. For failure by a Reserve Component officer, see paragraph 2–37.

*c. Derogatory information.* The following reasons (or ones similar) require an officer's record to be reviewed for consideration of terminating his or her appointment. Standing alone, one of these conditions may not support elimination, however, this derogatory information combined with other known deficiencies form a pattern that, when reviewed in conjunction with the officer's overall record, requires elimination.

(1) Punishment under UCMJ, article 15.

(2) Conviction by court-martial.

(3) Denial of security clearance. (See AR 604–10 for further explanation).

(4) A relief for cause officer evaluation report (OER) (DA Form 67–8, (US Army Officer Evaluation Report)) under AR 623–105, paragraph 5–18.

(5) Adverse information filed in the OMPF in accordance with AR 600–37.

(6) Failure of a course at a service school.

## 4–3. Medical condition

*a.* An officer referred or recommended for elimination under this chapter who does not meet medical retention standards will be processed through both the provisions of this regulation and through the MEB/PEB process as described in paragraph 1–22.

*b.* When it is determined the officer's mental condition contributed to his or her military inefficiency or unsuitability, the medical evaluation will include a psychiatric study of the officer. This study will indicate whether the officer was able to distinguish right from wrong and whether the officer currently has the mental capacity to understand board and judicial proceedings and participate in his or her defense. When applicable, the report will also indicate whether the incapacitating mental illness could have been the cause of the conduct under investigation.

*c.* At the time an officer is to appear before the Board of Inquiry, if he or she does not possess sufficient mental capacity to understand the nature of the proceedings or does not behave or cooperate intelligently in his or her defense, the proceedings will be delayed until the officer recovers, or the officer will be processed through medical channels, whichever applies.

*d.* If a physical or mental condition develops after an officer has been recommended for involuntary separation or after the Board of Inquiry proceedings are completed, the officer's commander will immediately notify PERSCOM (TAPC–PDT–PM).

## 4–4. Limitations

*a.* An officer will not be considered for involuntary separation because of conduct that has been the subject of judicial proceedings that resulted in an acquittal.

*b.* Except as provided in *d* below, no officer will be considered for elimination for reasons stated in paragraph 4–2 because of conduct that has been the subject of administrative elimination proceedings that resulted in final determination that the officer should be retained in the Service. For purposes of this paragraph, an officer will be considered to have been the subject of elimination proceedings only if allegations against the officer were acted on by a Board of Inquiry convened under this chapter.

*c.* The limitations set forth in *b* above are not applicable when—

(1) Substantial new evidence is discovered that was not known at the time of the original proceedings despite the exercise of due diligence and that would probably produce a result significantly less favorable for the officer at a new hearing.

(2) Subsequent conduct by the officer warrants considering him or her for discharge. Such conduct need not independently justify the member's elimination but must be sufficiently serious to raise a substantial question as to the officer's potential for further useful military service. However, this exception does not permit further consideration of conduct of which the officer has been absolved in a prior final factual determination based on the merits by a judicial body.

(3) An express exemption has been granted by PERSCOM, in writing, upon a determination that administrative separation should be effected becuase of the unusual circumstances of the case.

*d.* Under the circumstances in (1) through (4) below, an officer who has been considered for elimination and retained on AD may again be required to show cause for retention:

(1) An officer may be again considered for elimination because of lack of proficiency or recurrent misconduct subsequent to the earlier consideration.

(2) An officer may be again considered for elimination because of misconduct that occurred prior to that alleged in the earlier proceedings but that was not sooner discovered despite the exercise of due diligence.

(3) An officer who has been considered for elimination for substandard performance of duty and retained may again be considered for elimination for substandard performance of duty at any time 1 year after the prior case has been closed.

(4) An officer may be considered for elimination for misconduct, moral or professional dereliction, or in the interest of national security at any time subsequent to the closing of the prior case that resulted in the officer's retention on AD. However, an officer may not again be required to show cause for retention on AD solely because of conduct that was the subject of the previous proceedings, unless the findings and recommendations of the Board of Inquiry or the Board of Review that considered the case are determined to have been obtained by fraud or collusion. The grounds for elimination in the earlier case may be joined with new grounds in the later case, provided the earlier elimination proceedings does not include a factual determination specifically absolving the member of the allegations then under consideration. If the grounds for elimination in the earlier proceedings are joined, the additional grounds considered in the subsequent proceedings need not independently justify the member's discharge but must be sufficiently serious to raise a substantial question as to the member's potential for further useful military service.

*e.* Punishment resulting from trial by court-martial or under the provisions of UCMJ, article 15, for misconduct and subsequent use of this fact in support of elimination under this regulation do not constitute double jeopardy.

## 4–5. Separation date

An officer approved for involuntary separation by the ASA (M&RA) or whose request for resignation or discharge in lieu of elimination is approved will be separated accordingly.

*a.* For misconduct, moral or professional dereliction, or in the interest of national security.

(1) In CONUS, an officer will be separated no earlier than 5 calendar days and not later than 14 calendar days after the officer receives written notification.

(2) Outside CONUS, an officer will be returned to the CONUS separation TP/TA no later than 21 calendar days after the officer receives written notification. Separation will occur no later than 5 calendar days after arriving at the CONUS TP/TA.

*b. Solely for substandard performance of duty.* Not later than the 30th calendar day after receipt of notification by the officer concerned, the officer will not be released prior to the 30th calendar day without his or her consent.

## Section II
## Boards

### 4–6. Board of Inquiry

*a.* The Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army. The Government is responsible to establish, by preponderance of the evidence, that the officer has failed to maintain the standards desired for his or her grade and branch or that the officer's conduct has been prejudicial to national security. In the absence of such a showing by the Government, the board will retain the officer. However, the respondent is responsible for producing evidence to disprove the Government's position.

*b.* Boards of Inquiry are appointed by the appropriate GOSCA. Concurrence must be obtained from the appropriate commander when an officer assigned to a different command is used on a Board of Inquiry. The local installation convening the Board of Inquiry will fund the travel of board members from other installations.

*c.* The GOSCA will advise members of a Board of Inquiry that duty on the board takes priority over all other duties unless properly excused by the appointing authority.

*d.* The Board of Inquiry will be completed no later than 90 calendar days from the date the GOSCA is notified by PERSCOM to conduct the Board of Inquiry or on a GOSCA initiated elimination, from the date the GOSCA directs that a Board of Inquiry be conducted. Whenever completion of the Board of Inquiry is delayed beyond the established time, the GOSCA will notify CDR, PERSCOM (TAPC–PDT–PM), by electrical message of the reason for the delay and the projected date for the Board of Inquiry to be completed.

*e.* The CG, U.S. Army Military District of Washington, will have jurisdiction as GOSCA for all personnel assigned or attached to the U.S. Army, Military District of Washington. This authority may be delegated by the CG, U.S. Army, Military District of Washington, in appropriate cases to officers who could otherwise act as GOSCAs.

*f.* The GOSCA will issue the orders appointing the Boards of Inquiry.

*g.* Except as modified by this regulation, the board will conform to the provisions of AR 15–6 applicable to formal proceedings with respondents.

### 4–7. Board membership

*a.* Boards will consist of at least three voting members and a recorder, legal advisor, and respondent's counsel without vote. The president of the board of inquiry will be the grade of colonel or above and senior in grade to the respondent. Other voting members will be RA officers on AD (unless the respondent is a RC officer) in the grade of lieutenant colonel or above and senior in grade and rank to the respondent. When the respondent is an RC officer, one or more of the voting members will be an RC officer, preferably the same component.

*b.* When an RC officer on AD is not reasonably available, the GOSCA will, through the MACOM, advise PERSCOM (TAPC–PDT–PM) and request that a retired RC officer (10 USC 1187) officer in the grade of lieutenant colonel or above be ordered to AD to serve on the Board of Inquiry. When the GOSCA knows that an eligible and qualified retired RC officer is located in the area of responsibility, that officer's name, rank, date of rank, and address will be furnished the MACOM and to PERSCOM (TAPC–PDT–PM). The GOSCA will also include the respondent's rank and date of rank and the approximate convene date of the Board of Inquiry.

*c.* The MACOM, if possible, or the CG, PERSCOM, will make the final selection of the officer and if necessary coordinate with CG, ARPERCEN, to issue the AD orders. The CG, PERSCOM, or the MACOM will notify the GOSCA (by electronic message) of the selected officer, including the officer's AD entry date.

*d.* When the respondent is a minority, female, or special branch (10 USC 3064), the board will (upon the officer's written request) include a minority, female, or special branch as voting member (if reasonably available, as this provision is not an entitlement). If an officer is in more than one category and he or she requests officers from all or two categories, the board membership may be met by one or more officers (if reasonably available, as this provision is not an entitlement). The request for these members, if desired, will be submitted 7 days from the date that the respondent receives the notification or else the right to request is waived.

*e.* When the reasons for elimination include substandard performance of duty (para 4–2, except 4–2a(9) and (10)), the board membership will include an officer of the same branch as the respondent (if reasonably available, as this is not an entitlement). Normally, this is the only time a Chaplain, AMEDD, or JAGC officer serves as a board member unless he or she is the only available RC colonel in the area and the respondent is an RC officer.

*f.* No officer will be a voting member of a Board of Inquiry who—

(1) Is serving (or has previously served) as a witness for the respondent.

(2) Served as a member of the selection board in the particular case or served as a member on any previous Board of Inquiry, Review, or other board of officers with respect to the respondent.

(3) Was a member (or was the reviewing authority) of a previous court-martial in which the respondent was the accused.

(4) Previously recommended (or participated in recommending) the respondent for elimination from active duty.

(5) Rendered a derogatory evaluation report on the respondent.

(6) Otherwise considered the respondent's case.

*g.* In addition to the reasons stated in *f* above, voting members and the legal advisor may be challenged for cause for any reason that indicates they can not participate in the case in a fair and impartial manner. The challenge will be determined by the senior unchallenged board member.

*h.* Except for the legal advisor and the recorder, only voting members may attend a closed session.

## 4–8. President of the Board of Inquiry

The board's president—

*a.* Ensures the respondent is granted reasonable time to prepare and present his or her case. Undue delay will not be permitted and the case will be conducted as expeditiously as possible.

*b.* Determines the board's convene date (not earlier than 30 calendar days from the officer's receipt of notification to show cause by CG, PERSCOM, or GOSCA).

*c.* Will make every effort to ensure Board of Inquiry is completed no later than 90 calendar days from the date the GOSCA directs that a Board of Inquiry be conducted.

*d.* Secures a proper location with an atmosphere consistent with the spirit and seriousness of the proceedings.

*e.* Formally calls each session to order.

*f.* Administers the oath to the recorder.

*g.* Ensures the board members are familiar with the elimination policy of this regulation and have been afforded the opportunity to examine and study the respondent's elimination packet prior to convening the Board of Inquiry and asked if they are aware of any grounds that might be the basis for challenge for cause.

*h.* Advises the respondent of his or her responsibilities, rights, and options as outlined in paragraph 4–11.

## 4–9. Recorder of the Board of Inquiry

*a.* The board recorder will be a JAGC officer who is permanently assigned to the board. The board service will constitute the recorder's primary duty; however, it will not preclude other duties when the workload permits. (Alternate or assistant recorders may be detailed to the Board of Inquiry.)

*b.* The recorder is responsible for the proper presentation and handling of the Government case, to include the development of new evidence pertinent to the factual allegations in the case. The recorder's duties are not discharged by a perfunctory entering in the record of evidence provided by the Department of the Army. The recorder will make the investigation of the case as is indicated, seek new evidence that may be locally available, and become thoroughly familiar with the respondent's history and the deficiencies or conduct (as appropriate) that led the selection board, CG, PERSCOM, or GOSCA to conclude that the officer fails to meet prescribed standards or has been derelict in his or her moral professional duties. The recorder will also be able to place evidence offered by the respondent in perspective with the remainder of the officer's military record.

*c.* If during the course of the recorder's investigation of the case, the recorder finds additional evidence similar in nature to that previously presented to the officer under paragraph 4–2, that evidence is admissible. This additional evidence may be considered by the Board of Inquiry as proof of an amended or new factual allegation in support of a reason for elimination.

(1) Only in those instances where the newly discovered evidence results in the addition of a reason for elimination (not included in the officer's notification memorandum (para 4–18)) is it necessary to return the case to the CG, PERSCOM, or GOSCA for issuance of a new notification memorandum.

(2) The fact that the additional evidence may support the stated reason of conduct unbecoming an officer (para 4–2b(8)) does not in itself allow its consideration unless it can also be related to another enumerated reason for elimination in paragraph 4–2, which was included in the officer's notification memorandum.

(3) If such additional evidence is considered and if the board determines that the officer has not had a reasonable period of time to prepare a response to such evidence, reasonable delay must be granted on the officer's request.

*d.* The recorder will not assist the board in drafting its findings and recommendations but will, in addition to the above mentioned duties, comply with AR 15–6, paragraph 5–3, and complete the following:

(1) Notify the officer (in writing and not less than 10 calendar days before the convene date) of the time and location where the Board of Inquiry will convene.

(2) Allow the officer access to releasable records and furnish copies (if desired) prior to the hearing, as is reasonably necessary, for the respondent to prepare and present the case.

(3) Request two copies of the respondent's OMPF (microfiche) and ORB from PERSCOM (TAPC–MSR).

(4) At the initial session, read the order/letter appointing the board.

(5) Enter in the record the time, date, place, and station and indicate the presence of the board members, respondent and his or her counsel (if any).

(6) Administer the oath to board members, legal advisor, witnesses, and reporter.

(7) Ensure all records and documents relating to the case are provided to the board members.

(8) Verbally present to the board a synopsis of the entire case when appropriate.

(9) Cross-examine the witnesses called by the respondent or their counsel.

*e.* For an RA commissioned officer when the reason for elimination is based on acts or behavior that is not clearly consistent with the interest of national security, the appointing authority will make available for appointment to the Board of Inquiry a legal advisor, who will perform in connection with the board proceedings the duties prescribed for him or her in AR 604–10, chapter 6. The recorder and the assistant recorder (*a* above) will perform the duties prescribed in AR 604–10, chapter 6.

## 4–10. Legal advisor
The legal advisor is a JAGC officer assigned (by the appointing authority) to the Board of Inquiry to serve only as an advisor, not a voting member). The legal advisor—

*a.* Will be present at all open sessions and may be called on to advise on the admissibility of evidence, arguments, motions or other contentions of counsel, procedures, and any other matter determined appropriate by the president of the board.

*b.* Is prohibited from taking part in presenting the case or cross-examining witnesses.

*c.* Will not give *ex parte* advice, except as provided for during deliberation (para 4–15*a*), in a closed session of the Board of Inquiry.

*d.* May not dismiss any factual allegation, reason for elimination, or recommendation for elimination against the respondent but will advise the board as to the proper form of such, paying special attention to procedures for the findings and recommendation of the board (para 4–15*b*).

*e.* Will perform the duties prescribed in AR 604–10, chapter 6, paragraph 4–9*c*, when required in connection with the board proceedings .

## 4–11. Respondent
When a Board of Inquiry convenes to consider an officer's recommendation for involuntary separation, the board will determine whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence. The respondent will be present at all open sessions of the board unless he or she is excused by the president of the board and expressly waives the right to attend. Additionally, the respondent—

*a.* Will be provided with counsel who is an officer of the JAGC or be allowed to obtain civilian counsel of his or her own selection without expense to the Government, provided that procurement of his or her own counsel does not result in an unreasonable delay. The GOSCA will determine whether a requested delay to obtain civilian counsel is reasonable. If a requested delay is denied, the determination and the reasons will be stated in writing and made a part of the records of proceedings by the GOSCA.

*b.* Will be allowed reasonable time, as determined by the Board of Inquiry, to prepare his or her case. The respondent may submit a written request (citing the specific reasons) for continuance to the Board of Inquiry. In no instance will the officer have less than 30 calendar days from the date of notification of his or her requirement to show cause for retention on AD.

*c.* Will be allowed, at all stages of the proceedings, full access to the records of the hearings, including all documentary evidence referred to the board, except when protection of classified documents is clearly consistent with the interests of national security. In such cases, the respondent will be furnished, to the extent that the national security permits, as determined by the Secretary of the Army, a summary of the information contained in the documents withheld.

*d.* May challenge for cause any member of the board. The convening authority will appoint additional members if necessary to ensure that the board membership is not reduced to fewer than three officers.

*e.* Has the right to have knowledge of his or her past performance of duty as reflected in his or her evaluation reports.

*f.* Will be allowed to appear in person and present evidence or be represented by counsel, before a Board of Inquiry. The respondent—

(1) Will not be reimbursed for expenses incident to the appearance or assistance of civilian counsel.

(2) At any time after the appointment of the board and before the close of the proceedings, may submit documents to the Board of Inquiry from his or her record of service, letters, answers, depositions, sworn or unsworn statements, affidavits, certificates, or stipulations. This includes but is not limited to, depositions of witnesses not deemed to be reasonably available or witnesses unwilling to appear voluntarily.

(3) Will be allowed to present his or her case without undue interference by the board. However, unreasonable delays will not be tolerated. Such presentations may include any evidence relevant to a respondent's rehabilitation or reformation as well as any matters in extenuation or mitigation that the respondent desires to present.

(4) May testify in person or elect to remain silent. Should the respondent elect to testify, he or she may be required to submit to examination by the board as to any matter concerning which he or she testified but not in contravention of the UCMJ, article 31. When electing to testify, the respondent is entitled to an explanation of his or her rights

regarding self-incrimination under UCMJ, article 31, and a Privacy Act statement will be prepared and signed. (See AR 15–6, app B.)

*g.* May request witnesses, members of the Army whose testimony he or she believes to be pertinent to the case, appear before a Board of Inquiry.

*h.* May question any witness brought before the board.

*i.* May, at any time prior to final action in his or her case—

(1) Apply for voluntary retirement, if eligible.

(2) Tender resignation.

(3) Request discharge (RA officers only—10 USC 1186).

*j.* Will be asked before the hearing is terminated to state for the record whether he or she has presented all available evidence in his or her behalf. If not, the respondent will be required to make a concise statement of the substance of the expected evidence. The statement and any documentary evidence referred to the board will be included in the record of hearing. The board will then determine whether the respondent will be granted additional time to produce such evidence.

*k.* Will be furnished a copy of the proceedings less classified documents if requested.

*l.* Will have the right to submit to the GOSCA a statement or brief within 7 calendar days after receipt of the Board of Inquiry report of proceedingsthe case.

## 4–12. Respondent's counsel

*a.* A JAGC officer will be assigned to each Board of Inquiry as the respondent's counsel.

*b.* The respondent is also entitled to retain civilian counsel at his or her own expense. If civilian counsel is retained, the assigned military counsel will be relieved of duties and responsibilities in connection with the case unless the respondent chooses to use any services of the assigned counsel.

*c.* The respondent's counsel may request, on the respondent's behalf, copies of documents contained in the respondent's OMPF and/or evaluation report files that may assist in preparing the case. These documents will be specifically identified and limited to documents relevant to the case. Forward requests (by electronic message) to PERSCOM (TAPC–PDT–PM).

*d.* The respondent's counsel will be present at all open sessions of the board unless his or her absence is expressly excused by the president of the board.

## 4–13. Witnesses

To the maximum extent possible, the respondent has the right to be confronted with the witnesses against him or her.

*a.* The personal appearance of witnesses should be obtained whenever practicable in preference to the use of depositions, affidavits, or written statements. Accordingly, such requests will be honored by the board if the requested witness is considered reasonably available and his or her testimony will add materially to the case. Requests for witnesses will include a statement specifying the substance of expected testimony.

*b.* The president of the Board of Inquiry will request the commander or Government agency to order witnesses to appear as witnesses for the Government that are members of the Armed Forces or civilian employees of the Government. The availability of the witness is determined by the appropriate commander. If the commander determines that a requested witness is not reasonably available, the reasons will be furnished to the president of the board, who will have this determination appended to the record of proceedings.

*c.* Military members and civilian employees of the Army, called as witnesses on behalf of the Government and required to travel are entitled to temporary duty allowance as prescribed in the JFTR and AR 37–106, chapter 13. Other witnesses requested by the respondent will not be reimbursed for expenses relating to their appearance unless they qualify for invitational travel orders under JFTR.

*d.* Witnesses appearing before the board will be sworn.

*e.* Boards of Inquiry may call witnesses on their own motion.

## 4–14. Spectators

At the respondent's request, the board president may permit the respondent's personal friends or relatives to be present during open board hearings. However, the respondent will be advised the presence of these spectators terminates the confidential status of the proceedings. The board president may exclude any spectator when (in the opinion of the board) his or her presence interferes with the proceedings. Any person called as a witness will not be present as a spectator.

## 4–15. Conclusion of hearing

*a. Deliberation.* After the closing arguments, only the voting members of the Board of Inquiry will meet in the closed sessions of deliberations. The board may seek the advice of the legal advisor whenever necessary. However, the board will be opened, and the advice will be obtained in open session (and incorporated in the record) with the recorder, respondent, and his or her counsel present.

*b.* Findings and recommendations.

(1) The Board of Inquiry determines its findings and recommendation by secret written ballot in closed session, with a majority vote deciding any issue.

(2) Based on the evidence (presented at the hearings), the board will make a separate finding (including a brief statement) on each factual allegation and reason for involuntary separation. The board may (based on the evidence) present findings that amend or specify new allegations. However, new allegations must support a reason for elimination that was included in the findings of the selection board or in the officer's notification memorandum. The board may recommend retention (with or without reassignment) or involuntary separation (see para 4–22 for homosexual conduct cases). The board will include the type of discharge certificate and characterization to issue, when elimination is recommended (and the officer is not retirement eligible (10 USC 3911)) for misconduct, moral or professional dereliction, or in the interest of national security.

(3) The board may not recommend removal of documents such as OERs, article 15s, and Memorandum of Reprimand from an officer's OMPF. The board recommendations are limited to either retention (with or without reassignment) or elimination.

(4) After the board determines its findings and recommendations, the board members may request the presence of the legal advisor and reporter at the closed session to assist with compiling the board's findings and recommendation in the acceptable format.

(5) The board's findings and recommendations will be announced to the respondent.

*c.* Report of proceedings.

(1) The record of proceedings will be kept in summarized form unless a verbatim record is required by the appointing authority after consultation with the servicing judge advocate or legal advisor concerning the availability of verbatim reporters. The summarized transcript will include the following:

*(a)* A copy of the order appointing the Board of Inquiry and amending orders (if any).

*(b)* A copy of the documents showing initiation of the elimination action and the decision to refer the case to a Board of Inquiry.

*(c)* Name of witnesses called before the board.

*(d)* A verbatim transcript of the findings and recommendations of the Board of Inquiry.

*(e)* Other information as is deemed appropriate by the appointing authority. The board president, legal advisor, recorder, or respondent's counsel may recommend other information for inclusion.

*(f)* An accurate account of the board's proceedings, insofar as practicable, will be prepared according to the general instructions set forth in AR 15–6, chapter 3, section III. A DA Form 1574 (Report of Proceedings by Investigating Officer/Board of Officers) will be prepared to accompany the verbatim or summarized proceedings.

*(g)* A summarized record of testimony presented and heard and of all other formal conversations that took place during all open sessions of the Board of Inquiry.

*(h)* A summarized record of any closed session that required the presence of the legal advisor and the reporter.

*(i)* True copies or true extract copies of all documents used as a basis for requiring the respondent to show cause and all other documents that are accepted as evidence in the case. These documents must be legible and reproducible. Copies that are illegible will not be used.

*(j)* A statement that the findings and recommendations were determined by secret written ballot in closed session. The members of the Board of Inquiry who did not concur in the findings and/or recommendations of the Board of Inquiry may file a statement of their nonconcurrence and the reasons therefore for inclusion in the record.

(2) Guidance for the preparation of a verbatim report of a Board of Inquiry is contained in figure 4–1. This text should be modified freely when preparing a summarized transcript.

(3) A Board of Inquiry data sheet (fig 4–2) will be used as a final check of the report of proceedings only insofar as it is consistent with the elimination procedures established by this regulation. Figure 4–2 is only intended to provide guidance.

(4) Clemency may not be concurrently recommended by a Board of Inquiry when the board has concluded that an officer should be eliminated. Clemency can only be exercised by the Secretary of the Army.

## 4–16. Actions concerning Board of Inquiry defects

At any time after receipt and review of a case by the GOSCA, the MACOM, or PERSCOM, the following actions may be taken with respect to substantial defects that may be noted:

*a.* The retention of the officer may be directed.

*b.* If the Board of Inquiry has failed to make findings or recommendations required by the applicable regulations, the case may be returned to the same board for compliance with the regulations concerned.

*c.* If there is an apparent procedural error or omission in the record of proceedings that may be corrected without reconsideration of the findings and recommendations of the board, the case may be returned to the same board for corrective action.

*d.* If the Board of Inquiry committed an error, other than as is dictated in *b* and *c* above, that substantially prejudiced

a substantial right of the officer, the case may be returned for a rehearing by a new board. The new board may be furnished the evidence properly considered by the previous board, including extracts from the record of testimony of those witnesses not deemed reasonably available to testify at the rehearing. The new board may call additional witnesses. New allegations that could form the basis for an elimination under paragraph 4–2 may be presented to the new Board of Inquiry. First, however, the officer will be given notice of the new allegations and provided an opportunity to respond. The case will then be processed as stated in paragraph 4–18. The new board will not be advised of the findings and recommendations of the previous board. The new board's findings and recommendations may not be less favorable than that of the previous board unless additional allegations are considered. Likewise, the recommendation of the appointing authority may not be less favorable than his or her initial recommendation, unless additional allegations are considered by the subsequent board.

*e.* When a case is returned to the board pursuant to *b* or *c* above, and one or more members of that board are unavailable because of factors such as death, hospitalization, or PCS, new members may be appointed. The case may proceed with an opportunity to challenge the members and after the substance of all proceedings is made known to the new member or members and the recorded testimony of each witness previously examined is made known to the new member. No more than one rehearing may be directed by the MACOM or the GOSCA without approval from HQDA.

## 4–17. Board of Review

*a.* An officer recommended for elimination by a Board of Inquiry will have his or her case referred to a Board of Review. The Board of Review is appointed by the Secretary of the Army and has the same board composition as the Board of Inquiry. The Board of Review, after thorough review of the records of the case, will make recommendations to the Secretary of the Army as to whether the officer should be retained in the Army. Appearance by the respondent (or the counsel) is not authorized. The Board of Review will refer to paragraph 4–22 for homosexual conduct cases.

*b.* No officer will sit as a member of the Board of Review who—

(1) Has been called as a witness.

(2) Was a member of the selection board for respondent.

(3) Appeared as a witness before or was a member on any previous Board of Inquiry, Board of Review, or board of officers with respect to the respondent.

(4) Was a member or was the reviewing authority in a court-martial before which the respondent was the accused.

(5) Previously has recommended or participated in recommending elimination or REFRAD of the officer concerned.

(6) Rendered a derogatory evaluation report on the accused.

(7) Otherwise has considered the case of the accused.

(8) Does not meet the board membership requirements.

*c.* When the board recommends—

(1) Retention in the Army (with or without reassignment), the proceedings will be forwarded to PERSCOM (TAPC–PDT–PM) and the case will be closed.

(2) Elimination from the Army (to include type of discharge and characterization, if applicable), the recommendation will be transmitted to the Secretary of the Army, who makes the final decision.

*d.* An officer discharged solely for substandard performance of duty will receive an honorable discharge. The Board of Review may recommend the characterization of discharge to be more favorable than recommended by the Board of Inquiry but not less favorable.

*e.* When the Board of Review recommends elimination, it may also recommend clemency, stating the reasons. However, only the Secretary of the Army may grant clemency.

*f.* The Board of Review will, if requested, furnish the respondent a copy of the board proceedings.

## Section III
## Task: Process Elimination of a Nonprobationary Officer

## 4–18. Rules for processing an elimination of a nonprobationary officer

*a.* Elimination action may be initiated by—

(1) Commanding General, PERSCOM. Such notification will be sent by certified mail.

(2) A GOSCA, for an officer assigned or attached to his or her command (see Glossary) (unless specifically withheld by HQDA.)

(3) The Deputy Chief of Staff, G-1, when recommendations are made by HQDA promotion, school, or command selection boards that an officer should be required to show cause for retention on active duty. The DCS, G-1 or his or her designated representative in the grade of major general or above will review such names and decide if initiation of elimination is appropriate. If initiation of elimination is appropriate, the action will be processed according to the rules and steps of the applicable sections of this chapter.

(4) The Secretary of the Army, the Chief of Staff, and such officials in their offices as are designated by them. The action will be processed according to the rules and steps of the applicable sections of this chapter.

*b.* Unless precluded by *d*(4) below, elimination action will be initiated against an officer who is identified by one or more of the reasons outlined in paragraph 4–2.

*c.* Any subordinate commander may recommend to the GOSCA the initiation of elimination proceedings for an officer in his or her command.

*d.* The commander has the discretion to initiate disciplinary action under the UCMJ or to recommend or initiate elimination proceedings under the provisions of this regulation.

(1) The fact that elimination proceedings were initiated when disciplinary action could have been taken will not affect the validity of the elimination proceedings.

(2) Elimination action will not be used in lieu of disciplinary action solely to spare an officer who may have committed serious misconduct from the harsher penalties that may be imposed under the UCMJ.

(3) Conduct that was the subject of judicial or nonjudicial punishment may be the basis for elimination proceedings under this regulation. (See para 4–4*b.*)

(4) Elimination proceedings, however, will not be initiated with respect to conduct that is the subject of UCMJ charges unless the charges are dismissed or appellate review has been completed.

*e.* Regardless of who initiates the elimination action, the initiating official will furnish the appropriate MACOM a copy of the notification memorandum. The GOSCA will ascertain the identity and location of Government witnesses and make reasonable efforts to ensure their availability to appear before a Board of Inquiry.

*f.* On receipt of elimination actions from the MACOM commander, CG, PERSCOM may take the following actions prior to the Board of Review:

(1) Close the case (prior coordination with the initiating official required for an elimination initiated under *a*(3) and (4) above and, through channels, notify the officer.

(2) Forward the case to a Board of Review.

*g.* When the Board of Review recommends elimination, the board will forward the case directly to the Secretary of the Army for the final decision.

*h.* When the Board of Review recommends retention (with or without reassignment), PERSCOM (TAPC–PDT–PM) will close the case and, through channels, notify the officer.

*i.* When the Secretary of the Army approves elimination, PERSCOM (TAPC–PDT–PM) will forward separation instructions to the appropriate PSC/MPD.

## 4–19. Steps for processing an elimination of a nonprobationary officer

The required steps for processing an elimination of a nonprobationary officer are as shown in table 4–1.

**Table 4–1**
**Processing elimination of a nonprobationary officer**

| Step | Work center | Required action |
|---|---|---|
| 1 | PPAA<br>BN S–1<br>C&S | The initiating official (para 4–18*a*(1) or (2) or (3) or (4) above) notifies the officer in writing that elimination action has been initiated and that he or she is required to show cause for retention on AD (fig 4–1). Initiates a DA Form 268. (See AR 600–8–2.) |
| 2 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer of the reasons supporting the elimination action and the factual allegations supporting the reasons. Only applicable reasons as outlined in paragraph 4–2 (or para 4–22 for homosexual conduct) that can be supported by specific factual allegations and evidence may be the basis for elimination. Evidence to support the elimination must be able to stand on its own merits. Prior coordination with the servicing judge advocate or legal advisor is required for actions initiated by the GOSCA. Advises the officer that he or she may—<br>a. Tender resignation in lieu of elimination (para 4–24).<br>b. Request discharge in lieu of elimination (an RA commissioned officer only) (para 4–24).<br>c. Apply for retirement in lieu of elimination if otherwise eligible for voluntary retirement as stated in chapter 6, paragraph 6–17*d*. Voluntary retirement application will be amended to specifically state that the application is submitted in lieu of elimination.<br>d. Appear before a Board of Inquiry to show cause for retention. |
| 3 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that he or she has 30 calendar days to acknowledge receipt in writing, to prepare a written statement or rebuttal or elect one of the options as stated in *a*, *b*, *c*,and *d* above. |
| 4 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer of the least favorable discharge that he or she may receive. (An officer separated solely for substandard performance (para 4–2*a*) will receive an Honorable Discharge. If separated for reason(s) under paragraph 4–2*b*or 4–22*b* (homosexual conduct) an officer may receive an Under Other Than Honorable Discharge. |

**Table 4–1**
**Processing elimination of a nonprobationary officer—Continued**

| Step | Work center | Required action |
|---|---|---|
| 5 | PPAA BN S–1 C&S | The initiating official advises the officer that he or she may consult with the local finance and accounting officer concerning possible entitlement to separation pay. |
| 6 | PPAA BN S–1 C&S | The initiating official advises the officer that if he or she requests resignation or discharge in lieu of elimination action, he or she will be separated as stated below.<br>*a.* Not later than 30 calendar days after receipt of notification that request for resignation or discharge was approved (only when separated solely for substandard performance). Release will not be prior to the 30th day without the officer's consent.<br>*b.* Not later than 14 calendar days and no earlier than 5 calendar days after receipt of notification that the request for resignation or discharge was approved when stationed in CONUS.<br>*c.* For an officer assigned OCONUS, he or she will be returned to the CONUS separation TP/TA no later than 21 calendar days after receipt of written notification that the request for resignation or discharge was approved, and separated no later than 5 calendar days after arrival at the CONUS TP/TA. |
| 7 | C&S | The initiating official personally signs the memorandum. |
| 8 | PPAA BN S–1 C&S | The GOSCA furnishes a copy of the notification memorandum directly to CDR, PERSCOM (TAPC– PDT–PM) and the appropriate MACOM, if applicable. |
| 9 | SLDR | Officer responds with acknowledgement of receipt (fig 2–4). Submits a written statement or rebuttal or elects one of the options in step 2 above within 30 calendar days.<br>*a.* The statement or rebuttal may be prepared with the assistance of an officer of the JAGC or civilian counsel obtained by the officer at no expense to the Government.<br>*b.* The statement or rebuttal should contain any pertinent facts bearing on the question of the officer's elimination. Documents submitted must be legible and reproducible. They may be sworn or unsworn.<br>*c.* The officer submits the appropriate application for separation if in lieu of elimination option is selected.<br>*d.* The officer undergoes a separation physical examination within 5 duty days from the date the option is chosen. |
| 10 | C&S | The initiating official (CG, PERSCOM or GOSCA, as appropriate), on receipt of the officer's statement and/or option selection, will act as follows—<br>*a.* Closes the case (see para 4–22 and 4–23 for homosexual conduct). (Prior to closing cases initiated under para 4–18a(3) or (4), CG, PERSCOM, will coordinate with the initiating official.) (The GOSCA may only close a case that he or she initiated.)<br>*b.* Expeditiously forwards the appropriate application and all elimination papers directly to CDR, PERSCOM (TAPC–PDT–PM), if the officer elects one of the options in step 2a through cof this table. (When the GOSCA is not the GCMCA, furnishes a copy to the GCMCA.) The forwarding endorsement includes the direct point of contact for the elimination action (to include name and telephone number). Informs the MACOM of the action.<br>*c.* If the officer declines to elect an option, refer the case to a Board of Inquiry. The GOSCA is authorized to appoint a field Board of Inquiry without referral to PERSCOM. The GOSCA notifies CDR, PERSCOM (TAPC–PDT–PM), by electronic message that a Board of Inquiry is being appointed and requests that two copies of the officer's OMPF and ORB be provided.<br>*d.* Determines whether medical board or physical evaluation board proceedings are pending or appropriate (para 4–3a) if the case is not closed. |
| 11 | C&S | The GOSCA, prior to forwarding the case to the Board of Inquiry, ensures that—<br>*a.* With the exception of business entries and official records and reports, health records, and CID investigation reports, all statements submitted, including reports of the investigation, are under oath or affirmation. This does not apply when a witness is dead, mentally incompetent, or missing, or when the exigencies of the service preclude obtaining the officer's statement in affidavit form.<br>*b.* Documents are legible and reproducible.<br>*c.* The statement submitted by the officer is made a part of the record. |
| 12 | C&S | The GOSCA forwards the case to the Board of Inquiry. The Board of Inquiry will be completed no later than 90 calendar days from the date that the GOSCA directs that a Board of Inquiry be conducted. |
| 13 | C&S | The GOSCA forwards the Board of Inquiry proceedings to the appropriate MACOM no later than 30 calendar days after the board's adjournment. This time limit must be met. |
| 14 | C&S | The MACOM forwards the board's proceedings to CDR, PERSCOM (TAPC–PDT–PM), no later than 60 calendar days after the board's adjournment. This time limit must be met. |
| 15 | C&S | The GOSCA, when a Board of Inquiry recommends retention, closes the case, notifies the officer in writing, and notifies CDR, PERSCOM (TAPC–PDT–PM), that the officer has been retained by the Board of Inquiry and of the date of the officer's notification. Forwards the board's proceedings (original copy only, either verbatim or summarized transcript) with a copy of the officer's notification memorandum through the appropriate MACOM to CDR, PERSCOM (TAPC– PDT–PM). |

**Table 4–1**
**Processing elimination of a nonprobationary officer—Continued**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 16 | C&S | The GOSCA, when a Board of Inquiry recommends elimination, closes the case if retention is appropriate (only for eliminations initiated by a GOSCA for an officer assigned or attached to his or her command (unless specifically withheld by HQDA)) and complies with step 15 above. |
| 17 | C&S | The GOSCA, when the Board of Inquiry recommends elimination or it was initiated under paragraph 4–18a(1), (3), or (4), completes the following administrative actions: <br> *a.* Furnishes the officer a copy of the Board of Inquiry report and obtains a receipt of acknowledgement. <br> *b.* Gives the officer the options listed in step 2a through *c* of this table. <br> *c.* Advises the officer that— <br> (1) He or she may submit an appellate brief and statement within 7 calendar days after receipt of the Board of Inquiry report or proceedings. <br> (2) The entire case will be considered by a Board of Review and the officer will be entitled to a copy of the Board of Review report if the officer so desires. <br> (3) If the Board of Review determines that the officer should not be retained, the case will be referred to the Secretary of the Army for final action. If the Board of Review determines the officer should be retained, the case will be closed. In either event, the officer will be notified at the earliest and practicable time by CG, PERSCOM. <br> *d.* Have the officer undergo a separation physical examination (para 1–22). <br> *e.* Establish internal suspense controls to ensure expeditious processing of the separation physical examination. |
| 18 | C&S | The GOSCA, when a Board of Inquiry recommends elimination (after completing the administrative action required in step 17 above), forwards by personal endorsement the original report of the Board of Inquiry proceedings to the MACOM commander including— <br> *a.* Recommendation of approval or disapproval of the Board of Inquiry's recommendation (state reason(s) when disapproval is recommended). The GOSCA may recommend retention when elimination is recommended by the board. <br> *b.* A statement that the officer was furnished a copy of the Board of Inquiry report and whether the officer desires a copy of the Board of Review report. <br> *c.* A recommendation of the type of discharge to be issued. (Only applicable where the officer was required to show cause for retention for reasons indicated in paragraph 4–2b and provided the officer is not eligible for retirement under chap 6.) The recommendation of the type of discharge may be more favorable but may not be less favorable than that recommended by the board. <br> *d.* The officer's appellate brief (if submitted). The GOSCA must include a statement in the forwarding memorandum that the brief was reviewed and may submit any other appropriate comments concerning the brief. Derogatory information that has not been previously provided to the respondent will not be added to the forwarding memorandum. <br> *e.* All rebuttals and resignations or requests for discharge in lieu of elimination will have the GOSCA's personal endorsement. |
| 19 | C&S | The MACOM commander, when a Board of Inquiry recommends elimination does as follows: <br> *a.* Closes the case if retention is appropriate (only for eliminations initiated by a GOSCA for an officer assigned or attached to his or her command (unless specifically withheld by HQDA)). <br> *b.* If elimination is appropriate or if elimination was initiated under paragraph 4–18a(1), (3), or (4)— <br> (1) Forwards the Board of Inquiry proceedings to CDR, PERSCOM (TAPC–PDT–PM), recommending approval or disapproval of the Board of Inquiry's recommendations (state the reasons when disapproval is recommended). The MACOM may recommend retention when elimination is recommended by the Board of Inquiry. <br> (2) Recommends the type of discharge to be issued. (Only applicable where the officer was required to show cause for retention for the reasons stated in para 4–2b and provided the officer is not eligible for retirement under chap 6.) The type of discharge recommended may be more favorable but may not be less favorable, than that recommended by the board. <br> (3) Submits statement in the forwarding memorandum that the appellate brief (if submitted) was reviewed and may include any comments concerning the brief. Derogatory information that has not been previously provided to the respondent will not be added to the forwarding memorandum. <br> (4) Personally signs the forwarding endorsement. |
| 20 | PPAA (TP/TA) | On receipt of separation instructions, takes action to separate the officer. Final release orders and forms cite regulatory authority and SPD as shown in AR 635–5–1. |

**Section IV**
**Task: Process Elimination of a Probationary Officer**

## 4–20. Rules for processing an elimination of a probationary officer

*a.* The rules for a nonprobationary officer (para 4–18) also apply to a probationary officer.
*b.* A probationary officer is—

(1) An RA commissioned officer with fewer than 5 years of ACS (10 USC 630).

(2) An RC officer who has fewer than 5 years commissioned service.

(3) A warrant officer who has fewer than 3 years service since original appointment in his or her present component.

*c.* If at any time during the processing of the recommendation, the officer no longer meets the probationary criteria stated above, the case will be processed under paragraph 4–18.

*d.* An officer identified for elimination may—

(1) Tender a resignation in lieu of elimination.

(2) Request discharge in lieu of elimination (RA officer only).

(3) Apply for retirement in lieu of elimination if otherwise eligible. (Format for voluntary retirement will be amended to specifically state that the application is submitted in lieu of elimination.)

*e.* Processing an officer's recommendation for elimination under this paragraph does not require referral to a Board of Inquiry or a Board of Review unless the officer declines to elect one of the options listed above and an Other Than Honorable Discharge is recommended.

*f.* If the officer declines to elect one of the options listed in *d* above and if an Honorable or General Discharge (Under Honorable Conditions) is recommended, CG, PERSCOM, will forward the case to the Secretary of the Army for final decision. The GOSCA will make a formal recommendation concerning the options submitted by the officer.

*g.* If the officer declines to elect one of the options listed in *d* above and if an Other Than Honorable Discharge is recommended, the case will be processed as if the officer was a nonprobationary officer.

*h.* When appropriate, CG, PERSCOM, will forward the case to the ASA (M&RA).

*i.* The ASA (M&RA) may direct—

(1) Retention.

(2) Discharge.

(3) Referral to a Board of Inquiry.

*j.* Action by the ASA (M&RA), acting for the Secretary of the Army, is final.

*k.* When the ASA (M&RA) directs the officer's retention, PERSCOM (TAPC–PDT–PM) will close the case and notify the officer through the GOSCA and furnish a copy to the appropriate MACOM.

*l.* When the ASA (M&RA) approves the elimination, PERSCOM (TAPC–PDT–PM) will forward separation instructions to the appropriate PSC/MPD.

*m.* When the ASA (M&RA) refers the case to a Board of Inquiry, procedures in table 4–1, steps 10 through 19 will be followed.

## 4–21. Steps for processing an elimination of a probationary officer

The required steps for processing the elimination of a probationary officer are as shown in table 4–2.

**Table 4–2**
**Processing elimination of a probationary officer**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 1 | PPAA BN S–1 C&S | The initiating official (para 4–18a(1) or (2) or (3) or (4) above) notifies the officer in writing that elimination action has been initiated and that he or she is required to show cause for retention on AD (fig 4–1). Initiates a DA Form 268. (See AR 600–8–2.) |
| 2 | PPAA BN S–1 C&S | The initiating official advises the officer of the reasons supporting the elimination action and the factual allegations supporting the reasons. Only applicable reasons as outlined in paragraph 4–2 or (para 4–22b for homosexual conduct) that can be supported by specific factual allegations and evidence may be the basis for eliminations. Evidence to support the elimination must be able to stand on its own merits. Prior coordination with a servicing judge advocate or legal advisor is required for actions initiated by the GOSCA. Advises the officer that he or she may— <br> a. Tender resignation in lieu of elimination (para 4–24). <br> b. Request discharge in lieu of elimination (RA commissioned officer only) (para 4–24). <br> c. Apply for retirement if otherwise eligible for voluntary retirement as stated in paragraph 6–17. Voluntary retirement application will be amended to specifically state that the application is submitted in lieu of elimination. |

**Table 4–2**
**Processing elimination of a probationary officer—Continued**

| Step | Work center | Required action |
|---|---|---|
| 3 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that he or she has 30 calendar days to acknowledge in writing, to prepare a written statement or rebuttal, and/ or to elect one of the options stated in step 2 above. Advises the officer of the least favorable discharge and characterization that he or she may receive. An officer separated solely for substandard performance (para 4–2a) will receive an Honorable Discharge. If separated for reason(s) under paragraph 4–2b or 4–22b(homosexual conduct), an officer may receive an Under Other Than Honorable Discharge. If an Honorable or General (Under Honorable Conditions) discharge is recommended, there will be no Board of Inquiry unless directed by the ASA (M&RA). |
| 4 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that he or she may consult with the local finance and accounting officer concerning possible entitlement to separation pay. |
| 5 | PPAA<br>BN S–1<br>C&S | The initiating official advises the officer that if he or she requests resignation or discharge in lieu of elimination action, he or she will be separated as stated below.<br>    a. Not later than 30 calendar days after receipt of notification that request for resignation or discharge was approved (only when separated solely for substandard performance). Release will not be prior to the 30th day without the officer's consent.<br>    b. Not later than 14 calendar days or earlier than 5 calendar days after receipt of notification that the request for resignation or discharge was approved when stationed in CONUS.<br>    c. For an officer assigned OCONUS (except as stated in a above), he or she will be returned to the CONUS separation TP/TA no later than 21 calendar days after receipt of written notification that the request for resignation or discharge was approved and will be separated no later than 5 calendar after arrival at the CONUS TP/TA. |
| 6 | C&S | The GOSCA personally signs the memorandum. |
| 7 | PPAA<br>BN S–1<br>C&S | The GOSCA furnishes a copy of the notification memorandum directly to CDR, PERSCOM (TAPC–PDT–PM). |
| 8 | SLDR | The officer responds with acknowledgement of receipt (fig 2–4). Submits a written statement or rebuttal and/or elects and submits an option at step 2 above to the initiating officer within 30 calendar days.<br>    a. The statement or rebuttal may be prepared with the assistance of an officer of the JAGC or civilian counsel obtained by the officer at no expense to the Government.<br>    b. The statement or rebuttal should contain any pertinent facts bearing on the question of the officer's elimination. Documents submitted must be legible and reproducible. They may be sworn or unsworn.<br>    c. Undergo a separation physical examination within 5 duty days if an option is selected. |
| 9 | C&S | The initiating official (CG, PERSCOM, or the GOSCA, as appropriate), on receipt of the officecer's statement or rebuttal and/or option selection, does as follows:<br>    a. Closes the case. (See paras 4–22 and 4–23 for homosexual conduct.) (Prior to closing cases initiated under para 4–18a(3) or (4), CG, PERSCOM, will coordinate with the initiating official.) (The GOSCA may close a case that he or she initiated.)<br>    b. If the officer elects one of the options listed at step 2, forwards the appropriate application and all elimination documents directly and expeditiously to CDR, PERSCOM (TAPC–PDT–PM). Recommends approval or disapproval of the application and includes the point of contact (name and telephone number) and informs the MACOM of this action.<br>    c. If the officer declines to elect one of the options, and an Honorable or General Discharge (Under Honorable Conditions) is recommended, forwards the case directly to CDR, PERSCOM (TAPC–PDT–PM). Include the point of contact (name and telephone number) and inform the MACOM of this action.<br>    d. If the officer declines to elect one of the options and if an Under Other Than Honorable Discharge is recommended, the elimination action will be processed under the procedures for a nonprobationary officer at table 4–1, steps 10 through 19, then return to step 11 below.<br>    e. If the case is not closed, determine whether medical board or PEB proceedings are pending or appropriate (para 4–3a). |
| 10 | PPAA<br>(TP/TA) | On receipt of separation instructions, take action to separate the officer. Final release orders and forms cite regulatory authority and SPD as shown in AR 635–5–1. |

## Section V
## Task: Process Elimination of an Officer for Homosexual Conduct

### 4–22. Rules for processing an elimination of an officer for homosexual conduct

    a. AR 600–20 contains general policies concerning homosexual conduct, including statutory provisions, pertinent definitions, and guidelines for command-directed fact-finding inquiries. AR 195–2 provides guidance on criminal

investigation of sexual misconduct by the U.S. Army Criminal Investigation Command and other DOD Law Enforcement organizations. AR 380–67 offers guidance on personnel security and clearance matters related to homosexual conduct.

*b.* Homosexual conduct is grounds for separation from the Army under the criteria and terms set forth below. Homosexual conduct includes homosexual acts, a statement by an officer that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage. A statement by an officer that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the officer's sexual orientation but because the statement indicates a likelihood that the officer engages in or will engage in homosexual acts. An officer's sexual orientation is considered a personal and private manner and is not a bar to continued service under this section unless manifested by homosexual conduct in the manner described below. Except as indicated, a officer will be separated if one or more of the following approved findings have been made by the separation authority:

(1) The officer has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts, unless there are further approved findings that the officer has demonstrated that—

*(a)* Such acts are a departure from the officer's usual and customary behavior;

*(b)* Such acts under all the circumstances are unlikely to recur;

*(c)* Such acts were not accomplished by use of force, coercion, or intimidation;

*(d)* Under the particular circumstances of the case, the officer's continued presence in the Army is consistent with the interests of the Army in maintaining proper discipline, good order, and morale; and

*(e)* The officer does not have a propensity or intent to engage in homosexual acts.

*(f)* In determining whether retention is appropriate, separation boards/authorities must ensure that all of the foregoing limited conditions are met. Additionally, a determination as to whether retention is warranted under the limited circumstances is required if the officer clearly and specifically raises such limited circumstances.

(2) The officer has made a statement that he or she is a homosexual or bisexual, or words to that effect, unless there are further approved finding that the officer has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. A statement by a officer that he or she is homosexual or bisexual, or words to that effect, creates a rebuttable presumption that the officer engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. The rebuttable presumption provision will be specifically included in the initiation of the elimination memorandum (fig 5–1). The officer will be advised of this presumption and given the opportunity to rebut the presumption by presenting evidence demonstrating that he or she does not engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts. Propensity means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages or will engage in homosexual acts. In determining whether an officer has successfully rebutted the presumption that he or she engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts, some or all of the following may be considered:

*(a)* Whether the officer has engaged in homosexual acts;

*(b)* The officer's credibility;

*(c)* Testimony from others about the officer's past conduct, character, and credibility;

*(d)* The nature and circumstances of the officer's statement;

*(e)* Any other evidence relevant to whether the officer is likely to engage in homosexual acts (this list is not exhaustive; any other relevant evidence may also be considered).

(3) The officer has married or attempted to marry a person known to be of the same sex (as evidenced by the external anatomy of the persons involved).

(4) The officer will bear the burden of proving by a preponderance of the evidence throughout the proceedings that retention is warranted under the limited circumstances described in paragraphs (1) and (2) except in cases where the officer's conduct was solely the result of a desire to avoid or terminate military service.

*c.* Separation is not required when a determination is made that—

(1) The officer engaged in acts, made statements, or married or attempted to marry a person known to be of the same biological sex for the purpose of avoiding military service; and

(2) Separation of the officer would not be in the best interest of the Army.

*d.* Subsequent to the original initiation of elimination action, succeeding actions required to dispose of the case will be attended to vigorously. Except for delays required to protect the rights of the the respondent, prompt attention and expeditious handling will be given to elimination cases.

*e.* A nonprobationary officer (and a probationary officer recommended for a discharge of Under Other Than Honorable Conditions) recommended for elimination due to homosexual conduct is entitled to a Board of Inquiry and a Board of Review.

*f.* An officer recommended for elimination due to homosexual conduct will undergo a medical evaluation.

*g.* An officer recommended for elimination due to homosexual conduct will have a psychiatric evaluation when requested by—

(1) The officer.

(2) The examining physician.

(3) The commander that recommended separation.

(4) The Board of Inquiry.

*h.* The type of discharge an officer receives will reflect the characterization of service. An officer may receive a discharge Under Other Than Honorable Conditions when there is a finding that during the current term of service, the officer attempted, solicited, or committed a homosexual act—

(1) By using force, coercion, or intimidation.

(2) With a person under age 16.

(3) With a subordinate in circumstances that violate customary military superior-subordinate relationships.

(4) Openly in public view.

(5) For compensation.

(6) Aboard a military vessel, aircraft, or another location subject to military control, which had or was likely to have an adverse impact on discipline, good order, or morale. Because of the close proximity of other members of the Armed Forces under these circumstances, privacy cannot reasonably be expected.

*i.* A board convened to determine whether an officer should be separated for homosexual conduct will follow the procedures authorized in appropriate paragraphs of this regulation except for the following:

(1) If a Board of Inquiry or Review finds that one or more of the circumstances under *b* above is supported by the evidence, the board will recommend elimination as appropriate unless the board finds that retention is required under the limited circumstances described above.

(2) If the board does not find that there is sufficient evidence that one or more of the circumstances authorizing separation has occurred, the board will recommend retention unless the case involves another basis for separation for which the officer has been duly notified.

(3) The burden of proving that retention is required under the limited circumstances rests with the officer except in cases where the officer's conduct was solely the result of a desire to avoid or terminate military service.

(4) Specific findings regarding the existence of the limited circumstances requiring an officer's retention set forth in *b* above are required to be made by a Board of Inquiry or Review only if—

*(a)* The officer specifically presents the limited circumstances; and

*(b)* The board relies on such circumstances to justify the officer's retention.

*j.* Upon final approval by the ASA (M&RA) of elimination proceedings against any officer of the active Army, that officer, regardless of component, will be discharged as the result of such proceedings. The office of PERSCOM (TAPC–PDT–PM) will forward separation instructions to the appropriate PSC/MPD.

## 4–23. Steps for processing an elimination of an officer for homosexual conduct

The required steps for processing an elimination of an officer for homosexual conduct are as shown in table 4–3.

**Table 4–3**
**Processing elimination of an officer for homosexual conduct**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 1 | BN S–1 PPAA | Commander receives information that an officer may require that elimination action be initiated because of homosexual conduct or the officer makes a self-admitted written statement that he or she is homosexual or bisexual. |
| 2 | BN S–1 PPAA | The commander inquires thoroughly and comprehensively into the matter and ascertains all the facts. |
| 3 | BN S–1 PPAA | The commander initiates an investigation if there is any credible evidence to believe that a basis for elimination exists due to homosexual conduct |
| 4 | BN S–1 PPAA | The commander, when the information is sufficient enough to authorize investigation, takes necessary action to protect the security of the command. This includes suspension of the officer's security clearance (if any) and denial of his or her access to classified defense information, until the case is closed. |
| 5 | BN S–1 PPAA | The commander initiates a DA Form 268. (See AR 600–8–2.) |
| 6 | BN S–1 PPAA | When an investigation is required, AR 195–2 provides guidance on criminal investigations of sexual misconduct by CID and other law enforcement organizations. However, CIDR 195–1 states that CID will not normally investigate allegations of adult private consensual sexual misconduct if that offense is the only offense involved unless referred by a commander or upon approval by CG or Deputy Commander, U.S. Army Criminal Investigation Command (USACIDC). |

**Table 4–3**
**Processing elimination of an officer for homosexual conduct—Continued**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 7 | BN S–1<br>PPAA | The commander, when the investigation substantiates the allegations—<br>   *a.* Refers the officer for a medical examination and mental status evaluation.<br>   *b.* Refers to AR 380–67 on personal security and clearance matters related to homosexual conduct. Revocation of security will be according to AR 380–67, chapter 8. |
| 8 | C&S | A physician conducts a medical evaluation that includes a mental status evaluation SF Form 600 (Health Record-Chronological Record of Medical Care). |
| 9 | C&S | A psychiatrist conducts a psychiatric evaluation (when required). Includes in the diagnosis an opinion of whether—<br>   *a.* The officer was able to distinguish right from wrong at the time of the conduct under investigation.<br>   *b.* The officer currently has the mental capacity to understand board and judicial proceedings and participate in his or her own defense.<br>   *c.* The officer is suffering from an incapacitating mental illness and whether the illness was probably the cause of the homosexual conduct. |
| 10 | C&S | The medical treatment facility commander forwards the original medical evaluation (including the psychiatric study, if any) to the unit commander and ensures a copy of each report is filed in the officer's health record. |
| 11 | BN S–1<br>PPAA | The commander ensures that all facts indicating homosexual conduct be recorded properly. The file will contain the following:<br>   *a.* Officer's date and place of birth.<br>   *b.* Amount of active service.<br>   *c.* Date and current period of service.<br>   *d.* Statement of witnesses (UCMJ, art 31).<br>   *e.* Medical evaluation reports.<br>   *f.* Officer's statement (in their own behalf if it is desired). |
| 12 | BN S–1<br>PPAA | The commander, if there is not sufficient evidence to make a recommendation for elimination, stops the action. |
| 13 | BN S–1<br>PPAA | The commander, if there is sufficient evidence, forwards the file with recommendation for elimination through command channels to the GOSCA for processing. Intermediate commanders may take one of the following actions:<br>   *a.* Recommend disapproval of recommendation because there is not sufficient evidence that one or more of the circumstances authorizing separation under paragraph 4–22*b* has occurred.<br>   *b.* Recommend approval of the commander's recommendation and forward the file to the GOSCA. |
| 14 | C&S | The GOSCA may disapprove the recommendation for elimination, close the case and return it to the originator due to insufficient evidence that one or more of the circumstances authorizing separation under paragraph 4–22*b* has occurred or may approve the recommendation and notify the officer in writing that elimination action has been initiated and that he or she is required to show cause for retention on active duty.<br>   *a.* When the case is for a probationary officer, follow steps 1 through 10 of table 4–2 and step 15 below. If the officer declines to elect one of the options and if an Under Other Than Honorable Conditions Discharge is recommended, the elimination action will be processed under the actions at table 4–1, steps 1 through 19, and step 15 below. If the ASA (M&RA) directs a Board of Inquiry, the elimination action will be further processed under table 4–1, steps 10 through 19, and then return to step 15 below.<br>   *b.* When the case is for a nonprobationary officer, follow steps 3 through 19 of table 4–1 and then return to step 15 below. |
| 15 | PPAA<br>(TP/TA) | On receipt of separation instructions, takes action to separate the officer. Release orders and forms will cite regulatory authority and SPD as shown in AR 635–5–1. |

## Section VI
## Task: Process an Option That an Officer Elects While Elimination Action Is Pending

### 4–24. Rules for processing an option that an officer elects while elimination action is pending

   *a.* An officer identified for elimination may, at any time during or prior to the final action in the elimination case, elect one of the following options (as appropriate):

   (1) Submit a resignation in lieu of elimination.

   (2) Request discharge in lieu of elimination (RA officer only).

   (3) Apply for retirement in lieu of elimination if otherwise eligible.

   *b.* When an option is elected, elimination proceedings will be suspended pending final action on the option elected by the officer.

*c.* Any voluntary retirement of an officer who has been convicted by general court-martial and any retirement in lieu of elimination for misconduct, moral or professional dereliction, will be sent to CDR, PERSCOM (TAPC–PDT–PM), for forwarding to the Army Grade Determination Review Board to determine the highest grade the officer satisfactorily held while on AD. Final retirement grade determination is made by ASA (M&RA). The office of PERSCOM (TAPC–PDT–PM) forwards the following:

(1) Retirement application.

(2) The elimination notification memorandum (to include all supporting documentation).

(3) Officer rebuttal (if any).

(4) OMPF.

*d.* Upon final determination, PERSCOM (TAPC–PDT–PM) will forward appropriate separation instructions to the appropriate PSC/MPD.

## 4–25. Steps for processing an option that officer elects while elimination action is pending

The required steps for processing an option that officer elects while elimination action is pending are as shown in table 4–4.

**Table 4–4**
**Processing an option that officer elects while elimination action is pending**

| Step | Work center | Required action |
|------|-------------|-----------------|
| 1 | SLDR | Selects an option.<br>*a.* Resignation, if reason for elimination is substandard performance of duty. (Use format shown in fig 4–4.)<br>*b.* Resignation, if reason for elimination is substandard performance and/or misconduct, moral or professional dereliction, or in the interest of national security. (Use format shown in fig 4–5.)<br>*c.* Discharge, if reason for elimination is substandard performance of duty. (Use format shown in fig 4–6.)<br>*d.* Discharge, if reason for elimination is substandard performance and/or misconduct, moral or professional dereliction, or in the interest of national security. (Use format shown in fig 4–7.)<br>*e.* Retirement. (Use format shown in figure 6–1, amended as required to specifically state that the application is submitted in lieu of elimination proceedings.) |
| 2 | PPAA<br>BN S–1 | Processes the option. Determines whether medical board or PEB proceedings are pending or appropriate (para 4–3*a*). The commander makes recommendation for approval or disapproval and for type of discharge and forwards to the GOSCA with the following documents:<br>*a.* Elimination recommendation memorandum (GOSCA to officer).<br>*b.* Self-admitted homosexual conduct statement (if applicable).<br>*c.* Report of investigation (if applicable).<br>*d.* Medical examination and mental status evaluation (if applicable).<br>*e.* DA Form 268. |
| 3 | C&S | The GOSCA makes recommendation for approval or disapproval and for type of discharge to be furnished and immediately forwards the option request, to include all supporting documents to CDR, PERSCOM (TAPC–PDT–PM), with an information copy to the MACOM commander and GCMCA (if different from the GOSCA) concerned. |
| 4 | C&S | The GOSCA advises CDR, PERSCOM (TAPC–PDT–PM), in writing of the status of the Board of Inquiry proceedings, including results and the MACOM's action (if applicable). |
| 5 | PPAA<br>(TP/TA) | On receipt of separation instructions, takes action to separate the officer. Release orders and forms will cite the regulatory authority and SPD as shown in AR 635–5–1. |

*(Letterhead)*

*Office symbol (MARKS number)*                                                  *(Date)*
MEMORANDUM THRU (Channels)

FOR: *(Individual officer)*

SUBJECT: Initiation of Elimination

1. You are required to show cause for retention on active duty under the provisions of *(insert AR 600-8-24, applicable para)*because of *(insert reasons(s), that is, substandard performance of duty and/or misconduct and/or moral or professional dereliction).*

2. My action is based on the following specific reasons for elimination:*(List only applicable reasons as outlined in AR 600-8-24, para 4-2 or para 4-22, that can be supported by specific factual allegations and evidence. Examples are listed in a and b below.)*

   a. Failure to exercise necessary leadership required of an officer of your grade. Specifically, as a result of the following incidents, you were relieved from command as evidenced by your relief for cause OER for the period YYMMDD-YYMMDD (encl xx):

     (1) *(State factual allegations.)*

     (2) *(State factual allegations.)*

   b. Intentional neglect of performance of duties. Specifically, your neglect to properly secure weapons assigned to your custody as evidenced by OER for the period of YYMMDD-YYMMDD (encl xx).

3. In conjunction with this action, a DA Form 268 (Suspension of Favorable Personnel Actions) has been initiated according to AR 600-8-2 (encl xx).

4. You may either have the assistance of an officer of The Judge Advocate General's Corps appointed as counsel or seek civilian counsel of your own selection (obtained by you at no expense to the Government) to prepare a written statement indicating any pertinent facts or any rebuttal bearing on the question of your elimination.

   a. This statement may be sworn or unsworn.

   b. Documents submitted in rebuttal must be legible and reproducible.

   c. You may also confer with your counsel for legal advice concerning your options stated in paragraph 7 below.

5. *(FOR PROBATIONARY OFFICERS ONLY)* I am recommending you to be discharged with an/a *(specify discharge)*Discharge. *(For officers recommended for an Honorable or General Discharge, add)*"If an Honorable or General Discharge is recommended, your case will be forwarded directly to PERSCOM for submission to the Assistant Secretary of the Army (Manpower and Reserve Affairs), without referral to a Board of Inquiry." *(For officers recommended for misconduct or moral or professional dereliction, add)*,"The least favorable discharge you may receive is an Under Other Than Honorable Conditions Discharge." The least favorable characterization of service you may receive is an Under Other Than Honorable Conditions *(include when an officer is recommended for misconduct or moral or professional dereliction).* The final decision on the type of discharge will be determined by HQDA*(include for all officers).*

   *(FOR A NONPROBATIONARY OFFICER)* If you are eliminated for substandard performance of duty only, you will receive an Honorable Discharge. If you are eliminated for misconduct, moral or professional

**Figure 4–3. Sample format for initiation of elimination**

dereliction, the least favorable discharge you may receive is an Under Other Than Honorable Conditions Discharge. The final decision on the type of discharge will be determined by HQDA *(include for all officers)*.

6. Before taking further action, I will consider all written comments or a rebuttal that you may submit with your acknowledgment.

7. In accordance with AR 600-8-24 paragraph 4-11, you may--

   a. Submit your resignation in lieu of elimination according to AR 600-8-24, chapter 4. You may not request an effective date. The effective date will be as stated in AR 600-8-24, paragraph 4-5.

   b. Request discharge in lieu of elimination *(RA commissioned officers only)*, according to AR 600-8-24, chapter 4. You may not request an effective date. The effective date will be as stated in AR 600-8-24, paragraph 4-5.

   c. Apply for retirement in lieu of elimination if otherwise eligible, according to AR 600-8-24, chapters 4 and 6. The effective date for retirement will be *(as applicable, if you have at least 19 years and 6 months of AFS but less than 20 years AFS, the effective date will not be later than 60 days from the date you attain 20 years AFS. If you have 20 or more years AFS, the effective date will be no later than 60 days from the date you elect retirement in lieu of elimination)*. You must specifically state that your application for retirement is submitted in lieu of elimination.

   d. *(FOR A NONPROBATIONARY OFFICER)* In place of resignation, discharge, or retirement, submit a rebuttal or a declination statement and request appearance before a Board of Inquiry.

   e. *(FOR A PROBATIONARY OFFICER)* In place of resignation or discharge, submit a rebuttal statement and if a discharge Under Other Than Honorable Conditions is recommended, request appearance before a Board of Inquiry.

8. You have 30 calendar days from the date you receive this notification to acknowledge receipt in writing and exercise one of the options in paragraph 7.

9. Your acknowledgment should be in the format provided at AR 600-8-24, figure 2-4. If you elect an option in paragraph 7a through c, you will include your tender of resignation, request for discharge, or application for retirement in lieu of elimination as an enclosure to your acknowledgment.

FOR THE COMMANDER:


Encls *(as appropriate)*                    *(Initiator or the GOSCA signature)*
   *(List supporting documents)*
   *(OERs, LOR, Art 15, and so forth)*
Format *(acknowledgments)*


CF:
TAPC-PDT-PM
CDR *(appropriate MACOM)*

Note: The OMPF and ORB will not be forwarded with the memorandum initiating the elimination action. If the officer elects a Board of Inquiry, an updated OMPF and ORB will be provided at that time.

**Figure 4–3. Sample format for initiation of elimination**

**Headquarters**
**Department of the Army**
**Washington, DC**
**26 February 2004**

***Army Regulation 40–68**

**Effective 26 March 2004**

**Medical Services**

# Clinical Quality Management

By order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

*Joel B. Hudson*

JOEL B. HUDSON
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This consolidated regulation prescribes policies, procedures, and responsibilities for the administration of the Clinical Quality Management Program. It includes Department of Defense and statutory policies addressing medical services quality management requirements. In addition, it implements Department of Defense Directives 6025.13, 6040.37, and 6000.14 and other Department of Defense guidance as addressed in the summary of change.

**Applicability.** This regulation applies to the Active Army, the Army National Guard of the United States, including periods when operating in an Army National Guard capacity, and U.S. Army Reserve. This document applies in both the table of

distribution and allowances and table of organization and equipment environments. It applies to all personnel (Active Army, Army National Guard of the United States, the U.S. Army Reserve, civilian general schedule employees, contract personnel, American Red Cross volunteers, and foreign national local hires) who work within medical department activities, medical centers, dental activities, and organizations for which the Army Medical Department is the responsible official. This publication is applicable during mobilization.

**Proponent and exception authority.** The proponent of this regulation is The Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or a direct reporting unit or field operating agency of the proponent agency in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity

and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions and identifies key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from The Surgeon General (DASG–HSZ), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Office of The Surgeon General (DASG–HSZ), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Distribution.** This publication is available in electronic media only and is intended for command levels B, C, D, and E for the Active Army; C, D, and E for the Army National Guard of the United States; and B, C, D, and E for the U. S. Army Reserve.

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*

---

*This regulation supersedes Army Regulation 40–68, dated 20 December 1989, and Army Regulation 40–48, dated 7 November 2000. It rescinds DA Forms 5440–17–R, 5440–27–R, and 5441–27–R, dated June 1991; and DA Forms 5440–26–1–R, 5440–26–2–R 5441–17–R, 5441–26–1–R, 5441–26–2–R, and 5753–R, dated July 1989. (DA Forms 5440–26–3–R and 5441–26–3–R were rescinded in June 1995.)

**UNCLASSIFIED**

the granting health care organization. Privileges may be granted with or without an accompanying appointment to the medical/dental staff. The three categories of clinical privileges that may be awarded are—

*a. Regular privileges.*

(1) Regular privileges grant the provider permission to independently provide medical, dental, and other patient care services in the facility within defined limits. Regular privileges are granted to providers only after full verification and review of credentials. Regular privileges will not exceed a 24-month period without renewal.

(2) In granting regular privileges, the commander will define the limits of those privileges to include whether or not enhanced supervision is required. The nature and extent of enhanced supervision will be delineated in writing. The commander will also specify limits on regular privileges based upon the MTF mission requirements and the ability to support the requested privileges.

(3) A provider granted regular privileges may be considered for any type of medical staff appointment as discussed in paragraph 9–5d.

*b. Temporary privileges.*

(1) Temporary privileges authorize a provider to independently provide medical, dental, and other patient care services on a time-limited basis to meet pressing patient care needs when time constraints will not allow full credentials review. The use of temporary privileges should be rare. This category of privileges is appropriate in bona fide patient emergency situations or a declared disaster and is not intended for the administrative convenience of the department/service. Temporary privileges will not exceed a period of 30 days and are not subject to renewal. Any subsequent request for consecutive privileges should be assessed to determine if regular privileges are more appropriate.

(2) Because the MTF has not conducted a thorough credentials review prior to granting temporary privileges, there is an added degree of risk relevant to the competency of the provider. In order to minimize the risk associated with granting temporary privileges, the following actions, as a minimum, will occur.

*(a)* A copy of the provider's license will be obtained and verified with the issuing agency.

*(b)* Telephonic contact will be made with the facility where the provider has regular privileges to verify that the individual is clinically competent, fully qualified, and that the requested privileges are within the individual's current scope of practice and privileges. The chief of the medical staff, department chair, or other appropriate authority may provide this information. Or, if available, the ICTB may be used for the purpose of granting temporary privileges.

(3) A complete, thorough credentials review will occur during the period of the temporary privileges.

(4) Temporary privileges may be granted with or without a temporary appointment to the medical staff.

(5) The use of temporary privileges is authorized for all categories of providers.

*c. Supervised privileges.*

(1) Supervised privileges are granted to providers who do not meet the requirements for independent practice because they lack the necessary license, certification, or other authorizing document. These providers are not eligible for a medical staff appointment and are unable to practice independently. Providers working under supervised privileges can practice only under a written plan of supervision with a licensed person of the same or a similar discipline. See paragraph 5–3 for additional information regarding supervision of practice.

(2) This category of privileges will not be granted to licensed providers, or providers holding other authorizing documents, even though the defined limits of their privileges include supervision.

(3) Supervised privileges should not be confused with enhanced supervision of practice offered to those privileged providers who, for a defined period of time, require oversight of their clinical practice. (See para 9–4e for additional information regarding enhanced supervision.)

(4) Supervised privileges will be granted for periods not to exceed 24 months. Providers who are required to have a license will obtain that license within the time frame specified in chapter 4. These providers may request regular privileges and a medical/dental staff appointment once a license is obtained.

## 9–4. The clinical privileging process

*a. Forms required for award of privileges.* Performance data and other information (appropriate DA forms) to be considered in the privileging process are maintained in the PAF. These documents are transferred to the PCF, as appropriate, upon biennial renewal of the provider's clinical privileges (para 9–4c(6)), PCS, or separation from service/employment. The original will be placed in the PCF with a copy furnished to the provider.

*Note.* Providers will transition to use of the revised privileging documents addressed below at their next reappraisal/reprivileging opportunity.

(1) *DA Form 4691.* DA Form 4691 provides a synopsis of the provider's education and experience at the time of initial application for clinical privileges and medical staff appointment (if applicable). It includes professional education, postgraduate training, previous clinical assignments, specialty board certification, professional society membership, and credentials action history. For the provider with continuous Federal service, DA Form 4691 is completed only once, at the provider's first military duty station or place of DOD employment. For all categories of providers with noncontinuous Federal service (that is, there is a lapse in clinical privileges/staff appointment within the DOD), this form must be completed if the interval between periods of service is greater than 180 days. Initial clinical privileges

and medical staff membership are valid for a period of 1 year. During this 12-month period, regularly scheduled evaluation of the provider's performance is required.

(2) *DA Form 4691–1 (new)*. DA Form 4691–1 is used by providers with continuous Federal service, or a lapse in periods of service of less than 180 days, to request renewal of clinical privileges and medical staff reappointment. Information entered on this form relates to the provider's professional activities (for example, education, experience, professional recognition, and so forth) since the previous application for clinical privileges and medical staff appointment.

(3) *DA Form 5374*. This form contains provider-specific performance data, both qualitative and quantitative. It is used to evaluate the provider's demonstrated clinical performance according to established standards and compared to that of his/her peers. In conjunction with DA Form 5441-series, this two-page assessment contains evidence of the individual's competence, skills, and abilities, and provides objective and subjective data upon which to base award/renewal of clinical privileges and appointment/reappointment to the medical staff.

(4) *DA Form 5440*. The appropriate discipline-specific DA Form 5440 (as delineated in app A) will be used to document the request by the provider for clinical privileges and the recommendation for approval by the department/service chief and the credentials committee. Any variance between the privileges requested by the provider and the privileges recommended for approval by the supervisor should be discussed prior to submission of the DA Form 5440. Any unresolved discrepancies must be explained in Section II, Comments, for consideration by the credentials committee. These forms may contain categorical (patient risk and provider training requirements) and itemized disease and procedure-based privileging information by discipline. The disease-related and procedural content of this form will be individualized to address the current competency of the provider requesting privileges as well as the needs and capabilities of the MTF. The requirements for residency training and board certification as stated on the DA Form 5440 cannot be changed at the local level. The entire DA Form 5440-series is available in the AMEDD Electronic Forms Support System and at http://www.apd.army.mil/USAPA_formsPUBformrange_f.asp for printing and/or local reproduction on 8½- by 11-inch paper.

(5) *DA Form 5440–22 (Delineation of Clinical Privileges)*. This blank form is used as a continuation sheet for those providers completing their discipline-specific DA Form 5440 and for expanded role functions or practice specialties not otherwise included in the DA Form 5440 series (for example, endocrinology, adolescent psychiatry). This form is available for customized use, as needed.

(6) *DA Form 5440A*. DA Form 5440A is used to record executive-level medical staff recommendations and decisions by the commander concerning the clinical privileges and medical/dental staff appointment (if applicable) of all privileged providers.

(7) *DA Form 5441*. The discipline-specific DA Form 5441 will be used to evaluate the provider's competence and skill in the performance of his/her clinical privileges. Appendix A contains a listing of forms in the 5441-series. The content of this document corresponds to the privileges for the specialty as outlined on the DA Form 5440.

(8) *DA Form 5753 (USAR or ARNG Application for Clinical Privileges to Perform Active or Inactive Duty Training)*. This form is obsolete and is replaced by revised DA Form 4691 (for initial privileges) or DA Form 4691–1 (for privilege renewal) which are used for clinical privileging by both AA/USAR/ARNG.

(9) *DA Form 5754*. All privileged providers will complete a DA Form 5754. DA Form 5754 provides information on licensure, malpractice, clinical privileges, and conditions that may impact the individual's ability to deliver care. The form is completed as part of the initial application for clinical privileges and at each subsequent renewal of privileges.

*b. Initial application for privileges.*

(1) Upon arrival at the first duty station or place of DOD employment, the provider must submit a request for initial clinical privileges. The request will include the following:

*(a)* DA Form 4691.

*(b)* The appropriate DA Form 5440 with the provider completing the column on the left side of the form by properly coding the specific category of privileges requested, if applicable, and each individually listed privilege.

*(c)* For the newly graduated provider requesting privileges for the first time, DA Forms 5440, 5441, and 5374, if available, (prepared by the clinical director/faculty) document his/her competence, skill, and ability in the training setting. (See para *h*(3) below.) For providers currently involved in civilian practice or those with a lapse in privileges/staff appointment in the DOD of greater than 180 days, the most current evaluation of clinical performance (DA Forms 5441 and 5374) and peer recommendations contained in the PCF will substitute.

*(d)* DA Form 5754 completed and signed by the provider.

*(e)* All verified/validated credentials and other documents, as required in paragraph 8–7.

*(f)* Evidence that a CHBC has been initiated as per the Crime Control Act of 1990 (42 USC 13041) and AR 608–10 for individuals (contract/volunteer) who provide health care or other services for children under the age of 18 years. (Also see para 8–7*o*.)

(2) The request will be reviewed by the department or service chief who will properly code each category, if applicable, and privilege in the appropriate column of the DA Form 5440. The recommendation by the department or service chief for the award or the limitation of privileges requested will include specific rationale or justification of

same in the "Comments" area (Section II). The request will then be forwarded to the MTF credentials committee/function for review.

(3) The provider's validated credentials (para 8–7) and the completed DA Forms 4691 and 5440-series serve as the basis for the granting of clinical privileges. The credentials committee/function will forward its recommendation for clinical privileges and medical/dental staff appointment (if applicable) through the ECMS/ECDS (AA facilities and USAR/ARNG units wherever feasible) to the facility commander.

(4) The commander is the approving authority for the award of clinical privileges and medical/dental staff appointment. The commander's signature on DA Form 5440A authorizes clinical privileges and staff appointment, if appropriate, based on the individual provider's licensure, education and training, experience, and his/her demonstrated professional competence.

*(a)* DA Form 5440A will be used to record the executive level medical staff recommendations and the commander's decision concerning the clinical privileges and medical/dental staff appointment of providers. Credentials committee/function minutes/reports will reflect deliberations made by this committee regarding both privileging and appointment status for each provider.

*(b)* The type of medical/dental staff appointment, if applicable, will be recorded in Block 6b, DA Form 5440A.

*(c)* Block 6c of DA Form 5440A will reflect the current recognized privileging category. Block 6d notes admitting privileges.

*(d)* Signature by the department/service chief and the chairperson of the credentials committee affirms that a review was made of the provider's primary-source-verified licensure, education and training, experience, capability to perform the requested privileges, and documented current competence. Age groups for whom the provider will render health care services are indicated in block 6g. Any age or patient population-specific comments will be included in block 7.

*(e)* For providers who are assigned to one department/service/clinic and request privileges in another, the discipline-specific DA Form 5440s will be submitted; the appropriate chiefs in both departments/services/clinics will be named and will sign the DA Form 5440A. Block 7 may be used for the additional signatures.

*(f)* When privileges are modified from those requested, the reason will be stated in block 7. (Examples of such reasons include lack of technological resources, lack of support staff, privileges unauthorized by the AMEDD, lack of provider credentials, lack of demonstrated competency, or lack of professional performance.)

(5) The authenticated copies of DA Forms 5440 and 5440A serve as notification to the provider of the award/renewal of his/her clinical privileges and medical staff appointment. A cover memorandum to the provider may also be prepared. (See fig 9–1.) The provider must acknowledge receipt of these documents by signed memorandum returned to the PCF manager. (See fig 9–2.) The original DA Forms 5440, 5440A, 4691, and 5754 will be maintained in the provider's PCF with copies returned to the provider.

*c. Periodic reappraisal and renewal of privileges.*

(1) Provider performance will be continuously monitored through facility-specific ongoing performance assessment activities to ensure that quality patient care is rendered. Providers are responsible for submitting CME, continuing dental education, or documentation of other discipline-specific professional education, licensure renewals, BLS certification renewals, and other certification renewals or credential updates to the PCF manager in a timely manner.

(2) Clinical privileges are in effect for a period not to exceed 24 months from the date granted. It is the responsibility of each provider to request the renewal of his/her clinical privileges and medical/dental staff appointment (if applicable) every 2 years. The request for renewal will be submitted far enough in advance to permit an evaluation of current clinical privileges and performance. Failure to request renewal in a timely fashion may result in the expiration of the provider's privileges.

(3) For clinical privileges renewal, DA 4691–1 will be submitted. Appropriate attachments include a new DA Form 5440 and 5754 completed and signed by the provider and DA Forms 5441 and 5374 prepared by the individual's department/service chief.

(4) DA Form 5441 documents the assessment of the provider's performance of currently assigned privileges and his/her professional performance according to established standards. Reappraisal and renewal of clinical privileges are based on provider performance, facility capabilities, and the needs of the beneficiaries. (See app A for a complete listing of the DA Forms 5440 and 5441 series.)

*(a)* The "privileges performed" and evaluated on DA Form 5441 must be identical to the "privileges delineated" as requested on DA Form 5440.

*(b)* When privileges are to be modified because of the performance reappraisal, the reason will be stated under "Comments" on DA Form 5441.

*(c)* DA Form 5374 will be used to evaluate professional clinical and interpersonal skills. It will be completed by the department/service/clinic chief and will include both qualitative and quantitative performance data. The assessment will address the individual's clinical and technical skills based on locally determined performance criteria, as well as a comparative analysis of the provider's performance in relation to aggregate data from a representative peer group sample. The comparative analysis that is performed should contain both intra- and inter-facility data.

(5) A review of provider credentials will be conducted. Privilege reappraisal and subsequent renewal will be based

on education, training, experience, clinical performance evaluations, provider activity profile data, professional conduct, PI activities, and the provider's capability to perform the requested privileges (formerly called health status).

(6) If the provider's performance is deemed to be substandard, or not current, enhanced supervision may be required for a period of time as specified by the commander (para *e* below), or remedial training may be warranted (para *f* below).

(7) At the time of privilege reappraisal/renewal, other than current data may be removed from the PAF and destroyed (or given to the provider). This will take place only after it has been determined, based on credentials committee criteria, that this information is reflected accurately and completely in the current performance appraisal and other privilege delineation information contained in the PCF.

(8) The authenticated DA Forms 5440 and 5440A serve as notification to the provider of the renewal of his/her clinical privileges and medical staff appointment. A cover memorandum to the provider may also be prepared. (See fig 9–1.) The provider must acknowledge receipt of these documents by signed memorandum returned to the PCF manager. (See fig 9–2.) The original DA Forms 5440, 5440A, 5441, 4691–1, and 5754 will be maintained in the provider's PCF with copies returned to the provider.

*d. Application for renewal of privileges following PCS or permanent transfer.*

(1) Upon notification of the provider's impending PCS/transfer to another MTF, the losing unit will complete new DA Forms 5441 and 5374. The biennial appraisal will be considered current if it was completed within 6 months of departure. The credentials manager of the losing MTF will forward these forms together with the PCF and the provider's CCQAS file, by certified return receipt requested mail, to the receiving unit. The files will be forwarded far enough in advance to ensure arrival at the receiving facility at least 15 days prior to the provider's reporting date. Any documents that have not been included in the PCF, prior to its release, will be forwarded at the earliest possible opportunity. If the gaining facility has not received these documents upon the provider's arrival, immediate action should be taken to locate these sensitive files.

(2) The gaining MTF will use this documentation as the basis for initiating clinical privileging and medical/dental staff appointment actions. The PCF will include the most recent clinical performance appraisals (DA Forms 5441 and 5374), even if the provider transfers to a leadership or administrative position involving no clinical practice or to student status (para 9–5).

(3) With the release of CCQAS version 2.6, the data contained in this restricted-access data base—in conjunction with DA Forms 5374 and 5441—will facilitate the privileging of newly assigned providers. Preliminary review of credentials for privileging and medical staff appointment can begin in advance of the provider's actual arrival or the facility's receipt of his/her PCF.

(4) Electronic/telephonic communication between facility credentials managers regarding providers in transit is likewise encouraged. The information documented as a result of these interactions may serve in place of the actual forms in the privileging process. Any credentialing/privileging action taken by the credentials committee based on other than actual documents in the PCF will be annotated in meeting minutes/reports. Verification of receipt of the document(s) in question, and that it is in order, will be noted in subsequent meeting minutes/reports.

(5) Upon arrival at the new duty station or place of employment, the provider will submit a request for renewal of clinical privileges and, if applicable, medical/dental staff appointment. The request will include the documents noted above. Transfer between AMEDD facilities is considered continuous DOD service under the same GB (TSG) and, provided the stipulations of paragraph *a*(1) above are met, renewal of provider privileges and professional staff reappointment are appropriate.

(6) The provider (AA/USAR/ARNG) will apply for privileges immediately but in no case later than 5 duty days (10 duty days for OCONUS providers) following arrival. The USAR/ARNG privileged provider will meet with the unit credentials manager as soon as possible to submit his/her credentials for review and to apply for unit-level privileges, if appropriate. All providers must be privileged prior to being involved in or assigned to patient care activities.

*e. Enhanced supervision for providers.*

(1) Enhanced supervision is not an adverse privileging action against a provider. It does not alter the individual's medical/dental staff appointment status nor does it reduce the provider's category of privileges as awarded by the institution.

(2) Enhanced supervision for up to 6 months (with extension granted on an individual basis) may be required when, in the best interest of quality patient care, the privileged provider's performance warrants closer attention or scrutiny. Some examples include—

*(a)* Following a PCS move or during a TDY to ensure full clinical competence.

*(b)* When privileges for a new procedure or technology are considered.

*(c)* For providers returning to clinical practice following an extended absence from patient care responsibilities.

*(d)* For the novice provider who is developing his/her clinical practice skills.

(3) Although only the initial category of medical/dental privileges/staff appointment specifically requires review of the medical/dental staff member's performance, this does not preclude enhanced supervision or performance review of providers in an active, affiliate, or temporary appointment status or providers who do not have a medical/dental staff appointment.

(4) Routine, ongoing performance assessment is the basis for all PI activities and is essential for providers with all types of medical/dental staff appointments and all categories of privileges. The credentials committee/function will recommend, for the commander's approval, the specific enhanced supervision requirements based upon the provider's needs.

*(a)* The requirement for enhanced supervision will be indicated in block 6e of DA Form 5440A. The provider's performance will be reviewed by the credentials committee upon completion of the specified time period for the supervision. If it is determined that the supervision is no longer required, a new annotation will be made in block 5. The appropriate credential committee/function minutes/report will reflect this decision. The provider's privileging period will not change.

*(b)* The requirement for supervision to determine or monitor the clinical competence of newly assigned providers, those who practice infrequently, or those requesting new privileges is not considered adverse and does not require reporting.

*(c)* If the period required for enhanced supervision is greater than 12 months, remedial training for the privileged provider should be considered.

*(d)* In contrast to the above, requirements for supervision resulting from an adverse privileging action (for example, restriction of privileges) will be reported as adverse according to the procedures outlined in paragraph 10–6*f*(5).

*f. Formal remedial training program.*

(1) When a provider with clinical privileges fails to maintain required proficiency levels to practice in his/her specialty, at the discretion of the commander, a remedial training plan designed to enhance proficiency levels may be implemented. The decision to implement a formal remedial training program must be based on the individual circumstances of the provider and any additional unit-related considerations.

(2) The formal remedial training program, as addressed here, is appropriate for AD service-obligated providers who have had their privileges either suspended or restricted by the facility commander. (See para 10–6*f*(5).) Providers who have had their privileges reduced or revoked are not eligible for remedial training.

(3) The unique nature of each situation necessitates an individualized approach to determining the length of the formal training, the location, and other specifics.

(4) In the interest of the privileged provider, this training is best accomplished after PCS to a new assignment or during a period of TDY.

(5) Requests for remedial training will be initiated by the provider's current MTF commander and forwarded through the next higher headquarters to Commander, USAMEDCOM, ATTN: MCHO–CL–Q, 2050 Worth Road, Fort Sam Houston, TX 78234–6010. Requests concerning dentists will be forwarded to the Commander, USADENCOM, ATTN: MCDS, 2050 Worth Road, Fort Sam Houston, TX 78234–6004. Specific criteria defining the expected trainee outcomes will be included as part of the request.

(6) The goals, duration, and location of remedial training will be addressed in recommendations to TSG by the Commander, USAMEDCOM, ATTN: MCHO–CL–Q, 2050 Worth Road, Fort Sam Houston, TX 78234–6010 or the Commander, USADENCOM, ATTN: MCDS, 2050 Worth Road, Fort Sam Houston, TX 78234–6004 in consultation with the appropriate specialty consultant to TSG.

*(a)* The decision will be coordinated with the MTF commander or designee, the MTF commander or designee at the training site, and, if necessary, the Health Services Division, HRC, ATTN: TAPC–MSR, 200 Stovall Street, Alexandria, VA 22332–0002.

*(b)* The respective corps chief or designee has final approval of the remedial training plan.

*(c)* The Chief, QMD, USAMEDCOM, ATTN: MCHO–CL–Q, 2050 Worth Road, Fort Sam Houston, TX 78234–6010 will be kept informed of the privileged provider's progress in the remedial program and the ultimate outcome.

(7) Generally, an individual identified as needing remedial training will be assigned to an MTF that is at 85 percent or higher fill against the authorizations in his/her specific AOC or as determined by the TSG consultant in the AOC/ ASI. At the time the provider in remedial training returns to full practice, he/she may be slotted against a valid authorization. The provider may be retained at the facility that provided the training, returned to his/her original unit, or reassigned to a new duty station. Coordination for reassignment will be accomplished by HRC in conjunction with the appropriate TSG specialty consultant.

(8) Providers who do not successfully complete remedial training may be processed for separation under the provisions of AR 600–8–24 or AR 135–175, as appropriate.

(9) In contrast to formal remedial training, informal training may be utilized for any category/discipline of provider/ professional at any time. This is coordinated at the local level by the individual's chain of command. The USAR/ ARNG provider who wishes to re-establish clinical competency may request, through his/her chain of command, an AT opportunity for skills enhancement purposes.

*g. Modification of privileges at the request of the provider.*

(1) If a provider requests modification of his/her clinical privileges for the upcoming period, a new DA Form 5440 will be prepared with the specific privileges to be modified appropriately coded. The requested modification may be for augmentation or reduction of privileges. If the request is for an augmentation of privileges, documentation of

appropriate education, training, and experience to support the additional privileges is required. Providers who request privileges substantially less than those of members of their specialty AOC or skill identifier (SI) will require careful evaluation and subsequent action by the credentials committee.

(2) If the modification reduces the provider's privileges, written justification will be submitted with the DA Form 5440. The credentials committee will determine if—

(a) The request is warranted and what accommodations are appropriate considering the individual's special needs associated with a medical condition or other documented situation related to performance deficit(s).

(b) The privileged provider will undergo a period of structured training. If the training is approved (does not include the formal remedial training described above), the temporary modification of privileges, if 30 days or less, will not result in an adverse privileging action.

(c) A recommendation should be made to change the provider's AOC or SI and terminate any special pay.

(d) Separation in a less-than-fully-privileged status should be recommended.

(3) A privileged provider cannot voluntarily request a modification of privileges in order to avoid an adverse privileging action. A voluntary surrender or restriction of privileges while under investigation for possible professional incompetence or unprofessional conduct, or as part of an agreement with the organization for not conducting an investigation or professional review action, will be reported to the Commander, USAMEDCOM, ATTN: MCHO–CL–Q, 2050 Worth Road, Fort Sam Houston, TX 78234–6010. Such actions may require subsequent reporting to the NPDB according to paragraph 10–12a(1).

h. GPHE participants.

(1) Supervision.

(a) Physician and dental providers with regular privileges in the same AOC or SI and an active appointment on the medical/dental staff will supervise MC/DC graduate level clinical residency and fellowship program participants. Nonphysician privileged providers in graduate clinical training programs will be supervised by a provider with the same or similar AOC/SI and regular privileges or by a physician.

(b) The degree of supervision (direct or indirect) afforded the provider in student status will be appropriate to the individual's level of progress, the risk of the procedure, and the seriousness of the patient's illness. (See para 5–3b(2)(a) for additional information regarding supervision of GPHE trainees.) Concurrent consultation will be obtained for any patient for whom a substantial risk is implied or the diagnosis is obscure. This consultation will be documented on SF 509 (Medical Record-Progress Notes), on SF 513, or on SF 600. (See AR 40–66 for instructions on the use of these forms.) Situations that require mandatory direct supervision will be identified by the program director—in writing—and documentation of such will be provided to all those involved.

(2) Privileges/staff appointment for eligible trainees. Fellows and other privileged providers involved in a second residency may apply for regular privileges in their primary specialty (for example, fellows in plastic surgery who are eligible for regular privileges in otolaryngology may apply for otolaryngology privileges; eligible pediatricians in endocrinology fellowships may apply for pediatric privileges). These providers may be granted either an active or affiliate appointment according to their expected participation in medical staff activities or an initial appointment if they have not held a medical staff appointment in a DOD facility during the past 180 days.

(3) Training credentials files (TCFs). A TCF and a PAF will be developed and maintained during GPHE for interns, residents, and other trainees (all disciplines), in military training programs, for whom a PCF has not yet been established. The TCF will be initiated during the first year of training and will contain verified copies of diplomas, licenses, clearing house reports, training certificates, practice experience documents, curriculum vitae, and other documents, as appropriate. TCFs and PAFs will be maintained by the GME director or as indicated by the commander. Performance assessments will be conducted at least every 6 months; on an annual basis the department chief will provide a written recommendation to approve/disapprove matriculation to the next year's training level. All such assessments will be filed in the PAF. Other documentation such as letters of appreciation, patient complaints, and other reports that may lend themselves to trending or profiling the trainee's performance will also be filed in his/her PAF.

(4) Clinical performance evaluation. Prior to completion of the clinical training program, trainees will submit the appropriate discipline-specific DA Form 5440 through their service and department chiefs to the GPHE committee (military setting) or to their faculty advisor/preceptor (civilian setting). The trainee, based on a self-appraisal, is attesting to his/her current level of competence related to privileges appropriate to his/her specialty.

(a) One month prior to completion of the training, the trainee's clinical supervisor will complete, and the GPHE committee (or committee with comparable professional oversight authority) will authenticate, DA Forms 5441 and 5374. These documents address the trainee's professional skills, abilities, and competence and reflect recommendations for clinical privileges at the provider's subsequent duty assignment based on his/her performance during training. DA Forms 5440, 5441, and 5374 will become a permanent part of the TCF. The information contained in the TCF becomes the basis for the PCF.

(b) The GPHE committee will decide which, if any, of the interval performance assessments and other data accumulated during the training period will remain in the TCF. In instances where an MTF GPHE committee does not exist, a comparable line of academic authority must be locally established based on the availability of professional resources. The MTF commander will delegate responsibility for the duties performed by the GPHE office/committee,

for academic/clinical oversight, and for documentation of the trainee's clinical competence, as appropriate. The TCF will be forwarded by certified return receipt requested mail, to the credentials coordinator at the gaining facility to arrive 15 days prior to PCS. In the absence of GPHE committee, as a minimum DA Forms 5440, 5441, and 5374 will be forwarded by the supervisor through the credentials committee/function to the trainee's next unit of assignment.

*(c)* DA Forms 5440, 5441, and 5374 are available at Web site http://www.apd.army.mil/. Each corps will ensure that instructions for proper completion, authentication, and transmittal to the first unit of assignment are provided to military and GS civilian trainees enrolled in civilian GPHE/long-term health education and training clinical programs. The trainee will ensure that the completed documents are mailed by the authorized supervisor (program director/faculty member/preceptor) to the trainee's first unit of assignment (ATTN: MTF Credentials Office). These documents will not be relinquished to the trainee. The performance data contained on the DA Forms 5441 and 5374 serve as the basis for award of initial clinical privileges and professional staff appointment. Clinical performance evaluation is in addition to, and does not substitute for, the academic evaluation report that is required in accordance with AR 623–1.

(5) *Failure to complete.* In the case of a provider's failure to complete his/her training program or he/she is removed from a program for lack of competence or for disciplinary reasons, the details will be documented in the individual's TCF.

(6) *Reporting.* The administrative management and reporting of providers who fail to complete or are removed from a training program for substandard performance or unprofessional conduct will be made according to paragraphs 9–7, 10–13, and 10–15.

*i. Formal on-the-job training (OJT).* OJT programs involve formal, structured training designed to provide knowledge and technical expertise to providers who are expected to receive privileges in a given AOC or SI or for augmentation of clinical privileges associated with new technology or a new procedure(s). The commander will require a written program of instruction, specific learning objectives, and clearly identified training outcomes for the OJT program.

(1) Providers with defined privileges in the same AOC or SI will supervise OJT trainees. The degree of supervision will be appropriate to each trainee's level of progress, the risk of the procedure, and the seriousness of the patient's illness. The trainee will obtain concurrent consultation for any patient for whom a substantial risk is implied or the diagnosis is obscure. Situations requiring mandatory direct supervision will be identified in writing by the OJT program director/coordinator, and documentation of this requirement will be provided to all those involved.

(2) Individuals progressing unsatisfactorily in a formal OJT program will be managed according to established training program procedures.

(3) One month prior to completion of training, the preceptor will complete DA Forms 5441 and 5374 which will reflect those clinical privileges warranted at the individual's MTF of assignment based on performance during training. These forms will be forwarded through the GPHE committee, if one exists, otherwise through the credentials committee, to the gaining facility. They will be forwarded by certified return receipt requested mail, to the credentials coordinator at the gaining facility to arrive 15 days prior to PCS. The gaining facility will use this information as the basis for granting clinical privileges. These forms become a permanent part of the individual's PCF.

## 9–5. Medical/dental staff appointment

*a.* Appointment to the medical/dental staff is a process distinct from that of granting clinical privileges. While similar data are considered for these concurrent procedures, they are separate recommendations to the commander by the credentials committee and must be reflected as such in the credentials committee minutes. DA Form 4691 or DA Form 4691–1, signed by the privileged provider and submitted to the credentials committee, is utilized to request clinical privileges and medical/dental staff appointment, if desired.

*b.* A medical/dental staff appointment reflects the provider's relationship with the medical/dental staff and the degree to which the provider participates in medical/dental staff surveillance and review as well as quality improvement activities related to the governance of the medical/dental staff.

(1) An appointment to the medical/dental staff can be granted only to licensed, certified, or registered providers and it must be accompanied by the granting of clinical privileges.

(2) A medical staff appointment is required for privileged providers to admit patients to inpatient services.

(3) Medical staff membership is not required of individually privileged nonphysician providers who do not admit patients, but they may request membership, if desired.

(4) No provider with regular or temporary privileges is precluded from membership on the medical staff solely because of his/her professional discipline or specialty.

*c.* The applicant for medical staff appointment with accompanying privileges will be oriented to pertinent U.S. Army and MTF procedures, policies, and regulations governing patient care and medical/dental staff responsibilities and expectations. The applicant will acknowledge in writing his/her intention (an attestation) to abide by these standards. The MTF is responsible for providing each privileged provider, who is a member of the medical/dental staff, copies of any significant revisions to the rules and regulations governing their practice.

*d.* The type of appointment will vary depending upon the clinical privileges granted, the availability of the provider